Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

---

UNITED STATES OF AMERICA,  )
  )
       Plaintiff,  )
  )     **ORIGINAL**
vs.  )
  )
CNA FINANCIAL CORPORATION, et al.,  )
  )
       Defendants.  )
_____)

Case No. A98-285 CV (JWS)

---

DEPOSITION OF LORI K. WING

---

Tuesday, November 30, 1999
10:00 a.m.

Taken by Counsel for Defendants
at
Lane Powell Spears Lubersky
420 L Street, Suite 300
Anchorage, Alaska

CORRECTION SHEET:
[X] Signature waived
[ ] Signed/dated
    no corrections made
[ ] Signed/dated
    corrections made

EXHIBIT B
Page 1 of 7

A98-286 CV (JWS)  
USA v CNA

LORI K. WING  
11/30/1999

Page 80

```
 1   Act; that it was cut in stone as to:  We will pay
 2   this; you need to buy insurance for that.
 3        Q.    When you say "we will pay this," you
 4   mean the federal government?
 5        A.    That's correct.
 6        Q.    So the gray area was, I guess, the area
 7   where you weren't sure where the federal
 8   government would pick up various claims, versus
 9   what the BBAHC would have to, right?
10        A.    Correct.
11        Q.    What does it mean, that this Mr. Hihn
12   did not want to pick up the gray area?
13        A.    The gray area was what we were trying to
14   insure.  We did not want to duplicate what the
15   Federal Tort Claim Act was providing.  But we
16   wanted to -- what the Federal Tort Claim Act was
17   not providing, that is what we wanted to insure.
18        Q.    So just that portion that the FTCA would
19   not cover, right?
20        A.    That's correct.
21        Q.    Why not?  Why not just insure
22   everything?
23        A.    Well, for one, it would be ridiculous
24   for my client to pay the premium for that, when
25   they are supposedly insured, for lack of a better
```

Page 100

```
 1    you're saying "complete."
 2       Q.    Did you ever discuss this with Mr. Clark
 3    at BBAHC, the scope-of-coverage issue with regard
 4    to the FTCA?
 5       A.    Oh, numerous times.
 6       Q.    And did he ever indicate to you what his
 7    understanding was of the scope of coverage under
 8    the FTCA, for BBAHC?
 9       A.    Robert did not ever express to me his
10    understanding of the FTCA.  Robert expressed his
11    concern over the gray areas.  If the FTCA does
12    not -- It was basically:  Lori, if the FTCA
13    doesn't take care of us, will the insurance; can
14    you find insurance to do it?  And that's
15    paraphrasing, but that was always Robert's
16    concern to me.  If the FTCA doesn't step up to
17    the plate, find us an insurance policy that will.
18       Q.    And that's what you did?
19       A.    I attempted to, to the best of my
20    ability, yes.
21       Q.    When you and Mr. Clark of BBAHC met with
22    Mr. Dean, this lawyer from Washington, D.C. -- By
23    the way, do you remember when that was?
24       A.    No, I don't.  And I may have documents
25    somewhere that show it, but I don't at this
```

A98-286 CV (JWS)  
USA v CNA

LORI K. WING  
11/30/1999

Page 101

1  point.
2     Q.     Well, when you did meet, when you three
3  met, do you recall Mr. Dean giving his opinion
4  that some form of private insurance would be
5  necessary?
6     A.     Yes, I do.
7     Q.     Did he tell you why he thought that was
8  necessary?
9     A.     We talked about funding outside, or
10 funding outside of the IHS. We talked about
11 activities or services they provided that were
12 not in the scope of services in the IHS contract.
13 We talked about things such as the directors not
14 being named in the FTCA.
15          Just a variety of things that there were
16 concerns over that he did not see as insured, for
17 lack of a better term, under the Federal Tort
18 Claim Act.
19    Q.     And Mr. Clark was sitting in there with
20 you guys while you were discussing this, right?
21    A.     That's correct.
22    Q.     You know, I got the impression that
23 there was more than just you, Mr. Clark and
24 Mr. Dean at this meeting.
25    A.     That is correct.

PACIFIC RIM REPORTING 907/272-4383

EXHIBIT B  
Page 4 of 7

Page 116

```
 1      Q.    It's addressed to CNA, right?
 2      A.    Yes.
 3      Q.    What's the purpose of this letter, or
 4   what was the purpose of this letter?
 5      A.    CNA at one point provided medical
 6   malpractice insurance; they had a program for it.
 7   And this is, I believe, before CNA and
 8   Continental had become one.  And we were
 9   submitting a submission to CNA, in hopes of
10   getting a quotation.
11      Q.    In the second paragraph there, the
12   sentence that begins with "however," it reads:
13   "However, the FTCA will not respond to all
14   exposures of BBAHC."  Do you see that?
15      A.    Yes.
16      Q.    By September 23 of '92, nearing the end
17   of 1992 - and, again, it's almost two years after
18   the February 8th, 1991 memorandum in Exhibit L
19   from the Washington, D.C. attorney, Mr. Dean - by
20   this time were you comfortable in the belief
21   that, you know, the FTCA just will not respond to
22   all the exposures of BBAHC; that it wasn't just a
23   gray area; there was just no question that the
24   FTCA would not cover everything?
25      A.    Yes, I would say that I was.
```

```
                                                          Page 117
 1      Q.      What caused you to -- I mean, from the
 2   previous exhibits and from your testimony, it's
 3   my understanding that there was this thought of
 4   gray area:  I'm not sure where the line was;
 5   there is a line; we need to quantify that.  That
 6   was your task, right?
 7      A.      That's correct.
 8      Q.      Now you've determined -- I guess my
 9   question is:  By September 23, 1992, had you
10   actually quantified it?
11      A.      I don't know that I had quantified it
12   any more than I had in the previous memo that you
13   had spoken of.  I think by this time I was
14   probably -- had now spent a number of years on it
15   and may be able to speak to it a little bit
16   better than I could have back in 1989 or 1988.
17      Q.      Still trying to quantify it by educating
18   the insurer, right?
19      A.      That is correct.
20      Q.      If we could go back to your declaration,
21   which is Exhibit B; and, in particular, if you'd
22   turn to Page 3, Paragraph 6.
23      A.      Okay.
24      Q.      The last sentence there states:  "In
25   other words, BBAHC and its counsel instructed us
```

Page 118

```
1    specifically that BBAHC did not desire insurance
2    coverage that would duplicate protection from
3    liabilities provided by the United States under
4    Section 638 and the FTCA."  Do you see that?
5         A.   Yes, I do.
6         Q.   All right.  Who at BBAHC gave you that
7    instruction?
8         A.   Well, we'd have to go back.  I mean,
9    Robert Clark without a doubt, and --
10        Q.   So it was more than one person?
11        A.   Well, my job as the insurance broker has
12   always been to report -- I report directly to the
13   CFO, and that has never changed, be it the
14   interim CFO or the active CFO.  And, again, they
15   have gone through a number, in the ten plus years
16   I've worked with them.
17             So depending upon whom it was I was
18   reporting to at the time, but still the CFO
19   position, they didn't want to duplicate what they
20   had, but what they wanted to protect what they
21   felt they didn't have.
22        Q.   Why didn't they want to duplicate what
23   they had?
24        A.   If it's provided and, you know, for lack
25   of a better word, if it's provided free of charge
```