```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3  _____
 4  UNITED STATES OF AMERICA,       )
                                    )
 5          Plaintiff,              )  ORIGINAL
                                    )
 6      vs.                         )
                                    )   CORRECTION SHEET:
 7  CNA FINANCIAL CORPORATION, et al.,)  ☒ Signature waived/time expired
                                    )   ☐ Signature waived
 8          Defendants.             )   ☐ Signed/dated/no corrections made
                                    )   ☐ Signed/dated/corrections made
 9  Case No. A98-285 CV (JWS)
10  _____
11                  DEPOSITION OF ROBERT CLARK
12  _____
13              Pages 1 - 157, inclusive
14              Thursday, January 11, 2001
                        9:10 A.M.
15
16         Taken by Counsel for Defendants
                          at
17         Bristol Bay Area Health Corporation
                6000 Kanakanak Road
18                Dillingham, Alaska
19
20
21
22
23
24
25
```

PACIFIC RIM REPORTING    907/272-4383
www.courtreportingalaska.com

EXHIBIT C
Page 1 of 8

1  who knows who all, you know, over the years.
2      Q.  So, as I understand your testimony, then, your
3  goal is to get private insurance, but not so much
4  private insurance that you're duplicating what you'd
5  have under the FTCA, right?
6      A.  Yeah, but I think -- see, the other thing is,
7  which is confusing to me, is because FTCA is new and we
8  don't understand exactly what that is, the doctors are
9  always worried that the FTCA is really covering it all.
10 So we have to get insurance to help that, and people use
11 terms like, well, gap or extra insurance or just to make
12 sure we're covered and there's nothing missing
13 somewhere.  Because we have lots of different programs
14 and there's always different questions, well, what about
15 this, what about that?  And I don't know, so better have
16 insurance, I guess.
17          So, we try to have insurance for everything.
18 But again, we don't want to go overboard because we
19 don't have enough money.  And yet, you don't want to
20 have nothing.  Which I think some places just rely on
21 FTCA.  And we're saying hey, maybe that's not good.
22 What if you think something different than the federal
23 attorneys and then you don't have no insurance.
24     Q.  All right.  So, you referred to getting advice
25 concerning this scope of coverage of the FTCA, as well

1   insurance, the insurance is supposed to cover it.  It
2   shouldn't be, well, IHS or the federal government's deep
3   pockets and they should cover all the expense.
4       Q.   This is what the federal government was saying
5   in general?
6       A.   Yeah, that's the way I understood it, is trying
7   to explain to us what that all meant.
8       Q.   Do you recall what, if any, response came from
9   the BBAHC side of this meeting to that general statement
10  by the government?
11      A.   I think what we were saying is that, hey, we
12  bought the insurance, or we think we're covered, you
13  guys just take care of it.  Just go and make this thing
14  go away, and we want to keep doing our business and you
15  guys take care of the whole thing there.  And that, you
16  know, the government is there for us, obviously.  We get
17  most of our programs and services and special
18  relationships with the federal government, not the
19  state.  So they're supposed to provide us the funding
20  and the services we need to take care of that.
21           But being this FTCA is kind of new, we keep
22  wondering, what does it really cover and why do you have
23  to justify everything and go through all kinds of hoops
24  to get something that's supposed to be there for you?
25  So, this is where, again, we always want to get some

```
 1   supplemental and other insurance to kind of make sure
 2   everything's covered one way or the other.
 3       Q.   Okay.
 4       A.   Whether it's too much or not enough of
 5   something, we don't want to do overkill or waste money,
 6   but we want to have the right amount of insurances to
 7   cover.  Then if something happens, why the heck do we
 8   have to get involved in it?  You guys got the
 9   information, take care of it and pay it, and let's get
10   on with life.
11       Q.   Thanks.
12            I'd like to mark the next in order, please.
13   (Exhibit D marked for identification.)
14   BY MR. DEVLIN:
15       Q.   If you and your counsel could look at Exhibit
16   D, please.  Exhibit D to your deposition.
17       A.   Okay.  I think I have a pretty good
18   understanding of this.  I remember reading this a long
19   time ago.
20       Q.   Okay.
21            MR. STEWART:  Let him ask a question.
22   BY MR. DEVLIN:
23       Q.   Just so we're clear on this.  Exhibit D is a
24   letter dated January 26, 1999, with a fax cover sheet
25   dated January 26, 1999 --
```

1    Q.    Okay.
2    A.    You know, if we should have done that or were
3  supposed to do it and we didn't do it, I don't know why
4  we didn't do it.  That's the part that I'm really
5  confused about.  I don't think we -- we bought insurance
6  to be a supplement to, and kind of an over layer or
7  something different than the government's insurance.  So
8  again, I don't know how that's all really supposed to
9  fit.  But I don't think we intended to buy insurance for
10  the government.  The government has its own insurance.
11    Q.    And when you say --
12    A.    We need our insurance.
13    Q.    I certainly don't mean to interrupt you.
14    A.    Yeah, it's fine.
15    Q.    When you say you meant to buy insurance as a
16  supplement to the government's insurance, are you
17  referring to the FTCA coverage?
18    A.    Yeah, the FTCA coverage, yeah.
19    Q.    Okay.
20          I want to go back now to when we're talking
21  about the issue of, or the manner in which you and
22  others from BBAHC would negotiate your contract with
23  IHS.  I want to go back to that area of inquiry.  All
24  right?
25    A.    Uh-huh.

1  acting within the scope --
2          MR. STEWART:  Wait a minute, I still don't have
3  a question.  You still don't have a question.
4  BY MR. DEVLIN:
5     Q.   Well, what is it you were looking for,
6  Mr. Clark?  What were you looking for in Exhibit G?
7     A.   I think there's still questions.  But if we try
8  to explain everything we do in the health area,
9  irregardless of who funds it, it's our scope of work,
10 we're providing health care to our people.  And we
11 believe we're acting within the scope of work of our
12 program there.
13         Now, I think these things saying that depending
14 on this, that or the other, something being narrowly
15 restrictive or was it really in or out, somebody will
16 determine whether it is or isn't.  If it's in the
17 contract and we say we're going to provide alcohol
18 services or mental health services or hospital services,
19 that's whatever it is in those areas, and somebody
20 shouldn't come back and pick it apart and say, well, the
21 FTCA covered it, but it really doesn't now because it's
22 something different than what we thought it was.
23         Well, we think it is everything.  So why is
24 somebody second-guessing something later?  And then and
25 now, I guess it's still that, while we think the scope

```
 1   of work and us providing things within that should be
 2   covered, why are we talking about something when it
 3   should have been covered?
 4        Q.   Okay.
 5        A.   Yeah.
 6        Q.   As I understand it, that question about what is
 7   covered by the FTCA and what is not covered --
 8        A.   Yeah.
 9        Q.   -- whether it follows funding or whether it
10   follows the language of the contract --
11        A.   Yeah.
12        Q.   -- is not something that has been resolved, or
13   may not have been resolved as of this date?
14        A.   I don't think it's still fully resolved, yeah,
15   right.  And I believe that's what this is saying here.
16             MR. STEWART:  I think perhaps more relevant for
17   your purposes, Mr. Devlin, you really want to ask
18   Mr. Clark is wasn't that a concern you had in 1993?
19             MR. DEVLIN:  That's exactly what area I would
20   like to get into next.
21        Q.   Your counsel is 100 percent right.  And my
22   purpose of showing this to you is, A, to refresh your
23   memory; B, to establish a time period for when you had
24   these concerns.
25             Now I'd like to know whether you had these same
```

```
 1   concerns in 1993.
 2        A.   I would say yes.
 3        Q.   All right.
 4             Now referring to Exhibit G.  The second page of
 5   Exhibit G, which again is the letter from Everett
 6   Rhoades, M.D. to Mr. S. Bobo Dean, of Hobbs Straus Dean
 7   & Wilder, dated August 22, 1991.
 8             First of all, who is Mr. Rhoades, or
 9   Dr. Rhoades?
10        A.   Dr. Rhoades is the Director of Indian Health
11   Service.  His corollary title is Assistant Surgeon
12   General.  But he is the number one man for IHS, for the
13   government to take care of all the IHS obligations,
14   Indian Health Service obligations.
15        Q.   Did he ever participate in any of these
16   contract negotiations you spoke about?
17        A.   I don't believe ever.
18        Q.   Okay.
19        A.   I think it's all delegated to contracting
20   officers.
21        Q.   Now to the second page, the first paragraph of
22   the second page.  That paragraph refers to a suggestion
23   purportedly by Mr. Dean.  That included within the scope
24   of work of the contract, IHS contract, "...all
25   activities IHS could have undertaken under the law, if
```