IN THE UNITED STATES DISTRICT COURT 2005 DEC 30 PM 2:16

FOR THE DISTRICT OF ALASKA

RECEIVED
US ATTORNEY OFFICE

------------------------------x

UNITED STATES OF AMERICA,    :

    Plaintiff,    :

  vs.    : Case No.

THE CONTINENTAL CASUALTY    : A98-285 CV (JWS)

COMPANY, dba THE CONTINENTAL    :

INSURANCE COMPANY,    :

    Defendants.    :

------------------------------x

30(b)(6) DEPOSITION OF ERIN M. FINN

Washington, DC

Tuesday, November 8, 2005

REPORTED BY:

SARA EDGINGTON, RPR

Exhibit 2

1  Mr. Stone, this happened right around September
2  11th. I believe oral argument occurred shortly
3  before or shortly after September 11th.
4      Q    The next day.
5      A    And I think you and Mr. Neeleman were
6  stranded in Alaska for a few days after that.
7      Q    11 days.
8      A    11 days. It was quite a long time. When
9  Mr. Neeleman notified CNA, I believe it was Beth Ann
10 Berger in Chicago, of the decision, it was close to
11 the end of September. At that time, Chris Borgeson,
12 my boss at the time, asked me to take a look at the
13 case and get involved in the case. I did.
14         Mr. Neeleman flew to Chicago. I met with
15 him. He explained what happened. We immediately
16 then sought the advice of another attorney, and
17 that's when we retained Dorsey & Whitney. At that
18 time -- that was in early October. At that time,
19 they basically -- at that time basically we had
20 decided we were going to go in to attempt to try to
21 resolve the case and to set up a mediation.
22         So the short answer is, you know, A, there

1   is no -- there was no roundtable discussion. It was
2   myself consulting with my direct manager, Chris
3   Borgeson, and consulting with new counsel, Dorsey &
4   Whitney.
5          With respect to the retender of the
6   defense, we were hopeful that we could resolve the
7   case with the government, which is what we attempted
8   to do when we mediated the case, you and I in
9   Anchorage, in December of that year. Those
10  discussions were not fruitful.
11         Dorsey then went back and reviewed the
12  Kallstrom case, and at that time, it's my
13  understanding that Kallstrom -- the pendency of
14  Kallstrom was up in front of the Alaska Supreme
15  Court for approximately 16, 17, 18 months at that
16  time. All briefing had been done. There was
17  basically nothing going on other than awaiting a
18  ruling from the Alaska Supreme Court.
19         I was working with John Treptow at Dorsey
20  at the time. My understanding is Mr. Treptow had
21  discussions directly with Ken Roosa of the U.S.
22  Attorney's Office in Alaska, talking in terms of

1  Casualty Company expects of its counsel regarding
2  accepting tender of the defense. And then I'll ask
3  you for the legal duty -- your belief as to the
4  legal duty of Continental Casualty to accept the
5  tender of defense of this type of case.
6      So first, what is Continental Casualty
7  Company's procedure regarding accepting or rejecting
8  tender of defense in a case where a court has
9  already held that the insured is an insured of
10 Continental?
11     MS. ROSS: I'm going to object to the form
12 of that question, but you can answer it.
13     THE WITNESS: As I indicated before, even
14 in light of Judge Sedwick's opinion where he
15 indicated that the U.S. government was an implied
16 additional insured under the Continental Insurance
17 Company policy, there were still coverage issues.
18 The only claim by Kallstrom was for emotional
19 distress damages. So that may or may not be covered
20 under the policy under Alaska law where, in terms of
21 the policy, there must be bodily injury. So that
22 was an issue that we needed to investigate.

1  Kallstrom?

2      A    Yes, but Mr. Treptow had discussions,

3  telephone discussions with Mr. Roosa in January.

4      Q    But during that time, he never accepted

5  tender of the defense, even with the reservation of

6  rights, did he?

7           MS. ROSS:  Object to the form.  You can

8  answer.

9           THE WITNESS:  We never formally accepted

10 the tender of defense, because during this process,

11 the United States was successful in its case with

12 Ms. Kallstrom.

13          BY MR. STONE:

14     Q    And that was March of 2002?

15     A    March of 2002, yes.

16     Q    So that's more than five months after the

17 United States specifically retendered the Kallstrom

18 case; isn't that true?

19     A    Yes.

20     Q    So in the five months, you never accepted

21 tender of the defense, even with a reservation of

22 rights, did you?

1      MS. ROSS: I'll object to the form. There
2 have been thousands of documents produced to the
3 United States government. This witness is not
4 required to have memorized each one of them, nor is
5 she designated for this topic.
6      To the extent you know the answer to the
7 question, you can answer.
8      THE WITNESS: As I indicated, I haven't
9 worked on this case since May of 2003, and in
10 preparation of today, I did not review the attorney
11 correspondence file. So it's been quite some time.
12      BY MR. STONE:
13 Q    You were the manager of this litigation
14 for Continental, though, on October 30th, 2001;
15 isn't that correct?
16 A    That's correct.
17 Q    And the first letter dated October 30,
18 2001, in Exhibit 2, in the last sentence of the
19 major paragraph, specifically says "the United
20 States hereby re-tenders defense of the Kallstrom
21 claims to Continental under the same theories
22 articulated in the July 8, 1998 letter."

```
 1              MS. ROSS:  I think you misread the last
 2    word.  That's fine.
 3              MR. STONE:  How did I misread it?
 4              MS. ROSS:  You said the July 8, 1998,
 5    letter," as opposed to "tender."
 6              MR. STONE:  The last word in that
 7    is "tender."  I apologize.
 8              BY MR. STONE:
 9       Q      Were you provided this letter that
10    Mr. Roosa sent to Mr. Schwab at Dorsey & Whitney?
11              MS. ROSS:  You're talking about the
12    October 30, 2001, or July 8, 1998 letter?
13              MR. STONE:  The October 30.  Thank you.
14              THE WITNESS:  Yes, I believe I was.
15              BY MR. STONE:
16       Q      So there was no question in your mind at
17    that time that the United States was again putting
18    you on notice and retendering the Kallstrom case; is
19    that correct?
20       A      Yes, but at this time, I believe we had a
21    mediation date set in early December where we were
22    working on one, and we were hoping to settle the
```

1   A   Thank you.

2   Q   So let's look at the period -- let's just

3   deal with the date October 30, 2001, and for the

4   next six months after that, during which you did not

5   accept the tender of the defense even though it had

6   been retendered. Can we deal with that period,

7   six-month period, beginning October 30, 2001?

8   A   Yes.

9       MS. ROSS:  Object to the form.  You can

10  answer.  You did.

11      BY MR. STONE:

12  Q   What were the procedures at that time

13  regarding whose responsibility it was to accept or

14  reject the tender of the defense when it came in to

15  Continental?

16  A   In 2001?

17  Q   Yes, ma'am.

18  A   It was my decision.

19  Q   Your decision.

20      So again, what would have been the

21  downside risk to Continental to accept the tender of

22  this defense in a case that had been, you believed,

1  for a legal conclusion.  It's outside the scope of
2  what she's designated for.
3           But you can answer if you have an opinion.
4           THE WITNESS:  No.  As I indicated, we were
5  hopeful that the case was going to resolve at the
6  mediation in December.  When it didn't, we
7  immediately focused on the Kallstrom issues.  Again,
8  to put this in light in terms of the timing, you
9  have to realize this was shortly after September
10 11th.  This, you know, was a very stressful time, I
11 think, for everybody involved, both personally and
12 professionally.
13          As soon as we could, we reviewed the
14 Kallstrom issues.  There were coverage issues
15 involved.  We talked with Roosa.  We talked with
16 outside counsel.  There were attorneys that weren't
17 willing to take on the defense of the U.S.
18 government at that time, and we basically had to
19 find someone that was willing to do that.
20          And then we discussed our reservation of
21 rights, and then we found out that the U.S. was
22 successful.  So, you know, we were in litigation

1  with each other during that entire period of time.
2          BY MR. STONE:
3      Q   But the United States at that time was
4  determined by law to be your insured; isn't that
5  true?
6      A   Implied additional insured.
7      Q   Right.  Be that as it may, an insured
8  under Alaska law at that time; correct?
9      A   Correct.
10         MS. ROSS:  Object to the form.  You can
11 and have answered.
12         BY MR. STONE:
13     Q   And do I understand that there was no
14 roundtable business discussion regarding the
15 acceptance or rejection of this tender of defense
16 that was made at least as late as October 30, 2001?
17     A   There was no roundtable in October of
18 2001, no.
19     Q   Well, my question would be, was there any
20 roundtable about this tender, whether it was October
21 or November or December or any time?
22     A   There was no roundtable discussions at

1  defending the U.S. government under a reservation of
2  rights.
3      Q   Did you tell Roosa or do you know if
4  Mr. Treptow told Roosa that you would accept tender
5  of defense?
6      A   I do not know.
7      Q   But you didn't tell Roosa?
8      A   I had no direct discussions with
9  Mr. Roosa.
10     Q   Did you instruct Mr. Treptow to tell Roosa
11 that Continental would accept the tender of defense
12 with a reservation of rights?
13     A   I don't have any recollection of that, no.
14     Q   Is it likely that you told him to do that?
15         MS. ROSS:  Object to the form.  To the
16 extent you can answer, you can answer.
17         THE WITNESS:  I know that -- it's my
18 understanding that Mr. Treptow had discussions with
19 Roosa on kind of logistically how this would work
20 and also what the status of the Kallstrom matter
21 was.  What Mr. Roosa understood from those
22 discussions, I don't want to make any assumptions.

1        BY MR. STONE:

2    Q    Before Mr. Treptow could make the
3    statement to Mr. Roosa that Continental would accept
4    tender of the defense with a reservation of rights,
5    you would have had to have given Mr. Treptow the
6    authority to make that statement to Roosa; is that
7    correct?

8    A    I'm sorry. Could you repeat the question?

9    Q    Before Mr. Treptow could have made the
10   statement to Mr. Roosa that Continental will accept
11   the tender of defense with a reservation of rights,
12   you would have had to give Mr. Treptow the authority
13   to do that, wouldn't you?

14   A    Yes.

15   Q    Did you give Mr. Treptow the authority at
16   any time to say to Mr. Roosa we're going to accept
17   the tender of defense with reservation of rights if
18   we can work all these problems out?

19        MS. ROSS: Objection; asked and answered.
20   You can answer it again.

21        THE WITNESS: I personally, sitting here
22   today, don't recall, because again, I didn't review