Gary A. Zipkin, Esq.
Guess & Rudd P.C.
510 L Street, Suite 700
Anchorage, AK 99501
Phone:     (907) 793-2200
Fax:        (907) 793-2299
E-mail:     gzipkin@guessrudd.com

Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| CNA FINANCIAL CORPORATION ) | |
| AND THE CONTINENTAL ) | |
| CASUALTY COMPANY d/b/a ) | |
| THE CONTINENTAL INSURANCE ) | |
| COMPANY, ) | Case No. 3:98-cv-285-JWS |
| ) | |
| Defendant. ) | |
| ) | |

## CONTINENTAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON THE UNITED STATES' PRAYER FOR PUNITIVE DAMAGES

Pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP"), The

Continental Casualty Company d/b/a The Continental Insurance Company (hereinafter

"Continental") hereby moves for an order granting it summary judgment on the United States' prayer for the recovery of punitive damages.  This motion is supported by the following memorandum of points and authorities.

## Introduction

A plaintiff that prevails in a bad faith case may--in extraordinary circumstances--be entitled to punitive damages.  However, a finding of bad faith clearly does not mean a plaintiff is automatically entitled to punitive damages.  Nor does it mean the question even gets to a jury.  The standard for punitive damages is substantively much more difficult to meet, and a plaintiff must meet a substantially higher burden of proof--clear and convincing evidence (versus preponderance of the evidence for bad faith).

Here, new facts revealed in recent punitive damages phase discovery, combined with undisputed facts already in the record, show that the United States cannot obtain punitive damages as a matter of law.  Accordingly, Continental Insurance Company and Continental Casualty Company (collectively, "Continental") respectfully move for summary judgment on the United States' prayer for such relief.

## Additional Facts Revealed In Discovery

The following undisputed facts have come to light in recent months.  These facts merit a fresh examination of what has happened in this case to date.  Frankly, they undercut the very foundation of previous rulings by this Court and the Ninth Circuit.  At the very least, these new facts demonstrate that Continental had a reasonable basis for denying coverage.

- The Government's Contracting Officer in the 1990s, who was the Indian Health Services official charged with negotiating Bristol Bay's Section 638 contract with the United States and verifying that Bristol Bay obtained required liability insurance, admits that she knew the Government was not listed as an insured under Bristol Bay's liability policies, the Government was not supposed to be listed, she never thought the Government was covered under the policies in any way, she was never told to have the Government listed as an insured, and she never asked Bristol Bay to list the Government as an insured.

- The Government's official position in the early- to mid-1990s was that it was unclear which potential liability claims against Bristol Bay and other Section 638 contractors would be covered by the Federal Tort Claims Act ("FTCA").  Therefore, the Government's lawyers advised the Contracting Officer that she could <u>not</u> tell Bristol Bay that the FTCA would cover all claims when Bristol Bay complained that it was unclear what the FTCA would cover and what it would not.

- In its split decision finding the United States was an implied insured, the Ninth Circuit opined that Bristol Bay would have no <u>insurable interest</u> (and Continental's policy would be "illusory") if the Government were not insured under the policy.  Even the Government's designated Rule 30(b)(6) witness admits, however, that "there are torts that occur on property that belongs to a 638 contractor that don't always fall within the scope of the FTCA."

- To this day, Bristol Bay continues to purchase general liability insurance which covers "gray areas" where the FTCA might not apply.  That insurance explicitly <u>excludes</u> the Government as a party.  Nonetheless, Bristol Bay pays a premium for that insurance that is <u>higher</u> than the premium it paid Continental for the policy at issue here.  Bristol Bay's purchase of insurance is prudent because, as the Government indicated it might, the

Government has rejected claims tendered by Section 638 contractors, determining that the FTCA did not apply.

- The Government's initial tender of its claim was wholly novel.  The lawyer who tendered on behalf of the Government recently admitted that he cited no case "holding that the United States qualified as an implied additional insured under a liability policy," and that he "would have cited it" if he knew of such a case.  In fact, the Government concedes that it did not have "clearly defined rights as an implied insured on general liability insurance policies" when it tendered in this case.  The Government's tender of the Wilsons' claims in this case was the first time it ever attempted to tender a claim as an implied insured.  In the words of Bristol Bay's lawyer, it "was all virgin territory."

- When the Government tendered, Continental's outside lawyers--both well-versed in Alaska insurance law--advised Continental that it had no duty to defend or indemnify the Government, and Continental reasonably relied on those opinions when it rejected the Government's tender.  Even though Continental waived the attorney-client privilege, there is no evidence Continental ever received contrary advice.

- Both Continental's outside lawyers and in-house personnel investigated whether the factual requirements of the implied insurance doctrine (as set forth in Avi-Truck) were satisfied before Continental rejected the Government's tender.  The Government, on the other hand, did not do so, deeming the facts about what Continental and Bristol Bay actually intended to be irrelevant.  Of course, in 2003, this Court held that those facts were not only relevant, but supported the entry of judgment in Continental's favor.

- Continental has paid its policy limits (plus interest and attorney's fees) under the Bristol Bay policy.  The United States is today in the same position it would have found itself if Continental had accepted its tender immediately.  In fact, the United States has stipulated it suffered no additional economic damages from Continental's tender rejection.

<u>Those Facts Preclude Punitive Damages</u>

Those undisputed facts, along with the facts previously in the record and discussed below, establish that punitive damages cannot be awarded in this case. That is true as a matter of both Alaska law and constitutional due process, and it is true for several independent reasons.

<u>Alaska law.</u> The fact that the United States' tender was novel alone precludes punitive damages under Alaska law. Never before this case, or since, has any court in any jurisdiction ruled that the United States was an implied insured entitled to reimbursement for its Federal Tort Claims Act payments. Never before or since has any other court ruled that anyone not named in a liability policy is nonetheless covered as an implied insured. Because the tender was novel and the Government's rights were not clearly defined, controlling Alaska Supreme Court precedent precludes punitive damages.

The fact that Continental reasonably relied on coverage opinions from experienced outside attorneys familiar with Alaska insurance law (one of whom is now a respected judge) also precludes punitive damages liability. Each of the attorneys retained by Continental performed his own legal analysis and factual investigation, and each concluded that Continental did not owe the United States a duty to defend or indemnify. Continental cannot be saddled with punitive damages for reasonably relying on its outside lawyers' advice.

The conflicting opinions of the four judges that examined the coverage issues in this case also preclude punitive damages. Punitive damages can only be awarded for outrageous conduct. Common sense dictates that an insurer's conduct in rejecting a tender of defense and indemnity cannot be deemed outrageous when half the judges who examined the issue concluded, with the benefit of a full record, that the tender rejection was proper.

Last, the undisputed fact that the Government was not damaged by Continental's conduct, and could not even potentially have been damaged, precludes punitive damages. Putting aside reimbursement for policy limits and defense costs (which the United States has now received), the United States was not damaged in any way by Continental's conduct--and it has so stipulated. Further, the evidence shows that Continental knew in advance that its rejection of the United States' tenders would not cause damages. Thus, far from acting maliciously or with reckless abandon, Continental considered the United States' interests and determined, accurately, that its chosen course of conduct would not cause harm.

Constitutional Law. The United States Constitution only allows punitive damages to be imposed on a defendant if it behaves in a highly reprehensible manner. Five factors must be considered. None of those factors is satisfied here. Therefore, no punitive damages may be imposed.

Assuming any extra-contractual award were constitutionally permissible, the award could not exceed what the government has already received--an award from the Court more than doubling Continental's contractual liability. The United States settled the underlying case with the Wilsons for $2.8 million. Although Continental has already paid its $1 million

policy limits (plus an additional million dollars for defense costs and interest), the Court awarded the United States all of its underlying settlement costs in 2002 (i.e., not only the $1 million policy limits, but the additional $1.8 million the United States paid to settle) because of Continental's ostensible bad faith. That $1.8 million award was punitive--the Court fashioned the award based on the perceived severity of Continental's conduct, not because Continental's conduct caused any harm to the government, which it clearly did not. Accordingly, the government has already obtained a "punitive" award that more than matches its compensatory damages. It cannot constitutionally obtain anything further.[1]

Statement of Facts

After nearly a decade of litigation, this Court is no doubt familiar with many of the facts of this case, and Continental will not repeat those facts in detail. A few points, however, are crucial:

- When Lori Wilson (the injured girl) first filed suit in 1994 against the Bristol Bay Area Health Corporation ("Bristol Bay"), the only named insured under Continental's policy, Bristol Bay tendered to both Continental and the Government.[2] Continental obtained a coverage opinion which determined that there was coverage for Lori Wilson's injury and promptly appointed counsel to

---

[1]  Although the Court previously ruled that the United States could pursue punitive damages, see Dkt. 166 at 17, subsequent discovery in the punitive damages phase has revealed new facts that merit a reevaluation of this issue, as discussed in the text. Further, the Court's earlier ruling was based solely on the "bad faith" element of the case, and did not take into account the substantially higher quantum of proof required to reach a jury on punitive damages. Id.

[2]  Deposition of Robert Stewart dated February 2, 2006 ("Stewart Tr.") at 53:22-54:4, attached as Exhibit A to the Affidavit of Gregory Silvey dated March 16, 2006 ("Silvey Aff.");

defend Bristol Bay.[3]  The Government, on the other hand, told Bristol Bay it was uncertain whether the FTCA applied.[4]  It never intervened in the state court case brought against Bristol Bay, and it took eight months for the Government to agree that the claim was covered.[5]

- •    Shortly after the accident, Continental authorized the payment of an advance or a loan to the Wilsons to assist them with their expenses pre-judgment, which Bristol Bay wanted to provide.[6]  The Government, on the other hand, was "adamantly opposed" to making any such payments, and Bristol Bay had to overcome its opposition.[7]

- •    When the United States first tendered the Wilsons' claims to Continental, no case had ever found an implied insured under a general liability policy.  That remains true today:  to our knowledge, this is the only case in United States history ever to

---

Deposition of William Hutson dated April 7, 2000 ("Hutson Tr."), at 108:20-109:17, 111:4-115:7, Silvey Aff. Ex. H.

[3]    Stewart Tr. at 41:5-42:13, Silvey Aff. Ex. A; Affidavit of James Friderici dated March 14, 2006 ("Friderici Aff.") ¶ 2; Letter from James B. Friderici, Esq. to William Hutson dated May 10, 1994, Friderici Aff. Ex. A; Letter from William Hutson to James B. Friderici, Esq. dated May 4, 1994, Friderici Aff. Ex. B.

[4]    Stewart Tr. at 50:23-51:14, Silvey Aff. Ex. A; Hutson Tr. at 114:9-19, Silvey Aff. Ex. H.

[5]    Id.; Deposition of Susan Lindquist, as Designee for the United States pursuant to Fed. R. Civ. P. 30(b)(6), dated February 9, 2006 ("Lindquist Tr."), at 60:6-9, Silvey Aff. Ex. P (Ms. Lindquist, as designee for the United States, does not know why the Government did not substitute in to the state court case brought by the Wilsons against Bristol Bay); Deposition of Deborah Segelhorst dated February 14, 2006 ("Segelhorst Tr.") at 81:5-11, Silvey Aff. Ex. Q.

[6]    Stewart Tr. at 80:8-82:20, Silvey Aff. Ex. A; Affidavit of William Hutson dated March 15, 2006 ("Hutson Aff."), ¶ 2; Transmittal from Robert Stewart, Esq. to William Hutson dated March 29, 2004, Hutson Aff. Ex. A; Letter from William Huston to Robert Stewart, Esq. dated April 20, 1994, Hutson Aff. Ex. B.

[7]    Stewart Tr. at 80:8-82:20, Silvey Aff. Ex. A; Hutson Aff. ¶ 2.

adopt the doctrine of implied insurance in connection with a general liability policy.[8]  The Government is not aware of any other such cases either.[9]

• At the time the Government tendered, no court in the United States had ever held that the Government could obtain reimbursement from an insurer for payments it made pursuant to the FTCA as an implied-at-law insured (as opposed to an insured under the express provisions of the policy).  This also remains true today: to our knowledge, this is the only case in United States history to hold that the Government is entitled to reimbursement from an insurer as an implied insured for its FTCA payments.[10]

• In fact, there is no evidence the Government ever even <u>tendered</u> a claim to an insurance company as a purported implied insured under a liability policy prior to its tender of the Wilsons' claim in this case.[11]

• Accordingly, the Government admits that it did not have "clearly defined rights as an implied insured on general liability insurance policies" maintained by Section 638 contractors like Bristol Bay until this Court issued its 2001 summary judgment ruling and the Ninth Circuit issued its opinion in this case in 2004.[12] Kenneth Roosa, the Assistant United States Attorney who represented the Government when it tendered, admits that the Government cited no case in its tenders "holding that the United States qualified as an implied additional insured under a liability policy," and that he "would have cited it" if he had known of

---

[8]   Silvey Aff. ¶ 2.
[9]   Lindquist Tr. at 34:20-35:1, Silvey Aff. Ex. P.
[10]  Silvey Aff. ¶ 2.
[11]  Lindquist Tr. at 31:9-32:18, Silvey Aff. Ex. P.
[12]  Lindquist Tr. at 116:12-118:11, Silvey Aff. Ex. P.

such a case.[13]  And Robert Stewart, a Bristol Bay lawyer who has been involved
in this case since the Wilsons first sued, agrees it "was all virgin territory . . . .
And it certainly was not altogether clear how the FTCA would coordinate with
private insurance, if at all."[14]

• In the face of the Government's tender under a novel legal theory, Continental
obtained a coverage opinion from a respected local attorney with expertise in
Alaskan insurance law.[15]  When the Government later re-tendered, Continental
retained another outside attorney, who now is a state superior court judge, to
independently assess the United States' theory.[16]  Both attorneys (Jim
Friderici, Esq. and the Hon. Craig Stowers) advised Continental that the
Government was not covered under the Bristol Bay policy.[17]  Hence, Continental
had no duty to defend or indemnify the Government.[18]  Neither felt any pressure
from Continental to reach any particular conclusions.[19]  There is no evidence that
Continental did not rely on counsels' recommendations when it denied the
Government's tenders.[20]

---

[13]   Deposition of Kenneth S. Roosa dated December 15, 2005 ("Roosa Tr."), at 29:24-30:9,
47:10-22, Silvey Aff. Ex. B; see Letter from Kenneth Roosa, Esq. to Lori Wing dated January 6,
1995 (the United States' initial tender), Silvey Aff. Ex. C; Letter from Kenneth Roosa, Esq. to
James Friderici, Esq. dated June 6, 1995 (the United States' second tender), Silvey Aff. Ex. D;
Letter from Kenneth Roosa, Esq. to Jennifer Taylor dated February 20, 1997 (the United States'
next tender), Silvey Aff. Ex. E.

[14]   Stewart Tr. at 39:18-24, Silvey Aff. Ex. A.

[15]   Friderici Aff. ¶¶ 3-4; Letter from James B. Friderici, Esq. to William Hutson dated
January 20, 1995, Friderici Aff. Ex. C.

[16]   Affidavit of the Hon. Craig F. Stowers dated March 16, 2006 ("Stowers Aff."), ¶¶ 2-3; Letter
from Craig F. Stowers, Esq. to Ray Faccenda dated May 28, 1997, Stowers Aff. Ex. A.

[17]   Id.

[18]   Id.

[19]   Id.

[20]   Hutson Aff. ¶¶ 3-6; Hutson Tr. at 76:6-22, 86:20-87:13, Silvey Aff. Ex. H (Mr. Friderici "had
advised us legally, as our -- as the attorney, in the case, that we should not accept tender by the

- Continental conveyed its rejections of the Government's tenders in letters written by its outside attorneys.[21] There is no evidence that even the Government thought these rejections were outrageous or malicious at the time.[22]

- The primary authority on which the United States relied in its tender, <u>Stewart-Smith Haidinger, Inc. v. Avi-Truck, Inc.</u>, requires a finding that the parties to the insurance contract (Continental and Bristol Bay) intended the unnamed party (the Government) or the class within which the unnamed party falls (in <u>Avi-Truck</u>, whoever owned the airplane) to benefit from the contract. 682 P.2d 1108, 1113 (Alaska 1984) ("where a third party is within the class <u>intended</u> to be benefited by the parties to an insurance contract, a third-party beneficiary insurance contract may be implied at law" (emphasis added)).

- Here, the evidence shows that neither Continental nor Bristol Bay, let alone both, intended the parties' insurance contract to benefit the United States. To the contrary, the relevant witnesses from both Continental and Bristol Bay testified they did ***not*** intend to benefit the United States.[23]

---

U.S. Government in the case," and "we relied on his opinion" in rejecting tender); <u>id.</u> at 77:15-20, 87:14-24 (although Continental relied on Friderici's recommendation, "we looked at the case and all of its merits independently. And we ended up looking at his material, and what we had in the file. And we came to the conclusion that we agree with him."); Affidavit of Ray Faccenda dated March 7, 2006, ¶¶ 1-4.

[21] Letter from James B. Friderici, Esq. to Kenneth S. Roosa, Esq. dated February 13, 1995, Friderici Aff. Ex. E; Letter from Craig F. Stowers, Esq. to Kenneth Roosa, Esq. dated June 19, 1997, Stowers Aff. Ex. B.

[22] Lindquist Tr. at 81:18-82:6, 84:1-11, 89:21-90:7, Silvey Aff. Ex. P.

[23] <u>See</u> Declaration of Lori Wing (Bristol Bay's broker) dated December 1, 1998, ¶¶ 4, 6, 8, Silvey Aff. Ex. F:

> [I]t has never been the intention of BBAHC, or Brady & Company as BBAHC's broker, to include the United States as an insured under any policy placed by Brady & Co. for BBAHC. . . .
> BBAHC and its counsel instructed us specifically that BBAHC did

- If the parties intended for the Government to be covered, they could easily have listed the Government on the Bristol Bay policy as a named or additional insured. The Government was omitted because there was no such intention--not even on the part of the Government itself.  Although the Government's Contracting Officer, Deborah Segelhorst, received certificates of insurance from Bristol Bay showing that Bristol Bay had its own liability insurance (which it was her job to verify), she never asked Bristol Bay to list the Government as a named or additional insured in its insurance policies, never thought the Government was listed as such, never intended for the Government to be listed as such, never thought the Government was covered under the policies, was never told to have the Government listed, never told Bristol Bay that it should have the Government

---

not desire insurance coverage that would duplicate protection from liabilities provided by the United States under Section 638 and the FTCA. . . .  We conveyed all of this information, including the written memoranda from BBAHC's counsel, to Continental Insurance Company's underwriters, to assist them in assessing and underwriting BBAHC's risks.

Deposition of Robert Clark (Bristol Bay's CEO) dated January 11, 2001 ("Clark Tr."), at 93:21-94:10, Silvey Aff. Ex. I (Bristol Bay never "intended for the United States government, the IHS, to be a named insured under any BBAHC policy"; Bristol Bay did not want to "buy insurance for the government" because "[t]he government has its own insurance"); Deposition of Darrel Richardson (Bristol Bay's COO) dated January 10, 2001 ("Richardson Tr."), at 85:6-9, Silvey Aff. Ex. J (same); Stewart Tr. at 58:6-23, Silvey Aff. Ex. A (Stewart has no recollection of anyone from Bristol Bay or elsewhere giving him "the slightest suggestion or hint that the parties to this insurance contract intended that the United States be treated or considered an additional insured under the Continental policy"); Deposition of Debra Wyatt Brown (a Continental underwriter) dated April 5, 2000 ("Brown Tr."), at 164:2-9, 165:16-166:1, 183:4-23, Silvey Aff. Ex. K (Brown never thought "that anyone intended for the United States to be an insured on BBAHC's policy" and never "consider[ed] the United States to be a covered organization under the policy"; neither Lori Wing, anyone from her office, anyone from Bristol Bay, nor anyone from the United States ever told her that the United States should be covered or a named or additional insured).

listed, and never thought the Government was covered as an implied insured.[24] That is because the only entity that was supposed to be insured was Bristol Bay, not the United States.[25]  Although Government lawyers sometimes contact Contracting Officers to better understand the contractual relationship between the United States and a Section 638 contractor, no one contacted Ms. Segelhorst to inquire about the United States' rights under Bristol Bay's policies or to find out if Ms. Segelhorst waived the Government's right to coverage.[26]

• In light of <u>Avi-Truck</u>'s requirements of intent, both Mr. Friderici and Judge Stowers interviewed fact witnesses to determine whether Continental and Bristol Bay intended to benefit the United States before they rendered their coverage opinions, and these witnesses confirmed that there was no such intent.[27]  Mr. Hutson also spoke to fact witnesses, including Ms. Wing and Mr. Stewart, before denying the United States' tender on Continental's behalf, and confirmed that Bristol Bay did not believe the United States was covered.[28]  The Government, on the other hand, made no effort at all to determine whether the parties intended to benefit the United States before it tendered, notwithstanding <u>Avi-Truck</u>'s requirements.[29]

• The United States threatened to sue Bristol Bay in 1999, claiming that Bristol Bay had an obligation (and failed) to have the United States expressly listed as an

---

[24]  Segelhorst Tr. at 49:6-25, 50:14-52:20, 54:1-17, 60:2-61:3, 87:1-5, Silvey Dec Ex. Q.

[25]  <u>Id</u>. at 51:10-52:20, 59:4-10.

[26]  Lindquist Tr. at 20:4-14, Silvey Aff. Ex. P; Segelhorst Tr. at 81:21-82:12, Silvey Aff. Ex. Q.

[27]  Friderici Aff. ¶ 4; Stowers Aff. ¶ 3.  Mr. Stewart told Friderici that he did not believe the United States was covered under the Bristol Bay policy, and conveyed to Mr. Roosa the fact that he made that statement to Friderici.  Roosa Tr. at 70:17-22, Silvey Aff. Ex. B.

[28]  Hutson Tr. at 29:12-32:13, 36:14-19, 114:21-115:12, Silvey Aff. Ex. H (Stewart and Wing thought the FTCA, not Continental's policy, should cover the Wilsons' claim); Hutson Aff. ¶ 6.

[29]  Roosa Tr. at 43:6-44:21, Silvey Aff. Ex. B.

additional insured on its policy with Continental.[30]  Although the U.S. Attorney's Office represented in its demand letter that "[t]he United States believed that [the Continental/Bristol Bay] policy provided coverage to the United States,"[31] Ms. Segelhorst disagrees--as the responsible Government official, she never believed the United States was covered.[32]

•    A divided Ninth Circuit panel opined that, if the Government were excluded, Bristol Bay would have no insurable interest because of the coverage provided by the FTCA.[33]  Mr. Roosa made the same point in the Government's initial tender letter.[34]  However, even the Government admits "there are torts that occur on property that belongs to a 638 contractor that don't always fall within the scope of the FTCA."[35]  In fact, the Government has rejected tenders by 638 contractors in Alaska, determining that the FTCA did not apply.[36]

•    After FTCA coverage was expanded in the early 1990s, Bristol Bay and other Section 638 contractors complained to the Government that it was unclear what would and would not be covered by the FTCA, largely because Bristol Bay received funding from many sources other than Indian Health Services.[37]  The Government's lawyers analyzed the situation, determined that they too thought it was unclear what the FTCA would cover, and advised Ms. Segelhorst and her

---

[30]   Letter from Robert C. Bundy, Esq. to Parry Grover, Esq. dated February 8, 1999, Silvey Aff. Ex. G; Stewart Tr. at 17:11-22, 21:8-23:4, 86:10-89:17, Silvey Aff. Ex. A; Roosa Tr. at 78:22-79:7, Silvey Aff. Ex. B; Clark Tr. at 75:15-21, 77:5-23, 80:21-81:1, 84:14-20, 91:20-92:10, Silvey Aff. Ex. I; Richardson Tr. at 32:24-34:17, 39:2-5, 40:3-13, Silvey Aff. Ex. J.

[31]   Letter from Robert C. Bundy, Esq. to Parry Grover, Esq. dated February 8, 1999,  at 2, Silvey Aff. Ex. G.

[32]   Segelhorst Tr. at 90:13-91:11, Silvey Aff. Ex. Q.

[33]   113 Fed. Appx. at 207.

[34]   Letter from Kenneth Roosa, Esq. to Lori Wing dated January 6, 1995 at 2, Silvey Aff. Ex. C.

[35]   Lindquist Tr. at 123:20-126:4, Silvey Aff. Ex. P.

[36]   Id.

department that they could not assure Section 638 contractors that all claims will be covered because even the Government did not believe that to be true.[38]

- Accordingly, the relevant witnesses from both Bristol Bay and Continental testified that Bristol Bay sought to obtain, and Continental provided, insurance that would apply and protect Bristol Bay when the FTCA did not--the Bristol Bay policy issued by Continental was supposed to be supplemental insurance that would cover the "gray areas" that everyone, including the Government, knew existed.[39]

---

[37]  Segelhorst Tr. at 63:1-4, 64:18-65:10, 67:1-68:17, 71:18-25, 84:8-85:7, Silvey Aff. Ex. Q.

[38]  Segelhorst Tr. at 64:18-65:10, 69:4-71:10, Silvey Aff. Ex. Q; Department of Health & Human Services Memorandum from Gary Thogersen, Esq. to Richard D. Frost dated September 10, 1991, Silvey Aff. Ex. R ("The extent to which FTCA coverage will be found to apply under the statute for non-IHS funded activities is not yet known. . . .  Under the circumstances we cannot assure the contractors that the FTCA would apply even if non-IHS activities were included within the scope of work of the contract.").

[39]  Deposition of Lori Wing dated November 30, 1999 ("Wing Tr."), at 80:13-17, 100:2-101:21, 116:16-25, 117:20-118:9, Silvey Aff. Ex. L (in purchasing insurance on Bristol Bay's behalf, "[w]e did not want to duplicate what the Federal Tort Claim Act was providing.  But we wanted to -- what the Federal Tort claims Act was not providing, that is what we wanted to insure"; Bristol Bay's outside counsel explained to Wing and Robert Clark that the FTCA would not cover all potential liability claims against Bristol Bay, and Clark specifically instructed Wing that Bristol Bay did not want to duplicate FTCA coverage); Clark Tr. at 27:2-13, 82:21-83:2, 94:5-7, 94:15-18, 108:5-110:2, Silvey Aff. Ex. I (the statutory amendments providing FTCA coverage were new, and Bristol Bay was uncertain what exactly was covered, so it wanted to purchase "supplemental and other insurance" to make sure it was protected; Bristol Bay's "goal is to get private insurance, but not so much private insurance that you're duplicating what you'd have under the FTCA," and it "bought insurance to be a supplement to, and kind of an over layer or something different than the government's insurance"); Richardson Tr. at 52:20-60:25, Silvey Aff. Ex. J (same); Deposition of Liz Hartshorn (Bristol Bay's CFO) dated January 12, 2001, at 60:19-62:16, Silvey Aff. Ex. M (Hartshorn wanted insurance that would not duplicate FTCA coverage); Deposition of Simpson Bobo Dean (Bristol Bay's outside counsel) dated February 21, 2001 at 48:8-52:11, 94:3-95:24, Silvey Aff. Ex. N (Dean advised Wing that it was uncertain what the FTCA would cover and that Bristol Bay needed "some kind of insurance which would protect [it] in the event it was determined that for whatever reason the FTCA did not apply";

- To this day, Bristol Bay continues to purchase general liability insurance that covers "gray areas" where the FTCA might not apply.[40]  That insurance explicitly <u>excludes</u> the Government as a party.[41]  Nonetheless, as to the insurable interest, Bristol Bay pays a premium for that insurance that is <u>higher</u> than the premium it paid Continental for the policy at issue here.[42]

- This Court concluded two years ago that the Bristol Bay policy "clearly did not embrace risks associated with insuring the Government."[43]  Based on that conclusion, the Court entered summary judgment in Continental's favor, holding that the Government was not covered under the policy.[44]  Although a divided Ninth Circuit panel reversed on coverage (without addressing the Court's rejection of the Government's bad faith claim, which was not appealed), one judge on the Ninth Circuit thought the Government was not covered under the policy as well, and dissented.[45]  Thus, two of the four judges that have ruled on the issue

---

Dean understood that Continental's policy "was obtained for the purpose of protecting BBAHC against claims outside the scope of the FTCA"); Brown Tr. at 38:15-39:10, 161:15-21, 172:6-173:18, 186:2-9, Silvey Aff. Ex. K (as the underwriter of the policy, Brown did not intend to provide general liability coverage where the FTCA provided coverage; rather, the policy was intended, and Brown and Wing agreed, that Continental would only provide coverage when Bristol Bay's employees were acting in a capacity that would not be covered by the FTCA, such as "when the insured were performing services funded by the State of Alaska"); Deposition of Sally Padgitt (a Continental underwriter) dated April 3, 2000, at 51:16-55:19, Silvey Aff. Ex. O (the Bristol Bay policy was not designed to "cover any risks that fell under the FTCA"); Hutson Tr. at 29:12-30:13, Silvey Aff. Ex. H ("We knew our policy was intended to only cover those nonfederally funded programs.  And they only cover state-funded programs for general liability.").

[40]  Stewart Tr. at 91:7-93:17, 96:21-97:7, Silvey Aff. Ex. A.
[41]  <u>Id.</u>
[42]  <u>Id.</u>
[43]  Dkt. 115 at 4.
[44]  <u>Id.</u> at 2-6.
[45]  <u>United States v. CNA Financial Corp.</u>, 113 Fed. Appx. 205, 208-09 (9th Cir. 2004).

have held that Continental's initial coverage conclusion--and that of the outside attorneys that advised Continental--was correct.

- The only injured party, Lori Wilson, was not left unprotected because of this coverage dispute. If anything, Lori Wilson benefited when Bristol Bay's counsel appointed by Continental obtained a ruling that the FTCA applied because she settled with the United States for almost three times policy limits.

- Based on the Ninth Circuit's ruling, Continental has paid the United States its policy limits of $1,988,646.99, which included (1) the $1 million face limit under the Bristol Bay policy, (2) the $150,000 the United States claims it incurred in defense costs and attorney's fees, and (3) interest on those amounts to date.[46]

- Thus, the United States has received all the benefits it would have received under the Bristol Bay policy if Continental had accepted its tender immediately. And, the United States has stipulated it suffered no additional damages.[47]

These undisputed facts preclude an award of punitive damages, as discussed below.

---

[46]  Silvey Aff. ¶ 3.

[47]  See Deposition of Deborah Senn dated January 11, 2006, at 209:15-210:7, Silvey Aff. Ex. T (counsel for the United States stipulating that "[t]he United States doesn't contend that there was serious harm other than the contention that Continental should have paid the $2.8 million for the settlement and the cost of defense."); Lindquist Tr. at 105:20-106:25, Silvey Aff. Ex. P (counsel for the United States offering to stipulate that "nothing about Continental's handling of the United States' tenders to it caused the United States to pay more to the Wilsons than they otherwise would have" and that "the case ultimately . . . would have settled for the same amount").

<u>Argument</u>

1.    SUMMARY JUDGMENT ON PUNITIVE DAMAGES MAY BE APPROPRIATE
      <u>EVEN AGAINST A PLAINTIFF THAT HAS PREVAILED ON A BAD FAITH</u>
      <u>CLAIM</u>

      A.    The Standards for Punitive Damages Are
            <u>Considerably More Stringent Than Those for Bad Faith</u>

            Just because this Court concluded that Continental acted in bad faith when it
denied the Government's tenders does not necessarily mean the Government can reach a jury on
its prayer for punitive damages.  To the contrary, as the Alaska Supreme Court has observed,
"[n]ot all conduct which amounts to the tort of bad faith is sufficiently outrageous to warrant an
award of punitive damages."  <u>State Farm Mutual Automobile Ins. Co. v. Weiford</u>, 831
P.2d 1264, 1266 (Alaska 1992) (affirming finding of bad faith, but reversing award of punitive
damages); <u>accord</u> <u>State Farm Fire & Casualty Co. v. Nicholson</u>, 777 P.2d 1152, 1158 (Alaska
1989) (affirming judgment for insured on bad faith claim but reversing award of punitive
damages because "there was insufficient evidence as a matter of law to support a finding of
outrageous conduct or a gross deviation from an acceptable standard of reasonable conduct");
<u>W.V. Realty, Inc. v. Northern Insurance Co.</u>, 334 F.3d 306, 318 (3d Cir. 2003) (same: "while
there was a basis for a finding of bad faith, there was no basis for an award of punitive
damages").  Indeed, this Court has previously made this very point.  <u>Ace v. Aetna Life Ins. Co.</u>,
40 F. Supp. 2d 1125, 1131 (D. Alaska 1999) ("The Alaska Supreme Court has vacated decisions
awarding punitive damages against insurers, even while it affirmed verdicts finding the insurers
acted in bad faith, much as this court did here." (citing <u>Weiford</u> and <u>Nicholson</u>)) (Sedwick, J.).

B.     The More Stringent Requirements for Punitive Damages
        Must be Proven by Clear and Convincing Evidence

        Punitive damages are a disfavored remedy in Alaska.  They can be awarded only
when there is clear and convincing evidence of outrageous conduct.  Weiford, 831 P.2d at 1266;
Chizmar v. Mackie, 896 P.2d 196, 210 (Alaska 1995) ("the plaintiff must prove by clear and
convincing evidence that the defendant's conduct was outrageous, such as acts done with malice,
bad motive, or reckless indifference to the interests of another") (internal quotation omitted).
"Although a showing of actual malice is not required, the plaintiff must establish, at a minimum,
that the defendant's conduct amounted to reckless indifference to the rights of others, and
conscious action in deliberate disregard of (those rights)."  Chizmar, 896 P.2d at 210 (citations
and quotation omitted); see W. Prosser and W. Keeton, The Law of Torts at 9-10 (5th ed. 1984)
(for punitive damages to be awarded, "[t]here must be circumstances of aggravation or outrage,
such as spite or 'malice' or a fraudulent or evil motive on the part of the defendant, or such a
conscious and deliberate disregard of the interests of others that [the defendant's] conduct may be
called willful or wanton").  Punitive damages cannot be awarded even for gross negligence
because "[t]he most extreme negligence lacks the essential element of conscious indifference to
consequences."  Knippen v. Ford Motor Co., 546 F.2d 993, 1002-03 (D.C. Cir. 1976); see
Chizmar, 896 P.2d at 210; Johnson & Higgins of Alaska Inc. v. Blomfield, 907 P.2d 1371, 1376
(Alaska 1995) ("Mere negligence is insufficient to justify an award of punitive damages.").

        Accordingly, "where there is no evidence that gives rise to an inference of actual
malice or conduct sufficiently outrageous to be deemed equivalent to actual malice, the trial
court need not, and indeed should not, submit the issue of punitive damages to the jury."

Weiford, 831 P.2d at 1266 (quoting Alyeska Pipeline Serv. Co. v. O'Kelley, 645 P.2d 767, 774 (Alaska 1982)).  The mere fact that a plaintiff has proven bad faith does not change that fact.  Id. at 1267 ("while there is some evidence which would justify a finding that State Farm was acting in bad faith, none of the evidence shows conduct which may fairly be categorized as outrageous."); see Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 18 (Texas 1994) ("Every tort involves conduct that the law considers wrong, but punitive damages are proper only in the most exceptional cases.  Unless bad faith is accompanied by aggravated conduct by the insurer, then compensatory damages alone are the proper remedy.").

2.      AS A MATTER OF ALASKA LAW, CONTINENTAL
        CANNOT BE HELD LIABLE FOR PUNITIVE DAMAGES

        There is no jury issue here.  Continental's conduct was far from outrageous.  In fact, there is literally no evidence showing actual malice or reckless indifference in Continental's rejection of the Government's tender.  The evidence shows Continental genuinely believed that the Government was not covered under Bristol Bay's policy.  There is no evidence that the Alaskan insurance lawyers upon whose advice Continental relied told it anything different.

        A.      The "Implied Insured" Coverage Issue Was Novel,
                And That Fact Alone Precludes An Award Of Punitive Damages

        The coverage issue presented by the Government's tender was wholly novel.  When the Government tendered the claims brought by the Wilsons, no court anywhere had ever adopted the doctrine of implied insurance as to a general liability (as opposed to a property) policy and no case anywhere had ever held that the Government could obtain reimbursement

from an insurer for payments it made pursuant to the FTCA where the Government was not a named or additional insured under the terms of the policy.[48]  None of the cases listed by the Government in its tender letters was on point--they all concerned property policies.[49]  There is no evidence the Government had ever even <u>attempted</u> a tender as an implied insured before this case.[50]

Thus, it was far from clear at the time of the tender that the Government was covered under Bristol Bay's policy.  The Government's own Contracting Officer did not think it was covered,[51] and everyone Continental consulted said it was not.  Even the Government admits today that it did not have "clearly defined rights as an implied insured on general liability insurance policies" when it tendered.[52]

---

[48]   Silvey Aff. ¶ 2; Lindquist Tr. at 34:20-35:1, Silvey Aff. Ex. P.

[49]   Letter from Robert C. Bundy, Esq. and Kenneth Roosa, Esq. to Lori Wing dated January 6, 1995, Silvey Aff. Ex. C; Letter from Kenneth Roosa, Esq. to James Friderici, Esq. dated June 6, 1995, Silvey Aff. Ex. D; Letter from Kenneth Roosa, Esq. to Jennifer Taylor, Esq. dated February 20, 1997, Silvey Aff. Ex. E; <u>see</u> Roosa Tr. at 29:24-30:9, 47:10-22, Silvey Aff. Ex. B (Mr. Roosa admitting that he cited no on point cases).  To support its claim of coverage, the United States primarily relied on <u>Avi-Truck</u>, which involved implied-at law coverage under a casualty policy.  Silvey Aff. Ex. C.  The United States also cited three cases in which the United States was reimbursed from an insurance carrier for payments it made under the FTCA, but in each of those cases the United States was an additional insured under the express terms of the policy as a person "legally responsible for the use" of the automobile covered by the policy.  <u>See</u> <u>Government Employees Ins. Co. v. United States</u>, 349 F.2 83, 84 (10th Cir. 1965) ("the crux of the problem before us is whether the insured intended to and did cover the United States as an additional 'insured' when it defined the word 'insured' to include the named insured and 'any person or organization legally responsible for the use' of the automobile."); <u>Irving v. United States</u>, 148 F. Supp. 25, 32 (D. S.D. 1957) (same); <u>Rowley v. United States</u>, 140 F. Supp. 295, 297 (D. Utah 1956) (same).

[50]   Lindquist Tr. at 31:9-32:18, Silvey Aff. Ex. P.

[51]   Segelhorst Tr. at 49:6-25, 50:14-52:20, 54:1-17, 59:4-10, 60:2-61:3, 87:1-5, Silvey Aff. Ex. Q.

[52]   Lindquist Tr. at 116:12-118:11, Silvey Aff. Ex. P.

The undisputed fact that the Government's rights were not clearly defined is dispositive.  As a matter of law, violations of rights that are not "clearly defined" cannot support a finding of maliciousness or reckless indifference and do not warrant punitive damages.  See State v. Haley, 687 P.2d 305, 315, 320 (Alaska 1984) (even though defendants' termination of plaintiff "violated her rights of free expression," the dismissal of her prayer for punitive damages was proper because "the scope of her constitutional rights was [not] so clearly defined that her dismissal evidenced a 'reckless indifference' to her rights"); Chizmar, 896 P.2d at 210 ("where standard of care is not clearly defined, breach does not support recovery of punitive damages" (citing Haley)).

Clearly, submitting an unsettled and unique legal question to the courts cannot subject an insurer to punitive damages.  See Peter v. The Progressive Corp., 2006 WL 438658 at *7 (Alaska 2006) (an insurer does not act in bad faith when it requires litigation to resolve a coverage issue that "was an open question to which an answer could not have been known until this court actually . . . ruled"); Dunn v. State Farm Fire & Cas. Co., 927 F.2d 869, 874 (5th Cir. 1991) ("But this insurer was entitled to have a court resolve the undecided question of law to determine its liability without being punished for referring the question to a court.  For requiring the resolution of the legal issue it cannot be liable under Mississippi law for punitive damages, even if it does not prevail on the underlying legal issue."); Aronson v. State Farm Ins. Co., 2000 WL 667285 *12 (C.D. Ca. 2000) ("The 'genuine issue' standard [precluding tort liability], or a similar standard, has been applied with particular force where, as here, the insurance claim presented either a complex or unresolved issue of law in the jurisdiction."); see also Kolstad v. American Dental Ass'n, 527 U.S. 526, 537 (1999) (under 42 U.S.C. § 1981, which permits an

award of punitive damages for actions taken with "malice or with reckless indifference" to protected rights, even "intentional discrimination does not give rise to punitive damages liability" where the "underlying theory of discrimination [is] novel or otherwise poorly recognized").

Under the Supreme Court's decisions in Haley and Chizmar, the undisputed fact that there was no authority clearly establishing the United States' rights under Bristol Bay's policy as an implied-at-law insured precludes an award of punitive damages as a matter of law.

B.      Continental Appropriately Solicited And Reasonably Relied
        On The Advice Of Experienced Insurance Coverage Counsel,
        And That Fact Precludes An Award Of Punitive Damages

In response to the Government's novel tender, Continental acted responsibly by obtaining an outside coverage opinion from a respected local attorney with expertise in Alaskan insurance law.[53]  Later, when the Government re-tendered, Continental obtained another opinion from a respected local attorney, who is now a judge.[54]  Both lawyers analyzed the Government's authorities, performed their own legal and factual research, and concluded in lengthy opinion letters that the Government was not covered.[55]  Neither attorney, nor any other adviser, ever indicated to Continental that the Government might be covered under Bristol Bay's policy.[56]

---

[53]  Friderici Aff. ¶¶ 3-4 &  Ex. C.
[54]  Stowers Aff. ¶¶ 2-3 & Ex. A.
[55]  Id.
[56]  Id.

Continental's reliance on the advice of counsel alone precludes an award of punitive damages.  See Gordon v. Nationwide Mut. Ins. Co., 30 N.Y. 2d  427, 433, 285 N.E. 2d 849, 852 (N.Y. 1972) (an insurer is not liable for punitive damages where it relies on the advice of counsel:  "It would be an extraordinary result to hold a client guilty of breach of good faith, [with] large punitive damages, because it acts on advice of counsel--even mistaken advice--about the precedential stature of a single case in the Miscellaneous Reports."); Bishop v. Mid-Century Ins. Co., Inc., 1997 WL 290935, *5 (10th Cir. 1997) (where insurer "conducted an investigation . . . and obtained the advice of outside counsel before denying coverage," there is a "reasonable and legitimate position for denying coverage" and bad faith claim fails); State Farm Mut. Auto. Ins. Co. v. Superior Court, 228 Cal. App. 3d 721, 725, 279 Cal. Rptr. 116, 117-18 (Cal. App. 1991) ("An insurer may defend itself against allegations of bad faith and malice in claims handling with evidence the insurer relied on the advice of competent counsel."); see also Bohemia, Inc. v. The Home Ins. Co., 725 F.2d 506, 511 (9th Cir. 1984) (no bad faith in refusing to settle based on advice of counsel:  "insurers often must place substantial reliance on local counsel in evaluating a case, and . . . [the insurer], having retained competent counsel, was entitled to rely on his non-negligent evaluation" (internal quotations and footnote omitted)).

Although this advice of counsel defense has not yet been expressly adopted as a matter of insurance law in Alaska, the courts of Alaska have approved the defense in analogous contexts.  See Alaska Placer Co. v. Lee, 553 P.2d 54, 60-61 (Alaska 1976) (rejecting claim for punitive damages for trespass:  "Reliance on the advice of a reputable attorney has been held to be a sufficient basis for a finding that a trespass was made in good faith."); Wheeler v. State, 659 P.2d 1241, 1252-54 (Alaska Ct. App. 1983) (approving jury instruction in securities case that good faith reliance on counsel precludes finding of willfulness).  There is no reason to think the

defense would not be adopted as a matter of Alaska law in the insurance context as well, as it has been virtually everywhere else.

Continental's reliance on its lawyers' advice was eminently reasonable.  It was an exercise of reasonable business judgment.  Everyone agrees that the coverage issues presented by the United States' tenders were complex, and it was therefore reasonable for Continental to solicit advice from outside experts.  It was also reasonable for Continental to listen to that advice.  Continental is headquartered in New York and does not have a major presence in Alaska.  Unlike the Government, which did no due diligence, Mr. Friderici and Judge Stowers performed a factual investigation into the contracting parties' intent before they issued their coverage opinions.[57]  Further, the evidence adduced in this litigation substantially confirms what Mr. Friderici and Judge Stowers discovered:  Bristol Bay and Continental did not intend to insure the interests of the United States.[58]  They wanted to insure gaps in the coverage provided by the United States.[59]

Given Avi-Truck's rule that the doctrine of implied insurance only applies when the contracting parties intend their contract to benefit the third party or the class to which the third party belongs, see 682 P.2d at 1113, Mr. Friderici's and Judge Stowers' conclusions on coverage made sense.  Continental was entitled to rely on those reasoned conclusions.  In so doing, Continental certainly did not act outrageously or maliciously.  See, e.g., Wheeler, 659 P.2d at 1252-54; compare Anderson v. Nationwide Ins. Enterprise, 187 F. Supp. 2d 447, 459

---

[57]  Friderici Aff. ¶¶ 3-4; Stowers Aff. ¶¶ 2-3; compare Roosa Tr. at 43:6-44:21, Silvey Aff. Ex. B (the government performed no such investigation).
[58]  See supra note 24.
[59]  See supra note 40.

(W.D. Pa. 2002) (permitting punitive damages claim to go to jury where "the first counsel

assigned to the case[] clearly advised Nationwide that its position was without merit," but insurer

nonetheless denied coverage).  Continental has waived the privilege, and there is no evidence

Continental's lawyers ever told it they thought there was coverage or even that it was a close

call.[60]

C.    The Fact That Coverage Was At Least "Fairly Debatable," As The
      Split in Judicial Opinion Reveals, Precludes An Award Of Punitive Damages

Two of the four judges that have analyzed the issue (not including Judge Stowers)

determined, at one point or another, that Continental and its outside lawyers were correct:  The

Government was not covered under the Bristol Bay policy.[61]  Because two of the judges who

examined the issue agreed with Continental, Continental's position was not outrageous--as a

matter of law.  Under Hillman and dozens of other authorities applying the "genuine dispute

doctrine," there can be no award of punitive damages here.  See Hillman v. Nationwide Mutual

Fire Ins. Co., 855 P.2d 1321, 1324-26 (Alaska 1993) (an insurer cannot be liable for bad faith in

denying coverage, let alone punitive damages, where its denial was "based on a reasonable

interpretation of the insurance contract" or "fairly debatable," as a split of opinion within an

appellate court evidences (internal quotations omitted)); Guebara v. Allstate Ins. Co., 237

F.3d 987, 992 (9th Cir. 2001) (under the "genuine issue as to coverage rule" or "genuine dispute

doctrine," an insurer's denial of coverage is not unreasonable as a matter of law where there was,

---

[60]    There is no evidence that anyone at the Government or Bristol Bay ever even claimed that
Continental's tender rejections, which were authored by its outside counsel, were outrageous,
malicious, or recklessly indifferent until the Government sought leave to amend its complaint to
add a prayer for punitive damages in 2002.  Lindquist Tr. at 47:3-19, Silvey Aff. Ex. P.
[61]    Dkt. 115 at 2-6; 113 Fed. Appx. at 208-09.

at the time of tender, a genuine issue as to coverage) (applying California law); <u>Tomaselli v.</u>
<u>Transamerica Ins. Co.</u>, 25 Cal. App. 4th 1269, 1288 n.14, 31 Cal. Rptr. 2d 433, 444 (1994)
(punitive damages cannot be imposed where the "tortious conduct was the result of a mistake of
law or fact, honest error of judgment, . . . or other such noniniquitous human failing"); <u>see</u> <u>also</u>
Allan D. Windt, Insurance Claims and Disputes § 9:26 at 135, 139 (4th ed. 2001) ("an insurance
company should not be subject to punitive damages . . . for refusing to pay a claim if it had an
arguable reason for its refusal. . . .  [If] a judge has independently reached the same reasoned
conclusion as the insurance company, the insurance company's conclusion that there is no
coverage cannot be so frivolous as to constitute bad faith.").  As this Court correctly observed in
its recent order on defendants' motion to compel, "the fact 'that one Ninth Circuit judge and this
court at one point in time sanctioned Continental's decision to reject the government's tenders
diminishes the reprehensibility of Continental's conduct.'"[62]

       That Continental denied a defense as well as indemnity does not change this
conclusion.  Even if Continental was incorrect in denying a defense (as the Ninth Circuit has
ruled), it does not follow that Continental acted outrageously when it did so.  An insurer cannot
be liable for punitive damages for rejecting a tender--including a tender seeking both defense and
indemnity--when it has a plausible, good faith belief that the tendering party has no rights under
the policy.  <u>See</u>, <u>e.g.</u>, <u>Lunsford v. American Guarantee & Liability Ins. Co.</u>, 18 F.3d 653, 656
(9th Cir. 1994) (reversing summary judgment for insurer on duty to defend coverage claim,
finding that insurer breached duty to defend, but affirming judgment for insurer on bad faith
claim under genuine dispute doctrine:  "as a matter of law . . . an insurer's denial of a claim is not

---

[62]    Dkt. 225 at 9-10 (quoting Continental's Reply at Dkt. 210).

unreasonable, so long as there existed a genuine issue as to the insurer's liability") (California law); Dewitt Construction Inc. v. Charter Oak Fire Ins. Co., 307 F.3d 1127, 1138 (9th Cir. 2002) (although insurer breached its duty to defend, it was entitled to summary judgment on bad faith claim because insurer's "duty to defend was not unambiguous" and "[t]he policy coverage was unclear in light of legitimate factual and legal issues pertinent to contract interpretation and application") (Washington law); Zurich Ins. Co. v. Killer Music, Inc., 998 F.2d 674, 680 (9th Cir. 1993) ("Although Zurich breached its duty to defend, breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself.") (internal quotations omitted) (California law); Nevada VTN v. General Ins. Co. of America, 834 F.2d 770, 777 (9th Cir. 1987) (although insurer breached its duty to defend, "it is not at all clear that [it] violated that duty in bad faith and hence is liable in tort.") (Nevada law); see also 22 Appleman on Insurance 2d § 136.8 at 64 (2003) ("Punitive damages are not recoverable for [an insurer's] refusal to defend, if the refusal was reasonable even though erroneous.").  Indeed, *this Court* has held as much in the past.  See Albany Ins. Co. v. Jones, 1996 WL 904756, *5, 8 (1996) (Sedwick, J.) (rejecting bad faith claim for breach of duty to defend:  "To claim bad faith in an insurer's failure to defend or indemnify, an insured must show the absence of a reasonable basis by the insurer for denying the insured the benefits of the insurance contract. . . .  Because Albany investigated the claim and based its denial of coverage on that information and a reasonable construction of the policy, Albany acted reasonably.").

   The Court previously held Continental liable for bad faith notwithstanding Hillman by limiting Continental to the bases set forth in its letter denying coverage, holding that Continental's "unarticulated reasonable explanation" that the doctrine of implied insurance

applies only to casualty and not liability policies was "irrelevant."[63]  However, the explanation set forth in Continental's tender denials--that <u>Avi-Truck</u> did not apply because Continental and Bristol Bay did not intend to benefit the Government or duplicate FTCA coverage--was itself reasonable.  Indeed, that explanation was adopted by this Court in 2003 when it granted Continental summary judgment because the Bristol Bay policy "clearly did not embrace risks associated with insuring the United States".[64]

The Court also previously observed that Continental admitted it had a duty to defend Bristol Bay's employees and thought it "difficult to understand how Continental would admit a duty to defend its employees but not the United States itself."[65]  Bristol Bay's employees, however, are *expressly* insured under Bristol Bay's insurance policy, while the United States is not.[66]  That is a highly significant difference.  Notably, Continental lived up to the only defense obligations to which it admitted in this case.  When the Wilsons sued Bristol Bay, Continental defended its insured even though Continental knew the FTCA arguably applied.[67]

---

[63]  Dkt. 166 at 16.

[64]  Dkt. 115 at 4.  In any case, while Continental continues to believe the Alaska Supreme Court would disagree with the Court's disregard for "unarticulated reasonable explanations" even in the context of a bad faith determination, see <u>Jones v. Horace Mann Insurance Co.</u>, 937 P.2d 1360 (Alaska 1997), there is no reason to think that manifestly reasonable explanations for a denial of coverage should *also* be disregarded when adjudicating a punitive damages claim.  To the contrary, all the evidence bearing on the denial of coverage--the totality of the circumstances--should be considered when adjudicating such a claim.  <u>See</u>, <u>e.g.</u>, <u>Pletnikoff v. Johnson</u>, 765 P.2d 973, 978 (Alaska 1988).

[65]  Dkt. 166 at 15.

[66]  Policy HMA 9500648-5, at 6, Silvey Aff. Ex. S (Bristol Bay's employees are insured).

[67]  Stewart Tr. at 41:5-42:13, Silvey Aff. Ex. A; Friderici Aff. ¶ 2.

Clearly, the coverage question presented by this case was debatable at the least, and Continental's articulated basis for rejecting the Government's tender was far from outrageous.  Therefore, punitive damages are not available as a matter of law.  Hillman, 855 P. 2d at 1324-26; Peter, 2006 WL 438658 at *6 (bad faith issue is whether insurer's tender rejection was made without a reasonable basis, and "questions raised as to particular practices of the insurance company 'have little or no relevance on that point'" (quoting Hillman).

      D.      Continental Did not Act Indifferently, Let Alone
                With Reckless Indifference, To Anyone's Rights

Even putting aside the undisputed facts that (1) the issue presented by the Government's tender was novel, (2) Continental reasonably relied on the advice of Alaska counsel in denying coverage, and (3) two judges concluded that Continental was correct, the facts show that Continental did not exhibit reckless indifference toward the Government's rights.

This is not a typical insurance bad faith case where something terrible happened because the insurance company refused to provide a defense or refused to fund a settlement, resulting in a runaway verdict.  The injured party--Lori Wilson--was protected throughout.  This was simply a legitimate dispute over contract interpretation.  Because of the Ninth Circuit's ruling in this case (and this Court's ruling on Continental's subsequent motion to dismiss), Continental has paid the Government its policy limits, plus interest, for a total of nearly $2 million.[68]  Hence, the Government is whole as of today because it has never alleged, let alone substantiated, that Continental's denial of coverage increased the settlement value of the case

---

[68]  Silvey Aff. ¶ 3.

brought by the Wilsons--in fact, it has stipulated that it did not.  Because Continental has paid

policy limits and there is no causal link between Continental's conduct and the amount of the

settlement, the Government is today in the same position in which it would have found itself if

Continental had accepted its initial tender in 1995--it has not been damaged in any way.

Further, the facts show that Continental knew when it denied the Government's

initial tender that the United States would not be injured in defending against the Wilsons'

action.  When the Government tendered in 1995, it represented that, "[a]t this time, the United

States is handling the defense of this matter . . . Once you assume the defense of this case, the

United States will continue its appearance in this case on an 'Of Counsel' basis . . . ."[69]  Based on

that representation, Continental's outside advisors determined that "[t]here is no reason to file a

declaratory judgment action" because the "United States is defending itself so there should be no

detriment to the United States even if it were held to be an insured under an implied beneficiary

theory."[70]  Thus, even though Continental was advised and believed that the Government was not

covered under the Bristol Bay policy, Continental considered the Government's interests before

it denied the tender and concluded--in hindsight correctly--that the Government would not be

damaged by a denial because it was being ably defended by the U.S. Attorney's Office.  There is

no evidence that Continental acted with malice or reckless indifference toward the Government,

and punitive damages are therefore unavailable.  See Chizmar, 896 P.2d at 210 ("Conduct cannot

be in reckless disregard of the safety of others unless the act or omission is itself intended,

notwithstanding that the actor knows of facts which would lead any reasonable man to realize

---

[69]  Letter from Kenneth Roosa, Esq. to Lori Wing dated January 6, 1995, Silvey Aff. Ex. C.
[70]  Letter from James B. Friderici, Esq. to William Hutson dated January 20, 1995, Friderici Aff.
Ex. C.

the extreme risk to which it subjects the safety of others.") (internal quotations omitted, emphasis added); Moriel, 879 S.W.2d at 24 ("an insurance carrier's refusal to pay a claim cannot justify punishment unless the insurer was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of a claim--such as death, grievous physical injury, or financial ruin.").

3.    AS A MATTER OF CONSTITUTIONAL DUE PROCESS, THE GOVERNMENT CANNOT OBTAIN ANY, OR ANY FURTHER, AWARD OF PUNITIVE DAMAGES

Under State Farm v. Campbell, 538 U.S. 408 (2003), any award of punitive damages in this case would violate substantive due process.  Because any punitive damages award would be unconstitutional, there is no reason to proceed with a jury trial on punitive damages.

Even if some award over and above policy limits were permissible, the Court should still summarily adjudicate the Government's punitive damages claim.  The highest award that could possibly be sustained is an award that matches the Government's compensatory damages award—a 1:1 ratio.  The United States has already obtained that amount—indeed more than that amount—because the Court's order granting the United States reimbursement for all of its settlement costs with the Wilsons, beyond policy limits, was punitive.  No further punitive damages may be awarded.

A.    Any Additional Award of Punitive Damages Would Be Unconstitutional

"The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a grossly excessive punishment on a tortfeasor." BMW of North America, Inc. v. Gore, 517 U.S. 559, 562 (1996) (internal quotations omitted).  Three guideposts inform whether a punitive damages award would be grossly excessive:  "the degree of reprehensibility of the [conduct]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Id. at 574-75.  The most important of these factors is reprehensibility.  Id.

Courts must consider five factors when assessing the reprehensibility of a defendant's conduct.  As State Farm explains, "[t]he existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."  538 U.S. at 419.  A high degree of reprehensibility, beyond mere tortious conduct, is required for the imposition of punitive damages.  Id. ("punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions").  That high degree of reprehensibility is lacking here, as an application of the Supreme Court's five factors demonstrates.

The five factors set forth by the Supreme Court are satisfied when:

[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions

or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, deceit, or mere accident.

Id.  None of these factors applies here.


1.    No Physical Injury.


There was no physical injury to the Government.  The only injured party was Lori Wilson.  This is a straightforward business dispute between an insurer and the United States--the most powerful entity in the world[71]--over which entity would pay an underlying claim.  Thus, the first factor does not apply.


2.    No Indifference or Reckless Disregard of Health or Safety.

Continental did not act with indifference or reckless disregard "of the health or safety" of anyone--certainly, none of Continental's acts or omissions endangered the United States' health or safety, assuming that were possible.  See Bach v. First Union Nat'l Bank, 149 Fed. Appx. 354, 365 (6th Cir. 2005) (this factor was not satisfied even though the plaintiff, an elderly widow, suffered significant injuries:  "because [the defendant's] actions occurred in the 'economic realm,' it cannot be said that the tortious conduct displayed indifference or reckless disregard for the health and safety of others").  Thus, the second factor does not apply.

---

[71]  See Lindquist Tr. at 42:11-14, Silvey Aff. Ex. P ("[W]e're not an insurance company.  We are a government.  We are unique in the world, for this country.  We are a very special entity.").

3.        The United States is not Financially Vulnerable.

The United States has stipulated that it is not financially vulnerable, and the third factor therefore does not apply.[72]

4.        This is a One of a Kind Case.

Continental's alleged violations were necessarily isolated because, as discussed in the sections above, this case was groundbreaking.  There is no evidence that Continental has a practice of rejecting tenders from purported implied insureds, or even that Continental has received any other such tenders.  See BMW of North America, 517 U.S. at 576-77 (this factor turns on whether the defendant's actions "formed part of a nationwide pattern of tortious conduct").  Accordingly, the fourth factor does not apply.

5.        There is no Evidence of Malice.

For all the reasons set forth in the sections above, Continental did not act maliciously when it rejected the United States' tenders.  Rather, it acted in a manner that was

---

[72]   Dkt. 195 at 2 (the United States representing that it "was not claiming that it was a 'financially vulnerable' plaintiff as the term was used in State Farm v. Campbell").

appropriate in the face of a tender under a novel legal theory and that did not prejudice the United States.

Because Continental did not act with a high degree of reprehensibility--as an analysis of the relevant factors reveals--punitive damages may not constitutionally be awarded. State Farm, 538 U.S. at 419; see Garamendi v. Altus Finance S.A., 2005 WL 3605274, *4 (C.D. Ca. 2005) (due process precluded any award of punitive damages--notwithstanding jury's award of $700 million in such damages--because "only economic injury was at stake" and the degree of reprehensibility of the conduct was not particularly high).

B.     Even If Some Award of Punitive Damages Could Pass Constitutional
       <u>Muster, the Court Has Already Granted the United States Such an Award</u>

Assuming some punitive damages award were permissible, any such award "must bear a reasonable relationship to compensatory damages". <u>BMW of North America, Inc.</u>, 517 U.S. at 580 (internal quotations omitted). Here, the greatest possible award would match, but could not exceed, the United States' compensatory damages.

Under <u>State Farm</u>, where punitive damages may be awarded at all, "four times the amount of compensatory damages might be close to the line of constitutional impropriety" in a normal punitive damages case. 538 U.S. at 425. However, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." <u>Id</u>. The Government's compensatory damages here are substantial by any measure. Indeed, the <u>State Farm</u> Court held that the compensatory award of $1 million there was "substantial." <u>Id</u>. at 426. Continental has already paid the Government twice that amount on its coverage claim.[73] And, the Government was paid full policy limits--the most available under the insurance policy.

Given the substantial compensatory damages already obtained by the Government and the absence of reprehensibility of Continental's conduct (applying the factors set forth above), no punitive award greater than the Government's compensatory recovery could possibly be sustained. <u>See id.</u> at 419, 420, 428 (the plaintiff's substantial compensatory recovery justified a punitive damages award only "at or near the amount of compensatory damages," even though

---

[73]   Silvey Aff. ¶ 3.

the defendant insurer's conduct was reprehensible); <u>see</u> <u>also</u> <u>Boerner v. Brown & Williamson</u> <u>Tobacco Co.</u>, 394 F.3d 594, 603 (8th Cir. 2005) (remitting award against tobacco company for physical injuries to amount equal to compensatory damages because compensatory damages were substantial and there was only evidence of callous disregard, not intent to victimize the plaintiff); <u>Williams v. ConAgra Poultry Co.</u>, 378 F.3d 790, 798-99 (8th Cir. 2004) (remitting award to amount equal to compensatory damages in race discrimination case because compensatory award of $600,000 itself was "a lot of money" that fully compensated the plaintiff); <u>TVT Records v. The Island Def Jam Music Group</u>, 279 F. Supp. 2d 413, 443-44, 455, 461 (S.D.N.Y. 2003) (remitting punitive damages awards to 1:1 ratio and lower because there was only one victim and only economic losses for which the compensatory award provided full compensation), <u>reversed on other grounds</u>, 412 F.3d 82 (2d Cir. 2005).

However, a punitive award greater than the Government's compensatory recovery has already been awarded. The Government paid the Wilsons $2.8 million to settle the underlying case. That is $1.8 million above the $1 million policy limits in the Continental policy. On cross-motions for partial summary judgment in 2002, the Court entered an order awarding the Government <u>all</u> of its underlying settlement costs--i.e., not only the $1 million policy limits, but also the additional $1.8 million the Government paid to settle with Lori Wilson--in light of Continental's bad faith. <u>United States v. CNA Financial Corp.</u>, 214 F. Supp. 2d 1044 (D. Alaska 2002). Thus, the Court has already given the Government a punitive damages award that exceeds the Government's compensatory damages.

Normally, an insurer that breaches its duty to defend or indemnify is liable up to its policy limits. <u>See</u>, <u>e.g.</u>, <u>Liberty Mut. Fire Ins. Co. v. Canal Ins. Co.</u>, 177 F.3d 326, 336 (5th

Cir. 1999).  The award of $1.8 million above policy limits here was non-compensatory--the

Government was ably represented by the U.S. Attorney's Office at all times, and there is no

evidence that the United States could have settled with the Wilsons for policy limits or some

other lower amount if Continental had appointed defense counsel.  The Court's additional, above

policy limits award was designed to punish Continental for its ostensible bad faith conduct.

Indeed, the Court acknowledged that Continental's argument that "its action did not actually

cause harm to the United States in excess of the coverage which was denied (plus defense costs,

of course)" had "some appeal," but rejected that argument based on the Alaska Supreme Court's

"public policy decisions."  214 F. Supp. 2d at 1046-47.  The Court's award of beyond policy

limits damages based on "public policy"--and without regard for causation of harm--was

punitive, not compensatory.  See Gordon, 30 N.Y. 2d  at 437, 285 N.E. 2d at 854 (extra-

contractual, beyond-policy-limits damages for bad faith are punitive); Cooper Industries, Inc. v.

Leatherman Tool Group, Inc., 532 U.S. 424, 432 (2001) (compensatory damages "are intended to

redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful

conduct," while punitive damages are "operate as 'private fines' intended to punish the defendant

and to deter future wrongdoing"); Alyeska Pipeline Service Co. v. O'Kelley, 645 P.2d 767, 774

(Alaska 1982) ("punitive or exemplary damages are those awarded in excess of actual loss");

Alaska Placer Co., 553 P.2d at 61 (when a plaintiff "is permitted to recover more than his actual

damages" based on "public policy reasons," that is "a form of punitive damages").


         The non-compensatory, punitive award obtained by the Government is worth $1.8

million plus interest--more than 1.5 times the amount of the Government's compensatory, policy

limits recovery.  Even if some punitive damages were appropriate, the United States cannot

obtain a greater windfall than it already has.

<u>Conclusion</u>

For all of the foregoing reasons, the Court should summarily adjudicate the United States' prayer for punitive damages, and take the trial currently set for May 2006 off calendar.

DATED at Anchorage, Alaska, this 16th day of March, 2006.


GUESS & RUDD P.C.
Attorneys for Defendants


By:    s/Gary A. Zipkin
Guess & Rudd P.C.
510 L Street, Suite 700
Anchorage, Alaska  99501
Phone: 907-793-2200
Fax:   907-793-2299
Email: gzipkin@guessrudd.com
Alaska Bar No. 7505048


QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
Attorneys for Defendants


By:    s/A. William Urquhart
Quinn Emanuel Urquhart
Oliver & Hedges, LLP
865 South Figueroa
Street, 10th Floor
Los Angeles, CA  90017
Phone: 1-213-443-3000
Fax:   1-213-443-3100
Email:

billurquhart@quinnemanuel.com

CERTIFICATE OF SERVICE
I hereby certify that on the
16th day of March, 2006, a copy
of the foregoing document was served
electronically on:

Richard L. Pomeroy, Esq.
A. William Urquhart, Esq.

and by regular U.S. mail on:

Richard Stone, Esq.
Civil Division, Torts Branch
U.S. Department of Justice
1331 Pennsylvania Avenue, N.W.
Washington, D.C.  20530

Guess & Rudd P.C.


By:_____s/Gary A. Zipkin_____

F:\DATA\6024\1\Pleading\45revisedMSJpunitives.doc