Page 1

1           IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF ALASKA

3  ———————————————————————————————————————————————

   UNITED STATES OF AMERICA,        )
4                                   )
                   Plaintiff,       )
5                                   )
       vs.                          )
6                                   )
   CNA FINANCIAL CORPORATION        )
7  AND THE CONTINENTAL CASUALTY     )
   COMPANY d/b/a THE CONTINENTAL    )
8  INSURANCE COMPANY,               )
                                    )
9                  Defendant.       )
   ————————————————————————————————)
10 Case No. A98-285 CV (JWS)
11

12 ———————————————————————————————————————————————

       VIDEOTAPED DEPOSITION OF ROBERT K. STEWART, JR.
13 ———————————————————————————————————————————————
14

                       Pages 1 - 106
15            Thursday, February 2, 2006
                       1:35 P.M.
16

            Taken by Counsel for Defendant
17                        at
                    Guess & Rudd
18            510 L Street, Suite 700
                  Anchorage, Alaska
19
20
21
22
23
24
25

EXHIBIT     A
Page  1  of 26

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 17

```
 1   this issue of, for example, the congressional
 2   amendments to the -- what's referred to as the
 3   Self-Determination Act, the Indian Self-determination
 4   Act?  Have you ever had occasion to delve into the
 5   specifics?
 6       A    Yes.
 7       Q    This sort of jumps ahead, but maybe it's time
 8   to do that
 9            (Exhibit No. 6 marked.)
10   BY MR. ZIPKIN:
11       Q    Exhibit 6 certainly is out of chronological
12   sequence.  Jumping ahead, you're aware that there came
13   a time when the United States of America demanded
14   indemnity from Bristol Bay Area Health Corporation in
15   connection with the claim asserted by the Wilson
16   family related to the serious injuries sustained by
17   their daughter, Lori Wilson?
18       A    Yes.
19       Q    And were you one of the attorneys for Bristol
20   Bay who evaluated that demand for indemnity from the
21   United States?
22       A    I did.
23       Q    I believe at the back of Exhibit 6 - these
24   things have Bates numbers - at Bates No. 900826 is a
25   letter from the United States Department of Justice,
```

EXHIBIT____A
Page __2__ of __26__

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 18

```
1    February 8, 1999, to Parry Grover.  And that's an

2    attorney at your office, right?

3        A    That's correct.

4        Q    And I believe it's signed by Mr. Bundy.  Yes,

5    Robert Bundy, at that time the United States Attorney;

6    is that right?

7        A    I can't confirm his signature.  I understand

8    that Mr. Bundy transmitted a letter to our firm as

9    counsel for BBAHC.

10       Q    And Exhibit 6, the beginning of Exhibit 6, is

11   a letter, I believe, authored by Mr. Dean; isn't that

12   right?

13       A    That's what I understand it to be, correct.

14       Q    And it was copied to you?  It shows you as a

15   cc, at Bates 900825?

16       A    That's correct.

17       Q    And do you recall that you did in fact

18   receive and review this letter?

19       A    I don't have an independent recollection

20   today, but after reviewing these files for production,

21   I have every reason to believe I did.

22       Q    Okay.  The last page of his letter - there's

23   many different opinions set forth - but the last page

24   has a section called Conclusions, page 8.  And I'm

25   interested in whether you're familiar with these
```

EXHIBIT ___A___
Page __3__ of _26_

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 19

```
 1    conclusions and whether you have formed any similar
 2    conclusions.
 3            For example, he says in the middle paragraph,
 4    at the last sentence of the middle paragraph, and I'll
 5    try to quote it:  "By requiring that any liability
 6    policy acquired by a tribal contractor to protect
 7    itself from claims which may fall outside the scope of
 8    the FTCA must also insure the United States, the
 9    federal government would defeat the purpose of the
10    Congress in extending FTCA coverage to tribal
11    contractors under the ISDEAA."
12            Do you see that?
13    A    I was trying to listen to you, so I --
14    Q    I'm sorry.
15    A    Show me where you are.
16    Q    I'm in this middle paragraph of page 8 of his
17    letter, and it's the second to the last, I guess,
18    sentence of that middle paragraph.
19    A    Okay, got it.
20    Q    Is that an opinion -- first of all, that was
21    an opinion expressed by counsel for BBAHC, right?
22    A    Yes.
23    Q    I mean, is it fair to say that that reflected
24    the position of BBAHC as of that date, May 2, 2000?
25    A    I think that would be fair to say.
```

EXHIBIT  A
Page  4  of  26

Page 20

```
 1      Q    Did you ever share similar opinions, you
 2   yourself share similar opinions, with any U.S.
 3   attorney or assistant U.S. attorney, to your
 4   knowledge?
 5      A    I can't recall a specific occasion, but it
 6   would not surprise me if I did.  And, you know, I
 7   counsel my clients, and I should be counseled, against
 8   volunteering narratives, but this demand was first put
 9   on the table, at least in a very informal way, by
10   Mr. Bundy and Mr. Roosa, Ken Roosa, the preceding
11   fall.
12           And by the time of this letter, May 2, the
13   demand and the stated basis for the demand had been a
14   subject of discussion with our client, among Mr. Dean,
15   among myself, among others.  And we had -- and then we
16   formed certain conclusions and then developed
17   strategies for communicating those conclusions to
18   persons outside the United States Attorney's Office.
19           And I think I have to be careful in terms of
20   talking about internal work product and/or
21   attorney-client communications, but I think it is fair
22   to say that on more than one occasion, and perhaps
23   many occasions, our view, that the legal basis for the
24   indemnity demand was without merit because of the
25   nature of the 1990 amendments to the ISDEAA, was
```

EXHIBIT_____A_____
Page __5__ of _26_

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 21

```
 1   communicated.
 2          And so this communication to Mr. McCloud was
 3   one of many.  And I am certain that on more than one
 4   occasion I articulated my view to Mr. Roosa.  I cannot
 5   recall having articulated my view with particularly to
 6   Mr. Pomeroy, and so -- but as to Mr. Roosa, I
 7   certainly know I shared that view.
 8      Q    In addition to demanding indemnity from BBAHC
 9   with respect to the claims asserted by the Lori Wilson
10   family, the government actually did want BBAHC to pay
11   back or to reimburse the United States for the amount
12   of the settlement that was paid to the Wilson family,
13   right?
14      A    You're going to have to ask Mr. Bundy or
15   Mr. Roosa or Mr. Pomeroy that question.  There were
16   occasions where it was stated that they had no -- the
17   United States had no intent of requiring a payment by
18   BBAHC.
19          Notwithstanding that, there were occasions
20   where their position was BBAHC had to enter into a
21   confession of judgment.  There were also efforts that
22   we became aware of that they attempted to have the
23   Indian Health Service initiate a contract claim
24   process as against BBAHC.
25          And so being an attorney and until I see a
```

EXHIBIT ___A___
Page _6_ of _26_

Page 22

```
 1   signature on a legally enforceable document, a
 2   statement that I don't have an intent to collect money
 3   from your client, but I am going to engage in other
 4   activities that are consistent with the collection of
 5   money, is one that I'm not necessarily going to rely
 6   upon.
 7        Q    The letter that's actually attached to
 8   Exhibit 6, the letter from Mr. Bundy, of course speaks
 9   for itself, but on the first page of that letter -
10   this is Bates 900826, on that page; you have it in
11   front of you - if you look at the last paragraph, it
12   makes specific reference to the fact that the United
13   States entered into a settlement agreement with the
14   Wilsons in August of 1997, pursuant to which the
15   United States paid a total of $2,800,000.  Do you see
16   that?
17        A    I do.
18        Q    And then on the next page, it recites what
19   the government believes is a binding indemnity
20   agreement.  And then on the next page, the last page,
21   it says:  "In light of Continental's denials of the
22   United States' tender, the United States at this time
23   demands indemnification from BBAHC."
24             Did you understand that they were threatening
25   a claim for indemnification for the full amount of the
```

EXHIBIT __A__
Page __7__ of __26__

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 23

```
 1    settlement referred to on the first page?
 2        A    I understand -- I understood it that way,
 3    unless and until I had something that I could rely
 4    upon that said differently.
 5        Q    Eventually the United States dropped their
 6    demand for indemnity; is that right?
 7        A    Eventually there was an assignment agreement
 8    entered into, which I think is part of the quid pro
 9    quo, was that demand was resolved in consideration of
10    the assignment of BBAHC's position under a particular
11    insurance policy.
12        Q    An assignment of whatever claims Bristol Bay
13    Area Health Corporation might have against my client,
14    Continental Insurance Company, that was the quid pro
15    quo for the government dropping the indemnity demand?
16        A    I'd have to look at the agreement and go
17    through it again to refresh myself, but in essence,
18    that was it, yes.
19        Q    Did you yourself ever conclude that there was
20    an valid claim that BBAHC had against Continental for
21    anything?
22        A    Well, I think now you're probing into work
23    product, and if you ask me who I might have said
24    something to about it, I --
25        Q    Yes, let's go there.
```

EXHIBIT __A__
Page __8__ of __26__

Page 39

```
1      A     You know, there is correspondence in the file
2  where Mr. Friderici believed that I had articulated a
3  position on behalf of BBAHC.  And my recollection, as
4  embodied in a letter or two back to him, was that no,
5  I did not believe I had done so, and there were
6  reasons that were -- in my mind, that were consistent
7  with that recollection.  And my recollection today is
8  no different than what I said to Mr. Friderici in
9  those letters.
10     Q     Okay.  I have copies of the letters.
11     A     You'd have to understand the context.  That
12 even though the FTCA was extended to general tort
13 claims in 1990, the Wilson matter, which arose in '92,
14 was one of the very first.  And it was -- there are
15 protocols today - certainly there were with the Krack
16 matter - as to what you do and how you give notice to
17 the IHS and how these are all handled.
18         It was all virgin territory back with this
19 Wilson matter.  And it certainly was not altogether
20 clear how the FTCA would coordinate with private
21 insurance, if at all.  And I think there was open
22 questions as to what would take precedence, how
23 that -- you know, and so, you know, we were very much
24 sorting it out.
25         I believe Mr. Friderici may have heard me
```

EXHIBIT  A
Page  9  of  26

USA v CNA

Page 41

1    from your earlier testimony - not just this minute,

2    earlier today - that you felt that CIGNA did the right

3    thing, it stepped up to the plate, it appointed

4    defense counsel and defended the case, right?

5        A    I don't know whether I said that in my

6    earlier testimony, but I would agree that - and at the

7    risk of humoring me a bit - I have had a point of

8    view, articulated to Ms. Wing, that the way things

9    ought to work, and endorsements relating to these

10   issues and CGL coverages ought to work, is that the

11   private carrier steps up until such time as the United

12   States certifies the claim for FTCA coverage.  It

13   provides a bright line.

14           And so while the private carrier may in fact,

15   at the end of the day, not have an indemnity

16   obligation, they will provide a defense until the

17   indemnity and the defense shift to the United States,

18   if at all.

19       Q    And isn't that exactly what occurred with

20   regard to Continental's conduct in connection with the

21   Wilson case?  Didn't Continental respond to the claim

22   by appointing defense counsel?

23       A    I believe that's a fair summary, yes.

24       Q    I mean, they appointed Mr. Friderici of

25   Delaney Wiles to defend the case?

Page 42

```
 1      A     That's correct.
 2      Q     And he continued to defend, being paid by
 3   Continental, right up to this bright line when the
 4   United States agreed that the claim was really more
 5   appropriately against the United States and that they
 6   would have U.S. Attorneys defend?
 7            MR. POMEROY:   Objection.   It misstates the
 8   facts.
 9   BY MR. ZIPKIN:
10      Q     Isn't that what happened?
11      A     Again, in a summary form, as I remember the
12   events, I think that's a fair characterization of the
13   events.
14      Q     And then just phrasing it the other way, just
15   to make sure I'm not missing anything, can you think
16   of anything that Continental did or didn't do in
17   connection with the way it responded to the Wilson
18   claim against Bristol Bay, that you find any fault
19   with, right up to the time that the United States
20   accepted that the claim was covered by the FTCA?
21      A     That Continental did?
22      Q     That Continental did or didn't do that you
23   find fault with.
24      A     Well, again, not to quibble, I told
25   Mr. Friderici at the time, I didn't think it was
```

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 50

1    Were you encouraging him to make that argument?

2        A    I don't know.  That's a good question.  I

3    think that argument -- well, I'm relatively certain,

4    if my memory serves me, that argument was made.  I

5    don't recall that I suggested to it to Mr. Friderici,

6    as opposed to Mr. Friderici independently coming to

7    that conclusion.

8        Q    Do you recall talking with him about it on

9    the phone, though, and coming to an agreement that it

10   was appropriate to tender the claim to the United

11   States and ask for them to step in?

12       A    Well, I don't think we're, you know ...

13       Q    I mean, the letter refers to procedures for

14   tendering.

15       A    Procedures for tender of claims.  And, you

16   know, I have not gone back and looked at that memo.

17   As I say, there are procedures that I am not familiar

18   with off the top of my head, where you provide notice

19   of an incident that can come within the scope of FTCA

20   coverage.  And I believe they are more formalized

21   today, I believe they were more formalized by the late

22   '90s, than they were at this point in time.

23            There had been discussions with, I believe

24   Mr. Torgerson and Mr. White, back in -- for the IHS

25   back in Maryland, as to how this claim ought to be run

1    through government channels so a determination could

2    be made as to whether the FTCA applied, because there

3    was some question as to whether the FTCA would

4    actually apply to this claim.

5         Q     There was some question raised by whom?

6         A     The United States.

7         Q     Right.  Is that in part a good reason for a

8    638 contractor to have its own liability insurance,

9    because there may be questions raised by the U.S.

10   about whether this or that claim does fall within the

11   coverage of the FTCA?

12        A     I think that's one reason why some 638

13   contractors like BBAHC chose to carry private

14   insurance.

15        Q     Right.  This gray area you referred to

16   earlier?

17        A     Yeah.  I don't think this is area is quite as

18   gray as it might have been made out to be.

19              (Exhibit No. 8 marked.)

20   BY MR. ZIPKIN:

21        Q     Showing you Exhibit 8.  It's a letter dated

22   June 10, 1994.  Do you recall that you received this

23   letter from Mr. Friderici?

24        A     While I don't have an independent

25   recollection, it's in our files, and so I presume I

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 53

1    claims to us, which is through an administrative

2    claim, and you can't file suit.  And who's going to

3    pick -- who's going to deal with -- you know, and if

4    that's the way they're going to deal with it, then

5    who's going to deal with what's going on here.

6            And, you know, certainly now my perspective

7    would be this is a reason why you might have private

8    insurance, as I mentioned a few moments ago, and the

9    kind of endorsement I have urged with Ms. Wing for

10   Alaska National and others, that private insurance

11   handles things like this until such time as the United

12   States Attorney has certified the claim under the

13   FTCA.

14       Q    So would you agree that you and Mr. Friderici

15   were collaborating at this point in time?

16       A    Yeah.

17       Q    I think I used the word "cooperating."

18       A    I think we were having open dialogue with

19   trying to have a variety of things occur in the legal

20   arena that were in the best interests of Bristol Bay

21   Area Health Corporation.

22       Q    And one of those things that you wanted to

23   see occur in the legal arena for the benefit of

24   Bristol Bay was for the government to accept a tender

25   and assume responsibility for the case, right?

Page 54

```
1       A    Well, however that sorted out.  To get in

2   place an acknowledgement that the FTCA applied and

3   that this claim was going to be handled in an

4   appropriate manner pursuant to the FTCA.

5            Now, you know, again, what I think your

6   question begs is, it was by no means clear in my mind

7   at that point in time as to - you know, setting aside

8   implied insured - who's primary, who's secondary,

9   whether there was coordination.  And I don't think

10  anybody understood any of that at that point in time.

11      Q    And does that go back to your earlier point,

12  that in part this was virgin territory, this was a

13  case fairly soon upon the changes, the amendments to

14  the Act?

15      A    That's correct.

16           (Exhibit No. 9 marked.)

17  BY MR. ZIPKIN:

18      Q    Exhibit 9 appears to be a letter from you.

19  If you can just identify it for us.  What is this?

20      A    Well, a letter from me to Mr. Roosa.  I think

21  on its face, it's me writing to Mr. Roosa, asking him

22  to let us know if the United States is going to make a

23  tender to one of BBAHC's insurance carriers through

24  its broker, Brady & Company.

25      Q    So the letter was to request Mr. Roosa to
```

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 58

```
 1    the policy provide coverage to the United States?
 2       A    I don't know whether that's a central issue.
 3    As a matter of law, in my view, you know, in practical
 4    terms, that was going to be an important thing to find
 5    out.
 6       Q    Well, did anyone ever give you the slightest
 7    indication - anyone, by that I mean Clark, Richardson,
 8    Wing, Dean, anybody - ever give you the slightest
 9    suggestion or hint that the parties to this insurance
10    contract intended that the United States be treated or
11    considered an additional insured under the Continental
12    policy?
13       A    Well, again you're asking me about -- a very
14    broad question, and a number of the communications
15    that would fall within the scope of that question are
16    going to be attorney-client privilege.
17            I sat through most of those depositions, and
18    I don't have an independent recollection of anybody
19    testifying to that effect.
20       Q    I'm going to jump ahead.
21       A    You know, and I'll add:  I can't recall, in
22    any other nonprivileged circumstances, that I heard
23    anyone say that.
24       Q    Just because you've referred to it, let's
25    mark this.  We won't spend to much time on it.
```

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 80

```
 1   BY MR. ZIPKIN:

 2       Q    A couple of loose ends I'd like to tie

 3   together if possible.  I was asking you some questions

 4   about how Continental appointed defense counsel to

 5   defend the claim by the Wilson family, and that that

 6   was Mr. Friderici.  Do you remember those questions?

 7       A    Generally, yes.

 8       Q    And to follow that forward a little bit, did

 9   there ever come a time when you were made aware of a

10   proposal, I believe it may have come from the attorney

11   for the Wilson family, Ames Luce, I believe, that

12   there might be a loan or some monies paid up front

13   towards ultimate settlement because of a time of need.

14   Are you familiar with that at all?

15       A    I'm familiar with the general subject matter

16   of -- maybe I can frame it --

17       Q    Sure.  Please.

18       A    -- very quickly.

19            The nature of what a 638 contractor does is

20   broader than just deliver health services to its

21   constituent community.  And the welfare, in broader

22   ways, of its community is important.

23            The parents of Lori D. Wilson -- I'm drawing

24   a blank on her mom's name, but Kenny was her dad, and

25   I believe it was Lori, was her mom.
```

EXHIBIT ___A___
Page __17__ of __26__

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 81

1     Q     Marilyn?

2     A     Marilyn.

3     Q     Yeah, Marilyn was the mom, Lori was the

4     daughter.

5     A     Yeah.  Lori was having to come into ANMC on a

6     monthly basis for treatment that would put a balloon

7     down her throat and expand the scar tissue.  That was

8     putting a tremendous strain on the finances of her mom

9     and dad, both of whom are recipients of services

10    through BBAHC.

11         And there was some real desire on the part of

12    BBAHC to alleviate some of that pressure.  That's why

13    when you say came from Mr. Luce, I'm not sure that

14    that was really the inception.

15         But in any event, a dialogue did ensue.  I

16    was a major participant in that.  We came upon a

17    structure that would be a loan, and there was dialogue

18    with both -- again, we're at this point where we don't

19    know how this is all going to sort out.  And so

20    there's dialogue with both the United States and with

21    Continental in terms of it seems to be a not unusual

22    thing that there are preliminary payments in tort

23    cases to mitigate and minimize damages, can we do this

24    thing.

25         And so yes, that's how I recall it evolving.

EXHIBIT___A____
Page __18_ of _26_

Page 82

1    Q    And your recollection was that this seemed
2    like a reasonable thing to do?
3    A    Well, it's something my client wanted to see
4    happen.
5    Q    And isn't it correct that Mr. Hutson, the
6    claim manager for Continental at that time on this
7    risk, was amenable?
8    A    That is my recollection, yes.
9    Q    And is it also your recollection that the
10   U.S. Attorney's Office was adamantly opposed?
11   A    For a period of time, and I have not
12   forgotten it, but I believe that that changed later
13   on.  I believe it changed in the fall of that year.
14   But initially there had been an obstacle, and my
15   recollection is BBAHC just went ahead and made things
16   happen.
17   Q    But BBAHC had to overcome the government's
18   opposition; is that a fair statement?
19   A    I think it is fair to say that there was
20   opposition on the part of the United States.
21   Q    And in terms of the ultimate settlement that
22   did occur, is it correct that BBAHC did not have to
23   come out of pocket one dollar for that ultimate
24   settlement?
25   A    I think that's correct.  BBAHC incurred not

EXHIBIT  A
Page  19  of  26

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 86

 1    reason to believe that the purpose for that was to

 2    liquidate a number they could then use in asserting a

 3    claim as against Continental.  That was not

 4    acceptable.

 5             The United States seemed intransigent in that

 6    position.  When Mr. Burgess was in there, I thought

 7    perhaps we can have a fresh start.  And it did not

 8    take that long for us to get a resolution that

 9    resolved that indemnity demand.

10    Q    Is it fair to say that this assignment is a

11    direct result of threats by the United States against

12    Bristol Bay?

13    A    I would probably say it somewhat differently.

14    That it represents a settlement and resolution of that

15    demand for indemnity.

16    Q    Do you recall if they gave you a number when

17    they were talking about a confession of judgment and

18    assignment of rights, a number for the judgment?

19    A    Boy, I don't remember off the top of my head.

20    I mean, I can't conceive, as I sit here today, that

21    there wasn't one, but I just don't remember.

22    Q    Is it fair to say that the government

23    demanded indemnity in a situation in which it was,

24    from your perspective, clearly not intended that the

25    government be indemnified?

Page 87

1    A    I think the position Mr. Dean articulated in
2    the letter you have there to Mr. McCloud, I think
3    there were other times that the same view was
4    articulated, was that the United States was not
5    entitled to indemnity.  And in my mind, and I think
6    the way it was articulated to Mr. McCloud, that was
7    pretty clear.
8         Even beyond that, had there been any merit,
9    the contract - and I think this was clear - limited
10    the scope of any indemnification obligation to about a
11    hundred thousand dollars.
12    Q    Is it fair to say --
13    A    So to the extent there was a demand in excess
14    of a hundred thousand dollars, that that was clearly
15    unmeritorious, in my opinion.
16    Q    Is it also fair to say that despite the clear
17    articulation of BBAHC's position on this, the
18    government was intransigent?
19    A    As to the confession.  And I think that's
20    what I said, yes.
21    Q    And just so the jury is clear, the government
22    wanted Bristol Bay to confess judgment in favor of the
23    government, correct?
24    A    Yes.
25    Q    For an amount that would be in the millions?

EXHIBIT ___A___
Page _21_ of _26_

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 88

```
 1      A      Again, I'm a little fuzzy on that.  I believe

 2   there was a number, and I believe the purpose, as

 3   articulated by Mr. Roosa to me, was that would then be

 4   beyond litigation by Continental and it would

 5   liquidate the obligation under the insured contract

 6   coverage, if there was such coverage.

 7      Q      Did Mr. Roosa ever tell you where he was

 8   getting these ideas for the confession of judgment?

 9   Whether he was talking to Rick Friedman or Richard

10   Dykstra or anybody else in getting such ideas?

11      A      You know, the United States consulted with an

12   attorney, and I believe on the East Coast.  I don't

13   think it was Rick Friedman.  And I almost think that

14   John Devlin was the one who brought that to my

15   attention.

16           Because I think what happened was Continental

17   did some discovery, about this time, of the United

18   States, and the United States produced some documents

19   to Continental.  And I had a conversation with John,

20   and John started telling me about that, assuming I

21   knew all about this, and it was absolutely news to me.

22   And at that point I went back to Mr. Roosa and said,

23   you know, This is what I've just learned.  Why don't

24   you tell me about that.

25           And again, you're getting me thinking about
```

EXHIBIT    A
Page 22 of 26

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 89

1    this for the first time in quite a while as I sit

2    here.  But one of the things that disturbed me was,

3    given the dating of some of these drafts -- I think

4    there was a draft assignment that had been prepared by

5    counsel that DOJ retained, and that they dated back to

6    this fall meeting with Mr. Bundy.

7           And at that point I had characterized in that

8    meeting as a threat against BBAHC, and Mr. Bundy said

9    no, no, no, this is not a threat.  And I said

10   nonsense – although I used stronger language than

11   that – yes, it is.

12          And these documents tended to confirm that

13   contemporaneous with that meeting, even though it was

14   being denied by Mr. Bundy, there had been an intent to

15   pursue my client and essentially threaten my client.

16   Q    As a means to ultimately successfully sue

17   Continental Insurance, right?

18   A    Again, you know, it appeared to me that was

19   the objective of the United States.

20   Q    And I'm not sure of the spelling of the name

21   Devlin.  D-E-V-L-O-N?

22   A    One of your predecessors, with Lane Powell.

23   Q    I'm not with Lane Powell.  But you mean one

24   of the --

25   A    One of your predecessors is --

EXHIBIT __A__
Page _23_ of _26_

```
 1   Alaska National carries CGL.  Lexington, I believe at
 2   times has had -- there's a hospital general liability
 3   and a med mal, and I think Lexington has most recently
 4   written the med mal, but that was a transition and I
 5   just don't remember.  I think Chubb has a piece of --
 6   possibly.  There's a number of carriers.
 7       Q    Is it fair to say that Bristol Bay continues
 8   to be concerned about this gray area of potential
 9   liability exposure that may not ultimately be covered
10   by the FTCA?
11       A    BBAHC continues to secure coverage for
12   comprehensive general liability at not insignificant
13   expense.  BBAHC continues to procure coverage for
14   medical malpractice at not insignificant expense.
15       Q    On the liability coverage, do you know
16   whether Alaska National, for example, the provider of
17   the liability policy or policies at some point after
18   Continental left the risk, whether Alaska National
19   expressly excludes the United States of America as an
20   insured?
21       A    Yes, they do.
22       Q    And nevertheless, Bristol Bay concluded it
23   was in its best business interest to procure that
24   policy, right?
25       A    I don't mean to be evasive, and I didn't mean
```

EXHIBIT____A____
Page _24_ of _26_

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 92

1  for the question before the last, but I mean, you're

2  asking me questions that begin perhaps to intrude into

3  an attorney-client.  I can tell you the facts that a

4  reasonable person --

5      Q    I'm just interested in --

6      A    I mean, in all candor, Mr. Zipkin, if I have

7  a discussion with my client as to why they're going to

8  procure coverage and I'm discussing risks and scope of

9  FTCA and so on and so forth, you're sort of asking me

10  to distill that, and I think that probably gets a

11  little closer to an attorney-client communication than

12  I am comfortable.

13      Q    Okay.  Well, I want to avoid that.  I really

14  do.

15          The fact is that they have, at least at some

16  point in the past, if not currently, a liability

17  policy through Alaska National that expressly excludes

18  the United States of America?

19      A    And that is correct.

20      Q    And the premium on that policy, would you say

21  it is approximately the same size premium as

22  Continental was charging for its policy?

23      A    Boy, I don't know.  I think earlier I told

24  you that the last time I looked at the CGL premium, it

25  was around the mid 20s.

EXHIBIT ___A___
Page 25 of 26

USA v CNA

ROBERT STEWART, JR.
2/2/2006

Page 93

1      Q     And when you say "the last time," is that a

2   policy for Alaska National or a policy for Continental

3   or who?

4      A     No.   That's an Alaska National policy.   Their

5   renewal cycle is October 1.   Insurance companies are

6   notoriously bad about getting you a policy sometimes,

7   and we try and review them on an annual basis.   And in

8   the process of that review, I will typically see the

9   premium charges for the whole array of coverages they

10  procure.

11     Q     Okay.  But for a one-year policy, liability

12  policy from Alaska National that expressly excludes

13  the United States, the premium was in the 20,000

14  range?

15     A     I think that's the most recent premium that

16  I'm aware of.  If it's not dead on, it's in that

17  ballpark.

18     Q     If you're uncomfortable with the question,

19  you'll let me know.  Are you aware of any contractual

20  obligations owed by Continental to BBAHC that

21  Continental breached?

22     A     I articulated the view, I believe in a letter

23  to Continental, that they had an obligation to provide

24  coverage with regard to the indemnity claim that got

25  tendered to them.

EXHIBIT_____A
Page 26 of 26