```
                                                                    Page 1
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3    _____
                                   )
 4    UNITED STATES OF AMERICA,    )
                                   )
 5              Plaintiff,         )
                                   )
 6         vs.                     )
                                   )
 7    CNA FINANCIAL CORPORATION    )
      AND THE CONTINENTAL          )
 8    CASUALTY COMPANY d/b/a       )
      THE CONTINENTAL INSURANCE    )
 9    COMPANY,                     )
                                   )
10              Defendant.         )
                                   )
11    Case No. A98-285 CV (JWS)
12
13    _____

14        VIDEOTAPED DEPOSITION OF KENNETH S. ROOSA
15    _____

16              Pages 1 - 98, inclusive

17           Thursday, December 15, 2005
                     9:10 A.M.
18
              Taken by Counsel for Defendant
19                          at
                     GUESS & RUDD
20            510 L Street, Suite 700
                  Anchorage, Alaska
21
22
23
24
25
```

Page 29

```
 1    I -- I can't say.
 2       Q.   All right.  The next paragraph has a
 3    sentence:  "Federal Courts have consistently held
 4    that the fact that an insured is entitled to
 5    coverage by the United States pursuant to the
 6    Federal Tort Claims Act does not excuse the
 7    insured's insurance company from responsibility for
 8    an otherwise meritorious claim."
 9            First of all, have I quoted that sentence
10    correctly?
11       A.   I believe so.
12       Q.   And then you cite three cases at that point
13    in the letter.  Is that true?
14       A.   That's right.
15       Q.   And then you go on to say, "In addition,
16    Chief Judge Holland, the judge assigned to this
17    case, recently ruled in Dorcas" -- D-o-r-c-a-s --
18    "versus Swanson that Allstate insurance Company was
19    required to defend and indemnify the United States
20    on the basis of a policy issued to its insured even
21    where the insured has no liability."  And you even
22    underlined that.  Did I read that correctly?
23       A.   You did read that correctly.
24       Q.   Would you agree with me that nowhere in
25    this letter do you cite a reported case from any
```

Page 30

```
 1   state in the United States holding that the United
 2   States qualified as an implied additional insured
 3   under a liability policy naming some other person?
 4       A.   You know, the letter says what it says.
 5   There's a lot of things that are not there.
 6       Q.   Would you agree with me -- with me that
 7   that's one of the things that's not there?
 8       A.   There are a lot of things that are not
 9   there.  That is one of them.
10       Q.   Jumping ahead a bit -- and we'll go through
11   the letters.  That's fine.  But to your knowledge,
12   did you ever cite, in any of your letters to any
13   representative of Continental, whether it's Lori
14   Wing or Jim Friderici or Craig Stowers or Mr. Hudson
15   or anyone else, did you ever, to your recollection,
16   ever cite any reported case from any jurisdiction in
17   America that stood for the proposition that the
18   United States of America was -- "was" -- an implied
19   additional insured on some other persons' or
20   parties' liability policy?
21           MR. STONE:  Objection.  Overly broad.
22   BY MR. ZIPKIN:
23       Q.   Did you ever do that?
24       A.   Did I ever do what?  I understand what --
25   what the question is, but what -- what are you
```

1    Ms. Lori Wing either before or -- or in, let's say,
2    the year after your tender that's dated in January
3    of '95, to ask her any questions relating to the
4    facts pertaining to the insurance for Bristol Bay?
5         A.   We deposed Lori Wing.
6         Q.   That wasn't my question.  Did you ever
7    attempt to interview or did you actually interview
8    Lori Wing?
9         A.   I think she had counsel.  I did not attempt
10   to interview her.
11        Q.   At the time that you initially tendered the
12   January -- I believe it's 6, January 6, 1995 tender
13   to Continental through Ms. Wing, had you undertaken
14   any effort to determine the facts about the parties'
15   intent to either cover or not cover the United
16   States?  Had you actually conducted any factual
17   investigation?
18        A.   Why would I do that?  This was a --
19        Q.   Perhaps to --
20        A.   This was a document case.  I was relying on
21   documents.
22        Q.   I'm sorry.  Just so I understand it, you
23   did not conduct a fact investigation.
24        A.   To determine parties' intent, you asked.
25        Q.   Yes, to determine parties' intent, the

Page 44

```
 1   contracting --
 2       A.   No.
 3       Q.   -- parties' intent to either cover or not
 4   cover the United States, to either insure --
 5       A.   You're talking about the insurance
 6   companies?  Whose -- which contracting parties are
 7   you talking about?
 8       Q.   Bristol Bay Area Health Corporation and
 9   Continental Insurance Company with the assistance of
10   Brady and Associates, Lori Wing, and perhaps counsel
11   such as Bobo Dean or other knowledgeable persons.
12       A.   I maybe operated under the mistaken
13   impression that insurance contracts are described
14   within the four corners of the document, and relied
15   on that.
16       Q.   Just so I understand it, you did not see
17   any need to interview any of the parties or their
18   representatives about intent.  That wasn't
19   important?
20       A.   Prior to January 6th of 1995, no, I did
21   not.
22            MR. ZIPKIN:  We have been going about an
23   hour.  And since I'm buried with my own paper, I would
24   like to take a short break.  Is that acceptable to
25   everybody?
```

Page 70

```
 1   April, March timeframe or if it was February, May.
 2   I -- I -- I couldn't put a close timeframe on it,
 3   but it would have been in the first half of '95.
 4        Q.   Fair enough.  Did his opinion -- was -- was
 5   his opinion initially, anyway, that he did not
 6   believe the government was an implied insured?
 7        A.   No.  His opinion was all over the -- all
 8   over the ballpark, and it varied depending on which
 9   time I talked to him.  And -- and I began to realize
10   that what I was hearing from Mr. Stewart was not
11   whatever his opinion might really be but what he was
12   doing was -- was trying to promote his client's
13   interest.  He was representing his attorney (sic).
14   He was not being completely forthright with me as to
15   what his own independent conclusions might have
16   been.
17        Q.   Did he ever share with you the fact that he
18   had told Mr. Friderici that Bristol Bay did not
19   believe the government was an implied insured?
20        A.   He shared that with me and other theories
21   as well.  He told me many things, and they were not
22   always consistent.
23        Q.   Did he ever ultimately tell you that he had
24   the opinion, at least at some point for some brief
25   or long period of time, that he thought the United
```