1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF ALASKA

3

4

5    UNITED STATES OF AMERICA,

5    Plaintiff,

6

        vs.    CIVIL ACTION NO. A98-285-CV(JWS)

7

CNA FINANCIAL CORPORATION and
8    THE CONTINENTAL CASUALTY COMPANY,
d/b/a THE CONTINENTAL INSURANCE COMPANY,

9

        Defendants.

COPY

10

11

12    DEPOSITION OF:    WILLIAM W. HUTSON, JR.

13    DATE:            April 7, 2000

14    TIME:            9:55 AM

15    LOCATION:        Offices of
                       A. William Roberts, Jr., &
16                     Associates
                       Suite 1980, 1201 Main Street
17                     Columbia, SC

18    TAKEN BY:        Counsel for the Plaintiff

19    REPORTED BY:     JANE G. LA PORTE
                       Professional & Merit Certifications

20

Computer-aided transcription by:

21

22        A. WILLIAM ROBERTS, JR., & ASSOCIATES

23    Charleston, SC          Columbia, SC
      (843) 722-8414          (803) 731-5224

24
      Greenville, SC          Charlotte, NC
25    (864) 234-7030          (704) 537-3919


A. WILLIAM ROBERTS, JR., & ASSOCIATES

WILLIAM W. HUTSON  -  EX. BY MR. POMEROY

1    conduct some type of investigation to find out what

2    the facts were.

3              So, no, they couldn't have been able --

4    they would not have been able to do it ahead of time.

5        Q.    Then in this case with Continental, was

6    it you that reviewed the facts and the policy in

7    determining there was a coverage question?

8              MR. DEVLIN:  Which case are you talking

9    about?

10             MR. POMEROY:  The Lori Wilson claim.

11       A.    Yes, okay.

12       Q.    And what was, as far as the coverage

13   question, what was -- what were the questions you had

14   about whether there was coverage under the insurance

15   contract for the Lori Wilson injuries?

16       A.    Well, very early on, the best I can

17   remember is, that we learned about potential problems

18   with a federally-funded program that this was

19   -versus- a state-funded program.

20             And the person that brought this to our

21   attention at first was not people in our company, but

22   was really Robert Stewart.

23             He thought it was not covered under the

24   policy.  And it just come under the Federal Tort

25   Claims Act.  And that's who we initially were dealing


A. WILLIAM ROBERTS, JR., & ASSOCIATES


EXHIBIT ___H___
Page _2_ of _16_

WILLIAM W. HUTSON  -  EX. BY MR. POMEROY

1    with in the case.

2              He was the one that brought that up to --

3    for the first time -- to us.  We didn't really know

4    all the issues up there in Alaska.  We knew our

5    policy was intended to only cover those nonfederally

6    funded programs.  And they only cover state-funded

7    programs for general liability.

8              So, I mean, our underwriting people knew

9    that.  I knew that, too.  But we weren't sure about

10   all this Federal Tort Claims Act thing.

11             And Stewart is the one that advised us

12   this should be one that should go under the Federal

13   Tort Claims Act.

14        Q.   When you said that you knew that this was

15   not covering the federally-funded programs, did

16   somebody tell you that?

17        A.   Yeah.

18        Q.   Who?

19        A.   It was one of the underwriting people

20   that, after this happened, after the loss took place.

21        Q.   Could you recall who that was?

22        A.   I can't, I just remember that we were --

23   I was into the investigation of it, and it wasn't

24   uncommon -- our company was set up and structured,

25   one of the first companies to ever do this, and a lot

A. WILLIAM ROBERTS, JR., & ASSOCIATES

EXHIBIT  H
Page 3 of 16

31

WILLIAM W. HUTSON  -  EX. BY MR. POMEROY

1    of people are now doing it.  We were structured that

2    claims and underwriting people sat next to each

3    other, because they could share information back

4    and forth about accounts that they were working on

5    together.

6            We purposely would put underwriters and

7    claims people on the same accounts.  So we had a very

8    big sharing of information with underwriting people.

9            A lot of companies don't do that, but we

10   did.  And so it wasn't uncommon that we would -- once

11   a loss took place -- that an underwriter would talk

12   to us about it, and call us.  And we would go through

13   that.

14           I know I talked to the broker at

15   one point.  I don't remember when it was, but

16   everybody was -- I remember initially with Stewart,

17   the broker, and those two.  And particularly they

18   were -- all had the issues about whether this was

19   really something that was going to be covered by the

20   Continental policy -versus- something that was going

21   to be covered by the Federal Tort Claims Act.

22           That was -- really came to us outside of

23   our own people that came over from the broker and

24   from the Stewart.

25           Q.   But you also spoke to the underwriting?


A. WILLIAM ROBERTS, JR., & ASSOCIATES


EXHIBIT H
Page 4 of 16

32

WILLIAM W. HUTSON  -  EX. BY MR. POMEROY

1          A.    At some point later on, yes.

2          Q.    And that would have been in New York?

3          A.    Probably was; yes.  I don't know exactly

4    when it was, but we had communications with

5    underwriting people all the time.  And -- but I know

6    that Stewart was probably the first one that raised

7    the issue, that this was a federally-funded program

8    and would come under the Federal Tort Claims Act.

9          Q.    Did Stewart raise the issue before or

10   after you had retained Mr. Friderici and his firm?

11         A.    Before, before.

12         Q.    Okay.

13         A.    Before.

14              MR. DEVLIN:  Just so that the record is

15   clear, make sure you know he's done asking a question

16   before you answer.

17              THE WITNESS:  Okay.  All right.  Going

18   too fast.

19              MR. DEVLIN:  That's okay.

20              MR. POMEROY:  Okay.

21         Q.    At what point did you retain Mr.

22   Friderici and his firm to defend the case?

23         A.    I don't remember.  I don't remember the

24   date.  I really don't.

25         Q.    Do you recall at what point in sort of


A. WILLIAM ROBERTS, JR., & ASSOCIATES


EXHIBIT H
Page 5 of 16

36

WILLIAM W. HUTSON  -  EX. BY MR. POMEROY

1    them.

2        Q.    And just so I'm clear, presently you do

3    consulting, and then you also do work as an insurance

4    broker?

5        A.    Yes, that's correct.

6        Q.    So, two separate jobs?

7        A.    No, really not. They coincide with each

8    other.  Because my consulting work is -- has resulted

9    in me doing broker work, is what I'm trying to say.

10            Consulting means that I go and consult

11   with whoever for a fee, and it may turn in that while

12   I'm consulting, they may want a product that I have,

13   you know, I would broker the product.

14       Q.    Going back to the coverage question on

15   the Bristol Bay Area Health Corporation policy, you

16   said that Bob Stewart was the first one that sort of

17   raised the question of Federal Tort Claims Act

18   coverage?

19       A.    The best of my recollection.

20       Q.    Now, was that before the family filed a

21   suit in Dillingham?

22       A.    The best of my recollection, it was.

23       Q.    When the family filed a suit in state

24   court in Dillingham, that is when you retained Mr.

25   Friderici's services to defend that claim?


A. WILLIAM ROBERTS, JR., & ASSOCIATES


EXHIBIT H
Page 6 of 16

WILLIAM W. HUTSON  -  EX. BY MR. POMEROY

1    have -- if I'm correct, I believe, that Jim Friderici

2    wrote a letter back stating that we weren't going to

3    take over the defense for the government.

4              I don't know exactly when it was.  It was

5    probably shortly after that.

6         Q.   And what would you -- had been your

7    involvement in drafting or in authorizing or working

8    on that letter that Friderici sent to -- denying the

9    tendered defense?

10        A.   My recollection is that he had advised us

11   legally, as our -- as the attorney, in the case, that

12   we should not accept tender by the U.S. Government in

13   the case, his legal opinion.

14        Q.   So did you then authorize him to write

15   back to the U.S. Attorney's Office, denying the

16   tendered defense?

17        A.   Probably, ultimately was the one that

18   told him that.  We probably ran it by some of the

19   other personnel up in New York.

20             But, basically, after his

21   recommendations, we relied upon his opinion and told

22   him:  Yeah, we agree.  Go ahead and do that.

23        Q.   Who would have had the authority to

24   authorize him to write the denial letter?

25        A.   It would have been probably myself and

A. WILLIAM ROBERTS, JR., & ASSOCIATES

EXHIBIT __H__
Page __7__ of __16__

86

WILLIAM W. HUTSON  -  EX. BY MR. POMEROY

1              MR. POMEROY:  Back on the record.

2    BY MR. POMEROY:

3         Q.    I would like to draw your attention to

4    Exhibit 16.

5         A.    Sixteen?  Okay.

6         Q.    And can you identify that for me.

7         A.    Well, it's dated February the 13th,

8    1995.  And it's a letter from Mr. Friderici to me.

9    And it looks like a letter where he sent a copy of a

10   response to the United States Attorney, denying the

11   tendered defense of the claim.  Okay.

12        Q.    And is the last two pages of that

13   exhibit, the letter to -- I think Mr. Roosa, denying

14   the claim, R-o-o-s-a?

15        A.    That's what it looks like, yes, giving a

16   reason why they are not insured under the policy.

17   And does not fall within any of the definitions of

18   section under the part of who is insured, basically;

19   okay.

20        Q.    Now, would you have given Mr. Friderici

21   the authorization to send that letter?  Or would that

22   have been -- have come from Mr. Cox?

23        A.    Based upon his advice of counsel, I would

24   have probably given him the opinion to send this

25   letter after talking to him on the telephone and


A. WILLIAM ROBERTS, JR., & ASSOCIATES


EXHIBIT  H
Page  8  of  16

87

WILLIAM W. HUTSON  -  EX. BY MR. POMEROY

1    reviewing his -- whatever correspondence he had sent

2    to us, about whether the United States was a part or

3    should have been any part or insured under our

4    policy, which they weren't.

5              Q.    And I believe you've already testified,

6    but I just wanted to clarify any doubts that you

7    relied upon Mr. Friderici's opinion that there was no

8    coverage under the policy in making, you know, your

9    determination, that there is no coverage under the

10   policy?

11             MR. DEVLIN:   Objection, asked and

12   answered.  Go ahead.

13             A.    Yes, I did rely upon his opinion.

14             Q.    And did you do -- I mean, was there

15   anything beyond Mr. Friderici's opinion that you

16   relied upon in authorizing denial of the tender?

17             MR. DEVLIN:   Objection, asked and

18   answered.  You went through that already, counsel.

19             A.    Yeah.  I have answered earlier, you know,

20   that we looked at his, and a general review of the

21   case, and, of course, our policy, and looked at what

22   he had to say.  And we came up with the same

23   conclusion that he did, that there wasn't any

24   coverage.

25             (PLF. EXH. 18, Six-page letter, June 8,


A. WILLIAM ROBERTS, JR., & ASSOCIATES


EXHIBIT ___H___
Page __9__ of __16__

108

WILLIAM W. HUTSON  -  EX. BY MR. DEVLIN

1        A.    -- yes or no.  I would have to see the

2    documents.  I really can't remember it.

3              (DFT. EXH. A, Two-page letter, June 16,

4              1994, Bates No. BBHC 001713 and BBHC

5              001714, was marked for identification.)

6              MR. DEVLIN:  I'm sorry, I just have this

7    one.

8              MR. POMEROY:  Sure.

9        Q.    Showing you what's been marked as Exhibit

10   A to your deposition, it's a letter dated June 16,

11   1994, from Mr. Friderici to the Litigation Branch of

12   General Counsel Office of General Counsel, DHHS.

13   Could you take a look at that for a second, just

14   review it.

15             Just let me know after you have had a

16   chance to read through it.

17       A.    I haven't seen this one in a long time.

18             Okay.  I do recall now remembering we

19   were talking mostly about 1995.

20       Q.    Why don't you tell me, first, before we

21   start talking about -- tell me what it is you have in

22   your hand, that's marked as Exhibit A.

23       A.    It's a letter to the Litigation Branch of

24   the Office of General Counsel in Washington, June

25   16th, 1994.  It's a --

A. WILLIAM ROBERTS, JR., & ASSOCIATES

109

WILLIAM W. HUTSON  -  EX. BY MR. DEVLIN

1      Q.   Who wrote that letter?

2      A.   Jim Friderici.

3      Q.   All right.

4      A.   It's a letter, okay.

5      Q.   Have you ever seen that letter before?

6      A.   Yeah, I have, after I see this, yeah.

7      Q.   You're copied on that letter, right?

8      A.   Right.

9      Q.   In the lower left-hand corner of the

10   second page, that's you, you're name; right?

11      A.   Yes.

12      Q.   What's the purpose of that letter?

13      A.   He's writing to the U.S. Attorney's

14   Office or Attorney General's Office, asking him to

15   take over the case, tender defense of the case to

16   them on behalf of Bristol Bay Area Health

17   Corporation.

18      Q.   Do you recall ever getting or seeing a

19   response to that letter?

20      A.   I can't recall.  I'm sure there may be a

21   response, but I would have to see it.

22      Q.   Now, does this letter -- well, let me ask

23   you this:

24           Do you have any recollection of Bristol

25   Bay Area Health Corporation tendering the defense of

A. WILLIAM ROBERTS, JR., & ASSOCIATES

111

WILLIAM W. HUTSON  -  EX. BY MR. DEVLIN

1      that he had written a letter, and he requested that

2      the United States defend Bristol Bay Area Health

3      Corporation in a lawsuit.

4          Q.    So was it your understanding from reading

5      that, that BBAHC had tendered the defense of the Lori

6      Wilson claim to the United States on April 23rd,

7      1994?

8          A.    That's what it says here, yes.

9          Q.    Do you have an independent recollection

10     of that now that you had your memory refreshed?

11         A.    I remember, specifically, this letter

12     from Friderici.  And I knew that he had done that

13     when he was defending the case.  Seems like now that

14     there was some recollection that someone with Bristol

15     Bay not Friderici had also done, that at some time --

16     and I think as it comes out here and shows he kind of

17     followed up on that.

18         Q.    Showing you what's been marked as Exhibit

19     B to your deposition.

20             MR. DEVLIN:  Have you seen that,

21     counsel?

22             MR. POMEROY:  Yes.

23     BY MR. DEVLIN:

24         Q.    Take a look at that and review it, and

25     let me know once you have had a chance to review it.


A. WILLIAM ROBERTS, JR., & ASSOCIATES

WILLIAM W. HUTSON  -  EX. BY MR. DEVLIN

1                What is Exhibit B, to your deposition.

2          A.    Okay, okay.  Now, I do remember the

3    reason -- this triggers my memory -- is that I

4    remember that there was a discussion by Bob Stewart's

5    office, with Gary Thogerson.

6          Q.    Who's Bob Stewart again?

7          A.    He is with this Davis -- I think he's

8    with Davis Wright Termaine.

9          Q.    Do you know what his role in this was?

10         A.    He was the attorney for Bristol Bay.

11   He's an independent attorney, he's not employed by

12   them in terms of an employee.  But I know he was

13   heavily involved in this case.

14         Q.    So he's their outside counsel?

15         A.    Yes.

16         Q.    And you said that there was a discussion

17   between Mr. Stewart and Mr. Thogerson?

18         A.    Thogerson.

19         Q.    Who is Mr. Thogerson?

20         A.    He's with the U.S. Department of Health

21   and Human Services.

22         Q.    Now this letter, Exhibit B, dated April

23   23rd, 1994, is it from Mr. Stewart to Mr. Thogerson,

24   right?

25         A.    Well, no, it's actually from Mr. -- the

A. WILLIAM ROBERTS, JR., & ASSOCIATES

113

WILLIAM W. HUTSON  -  EX. BY MR. DEVLIN

1    name you all mentioned, that's why I didn't recall

2    who it was, Perry Grover.

3         Q.    Okay.

4         A.    He wrote the letter.

5         Q.    Mr. Grover is with Mr. Stewart's firm,

6    Davis Wright Termaine?

7         A.    That's right.

8         Q.    All right.  Go on.

9         A.    Anyway, it's -- this is a letter.  It

10    goes on, says that he's writing on behalf of Bristol

11    Bay Health Area Corporation, regarding the lawsuit,

12    dated April 23rd is the letter.

13              Talks about his partner, Robert Stewart,

14    previously brought to your attention personal injury

15    claim presented on behalf of Lori Wilson, pursuant to

16    the Federal Torts Claim Act.  Mr. Stewart

17    corresponded with Mr. Thogerson about the claim on

18    April the 7th.

19              Well, I can remember a letter to me in

20    some form or fashion, that had Thogerson's name in

21    it, where Stewart talked about his discussion with

22    Thogerson, and thinking that this was a situation

23    that would come under the Federal Tort Claims Act.

24         Q.    Now, when did you receive this letter

25    that indicated a conversation between BBHC's counsel


A. WILLIAM ROBERTS, JR., & ASSOCIATES


EXHIBIT __H__
Page _14_ of _16_

114

WILLIAM W. HUTSON  -  EX. BY MR. DEVLIN

1    and Mr. Thogerson concerning coverage under the --

2    before or after this letter?

3        A.    I think it was before this.

4        Q.    So, it would have been before April 23rd,

5    1994?

6        A.    Oh, yes.  This is just a tender.  I mean,

7    it's a letter to them, and they are asking them to

8    take over defending the case.

9        Q.    So, on April 23rd, 1994, through that

10   correspondence, BBHC, through their counsel, Davis

11   Wright Termaine, tendered the defense of the Lori

12   Wilson claim to the United States?

13       A.    Yes.

14       Q.    And then Mr. Friderici followed up on

15   June 16th, 1994, and tendered a defense to the United

16   States; right?

17       A.    Yes.

18       Q.    Do you recall ever getting or seeing a

19   response to either one of those letters?

20       A.    I don't think I saw a response.

21       Q.    Now, when you read the April 23rd, 1994

22   letter, what did that indicate to you, concerning

23   BBAHC's thoughts concerning the scope of FTCA

24   coverage with regard to the Lori Wilson claim?

25       A.    Well, it indicates to me, in reviewing it

A. WILLIAM ROBERTS, JR., & ASSOCIATES

WILLIAM W. HUTSON  -  EX. BY MR. DEVLIN

1    now that -- that they thought that this was going to

2    come under the Federal Tort Claims Act, and it was a

3    federally-funded program, and that they didn't think

4    there was any coverage going to apply in regards to

5    the insurance policy.

6          Q.    The insurance policy from Continental?

7          A.    Right.

8          Q.    Now, in this letter, again dated April

9    23rd, 1994 --

10         A.    Uh-huh.

11         Q.    -- I'm sorry.  Is that a yes?

12         A.    Yes, correct.

13               (DFT. EXH. C, One-page letter, June 14,

14                1995, Bates No. BBHC 001837, was marked

15                for identification.)

16         MR. POMEROY:  Take one second here.

17         Q.    Showing what's been marked as Exhibit C

18   to your deposition, it's a June 14, 1995 letter, from

19   you to a Darrell Richardson.

20               Please review that, and let me know when

21   you have had a chance to look it over.

22         A.    Okay.

23         Q.    What is Exhibit C to your deposition?

24         A.    A letter of June 14th, 1995, to Darrell

25   Richardson.  He is an employee of Bristol Bay Area


                A. WILLIAM ROBERTS, JR., & ASSOCIATES


EXHIBIT ___H___
Page _16_ of _16_