```
               IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF ALASKA
_____
UNITED STATES OF AMERICA,      )
                               ) ORIGINAL
          Plaintiff,           )
                               )
     vs.                       )
                               )   CORRECTION SHEET:
CNA FINANCIAL CORPORATION,     ) ☒ Signature waived/time expired
et al.,                        ) ☐ Signature waived
          Defendants.          ) ☐ Signed/dated/no corrections made
_____) ☐ Signed/dated/corrections made
Case No. A98-285 CV (JWS)
_____

                    DEPOSITION OF ROBERT CLARK
_____

                      Pages 1 - 157, inclusive

                    Thursday, January 11, 2001
                             9:10 A.M.


                 Taken by Counsel for Defendants
                              at
                Bristol Bay Area Health Corporation
                       6000 Kanakanak Road
                        Dillingham, Alaska
```

PACIFIC RIM REPORTING   907/272-4383
www.courtreportingalaska.com

EXHIBIT I
Page 1 of 16

27

1  who knows who all, you know, over the years.
2       Q.   So, as I understand your testimony, then, your
3  goal is to get private insurance, but not so much
4  private insurance that you're duplicating what you'd
5  have under the FTCA, right?
6       A.   Yeah, but I think -- see, the other thing is,
7  which is confusing to me, is because FTCA is new and we
8  don't understand exactly what that is, the doctors are
9  always worried that the FTCA is really covering it all.
10 So we have to get insurance to help that, and people use
11 terms like, well, gap or extra insurance or just to make
12 sure we're covered and there's nothing missing
13 somewhere.  Because we have lots of different programs
14 and there's always different questions, well, what about
15 this, what about that?  And I don't know, so better have
16 insurance, I guess.
17           So, we try to have insurance for everything.
18 But again, we don't want to go overboard because we
19 don't have enough money.  And yet, you don't want to
20 have nothing.  Which I think some places just rely on
21 FTCA.  And we're saying hey, maybe that's not good.
22 What if you think something different than the federal
23 attorneys and then you don't have no insurance.
24      Q.   All right.  So, you referred to getting advice
25 concerning this scope of coverage of the FTCA, as well


Case 3:98-cv-00285-JWS   Document 232-10   Filed 03/16/2006   Page 3 of 16

75

1   description, what you do. For some people titles are a
2   big thing. Executive Director to me is the same as the
3   CEO or president or -- the head staff person for an
4   organization. I'm not a biggie with any of those things
5   there.
6       Q.  All right, thanks.
7       A.  The board basically will authorize whatever the
8   name would ultimately become. So someplace we have a
9   record, I don't know where.
10      Q.  Thank you.
11          Early on in your testimony you referred to a
12  meeting involving the executive committee and Mr. Roosa.
13          You don't need to look at this exhibit anymore.
14      A.  Okay, yeah.
15      Q.  Earlier in your testimony you referred to a
16  meeting --
17      A.  Yeah.
18      Q.  -- that you were involved in, which also
19  involved the executive committee from BBAHC and
20  Mr. Roosa.
21      A.  Uh-huh.
22      Q.  Do you recall that?
23      A.  Yes.
24      Q.  Do you recall when this meeting occurred?
25      A.  Oh, Jeez, I don't know, within the last couple


PACIFIC RIM REPORTING   907/272-4383
www.courtreportingalaska.com

EXHIBIT  I
Page  3  of  16

```
 1   recipient copy of that letter.
 2          Does this letter, this exhibit, help refresh
 3   your memory concerning when this meeting occurred?
 4   A.   Yes.
 5   Q.   Okay.  When did the meeting occur?
 6   A.   It was proposed for May 4, 1999.
 7   Q.   Do you recall whether that meeting went forward
 8   on May 4, 1999?
 9   A.   We had the meeting, and I'm guessing because of
10   the letter it was May 4, 1999.
11   Q.   Thank you.
12   A.   Yeah, I know we had the meeting, and I would
13   have never remembered the date except for this letter.
14   Q.   Who attended that meeting, do you recall?
15   A.   We had our executive committee of the Bristol
16   Bay Area Health Corporation board.  Whether it was
17   exactly all of them or not, I just don't recall.
18   Myself, Darrel Richardson.  I think both Roosa and Bundy
19   were there.  Anyway, there was a couple of guys from the
20   feds, federal government.  And then I believe Parry, and
21   maybe even you, I don't know.  I don't know who --
22   Q.   "You" is who?  Mr. Stewart?
23   A.   Bob Stewart maybe, and Parry Grover, I think.
24   Q.   All right.  I'm just asking what you recall.
25   A.   Yeah.
```

1    A.   Oh, God. I don't think so. I mean, we got,
2  like she's here and we're doing a recording, but I don't
3  think we had any -- it wasn't like our executive
4  committee meeting, we would take minutes and all that
5  stuff. I don't think we had that. That I recall,
6  anyway. I just don't remember that we did that.
7         We wanted to get an understanding with these
8  guys so they heard from our board, because our board is
9  our company, you know?
10   Q.   When you say "these guys," I don't understand.
11  From what guys?
12   A.   Roosa and Bundy.
13   Q.   Okay.
14   A.   They're the federal attorneys who should
15  represent us for the FTCA issues, should be thinking the
16  same way we think and everything, you know. And then,
17  if we got Continental, which is like -- the Continental
18  insurance is supposed to work for us, too. So we wanted
19  to just clarify where are we at, what are we doing, why
20  is this thing coming up, and all the case, you know?
21   Q.   Was anybody at Continental -- or a
22  representative for Continental at this meeting?
23   A.   Not to my recollection, I don't believe so.
24   Q.   Do you know if anybody from Continental was
25  asked to come to the meeting?

81

```
 1      A.   I don't think so.
 2      Q.   Do you remember if Mr. Roosa or Mr. Bundy spoke
 3   at this meeting?
 4      A.   Yeah, I remember they were speaking.
 5      Q.   Do you remember what they said?
 6      A.   No.  I can't remember details of anything on
 7   that.
 8      Q.   Do you remember generally what they were
 9   saying?
10      A.   Well, that they're trying to clarify what the
11   FTCA is, and that they -- let's see.  They were -- oh,
12   how the heck -- what the heck did they say?  They were
13   wanting -- I think they were thinking that the
14   Continental insurance should primarily be the coverage
15   of everything, rather than FTCA, I believe is the way
16   they were discussing it.
17           That's my recollections, of trying to figure
18   out, you know, who is primary and who is secondary, I
19   guess, on the coverage.  Because we got two coverages,
20   right?  We got the Continental coverage and we got the
21   FTCA coverage.  I think they think that Continental --
22   they were thinking the Continental coverage is the
23   primary coverage and should pay for the suit that had
24   come up, rather than just the government being the
25   default of taking care of everything.  If you buy
```

82

1 insurance, the insurance is supposed to cover it. It
2 shouldn't be, well, IHS or the federal government's deep
3 pockets and they should cover all the expense.
4     Q.   This is what the federal government was saying
5 in general?
6     A.   Yeah, that's the way I understood it, is trying
7 to explain to us what that all meant.
8     Q.   Do you recall what, if any, response came from
9 the BBAHC side of this meeting to that general statement
10 by the government?
11    A.   I think what we were saying is that, hey, we
12 bought the insurance, or we think we're covered, you
13 guys just take care of it. Just go and make this thing
14 go away, and we want to keep doing our business and you
15 guys take care of the whole thing there. And that, you
16 know, the government is there for us, obviously. We get
17 most of our programs and services and special
18 relationships with the federal government, not the
19 state. So they're supposed to provide us the funding
20 and the services we need to take care of that.
21         But being this FTCA is kind of new, we keep
22 wondering, what does it really cover and why do you have
23 to justify everything and go through all kinds of hoops
24 to get something that's supposed to be there for you?
25 So, this is where, again, we always want to get some

```
 1   supplemental and other insurance to kind of make sure
 2   everything's covered one way or the other.
 3       Q.   Okay.
 4       A.   Whether it's too much or not enough of
 5   something, we don't want to do overkill or waste money,
 6   but we want to have the right amount of insurances to
 7   cover.  Then if something happens, why the heck do we
 8   have to get involved in it?  You guys got the
 9   information, take care of it and pay it, and let's get
10   on with life.
11       Q.   Thanks.
12            I'd like to mark the next in order, please.
13   (Exhibit D marked for identification.)
14   BY MR. DEVLIN:
15       Q.   If you and your counsel could look at Exhibit
16   D, please.  Exhibit D to your deposition.
17       A.   Okay.  I think I have a pretty good
18   understanding of this.  I remember reading this a long
19   time ago.
20       Q.   Okay.
21            MR. STEWART:  Let him ask a question.
22   BY MR. DEVLIN:
23       Q.   Just so we're clear on this.  Exhibit D is a
24   letter dated January 26, 1999, with a fax cover sheet
25   dated January 26, 1999 --
```

84

1    A.    Uh-huh.

2    Q.    -- from Mr. Dean to Mr. Stewart and

3  Mr. Thogerson of the HHS office of general counsel.

4    A.    Uh-huh.

5    Q.    The letter attached to the fax cover sheet is a

6  letter from Mr. Dean to Mr. Thogerson, showing you as an

7  intended recipient of a copy, right?

8    A.    Yes.

9    Q.    And you said you remember reading this letter?

10   A.    Yeah.

11   Q.    Having read this letter, does it refresh your

12 memory as to what it -- what the U.S. government's

13 position was at this meeting you had in May of 1999?

14   A.    Well, the way I understand it is, what I think

15 was bugging the board and us regarding the position of

16 the federal government, was trying to either sue us or

17 get us to do something regarding this insurance, this

18 Continental.  And we didn't like the position or

19 approach the government was taking, because it seemed

20 like we were working at opposite ends with each other.

21       And, again, we shouldn't be stuck in this,

22 anyway.  They're supposed to take care of the problem,

23 and we shouldn't be wrapped into it or tied into it

24 or -- I think they wanted to either sue us or tie us in

25 somehow on it.  And anyway, the board wanted to express

91

```
 1   do what we're supposed to, but we're not going to be
 2   overhanded or underhanded to one or the other, or
 3   something like that.  You're both supposed to help us
 4   and take care of us.
 5        Q.   All right.  Anything else?  Okay.
 6             Going back to this paragraph, the first
 7   paragraph on the second page of Exhibit E.  And I'm
 8   referring now to the first full sentence of that
 9   paragraph.  The one that says, "The reservation of
10   rights appears to be based on the position of the United
11   States that BBAHC had a duty under the general
12   provisions of the 638 contract in force at the relevant
13   time to indemnify the United States by obtaining
14   insurance coverage naming it as an additional insured."
15        A.   Uh-huh.
16        Q.   I'm referring just to that sentence now.  All
17   right?  Have you had a chance to look at that?
18        A.   I see that, yes.
19        Q.   All right.
20             Now, did you have an understanding, when you
21   had this meeting in May of 1999, that the U.S.
22   government's position was that BBAHC should have had the
23   U.S. government as a named insured under its policy with
24   Continental?
25        A.   I didn't think we had to.
```

92

1    Q.   I'm not asking you if you thought you had to
2  right now.  I may ask you that later, but right now I'm
3  asking you if you had an understanding that that was the
4  government's position.  Mr. Roosa, Mr. Bundy and those
5  folks.
6    A.   I believe that's what they were -- that was
7  their understanding, they were saying to us, yeah.
8    Q.   Did they voice this opinion in the meeting, or
9  during the meeting in May of 1999, that you recall?
10   A.   I believe so.
11   Q.   All right.
12        By the way, this sentence refers to a 638
13 contract.
14   A.   Yes.
15   Q.   Tell us what that means, if you know.
16   A.   Well, the 638 contract is the agreement that we
17 have with the federal government to provide the services
18 and the coverages that they would provide for us under
19 that contract.
20   Q.   This is that contract we were talking about
21 earlier with IHS, right?
22   A.   Yes, the IHS contract.
23   Q.   All right.
24        Now, at any time did you ever have a belief
25 that BBAHC was supposed to acquire additional

```
 1   insurance -- or insurance naming the United States
 2   government as an additional insured?
 3       A.   I don't ever recall we were supposed to do
 4   that.
 5       Q.   All right.
 6            Did you ever intend that the United States be a
 7   named insured under any BBAHC insurance policy?
 8       A.   I just don't remember that, particularly then.
 9   Now they're saying we should have had it and all this
10   stuff and everything.  I mean, I could see that.  But --
11   and then Bobo's letter saying, well, he doesn't think we
12   should have had it then or now, but the government
13   itself seems to think we should have had it.
14       Q.   I'm not asking you --
15       A.   I don't know where there was a disconnect, if
16   there is any, but I don't know.
17       Q.   Let me back up.
18            I'm not asking you now what the government
19   thought.
20       A.   Uh-huh.
21       Q.   I'm asking you if you, in your capacity here at
22   BBAHC, have ever intended for the United States
23   government, the IHS, to be a named insured under any
24   BBAHC policy?  Did you ever intend that?
25       A.   I don't believe so.
```

94

```
 1     Q.    Okay.
 2     A.    You know, if we should have done that or were
 3  supposed to do it and we didn't do it, I don't know why
 4  we didn't do it.  That's the part that I'm really
 5  confused about.  I don't think we -- we bought insurance
 6  to be a supplement to, and kind of an over layer or
 7  something different than the government's insurance.  So
 8  again, I don't know how that's all really supposed to
 9  fit.  But I don't think we intended to buy insurance for
10  the government.  The government has its own insurance.
11     Q.    And when you say --
12     A.    We need our insurance.
13     Q.    I certainly don't mean to interrupt you.
14     A.    Yeah, it's fine.
15     Q.    When you say you meant to buy insurance as a
16  supplement to the government's insurance, are you
17  referring to the FTCA coverage?
18     A.    Yeah, the FTCA coverage, yeah.
19     Q.    Okay.
20           I want to go back now to when we're talking
21  about the issue of, or the manner in which you and
22  others from BBAHC would negotiate your contract with
23  IHS.  I want to go back to that area of inquiry.  All
24  right?
25     A.    Uh-huh.
```

108

1  acting within the scope --
2          MR. STEWART:  Wait a minute, I still don't have
3  a question.  You still don't have a question.
4  BY MR. DEVLIN:
5     Q.  Well, what is it you were looking for,
6  Mr. Clark?  What were you looking for in Exhibit G?
7     A.  I think there's still questions.  But if we try
8  to explain everything we do in the health area,
9  irregardless of who funds it, it's our scope of work,
10 we're providing health care to our people.  And we
11 believe we're acting within the scope of work of our
12 program there.
13         Now, I think these things saying that depending
14 on this, that or the other, something being narrowly
15 restrictive or was it really in or out, somebody will
16 determine whether it is or isn't.  If it's in the
17 contract and we say we're going to provide alcohol
18 services or mental health services or hospital services,
19 that's whatever it is in those areas, and somebody
20 shouldn't come back and pick it apart and say, well, the
21 FTCA covered it, but it really doesn't now because it's
22 something different than what we thought it was.
23         Well, we think it is everything.  So why is
24 somebody second-guessing something later?  And then and
25 now, I guess it's still that, while we think the scope

109

1  of work and us providing things within that should be
2  covered, why are we talking about something when it
3  should have been covered?
4      Q.   Okay.
5      A.   Yeah.
6      Q.   As I understand it, that question about what is
7  covered by the FTCA and what is not covered --
8      A.   Yeah.
9      Q.   -- whether it follows funding or whether it
10 follows the language of the contract --
11     A.   Yeah.
12     Q.   -- is not something that has been resolved, or
13 may not have been resolved as of this date?
14     A.   I don't think it's still fully resolved, yeah,
15 right.  And I believe that's what this is saying here.
16         MR. STEWART:  I think perhaps more relevant for
17 your purposes, Mr. Devlin, you really want to ask
18 Mr. Clark is wasn't that a concern you had in 1993?
19         MR. DEVLIN:  That's exactly what area I would
20 like to get into next.
21     Q.   Your counsel is 100 percent right.  And my
22 purpose of showing this to you is, A, to refresh your
23 memory; B, to establish a time period for when you had
24 these concerns.
25         Now I'd like to know whether you had these same

110

1    concerns in 1993.
2        A.   I would say yes.
3        Q.   All right.
4             Now referring to Exhibit G.  The second page of
5    Exhibit G, which again is the letter from Everett
6    Rhoades, M.D. to Mr. S. Bobo Dean, of Hobbs Straus Dean
7    & Wilder, dated August 22, 1991.
8             First of all, who is Mr. Rhoades, or
9    Dr. Rhoades?
10       A.   Dr. Rhoades is the Director of Indian Health
11   Service.  His corollary title is Assistant Surgeon
12   General.  But he is the number one man for IHS, for the
13   government to take care of all the IHS obligations,
14   Indian Health Service obligations.
15       Q.   Did he ever participate in any of these
16   contract negotiations you spoke about?
17       A.   I don't believe ever.
18       Q.   Okay.
19       A.   I think it's all delegated to contracting
20   officers.
21       Q.   Now to the second page, the first paragraph of
22   the second page.  That paragraph refers to a suggestion
23   purportedly by Mr. Dean.  That included within the scope
24   of work of the contract, IHS contract, "...all
25   activities IHS could have undertaken under the law, if