IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

---

UNITED STATES OF AMERICA,　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　vs.　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　)
CNA FINANCIAL CORPORATION, et al., )
　　　　　　　　　　　　　　　　　　)
　　　　　Defendants.　　　　　　　 )
_____)

Case No. A98-285 CV (JWS)

**ORIGINAL**

**CORRECTION SHEET:**
☒ Signature waived/time expired
☐ Signature waived
☐ Signed/dated/no corrections made
☐ Signed/dated/corrections made

---

DEPOSITION OF DARREL RICHARDSON

---

Pages 1 - 114, inclusive

Wednesday, January 10, 2001
11:10 A.M.

Taken by Counsel for Defendants
at
Bristol Bay Area Health Corporation
6000 Kanakanak Road
Dillingham, Alaska

PACIFIC RIM REPORTING   907/272-4383
www.courtreportingalaska.com

EXHIBIT J
Page 1 of 16

32

| | | |
|---|---|---|
| 11:52:51 | 1 | Continental and/or Bristol Bay might be an alternative |
| 11:53:01 | 2 | to seek. |
| 11:53:08 | 3 | Q.   When you say that -- by the way, who made this |
| 11:53:16 | 4 | representation?  Was it Mr. Roosa or Mr. Bundy, do you |
| 11:53:20 | 5 | recall? |
| 11:53:23 | 6 | A.   Both spoke, but it was primarily Mr. Bundy as I |
| 11:53:28 | 7 | recall. |
| 11:53:32 | 8 | Q.   And Mr. Bundy or Mr. Roosa, whoever did the |
| 11:53:41 | 9 | speaking, said that they were seeking alternative |
| 11:53:45 | 10 | coverages for the settlement paid in the Wilson case? |
| 11:53:50 | 11 | MR. STEWART:  Let me -- counsel, I think that's |
| 11:53:53 | 12 | a mischaracterization.  You asked the witness generally |
| 11:53:55 | 13 | what was discussed and he gave you a sort of general |
| 11:53:58 | 14 | summary.  He didn't testify that that was a |
| 11:54:01 | 15 | representation or a statement of any particular |
| 11:54:04 | 16 | individual present at the meeting.  I think -- and now |
| 11:54:08 | 17 | we're sort of going down with that assumption, and I |
| 11:54:10 | 18 | think you ought to clarify that. |
| 11:54:12 | 19 | BY MR. DEVLIN: |
| 11:54:12 | 20 | Q.   Did anybody, Mr. Roosa or Mr. Bundy, make that |
| 11:54:17 | 21 | specific statement? |
| 11:54:17 | 22 | A.   No.  That was my paraphrasing and |
| 11:54:21 | 23 | characterization of it. |
| 11:54:21 | 24 | Q.   Your understanding of what they were telling |
| 11:54:24 | 25 | you was that the United States was going to seek |

33

```
11:54:27  1   alternative coverages for the settlement paid in the
11:54:31  2   Wilson case?  That was your understanding?
11:54:33  3       A.   Correct.
11:54:33  4       Q.   All right.
11:54:35  5            Did either one of those individuals, Mr. Roosa
11:54:40  6   or Mr. Bundy, indicate how it was they were going to
11:54:44  7   seek such alternative coverages?
11:54:52  8       A.   Only vaguely.  And again, this is my
11:54:55  9   understanding and my characterization of it, but through
11:54:59 10   the legal process.
11:55:02 11       Q.   Meaning they were going to sue somebody?
11:55:04 12       A.   That was my understanding.
11:55:11 13       Q.   By the way, did you take notes during this
11:55:14 14   meeting?
11:55:14 15       A.   No.
11:55:14 16       Q.   Did you observe anybody else taking notes?
11:55:17 17       A.   I don't recall anybody.
11:55:19 18       Q.   So, there was no court reporter, of course,
11:55:22 19   sitting there taking it all down?
11:55:23 20       A.   No.
11:55:25 21            MR. STEWART:  You don't do that with the United
11:55:28 22   States Attorney.
11:55:33 23   BY MR. DEVLIN:
11:55:33 24       Q.   So, then, is it fair to say that your
11:55:37 25   understanding was that the United States was indicating
```

```
11:55:40  1   to you and the other executive -- or in the executive
11:55:44  2   committee meeting, that they were going to sue BBAHC
11:55:48  3   and/or Continental?
11:55:51  4       A.   That was my understanding.
11:55:53  5            Let me clarify just slightly.  I don't know
11:55:58  6   that I -- I don't know that I heard the word "sue" so
11:56:06  7   much, and maybe it is, maybe it isn't.  I may have
11:56:07  8   assumed that, but at least negotiate, sue, all the
11:56:12  9   various alternatives that might be available.
11:56:15 10       Q.   I'm just trying -- you used the term, "the
11:56:18 11   legal process."
11:56:18 12       A.   Right.
11:56:18 13       Q.   USA would use the legal process.  And I'm just
11:56:23 14   trying to determine what your understanding of that is.
11:56:27 15       A.   I had a broader understanding than just sue.  I
11:56:30 16   had an understanding of negotiate, sue, talk to, but
11:56:36 17   formally.  Not just a hi, how are you.
11:56:42 18       Q.   Right.
11:56:42 19            By the way, where did this meeting take place?
11:56:46 20       A.   At the offices of Davis Wright Tremaine.
11:56:49 21       Q.   In Anchorage?
11:56:50 22       A.   In Anchorage.
11:56:54 23       Q.   These executive committee members, do they live
11:56:57 24   in Anchorage or do they live here, or both?
11:57:00 25       A.   They live all over the Bristol Bay region.
```

```
12:19:03  1        A.   No.
12:19:09  2        Q.   Was it your understanding that the United
12:19:13  3   States was threatening to sue BBAHC for coverage?  Your
12:19:21  4   understanding now.  I'm not saying that --
12:19:23  5        A.   Right.  That was my understanding.
12:19:32  6             If I could back up to an earlier question, to
12:19:36  7   try to add a little more to it.
12:19:38  8        Q.   Sure.
12:19:39  9        A.   Because I have recalled since then that I think
12:19:42 10   that one of the purposes of this meeting that was held
12:19:48 11   in Anchorage was for the executive committee to -- in
12:19:53 12   fact, I think it was the major purpose -- was to tell
12:19:57 13   the U.S. Attorney how upset we were over that
12:20:03 14   possibility.
12:20:12 15        Q.   Did someone indeed make this known to the U.S.
12:20:16 16   Attorney?
12:20:18 17        A.   Yes, I believe so.  Again, I don't remember any
12:20:20 18   specific words, but I believe that we let them know that
12:20:26 19   BBAHC didn't like it.
12:20:30 20        Q.   You just don't recall who the human being was
12:20:33 21   that stood up and said it, right?
12:20:34 22        A.   No.  Not specifically, no.
12:20:43 23        Q.   Do you recall a response to this --
12:20:50 24        A.   Again --
12:20:51 25        Q.   -- from the U.S. Attorney?
```

```
12:20:52  1      A.   Again, in generalities, my impression was that
12:20:56  2  they listened but nothing changed.
12:21:06  3      Q.   At least with regard to this possibility of
12:21:11  4  some type of legal recourse against BBAHC by the United
12:21:16  5  States, was there any indication from the U.S. Attorney
12:21:21  6  what the basis for that action would be?
12:21:28  7      A.   My understanding was that they believed that we
12:21:39  8  had some obligation to name the U.S. -- I'm not sure of
12:21:48  9  the exact word, but to name the U.S. as -- I don't think
12:21:58 10  co-insurance is the -- in fact, I know that's not the
12:22:01 11  right word -- but as additional insureds on our policy.
12:22:10 12  I don't recall the exact term, and that's probably an
12:22:13 13  improper term, but --
12:22:16 14      Q.   Was there -- by the way, are you familiar with
12:22:20 15  the policy you're talking about?
12:22:23 16      A.   Not really.
12:22:23 17      Q.   Have you ever seen it before?
12:22:26 18      A.   Well, I've been told that I signed the
12:22:31 19  application for it, but to be honest, I don't recall it,
12:22:34 20  no.
12:22:35 21      Q.   I think I have the application you're talking
12:22:38 22  about here, and we'll get to that in a second.  In fact,
12:22:41 23  we might as well make it an exhibit since you mentioned
12:22:44 24  it.
12:22:55 25  (Exhibit C marked for identification.)
```

52

```
12:43:15  1        A.   No, I don't recall a specific time, no.
12:43:20  2        Q.   Do you recall having any such discussions with
12:43:24  3   Ms. Wing regarding the FTCA, prior to September 1993?
12:43:41  4        A.   I can't remember a specific date, so I can't
12:43:44  5   really answer you.  I can't remember whether it would
12:43:50  6   have been before or after, but I have had discussions.
12:43:53  7        Q.   So, you can't say you didn't have any
12:43:56  8   discussions with her regarding the FTCA prior to
12:44:00  9   September 1993, correct?
12:44:03 10        A.   I'm sorry, no, I can't say that I haven't.  I
12:44:07 11   can't say that I have, either one.  I've had
12:44:13 12   discussions, but not -- I can't identify the date.
12:44:16 13        Q.   Do you recall the substance of these
12:44:19 14   discussions?  Strike that.  Let me back up a second.
12:44:24 15             Were any of these discussions about the scope
12:44:30 16   of coverage of BBAHC under the FTCA?
12:44:35 17        A.   In general terms, yes.
12:44:39 18        Q.   What do you mean when you say "in general
12:44:40 19   terms"?
12:44:41 20        A.   Well, having come from the private sector, I
12:44:47 21   was totally unfamiliar with FTCA, and so I asked a
12:44:53 22   number of people, Ms. Wing as well as others, questions
12:44:57 23   about it so that I could try to understand it better.  I
12:45:05 24   know that in discussions with Ms. Wing, I have expressed
12:45:10 25   concern about the breadth of coverage of FTCA, about was
```

53

| | | |
|---|---|---|
| 12:45:19 | 1 | it adequate coverage, because I wanted to ensure, or to |
| 12:45:30 | 2 | ensure as much as possible, that BBAHC had insurance |
| 12:45:36 | 3 | coverage across the breadth. And I had, what I |
| 12:45:41 | 4 | understood of FTCA, is that there were gaps or holes, or |
| 12:45:45 | 5 | at least potential gaps and holes, that I wanted to be |
| 12:45:48 | 6 | covered by private insurance. So, in that general |
| 12:45:55 | 7 | regard I've had discussions. |
| 12:46:22 | 8 | Q.  Do you recall what Ms. Wing told you during |
| 12:46:27 | 9 | your discussions concerning these gaps or holes in |
| 12:46:32 | 10 | insurance coverage under the FTCA? |
| 12:46:40 | 11 | A.  I can't remember whether I got it from Ms. Wing |
| 12:46:43 | 12 | or other people I may have talked to. So I'd have to |
| 12:46:46 | 13 | answer your question no. |
| 12:46:48 | 14 | Q.  Okay. |
| 12:46:50 | 15 | These other people that you talked to regarding |
| 12:46:54 | 16 | this subject, the gaps or holes in FTCA coverage, would |
| 12:47:01 | 17 | that group include a man named Bobo Dean? |
| 12:47:06 | 18 | A.  Yes. |
| 12:47:07 | 19 | Q.  And who is Bobo Dean? |
| 12:47:11 | 20 | A.  It's S. Bobo Dean. |
| 12:47:14 | 21 | Q.  Oh, sorry. |
| 12:47:15 | 22 | A.  But I forget what his first name is. But he is |
| 12:47:21 | 23 | legal counsel to BBAHC, with the firm of Hobbs, Straus, |
| 12:47:28 | 24 | Dean & Walker, in Washington, D.C. |
| 12:47:32 | 25 | Q.  Did you ever provide information that Mr. Dean |

54

```
12:47:36   1   gave you, regarding the scope of FTCA coverage, to
12:47:43   2   Ms. Wing?
12:47:45   3       A.   I personally did not, no.
12:47:47   4       Q.   Do you know of anybody else who did?
12:47:51   5       A.   Again, I don't know.  I've heard that.
12:47:58   6       Q.   I'm sorry?
12:48:00   7       A.   I've heard that, but I do not know.
12:48:02   8       Q.   You've heard what?
12:48:03   9       A.   That there may have been a letter that -- or I
12:48:08  10   shouldn't say letter.
12:48:09  11       Q.   A memorandum?
12:48:11  12       A.   Yeah.  Yeah, I'm sorry, yes.
12:48:17  13       Q.   It was a memorandum from Mr. Dean's firm that
12:48:20  14   was provided to Ms. Wing through BBAHC personnel?
12:48:24  15       A.   It's absolutely pure hearsay, so I can't answer
12:48:29  16   whether that did or didn't occur.  That's hearsay on my
12:48:32  17   part.
12:48:34  18       Q.   Who did you hear that from?
12:48:34  19       A.   I can't even remember at this point.
12:48:36  20       Q.   Okay.
12:48:57  21            Regarding your understanding that there were --
12:49:04  22   or concern that there were gaps or holes in FTCA
12:49:07  23   coverage of BBAHC, I understand you don't recall exactly
12:49:12  24   where you gained this understanding, but what is your
12:49:18  25   understanding in that regard?
```

55

| | | |
|---|---|---|
| 12:49:21 | 1 | MR. STEWART: Well, I'm going to offer a |
| 12:49:25 | 2 | cautionary objection. And it is this: That legal |
| 12:49:32 | 3 | opinions have been provided to BBAHC, Mr. Richardson |
| 12:49:37 | 4 | would have been privy to them, by both the Hobbs Straus |
| 12:49:41 | 5 | firm and my firm, Davis Wright. Certain of those |
| 12:49:45 | 6 | opinions, and I think you're aware simply from discovery |
| 12:49:48 | 7 | in this matter, have been the subject of discussion with |
| 12:49:52 | 8 | insurance brokers, for example, others, third parties, |
| 12:49:56 | 9 | and so they certainly would not be privileged today. |
| 12:50:01 | 10 | The scope of coverage under the FTCA, however, |
| 12:50:04 | 11 | continues to be a current concern for this organization |
| 12:50:09 | 12 | and are current subject to dialogue, and certainly some |
| 12:50:13 | 13 | of that has not been shared with third parties. And so |
| 12:50:18 | 14 | there probably are discussions that have been had with |
| 12:50:22 | 15 | counsel which are no longer privileged, and others which |
| 12:50:26 | 16 | are privileged. |
| 12:50:27 | 17 | So, I want you to be able to engage in some |
| 12:50:30 | 18 | discovery here. I'm not going to jump in and tell him |
| 12:50:34 | 19 | he can't answer the question, period, but I think the |
| 12:50:36 | 20 | witness needs to be mindful of that distinction where |
| 12:50:41 | 21 | there's been counsel and advice and then it's been |
| 12:50:43 | 22 | shared with the world at large, that certainly isn't. |
| 12:50:47 | 23 | Where there's perhaps current issues, those remain |
| 12:50:51 | 24 | subject to privilege. |
| 12:50:52 | 25 | MR. DEVLIN: Would it make things easier if I |

PACIFIC RIM REPORTING    907/272-4383
www.courtreportingalaska.com

EXHIBIT J
Page 10 of 16

```
12:50:55   1    limit my question to his understanding?
12:51:02   2            MR. STEWART:  I think you can go with your
12:51:03   3    question as it is, and I'll certainly go on record that
12:51:09   4    I want him to answer it, but I think as long as there's
12:51:12   5    a common understanding that the purpose for the answer
12:51:15   6    is not to waive any extant privilege as it exists today.
12:51:19   7            MR. DEVLIN:  I understand.  I'm trying to craft
12:51:23   8    this --
12:51:24   9            MR. STEWART:  If we all agree it isn't going to
12:51:25  10    be a waiver, it isn't going to be a waiver.
          11            MR. DEVLIN:  Okay.
          12            MR. STEWART:  Mr. Pomeroy?
12:51:29  13            MR. POMEROY:  Fully understood.
12:51:32  14            MR. STEWART:  Agreed?
12:51:33  15            MR. POMEROY:  Agreed.
12:51:34  16    BY MR. DEVLIN:
12:51:34  17       Q.   All right.  Well, then, maybe you need to have
12:51:36  18    the question read back.
12:51:37  19       A.   I was going to ask for that.
12:52:09  20    (Record read.)
12:52:11  21            THE WITNESS:  Well, I was aware that
12:52:20  22    intentional torts was an area that wouldn't be covered.
12:52:26  23    I think one of the things that -- well, no.  I think.
12:52:31  24    One of the things that concerned me about FTCA coverage
12:52:36  25    was that it appeared to me that they were the determiner
```

57

```
12:52:40   1    of whether there was coverage or not.
           2    BY MR. DEVLIN:
12:52:42   3        Q.   They, being the U.S.?
12:52:44   4        A.   The U.S.
12:52:47   5             And a good portion of my concern was, while the
12:52:55   6    U.S. was trying to determine whether they were or not
12:52:59   7    covering, you know, whatever situation, there were
12:53:04   8    obligations that needed to be met within certain time
12:53:08   9    frames.  And defense costs might be incurred before the
12:53:17  10    U.S. ever decided whether it did or didn't cover.
12:53:21  11             So, I was concerned twofold, I suppose, of what
12:53:27  12    about those things that needed to be done legally, and
12:53:30  13    the cost of them prior to their determination; and then
12:53:34  14    secondly, what if they determined they wouldn't cover?
12:53:39  15    So I had concerns about making sure we had -- to me,
12:53:47  16    that's the holes, the gaps that I'm talking about.  That
12:53:50  17    we had some other layer of insurance available to us in
12:53:54  18    that event.
12:54:08  19        Q.   So, it was your understanding that these gaps
12:54:13  20    or holes in FTCA coverage of BBAHC would occur in two
12:54:19  21    events.  One, if there were defense costs incurred or
12:54:24  22    things, you know, that needed to be done while the U.S.
12:54:27  23    was deciding whether or not there was FTCA coverage,
12:54:31  24    right?
12:54:32  25        A.   Correct.
```



| | | |
|---|---|---|
| 12:54:33 | 1 | Q.  And two, in situations where the U.S. may just |
| 12:54:38 | 2 | say, "Hey, there is no FTCA coverage, you're on your |
| 12:54:41 | 3 | own."  Correct?  Those are the two types of situations? |
| 12:54:45 | 4 | MR. STEWART:  And intentional torts. |
| 12:54:47 | 5 | THE WITNESS:  Yeah, I was going to add, the |
| 12:54:49 | 6 | intentional torts.  That sort of goes along with the |
| 12:54:54 | 7 | second one.  And I'll explain just a little bit. |
| 12:54:59 | 8 | BY MR. DEVLIN: |
| 12:54:59 | 9 | Q.  Sure. |
| 12:55:00 | 10 | A.  This is hearsay.  But I had a physician on |
| 12:55:03 | 11 | staff who told me that he had a relative that had been |
| 12:55:10 | 12 | sued, I think it was for breach of confidentiality, who |
| 12:55:14 | 13 | was an IHS physician, and that the feds had refused to |
| 12:55:20 | 14 | defend him on the basis that that was an intentional |
| 12:55:25 | 15 | tort, and therefore that person ended up having to |
| 12:55:30 | 16 | defend it himself, you know, without any coverage.  And |
| 12:55:39 | 17 | bear the cost himself.  I do not know whether that was |
| 12:55:42 | 18 | true or not true, but it caused me concern. |
| 12:55:47 | 19 | So -- because, to me, an intentional tort, |
| 12:55:54 | 20 | while I realize many policies exclude intentional torts, |
| 12:55:58 | 21 | on the other hand, defending -- I mean, just because |
| 12:56:01 | 22 | you're accused doesn't mean you're guilty.  And |
| 12:56:04 | 23 | defending, you know, an intentional tort was something I |
| 12:56:08 | 24 | was concerned about. |
| 12:56:14 | 25 | Q.  So, then, the whole possible area of |

```
12:56:20  1   intentional tort lawsuits falls within the second gap or
12:56:25  2   hole in FTCA coverage that you were concerned about, and
12:56:28  3   that is a situation where the United States would just
12:56:30  4   say not covered by the FTCA, right?
12:56:34  5        A.   Correct.
12:56:34  6        Q.   All right.
12:56:34  7             Let's talk about that second gap or hole that
12:56:39  8   you were concerned about.  Leave aside the concern that
12:56:45  9   you'd have to spend money or incur costs in defending
12:56:51 10   while the U.S. was deciding whether or not there was
12:56:53 11   coverage.
12:56:54 12             Now, I just want to talk about the area where
12:56:56 13   the U.S. would just say, sorry, no coverage.  All right?
12:56:58 14        A.   Uh-huh.  Yes.
12:57:01 15        Q.   You mentioned one area and that was intentional
12:57:03 16   torts, that you can think of.
12:57:05 17             Did you have any understanding concerning FTCA
12:57:15 18   coverage in the context of different programs that are
12:57:20 19   carried out here at BBAHC?
12:57:26 20        A.   Yes, and probably this would add an additional
12:57:33 21   concern.  My understanding is that FTCA coverage
12:57:38 22   extended to, quote, the scope of work, unquote, that we
12:57:45 23   had with the Indian Health Service.  So, I had concerns
12:57:52 24   about, was everything that we did covered by that scope
12:57:57 25   of work?
```

| | | |
|---|---|---|
| 12:58:02 | 1 | Again, I know that our medical staff, at least |
| 12:58:09 | 2 | a portion of our medical staff, had concerns about |
| 12:58:12 | 3 | specifically the home health program, as to whether or |
| 12:58:14 | 4 | not that was covered. |
| 12:58:15 | 5 | Q.   What's the home health program? |
| 12:58:17 | 6 | A.   That's the nursing program that provides home |
| 12:58:27 | 7 | visits to patients under a physician's care, under a |
| 12:58:32 | 8 | physician's order. |
| 12:58:34 | 9 | Q.   And the concern was because they were going to |
| 12:58:38 | 10 | different folks' homes, away from this facility, that it |
| 12:58:41 | 11 | might not be covered?  Is that -- by the FTCA? |
| 12:58:45 | 12 | A.   Personally, I felt that we were covered by |
| 12:58:48 | 13 | FTCA, because it was listed, as I recall, in our scope |
| 12:58:54 | 14 | of work.  What I'm trying to say is that, but I know |
| 12:58:57 | 15 | that we had physicians that were on staff that were |
| 12:58:59 | 16 | concerned about it. |
| 12:59:00 | 17 | And so, while I believed we were covered, it's |
| 12:59:06 | 18 | just a concern -- I'm trying to use that as an example |
| 12:59:11 | 19 | of a concern about were there things that FTCA would not |
| 12:59:17 | 20 | cover because they were beyond or -- beyond the scope of |
| 12:59:24 | 21 | the service that we had as a contractual relationship |
| 12:59:27 | 22 | with IHS. |
| 12:59:48 | 23 | Q.   You've referred to IHS now a couple times. |
| 12:59:52 | 24 | Could you tell us what that stands for, please. |
| 12:59:52 | 25 | A.   I'm sorry.  Indian Health Service. |

| | | |
|---|---|---|
| 15:04:19 | 1 | THE WITNESS: I've never realized until |
| 15:04:24 | 2 | relatively recently that there was an obligation to do |
| 15:04:28 | 3 | that, so the answer to that is no. That -- God, I hope |
| 15:04:37 | 4 | I'm interpreting the question correctly, but -- |
| | 5 | BY MR. DEVLIN: |
| 15:04:40 | 6 | Q. Well, the question is, did you personally ever |
| 15:04:43 | 7 | have an intention that the United States be a named |
| 15:04:48 | 8 | insured on a BBAHC policy? |
| 15:04:51 | 9 | A. I personally did not, no. |
| 15:04:59 | 10 | Q. Is the United States -- to your knowledge, is |
| 15:05:01 | 11 | the United States a named insured on any policies today? |
| 15:05:06 | 12 | Any BBAHC policies today? |
| 15:05:08 | 13 | A. Not to my knowledge. |
| 15:05:27 | 14 | MR. DEVLIN: No further questions right now. |
| 15:05:32 | 15 | MR. STEWART: Could we take a break? |
| 15:05:36 | 16 | MR. POMEROY: Do you want to take a break? |
| 15:05:37 | 17 | MR. STEWART: Yeah. |
| 15:19:50 | 18 | (Short recess taken.) |
| 15:19:50 | 19 | THE WITNESS: On the record, I guess I'd like |
| 15:19:52 | 20 | to go back to my last -- to your last question, and my |
| 15:19:57 | 21 | answer, and have that read back, because I had a lot of |
| 15:20:01 | 22 | difficulty understanding the question, and I want to |
| 15:20:04 | 23 | make sure that I really accurately stated it. |
| 15:20:07 | 24 | MR. DEVLIN: Okay. |
| 15:22:44 | 25 | (Record read.) |



EXHIBIT J
Page 16 of 16