Page 1

1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF ALASKA

3    _____

                                    )
4    UNITED STATES OF AMERICA,       )
                                    )
5              Plaintiff,            )
                                    )
6        vs.                         )
                                    )
7    CNA FINANCIAL CORPORATION       )
     AND THE CONTINENTAL             )
8    CASUALTY COMPANY d/b/a          )
     THE CONTINENTAL INSURANCE       )
9    COMPANY,                        )
                                    )
10             Defendant.            )
     _____)
11   Case No. A98-285 CV (JWS)
12

13   _____

14   VIDEOTAPED DEPOSITION OF UNITED STATES OF AMERICA

          SUSAN J. LINDQUIST
15   _____
16
              Pages 1 - 128, inclusive
17
          Thursday, February 9, 2006
18                9:16 A.M.
19
          Taken by Counsel for Defendant
20                    at
              GUESS & RUDD
21        510 L Street, Suite 700
              Anchorage, Alaska
22
23
24                              EXHIBIT __P__
25                              Page _1_ of _25_

USA v CNA

SUSAN LINDQUIST
2/9/2006

Page 20

```
 1    any effort to consult with the United States'
 2    contracting officer with respect to this contract?
 3        A.    I don't know.
 4        Q.    Was it your understanding that there would
 5    be somebody in the government, a nonlawyer or
 6    somebody not within the Department of Justice, who
 7    would have been responsible for administering the
 8    contract with Bristol Bay, the federal contract?
 9        A.    Yes.  There is always someone.
10        Q.    And would that be typically somebody
11    that -- that would be contacted, in terms of
12    understanding the contractual relationship between
13    the government and that 638 contractor?
14        A.    Yes.  Sometimes we do contact that person.
15        Q.    When I say a 638 contractor, do you know
16    what I'm referring to?
17        A.    Yes.  Public Law 638.
18        Q.    Do you know even who that -- that
19    contracting officer was at the time the initial
20    claim came in?
21        A.    It probably was Gary Thogersen.
22        Q.    What makes you say that it was Gary
23    Thogersen?
24        A.    Because Gary Thogersen was the attorney for
25    the Department of Health & Human Services, and he
```

EXHIBIT___P___
Page _2_ of _25_

USA v CNA

SUSAN LINDQUIST
2/9/2006

Page 31

```
 1    versus someone at, say, Health & Human Services?
 2         A.    No.
 3         Q.    Do you -- do you know whether or not, prior
 4    to this case, that theory had ever been expressed in
 5    any other case?
 6         A.    I have memory of conversations about
 7    insurance, but not about explicit defenses or
 8    theories of recovery.
 9         Q.    So if I understand -- if I understand your
10    answer - I just want to make sure I understand it -
11    as you sit here now, you can't say that -- that this
12    wasn't the first case -- this Wilson case wasn't the
13    first case in which the government had -- had
14    contended it was an implied insured under a
15    liability policy?
16         A.    Under that specific --
17              MR. STONE:  Hold on a second.  You mean just
18    in Alaska.
19              MR. TAYBACK:  I'll limit it to Alaska now.
20              MR. STONE:  Because the Ritchie case is --
21              MR. TAYBACK:  Well, I don't think --
22              MR. STONE:  -- has been filed.
23              MR. TAYBACK:  -- the Ritchie case applies,
24    but --
25              MR. STONE:  Okay.
```

EXHIBIT___P___
Page _3_ of _25_

USA v CNA

1          MR. TAYBACK:  And I think I'm trying to get

2     her knowledge, by the way, not yours.

3          MR. STONE:  And you want to know in Alaska.

4     BY MR. TAYBACK:

5          Q.   I will say in Alaska for right now.

6          A.   Yeah, that's fine.  On that specific theory

7     of implied insurance, I don't know.  I do know we

8     had general discussions about insurance coverage and

9     the relationship between the United States and

10    tribal contractors.

11         Q.   Let me ask you:  Do you know whether or

12    not, beyond Alaska, this Wilson case was -- whether

13    this Wilson case was the first case in which the

14    government had articulated a theory in which --

15    under which it would be treated as an insured, as an

16    implied insured in a policy in which it's not named,

17    a liability policy in which it's not named?

18         A.   No.

19         Q.   You don't know one way or the other?

20         A.   No.  I have no discussions with attorneys

21    from other districts.

22         Q.   Would you -- based on -- based on your

23    knowledge of having been in the U.S. Attorney's

24    office here in Alaska for the last 15 years, 16

25    years, right -- 15 or going on 16 -- would you agree

EXHIBIT ___P___
Page __4__ of __25__

USA v CNA

SUSAN LINDQUIST
2/9/2006

Page 33

```
 1    that -- that the argument put forward here for
 2    being -- for the United States being deemed as an
 3    implied insured was a novel theory at the time it
 4    was asserted?
 5         A.   I can't say that, because I have not done a
 6    lot of research about -- insurance has been around
 7    for many hundreds of years, and it's not -- I don't
 8    think that implied insured is a novel theory.  I
 9    think that's been around for a long time.  But your
10    question is specific to this context, and my answer
11    is I don't know.
12         Q.   You just don't know one way or the other?
13         A.   Don't know.
14         Q.   And if you wanted to -- to find out whether
15    or not -- I guess whose idea it was to assert this
16    theory, who would you ask?
17         A.   Ken Roosa.
18         Q.   And if you wanted to find out whether it
19    was a novel theory at the time, who would you ask,
20    whether -- whether that person thought it was a
21    novel theory?
22         A.   Dealing strictly with tribal contractors?
23         Q.   Sure.  Sure.  Still limited for this
24    question.
25         A.   Oh, I would ask Jeffrey Axelrad.
```

Page 34

```
1        Q.    And who is Mr. Axelrad?
2        A.    He was the head of the Department of
3    Justice, Torts Division, in Washington, D.C.
4              MR. STONE:  Off the record for a second.
5              MR. TAYBACK:  Sure.
6              THE VIDEOGRAPHER:  Off record, 9:50.
7              (Off record.)
8              THE VIDEOGRAPHER:  We're on record, 9:50.
9              MR. TAYBACK:  I'm going to show you an
10   exhibit which I will have marked as Exhibit 3, I
11   guess.
12             THE REPORTER:  Did you want that stack marked
13   as 2?
14             MR. TAYBACK:  As 2, yeah.  I'm sorry.  For
15   the record, the -- the second stack, the stack of
16   documents that was produced this morning I have marked
17   as Exhibit 2 to this deposition.
18             (Exhibits 2 and 3 marked.)
19   BY MR. TAYBACK:
20       Q.    Before I ask you to take a look at that,
21   can I -- can you -- can you, from your knowledge,
22   name a single case in which -- anywhere, Alaska or
23   anyplace, I guess, where someone was found to be an
24   implied insured under someone else's liability
25   policy?
```

Page 35

1      A.    No.

2      Q.    Directing your attention to what's been

3   marked as Exhibit 3.  It's a -- appears to be a memo

4   dated January 7th, 1993, from Jeffrey Axelrad.  Do

5   you recognize this?

6      A.    No.

7      Q.    Have you ever -- if I can just ask you to

8   flip through it.  You didn't -- this isn't a

9   document you reviewed in preparing for your

10  deposition?

11     A.    Correct.

12     Q.    If I could direct your attention to --

13  well, I'll use the -- the Bates stamp numbers.

14  There's a Bates stamp in the lower right-hand

15  corner, DWT, and it starts off 0358 and goes through

16  0366.

17          If I could direct your attention to DWT 0365,

18  where it talks about coverage issues.  You see the

19  first sentence there talks about "Determinations of

20  coverage of individuals and entities under the

21  statutes discussed above," which include the Federal

22  Tort Claims Act and the Indian Self-Determination Act,

23  "must be done on an ad hoc basis"?

24     A.    Yes.

25     Q.    Is that consistent with the practice that

EXHIBIT  P
Page  7  of  25

USA v CNA

```
1        Q.    -- describe for me --
2        A.    -- Tort Claims Act does not make any
3   promises to anyone.  It says what we will do.  And
4   it says we will become the defendant and we -- and
5   so the -- the defendant is the United States.
6        Q.    Yes.
7        A.    And I am an attorney for the United States.
8   And we agree to defend this suit involving, now,
9   federal employees, and we agree to pay any damages.
10  But I don't think that we're indemnifying them.
11  As -- as Ken Roosa said, we're not an insurance
12  company.  We are a government.  We are unique in the
13  world, for this country.  We are a very special
14  entity.
15       Q.    When -- are you aware at all of the efforts
16  made by the Department of Justice and the U.S.
17  Attorney's office in this case to have Bristol Bay
18  indemnify it for the costs incurred in -- in this
19  case?
20       A.    No, I'm not aware of any of that.
21       Q.    Did you -- had -- had you heard about it?
22  I mean, whether you were aware of the details or
23  not, had you heard that that occurred?
24       A.    I would need some more details about what
25  "that" is.
```

1    but --

2        A.    And reckless indifference.

3        Q.    And reckless indifference.  Do you know

4    whether or not anyone from Health & Human Services

5    ever articulated the view that the rejection of the

6    United States' tenders under Bristol Bay's policy

7    was outrageous?

8        A.    I don't know.

9        Q.    Do you know whether or not anyone at

10   Bristol Bay ever said that the rejection,

11   Continental's rejection of the United States'

12   tenders under Bristol Bay's policy, was outrageous?

13       A.    I don't know.

14       Q.    Do you know whether anyone at either

15   Health & Human Services or Bristol Bay expressed the

16   view that Continental's rejection of the United

17   States tender under Bristol Bay's policy was

18   malicious or recklessly indifferent?

19       A.    I don't know.

20           MR. TAYBACK:  Could we take, like, just a

21   couple minutes?

22           MR. STONE:  Sure.

23           MR. TAYBACK:  Maybe five?

24           THE VIDEOGRAPHER:  Off record, 10:08.

25           (Recess taken.)

Page 60

```
 1              THE VIDEOGRAPHER:   Off record, 10:36.
 2              (Off record.)
 3              THE VIDEOGRAPHER:   We're back on record,
 4     10:37.
 5     BY MR. TAYBACK:
 6         Q.   Do you know what the government -- why the
 7     government didn't substitute into -- into the case
 8     between April and June of 1994?
 9         A.   No, I don't know.
10              (Exhibit 11 marked.)
11     BY MR. TAYBACK:
12         Q.   Directing your attention to what's been
13     marked as Exhibit 11.  It's a letter dated
14     December 7, 1994 to Mr. Roosa of the U.S. Attorney's
15     office in Alaska, from Robert Stewart, on behalf of
16     BBAHC.  Do you recognize this?
17         A.   No.
18         Q.   You didn't look at this in preparing for
19     today?
20         A.   No.
21         Q.   There's a -- if you look at the first page,
22     there's a -- a second paragraph there that talks
23     about:  "You," meaning Mr. Roosa, "stated you are
24     attempting to determine whether there is also
25     liability coverage for the claims through
```

Page 81

1    this incident, so then we pursued those.  But some

2    that I had started to pursue at the same time I

3    pursued Bosold I hadn't finished yet, and those

4    cases I -- I stopped pursuing.

5        Q.   If I could now direct your attention to

6    what I will mark as Exhibit 13.

7              (Exhibit 13 marked.)

8    BY MR. TAYBACK:

9        Q.   And this is a letter dated February 2nd,

10   1995, less than a month after Exhibit 12 was dated,

11   from Mr. Friderici to Ken Roosa.  Have you -- do you

12   recognize this letter?  Have you seen it before?

13       A.   No.

14       Q.   So this is not a letter that you looked at

15   before you -- in preparation for today?

16       A.   No.  But it was mentioned in Mr. Roosa's

17   deposition.

18       Q.   Show you what I would like to have marked

19   as Exhibit 14.

20              (Exhibit 14 marked.)

21   BY MR. TAYBACK:

22       Q.   Directing your attention to Exhibit 14.  Do

23   you -- do you recognize this letter?

24       A.   No.

25       Q.   Is the letter dated February 13th, 1995 to

USA v CNA

Page 82

```
 1    Mr. Roosa from Mr. Friderici rejecting the tender
 2    that was set forth in Exhibit 12?  Do you see that?
 3         A.   Yes.
 4         Q.   Is there anything outrageous or malicious
 5    or reckless about this letter?
 6         A.   I don't have an opinion about this letter.
 7         Q.   And -- and directing your attention to what
 8    I will mark as Exhibit 15.
 9              (Exhibit 15 marked.)
10    BY MR. TAYBACK:
11         Q.   And this is a letter dated June 6, 1995,
12    from Mr. Roosa back to Mr. Friderici.  Is this a
13    letter you looked at in preparation for testifying
14    today?
15         A.   No.
16         Q.   Have you ever seen this letter before?
17         A.   No.
18         Q.   You have no reason to believe that it was
19    sent as -- on or about the date that's indicated?
20         A.   No.
21         Q.   If I could direct your attention to
22    Exhibit --
23              MR. STONE:   Could you --
24              MR. TAYBACK:   -- 16.
25              MR. STONE:   I think you misspoke.
```

USA v CNA

```
 1            MR. TAYBACK:  What did I say?
 2            MR. STONE:  Read back -- that you have no
 3   reason to believe it was sent on or about -- I think
 4   you meant not sent.
 5   BY MR. TAYBACK:
 6       Q.  I have no reason to believe it was not
 7   sent.
 8       A.  Correct.
 9            MR. TAYBACK:  If I left out a "not," I
10   apologize.
11            MR. STONE:  That's no problem.  I just --
12            MR. TAYBACK:  Yeah.
13            (Exhibit 16 marked.)
14   BY MR. TAYBACK:
15       Q.  Directing your attention to a letter that's
16   been marked as Exhibit 16.  It's dated
17   February 20th, 1997 to Jennifer Taylor at HealthPro
18   from Mr. Roosa.  Have you ever seen this letter
19   before?
20       A.  No.
21       Q.  Do you have any reason to believe this
22   letter wasn't sent on the date indicated?
23       A.  No.
24            (Exhibit 17 marked.)
25   BY MR. TAYBACK:
```

USA v CNA

SUSAN LINDQUIST
2/9/2006

Page 84

```
 1        Q.   I'm going to show you what's been marked as
 2   Exhibit 17.  Do you recognize this letter?
 3        A.   No.
 4        Q.   Have you ever seen this letter before?
 5        A.   No.
 6        Q.   This is a letter dated June 19th, 1997,
 7   addressed to Mr. Roosa from Craig Stowers, who was
 8   writing from his law firm Clapp, Peterson & Stowers,
 9   acting on behalf of Continental with respect to a
10   subsequent tender.  Do you -- I guess do you know
11   who Craig Stowers is?
12        A.   Yes.
13        Q.   Did you ever deal with him as a -- as a
14   lawyer?
15        A.   Yes.  He was counsel for an ANMC physician
16   who had private insurance, and she was a fact
17   witness, and he came to the deposition.
18        Q.   Was he a competent lawyer, in your
19   experience?
20             MR. STONE:  Objection.
21             THE WITNESS:  My -- my experience with him
22   was so limited I -- I would --
23   BY MR. TAYBACK:
24        Q.   No --
25        A.   -- not provide --
```

USA v CNA

SUSAN LINDQUIST
2/9/2006

Page 89

```
 1              MR. STONE:  Objection.
 2              THE WITNESS:  I think --
 3              MR. STONE:  Asked and answered.
 4              THE WITNESS:  Yeah.  I don't think I have
 5     personal knowledge about that, just what I -- I know
 6     from reading Ken Roosa's deposition and -- and
 7     Ms. Senn's report.
 8     BY MR. TAYBACK:
 9         Q.   And -- well, Ms. Senn of course didn't
10     receive the letter at the time?
11         A.   No.
12         Q.   And so it's -- it's -- is it your
13     understanding, of Mr. Roosa's testimony, that his
14     reaction was that Mr. Stowers' position, as
15     articulated in Exhibit 17, was outrageous?
16         A.   I don't believe that's what he said.  It's
17     whatever what he said in his deposition.  But you
18     have to understand that no letter at -- certainly at
19     this point in litigation is in isolation.  There's
20     a -- there's a relationship going on here.
21         Q.   And -- and I guess what I want to know
22     is -- I suppose there certainly could be a letter in
23     theory that stated positions that would be
24     outrageous, this is ridiculous, this is absurd.  And
25     I'm trying to figure out whether anybody at the
```

USA v CNA

SUSAN LINDQUIST
2/9/2006

Page 90

```
 1    government, Health & Human Services, that you're
 2    aware of, looked at this letter and had that --
 3    formed that opinion.
 4         A.   I don't know.
 5         Q.   And is that true also with respect to
 6    whether this letter was malicious or -- or reckless?
 7         A.   Correct.  I don't know.
 8              MR. STONE:  Off the record for just a second.
 9              MR. TAYBACK:  Sure.
10              MR. STONE:  It's --
11              THE VIDEOGRAPHER:  Off record, 11:29.
12              (Off record.)
13              (Exhibit 18 marked.)
14              THE VIDEOGRAPHER:  On record, 11:29.
15    BY MR. TAYBACK:
16         Q.   Directing your attention to Exhibit 18.  Do
17    you recognize that?
18         A.   No.
19         Q.   Have you ever seen this letter before?
20         A.   No.
21         Q.   Did you look at it in preparation for your
22    testimony today?
23         A.   No.
24         Q.   Direct your attention to what I will mark
25    as Exhibit 19.
```

EXHIBIT ____P____
Page __16__ of __25__

USA v CNA

SUSAN LINDQUIST
2/9/2006

Page 105

```
 1        Q.   It's a February 8, 1999 letter to Parry

 2    Grover from Robert Bundy.

 3        A.   Correct.

 4        Q.   That's not a document you reviewed in

 5    connection with -- in preparing to testify today?

 6        A.   Correct.

 7        Q.   You're aware Parry Grover was one of the

 8    lawyers representing Bristol Bay?

 9        A.   Yes.

10        Q.   And who was Mr. Bundy?

11        A.   He was my boss.  He was the United States

12    Attorney.

13        Q.   I'm going to show you -- directing your

14    attention to the bottom of the first page, where it

15    talks about the -- the settlement agreement between

16    the United States and the Wilsons --

17        A.   Yes.

18        Q.   -- being $2.8 million.

19        A.   Yes.

20        Q.   It's true, isn't it, that -- that nothing

21    about Continental's handling of the United States'

22    tenders to it caused the United States to pay more

23    to the Wilsons than they otherwise would have?

24        A.   I don't know.

25             MR. STONE:  We may be able to enter into a
```

USA v CNA

1    stipulation about that, if you ask.

2              MR. TAYBACK:  Okay.  I would -- I would ask.

3    I'm asking.

4              MR. STONE:  Put it in writing.

5              MR. TAYBACK:  Okay.  I will put it in

6    writing.

7              MR. STONE:  Yeah.  So we know exactly what

8    we're --

9              MR. TAYBACK:  Sure.

10             MR. STONE:  -- trying to stipulate to.

11             MR. TAYBACK:  Sure.

12             MR. STONE:  I believe that's an accurate

13   statement --

14             MR. TAYBACK:  Okay.

15             MR. STONE:  -- actually but --

16             MR. POMEROY:  Or that the case ultimately

17   would not -- I mean, would have settled for the same

18   amount.  Now what the United States --

19             MR. STONE:  We don't know the answer to that.

20             MR. POMEROY:  -- would have paid versus a

21   tender to Continental under the policy versus --

22             MR. STONE:  Yeah.  We need to know what your

23   stipulation says --

24             MR. TAYBACK:  Okay.

25             MR. STONE:  -- before we can deal with that.

EXHIBIT _____ P
Page 18 of 25

USA v CNA

1    handle these claims, because they were fairly new

2    territory?

3        A.    I can neither disagree or agree.  I don't

4    know why Mr. Axelrad did that.

5        Q.    It's true, isn't it, that by 1995 even,

6    with respect to the United States' rights as an

7    implied insured on general liability policies of 638

8    contractors, the government didn't have any well --

9    any clearly established rights as an implied insured

10   by 1995?

11       A.    I don't know.

12       Q.    Is there a point at which you would say,

13   the government would say, the United States had

14   clearly defined rights as an implied insured on

15   general liability insurance policies for 638

16   contractors?

17            MR. STONE:  In the state of Alaska or --

18   BY MR. TAYBACK:

19       Q.    In the state of Alaska.

20       A.    Well, that would be the date of Judge

21   Sedwick's first opinion, but there's lots of Native

22   corporations all throughout the United States, and

23   there's many district courts that could have ruled

24   on this that I have no clue.

25       Q.    You don't know about?

EXHIBIT___P___
Page _1 9_ of _25_

Page 117

1       A.    No.  I don't know about those.

2       Q.    And you would think that those -- those

3   many cases, if there were any cases, would be cited

4   in some of the correspondence tendering the case to

5   Continental, you would think?

6       A.    Not unless they were published.  We

7   wouldn't know about them.

8       Q.    Okay.  And -- and if you wouldn't know

9   about them and you wouldn't cite them, Continental

10  wouldn't know about them?

11      A.    Correct.

12      Q.    And -- and as you sit here now, you

13  actually don't even know whether there are such

14  unpublished cases out there defining the rights of

15  the United States as an implied insured with respect

16  to a 638 contract?

17      A.    Correct.

18      Q.    You said that by the date of -- or on the

19  date of Judge Sedwick's first decision, the United

20  States' rights would have been clearly established,

21  in your opinion?

22      A.    Correct.

23      Q.    That would have been undone by his second

24  decision?

25      A.    Correct.

Page 118

```
 1        Q.    And that's why you -- you did not pursue
 2    certain other actions against other insurers,
 3    correct?
 4        A.    That's right.
 5        Q.    So after Judge Sedwick's second decision,
 6    the next juncture at which the United States' rights
 7    would have been clearly defined with respect to
 8    being an implied insured on a general liability
 9    policy of a 638 contractor would have been when the
10    Ninth Circuit reversed?
11        A.    I believe so, yes.
12        Q.    It's true, isn't it, that when Bristol
13    Bay -- Bristol Bay was the named insured on the
14    Continental policy at issue?
15        A.    I haven't seen the policy, but it appears
16    to be so.
17        Q.    I'll represent to you that Bristol Bay
18    is --
19        A.    Yes.
20        Q.    -- the named insured.
21        A.    I'm sure it's not a fact at issue.
22        Q.    It's true, isn't it, that when Bristol Bay
23    tendered the Lori Wilson claim to Continental,
24    Continental promptly responded?
25        A.    I don't know.
```

USA v CNA

SUSAN LINDQUIST
2/9/2006

Page 123

```
 1        Q.    What happened with the Scottsdale matter?
 2        A.    Nothing.  But a lot of that has to do with
 3   my own workload and my ability to -- to do things
 4   and the -- the amount of money at issue is -- is --
 5   is -- is really quite small.
 6        Q.    I guess I'm not really asking why -- why.
 7   I think I'm getting a why.
 8        A.    Correct.
 9        Q.    I guess my question is:  Did -- did
10   anything happen?  Did -- did the United States
11   pursue Scottsdale?
12        A.    No.
13        Q.    And yet, at the time that Scottsdale
14   rejected the United States' tender, Judge Sedwick's
15   first opinion existed?
16        A.    Yes.
17        Q.    Do you know whether BBAHC received funding
18   from the State of Alaska?
19        A.    No.
20        Q.    Do you know whether there -- whether there
21   are cases or have been cases in which the
22   government's decision not to defend a 638 contractor
23   in a tort case under the FTCA has been affirmed by
24   courts?
25              MR. STONE:  Do you understand that question?
```

EXHIBIT ___P___
Page _22_ of _25_

Page 124

```
 1               THE WITNESS:  Yes, I do.
 2               MR. STONE:  Okay.
 3               THE WITNESS:  Where -- where we declined to
 4     certify --
 5               MR. TAYBACK:  Yes.
 6               THE WITNESS:  -- in a particular tort.  I
 7     know we have declined to certify in torts.  I've had
 8     one myself, but it was against the Navy Seals.  The
 9     difficulty with the question is the Indian Health Care
10     Corporation, and I -- I remember one dealing with the
11     Department of Interior down in the -- in the forest
12     and a coup- -- oh, I know.  Quinhagak.  There was a
13     case at -- dealing with a four-wheeler at a
14     construction site.  And we didn't accept tender on
15     that one.
16     BY MR. TAYBACK:
17          Q.   And that's one you know of your personal
18     knowledge?
19          A.   Right.  But Mr. Pomeroy knows of another
20     one --
21          Q.   Okay.
22          A.   -- that he's written on a piece of paper.
23          Q.   Okay.
24          A.   But I don't -- if -- if someone -- am I
25     allowed to look at it to be reminded?
```

EXHIBIT  P
Page 23 of 25

USA v CNA

Page 125

```
 1        Q.    I don't have any objection.
 2        A.    Okay.  Maniilaq dog bite case.  Yes, there
 3   was a dog bite case.  And that was when a pharmacist
 4   owned a dog.  And we said, that's -- you're on your
 5   own.  It's your dog.  There's nothing about a
 6   pharmacist that needs a dog.  That's correct.  I
 7   don't know the name of the case.
 8        Q.    And so there are torts that occur on
 9   property that belongs to a 638 contractor that don't
10   always fall within the scope of the FTCA?
11        A.    Correct.
12        Q.    And so you got to make that coverage
13   determination and either yea or nay?
14        A.    Correct.  I'm always looking at the
15   property where the tort occurred, and I'm looking at
16   the people involved and the activity involved.
17        Q.    And so it would be reasonable for -- for a
18   638 contractor to have an insurance policy that
19   covers eventualities, possible torts, that might
20   occur at the 638 contractor's premises that might
21   not be covered by the FTCA?
22        A.    I can't say it's reasonable or
23   unreasonable.  It's their decision on how they want
24   to spend their money.  Some people have insurance
25   coverage.  Some -- some tribal corporations do, and
```

EXHIBIT ___P___
Page _24_ of _25_

USA v CNA                                                                                    SUSAN LINDQUIST
                                                                                             2/9/2006

Page 126

1    some don't.

2        Q.    Because it's their decision on how to spend

3    their money?

4        A.    Absolutely.

5              MR. TAYBACK:  I -- I have no further

6    questions.

7              MR. STONE:  No questions.

8              THE VIDEOGRAPHER:  We will close the record

9    then at 12:33.

10             (Proceedings concluded at 12:33 P.M.)

11             (Signature reserved.)

12                        -o0o-

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT____P____
Page 25 of 25