Deborah Segelhorst

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,    )

                          )

        Plaintiff,    )

                         )

    vs.               )  Case No.: A98-285 CV (JWS)

                         )

CNA FINANCIAL CORPORATION AND THE  )

CONTINENTAL CASUALTY COMPANY d/b/a )

THE CONTINENTAL INSURANCE COMPANY, )

                         )

        Defendant.    )

                         )

VIDEOTAPED

DEPOSITION OF:     Deborah Segelhorst

DATE AND TIME:     February 14, 2006
                  12:59 p.m.

LOCATION:         74-900 Highway 111
                  Suite 216
                  Indian Wells, California

REPORTER:        Laura S. Shackelford, CSR
                  Certificate No. 3568

EXHIBIT ___
Page _1_ of _29_

United States of America v. CNA Financial Corporation

Deborah Segelhorst

```
 1    contractors to maintain general liability insurance?

 2        A.    Yes.

 3        Q.    And you said that as contracting officer you

 4    were entitled to get a certificate of insurance?

 5        A.    Yes.

 6        Q.    And was that part of your -- as the officer

 7    responsible for procurement on behalf of IHS, was that

 8    part of your job responsibility, to make sure that

 9    Bristol Bay had insurance?

10        A.    Yes, it was part of the clause.  There was a

11    clause in the contract that said we had to have a

12    certificate of insurance, and the tribe would normally

13    supply that to us.

14        Q.    So the contract said that IHS was supposed to

15    get a certificate of insurance?

16        A.    Well, a copy of what the tribe got from their

17    insurance company.

18        Q.    Under the contract and under the contracting

19    regime which was in place before compacting came into

20    place --

21        A.    Uh-huh.

22        Q.    -- IHS was entitled to get a certificate of

23    insurance showing whatever insurance Bristol Bay

24    acquired?

25        A.    Uh-huh -- yes.
```

EXHIBIT Q
Page 2 of 29

United States of America v. CNA Financial Corporation

Deborah Segelhorst

1    Q.    Did you -- was Bristol Bay supposed to supply

2    that certificate of insurance on its own, or was IHS

3    supposed to request the certificate?

4    A.    We would request it.

5          Again, there was a clause in the contract that

6    said that the tribe had to provide that to us, and they

7    would just send us a copy.

8    Q.    So when you requested the certificate of

9    insurance, Bristol Bay would send it to you?

10   A.    Correct.

11   Q.    Do you recall any issues about Bristol Bay not

12   sending you a certificate of insurance?

13   A.    I don't, no.

14   Q.    When you received a certificate of insurance

15   from Bristol Bay, what would you do?

16   A.    We would normally just -- we would look at it

17   and then file it.

18   Q.    And when you looked at it, what would you look

19   at it for?

20   A.    Just to make sure, you know, that it said all

21   the right things, and that was it.

22   Q.    To make sure that -- was there a certain

23   minimum liability insurance that Bristol Bay was

24   supposed to have?

25   A.    No, no.

EXHIBIT Q
Page 3 of 29

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 51

1    Q.    What kinds of right things would you be looking

2  at?

3    A.    Well, again, basically we would just send it up

4  through our finance department, so they would take a

5  look at it.  And then we would also send it on to

6  headquarters for them to look at it, too.

7    Q.    Presumably you're looking to make sure that the

8  insurance listed Bristol Bay as the insured?

9    A.    Yes.

10    Q.    Because Bristol Bay was the entity that was

11  supposed to be insured?

12    A.    That's right.

13    Q.    When you received a certificate of insurance,

14  you would look at the named insured listed?

15    A.    Yes.

16    Q.    And you would make sure that Bristol Bay was

17  listed?

18    A.    Yes.

19    Q.    Were you checking to see if anyone else was

20  listed?

21    A.    No.

22    Q.    Did anyone ever tell you that the United States

23  was supposed to be listed as a named insured?

EXHIBIT__Q___

24    A.    No.

Page__4__of__29

25    Q.    Did you think, when you were in your role as

United States of America v. CNA Financial Corporation                          Deborah Segelhorst

Page 52

```
 1    contracting officer, that the United States was supposed
 2    to be listed as a named insured on Bristol Bay's
 3    policies?
 4         A.   Did I think?
 5         Q.   Yes.
 6         A.   No.
 7         Q.   So when you looked at a certificate of
 8    insurance, if it didn't list the United States as an
 9    insured, that wouldn't surprise you?
10         A.   No.
11         Q.   That wouldn't raise a red flag or anything?
12         A.   No.
13         Q.   Did anyone ever tell you that the United States
14    was supposed to be covered under Bristol Bay's
15    insurance?
16         A.   No.
17         Q.   Did anyone ever tell you that the United States
18    was supposed to be listed as an additional insured under
19    Bristol Bay's insurance?
20         A.   No.
21         Q.   Did anyone ever tell you that the United States
22    was supposed to be an implied insured under Bristol
23    Bay's insurance?
24         A.   I've heard that.  I can't say exactly when, but
25    I have heard that said that -- that they were.
```

EXHIBIT    Q

Page __5__ of __29__

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 53

1    Q.    What have you heard said, exactly?

2    A.    Well, that the government -- that if there was

3  a lawsuit or something, then the justice department

4  would look at the lawsuit, and they would determine

5  whether or not they would accept the lawsuit.

6    Q.    And when you say, "accept the lawsuit," what do

7  you mean by that?

8    A.    Well, would allow them to be sued.

9    Q.    Allow the United States to be sued?

10    A.    Right.

11    Q.    And do you understand that here you are

12  referring to -- for -- allow the United States to be

13  sued under the Federal Tort Claims Act?

14    A.    Yes.

15    Q.    When I say -- sometimes I will say "FTCA."  I'm

16  referring to the Federal Tort Claims Act.

17    A.    Yes.

18    Q.    So you have heard that there is a -- you have

19  heard that if a claim is filed against a 638 contractor,

20  the United States is going to decide whether it's going

21  to accept the lawsuit under the FTCA?

22    A.    Yes.

23    Q.    And that's what you were referring to?

24    A.    Yes.

25    Q.    Have you ever heard that -- withdraw.

EXHIBIT Q
Page 6 of 29

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

Page 54

1           In the mid 1990s time period did you have any

2    reason to think that Bristol Bay was listing the United

3    States as an insured on its insurance policies?

4           A.    No, I did not know that.

5           Q.    Do you remember having any discussions with

6    anyone about whether the United States should be an

7    insured under Bristol Bay's or another 638 contractor's

8    insurance policies?

9           A.    No.   No.

10          Q.    Do you remember having any discussions with

11   anyone about whether the United States should be covered

12   and protected under a 638 contractor's insurance

13   policies?

14          A.    No.

15          Q.    Certainly no one ever told you that you should

16   have the United States listed as an insured?

17          A.    Correct.

18          MR. POMEROY:  When you reach a convenient

19   point -- I don't know whether the witness does but I

20   need a break.

21          MR. PROCTOR:  That's fine by me.

22          THE VIDEOGRAPHER:  We are off the record at

23   approximately 2:06 p.m.

EXHIBIT Q
Page 7 of 29

24          (Recess was taken.)

25          THE VIDEOGRAPHER:  We are back on the record at

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 59

```
 1    insurance that you would request and receive from your
 2    638 contractors?
 3         A.   Yes.
 4         Q.   And you see it lists the insured there, and it
 5    lists the insured as Bristol Bay Area Health
 6    Corporation?
 7         A.   Yes.
 8         Q.   And that was the entity that was supposed to be
 9    listed as an insured?
10         A.   Correct.
11              (Exhibit D was marked for identification.)
12              MR. PROCTOR:  I marked as Exhibit D an
13    insurance policy.  At the top it says, "Issued by
14    Continental Insurance Company."  Then it says the named
15    insured is Bristol Bay Area Health Corporation.
16         Q.   Do you see that?
17         A.   Yes.
18         Q.   And you said you would -- withdraw that.
19              You don't recall ever actually seeing this
20    insurance policy?
21         A.   No, I don't.
22         Q.   Or having the actual policy sent to you before?
23         A.   No.
24         Q.   But you are not surprised that the listed named
25    insured is Bristol Bay Area Health Corporation?
```

EXHIBIT

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

1      A.    Correct.

2      Q.    Looking at this policy it would be -- or you

3   would think, looking at this policy, that the insured

4   party under the policy is Bristol Bay?

5      A.    Yes.

6      Q.    And the fact is that you never thought that the

7   United States was going to be insured under Bristol

8   Bay's policy?

9            MR. POMEROY:  Objection.  Calls for a legal

10  conclusion.

11           MR. PROCTOR:  You can still answer.

12           THE WITNESS:  No, I didn't.

13  BY MR. PROCTOR:

14     Q.    You never intended for the United States to be

15  covered under Bristol Bay's insurance policies?

16     A.    No.

17     Q.    Have you ever heard of -- we touched on this

18  briefly earlier.

19           Have you ever heard of the Doctrine of Implied

20  At-Law Insurance?

21     A.    No, I haven't.

22     Q.    No one ever told you that the United States was

23  covered as an insured under Bristol Bay's policies as an

24  implied at-law insured?

25     A.    No.

EXHIBIT  Q
Page  9  of  29

Ayotte & Shackelford            PSCSR@AOL.COM            760-340-2181

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 61

1     Q.    And you never intended for the United States to
2  be covered as an implied at-law insured?
3     A.    No.
4           MR. POMEROY:  I'm not sure I heard that term
5  used, either.
6           (Exhibit E was marked for identification.)
7  BY MR. PROCTOR:
8     Q.    Marked as Exhibit E is a Statement of Revenues
9  and Expenses for Bristol Bay, year ended 1989.
10          Do you see that at the top?
11    A.    Yes, I do.
12    Q.    Is this something that -- this type of
13  statement something that IHS would receive from Bristol
14  Bay?
15    A.    Yes.
16    Q.    And was this pursuant to the yearly audit, or
17  was it in a different context?
18    A.    This is part of a yearly audit that we would
19  receive.
20    Q.    So as part of the yearly audit that IHS would
21  perform, Bristol Bay would put together a statement of
22  its financial status and send that to IHS?
23    A.    Bristol Bay put this together with their
24  financial --
25    Q.    Right.

EXHIBIT____Q____
Page __10__ of __29__

United States of America v. CNA Financial Corporation

Deborah Segelhorst

1    A.    -- people.

2    Q.    Okay.  And in the columns at the top it lists

3    or appears to list the sources of funds.

4          Do you see that?

5    A.    Yes.

6    Q.    And it says in the middle "Indian Health

7    Service Programs," and that's $8 million and something?

8    A.    Yes.

9    Q.    And next to that it says "State of Alaska," and

10   there is more than a million dollars that Bristol Bay

11   gets Alaska?

12   A.    Yes.

13   Q.    And then it has "Other" next to it on the

14   right?

15   A.    Yes.

16   Q.    Then on the far left it says "General," and you

17   see there is down -- going down aways it says "$59,000"?

18   A.    Yes.

19   Q.    And that's for rent revenue?

20   A.    Yes.

21   Q.    So Bristol Bay, it looks like gets rent

22   revenues, in addition, $59,000 in that year?

23   A.    Yes.

24   Q.    And below that $369,000 for interest income?

25   A.    Yes.

EXHIBIT Q
Page 11 of 29

Ayotte & Shackelford          PSCSR@AOL.COM          760-340-2181

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 63

1    Q.   So it looks like Bristol Bay has at least this
2    many sources of funds -- several sources of funds in
3    addition to IHS?
4    A.   Yes.
5    Q.   We touched on this briefly earlier as well.
6         Are you aware that the Federal Tort Claims Act
7    covers some liability claims that can be stated against
8    638 contractors?
9    A.   I don't remember.
10   Q.   Do you -- I think you said earlier that you
11   remember some discussions about this?
12   A.   Yes.
13   Q.   Do you remember -- it sounds like it is a
14   pretty vague recollection?
15   A.   Yes.
16   Q.   Do you remember any details about those
17   discussions?
18   A.   Not really.
19   Q.   Do you remember when those discussions took
20   place?
21   A.   No.
22   Q.   Do you remember who they were with?
23   A.   No.
24   Q.   So you don't really have any recollection of
25   discussing the interplay of the Federal Tort Claims Act

EXHIBIT Q

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

Page 64

1    and 638 contractors?

2       A.    Other than being in general meetings with

3    various people.

4       Q.    And beyond that you have no recollection?

5       A.    No.

6       Q.    And I take it you don't have any recollection

7    of the statutory changes that affected the interplay of

8    the Federal Tort Claims Act and 638 contractors?

9       A.    Just vaguely, just vaguely.

10      Q.    No details at all?

11      A.    No.

12      Q.    Are you -- do you remember a distinction

13   between -- do you remember an issue about whether the

14   FTCA would cover or the United States would cover claims

15   that arose from activities that were not funded by IHS?

16      A.    Other than being told that they wouldn't cover

17   them, that's the extent of what I know.

18      Q.    So you were told that the FTCA and the United

19   States would not cover claims against 638 contractors

20   that arose from activities that were not funded by IHS?

21      A.    Correct.

22      Q.    Who told you that?

23      A.    I think it was Gary Thogersen.

24      Q.    Gary Thogersen?

25      A.    Yes.

EXHIBIT ___Q___
Page 13 of 29

Ayotte & Shackelford              PSCSR@AOL.COM              760-340-2181

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

Page 65

1    Q.   And who is he?

2    A.   He was our attorney -- Department of Health and

3    Human Service's attorney at the time.

4    Q.   What time period are we talking about here?

5    A.   Again, probably late eighties, maybe early

6    nineties.

7    Q.   Early nineties?

8    A.   Yes.

9    Q.   Could it be as late as mid nineties?

10   A.   It could be.

11        MR. POMEROY:  Could it be 2004?

12        THE WITNESS:  Yeah.

13   BY MR. PROCTOR:

14   Q.   Could it be 2004?

15        MR. POMEROY:  No.  Mr. Thogersen had retired by

16   then.

17        THE WITNESS:  He was gone.

18        (Exhibit F was marked for identification.)

19   BY MR. PROCTOR:

20   Q.   Marked as Exhibit F is what appears to be a

21   Department of Health and Human Services memorandum from

22   Gary Thogersen to Richard Frost?

23        MR. POMEROY:  It's Thogersen.

24        MR. PROCTOR:  Thank you.

25   Q.   It's dated September 1991?

EXHIBIT __Q__
Page _14_ of _29_

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 66

```
 1     A.    Yes.
 2     Q.    Who is Richard Frost?
 3     A.    He was the executive officer for the Alaska
 4  area.
 5     Q.    And what were -- what were his -- as executive
 6  officer, what's that job?
 7     A.    He handled all of the basic administrative
 8  offices within the area office, such as the procurement
 9  office, finance, personnel.
10     Q.    Was that -- it sounds like a high-level
11  position?
12     A.    Yes, it was.
13     Q.    Was he essentially the -- would it be fair to
14  characterize him as the main guy in Alaska?
15     A.    No.  The main guy was the area director.
16     Q.    So he's below the area director?
17     A.    Right.  There were three in the upper echelon:
18  The area director, deputy director, and executive
19  officer.
20     Q.    This is for Alaska specifically?
21     A.    Yes.
22     Q.    You see in the first paragraph -- and so this
23  is a memo that Mr. Thogersen sent, as counsel for Health
24  and Human Services, to Mr. Frost?
25     A.    Okay.
```

EXHIBIT Q
Page 15 of 29

Ayotte & Shackelford                PSCSR@AOL.COM                760-340-2181

United States of America v. CNA Financial Corporation

Deborah Segelhorst

```
 1        Q.    And you see in the first paragraph it says,
 2   "I've been asked to review proposals made by several of
 3   the Section 638 contractors suggesting certain
 4   activities be added to the scope of work in their
 5   respective contracts with IHS"?
 6        A.    Yes.
 7        Q.    Do you remember that issue?
 8        A.    I do now, yes.
 9        Q.    And do you remember -- can you explain what the
10   issue was, what you remember about it?
11        A.    Well, I remember it.  I don't remember all of
12   it, but I do remember that some of the tribes wanted us
13   to add programs to their scope of work under the federal
14   contract that we did not fund.  And so the request at
15   that time was then sent to Gary for a review and
16   response.
17        Q.    And you see one of the contractors -- 638
18   contractors listed is Bristol Bay?
19        A.    Is Bristol Bay.
20        Q.    Do you remember why Bristol Bay and the other
21   638 contractors wanted those programs added to the
22   contracts?
23        A.    Because they wanted us to cover them under
24   tort.
25        Q.    They wanted the United States to cover those
```

EXHIBIT    Q

Page 16 of 29

Ayotte & Shackelford                PSCSR@AOL.COM                760-340-2181

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

Page 68

```
 1   programs --

 2        A.    Those programs.

 3        Q.    -- under the Federal Tort Claims Act?

 4        A.    Yes.

 5        Q.    And it was unclear to them whether activities

 6   pursuant to those programs would be covered under the

 7   FTCA?

 8              MR. POMEROY:  Objection.  Calls for a legal

 9   conclusion.

10              MR. PROCTOR:  You can still answer.

11              MR. POMEROY:  If you know.

12              THE WITNESS:  Well, I guess, yeah, that's what

13   they wanted.

14   BY MR. PROCTOR:

15        Q.    Right.

16              That's what you were telling us?

17        A.    That's what they were telling us, yes.

18        Q.    You see the last sentence of that paragraph

19   Mr. Thogersen is spelling it out.

20              He says, "Other proposed additions deal with

21   activities that are not funded by IHS but are operated

22   under a separate contract with the State or some other

23   entity"?

24        A.    Correct.

25        Q.    And that's the issue that you were talking
```

EXHIBIT __Q__
Page __17__ of __29__

Page 69

1    about, adding these programs that are not funded by IHS
2    to the contracts?
3        A.    Correct.
4        Q.    Going down to the third paragraph, do you see
5    Mr. Thogersen writes, "The extent to which FTCA coverage
6    will be found to apply under the statute for non-IHS
7    funded activities is not yet known"?
8            Do you see that?
9        A.    Yes.
10       Q.    Do you remember discussions about how much the
11   FTCA would cover and how much the statutory amendments
12   changing the FTCA's coverage, how that would play out?
13       A.    No.
14       Q.    Do you know Mr. Thogersen?
15       A.    Yes, I do.
16       Q.    Did you -- do you remember having discussions
17   with Mr. Thogersen about the FTCA?
18       A.    Again, they were mostly based on this issue
19   here, and just very -- there wasn't a lot of discussion.
20       Q.    Right.
21       A.    I mean, other than, you know, this letter that
22   I can really remember talking to him about.
23       Q.    Do you remember seeing this letter?
24       A.    I probably did.

EXHIBIT Q
Page 18 of 29

25       Q.    If you turn to the last page, you see it cc's

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 70

```
 1    Donald White?
 2         A.    Donald White.
 3         Q.    Who was he?
 4         A.    He also was a contract specialist that worked
 5    for me in 638.
 6         Q.    So you supervised Mr. White?
 7         A.    Yes, I did.
 8         Q.    And this is the kind of memorandum that he
 9    would pass on to you to look at?
10         A.    Yes.
11         Q.    You see Mr. Thogersen goes on and says in the
12    third paragraph, "So far there has been little
13    experience with claims in litigation involving 638
14    contractors.  A more precise picture of FTCA coverage
15    will only be known when the courts begin to look at
16    individual cases as they arise."
17         A.    Yes.
18         Q.    Do you remember that being an issue, that
19    everyone was uncertain what exactly the FTCA was going
20    to cover and what it wasn't going to cover?
21         A.    Correct.
22         Q.    And you remember -- withdraw.
23               Then the last sentence, right after that one,
24    it says, "Under the circumstances we cannot assure the
25    contractors that the FTCA would apply even if non-IHS
```

EXHIBIT   G
Page 19 of 29

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

Page 71

1    activities were included within the scope of work of the
2    contract."
3        A.    Correct.
4        Q.    Do you see that?
5        A.    Yes.
6        Q.    And so Mr. Thogersen was saying to Mr. Frost
7    and cc'ing your department that you can't tell the
8    contractors that the FTCA is going to protect them
9    because we don't know?
10       A.    Correct.
11            MR. POMEROY:   That --
12   BY MR. PROCTOR:
13       Q.    Okay.   In retrospect are you aware of exactly
14   what the FTCA -- when exactly the United States will
15   defend a 638 contractor under the FTCA and when it
16   won't?
17       A.    No, I don't know that.
18       Q.    But you do remember that Bristol Bay and other
19   638 contractors were telling your department that they
20   are not sure what's going to be covered under the FTCA?
21       A.    Correct.
22       Q.    And they wanted your department to add
23   contractual language clarifying what would be covered
24   under the FTCA?
25       A.    Correct.

EXHIBIT  G
Page 20 of 29

Ayotte & Shackelford              PSCSR@AOL.COM              760-340-2181

Deborah Segelhorst

Page 81

```
 1   Federal Tort Claims by reason of the Section 638
 2   contract between Bristol Bay and the Indian Health
 3   Service"?
 4       A.   Yes.
 5       Q.   So it looks like in December 1994, eight months
 6   after Bristol Bay first advised the United States that
 7   the Wilsons had sued the United States, finally agreed
 8   that the claim was covered by the FTCA?
 9           MR. POMEROY:  Objection.  The letter speaks for
10   itself.
11           THE WITNESS:  Yes.
12   BY MR. PROCTOR:
13       Q.   Do you know what Jake's Place is?
14       A.   If I remember correctly, it was kind of a --
15   what do you call it? -- outreach type of place for
16   people to go who had alcohol or drug problems.
17       Q.   And this was at Bristol Bay?
18       A.   Yes.
19       Q.   Do you remember when it was created?
20       A.   No.
21       Q.   In the mid 1990s did anyone ever ask you to see
22   the certificates of insurance for Bristol Bay?
23       A.   I honestly don't remember.
24       Q.   Did anyone ever ask you why the United States
25   was not listed on Bristol Bay's insurance with third
```

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 82

```
 1   parties?

 2        A.    No.

 3        Q.    Did anyone ever ask you whether you waived the

 4   United States' right to have the United States listed on

 5   Bristol Bay's -- listed as an insured on Bristol Bay's

 6   insurance with third parties?

 7        A.    No.

 8        Q.    Did anyone ever tell you that you should have

 9   had or should have demanded that the United States be

10   listed as a named or additional insured on Bristol Bay's

11   insurance policies with third parties?

12        A.    No.

13        Q.    Do you know where Bristol Bay gets the funds

14   that it used to pay for -- to pay the insurance premiums

15   for the insurance policies that it had with third-party

16   insurers?

17        A.    No, I don't.

18        Q.    As far as you know, those funds didn't come

19   from IHS?

20        A.    No.

21        Q.    They could have come from the State of Alaska?

22        A.    Correct.

23        Q.    Or some other source?

24        A.    Correct.

25              (Exhibit K was marked for identification.)
```

EXHIBIT _Q_
Page _22_ of _29_

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 83

```
 1    BY MR. PROCTOR:
 2         Q.    Marked as Exhibit K it appears to be a
 3    statement of revenues and expenses for Bristol Bay Area
 4    Health Corporation.
 5              Do you see that?
 6         A.    Yes.
 7         Q.    And this is another example of something that
 8    Bristol Bay would have prepared and given to IHS
 9    pursuant to the IHS' yearly audits of Bristol Bay?
10         A.    Yes.
11         Q.    If you go down on the left-hand column, you see
12    it says "Insurance," third from the bottom?
13         A.    Yes.
14         Q.    And then listed next to it, first thing is
15    $86,000?
16         A.    Yes.
17         Q.    And that's under the "General Fund"?
18         A.    Yes.
19         Q.    Then it's got $73,000 under "Board Designated
20    Funds"?
21         A.    Yes.
22         Q.    Then under "Indian Health Services" there is
23    nothing listed next to insurance?
24         A.    Correct.
25         Q.    So that indicates to you that Indian Health
```

EXHIBIT __Q__
Page _23_ of _29_

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 84

```
 1    Service's funds were not used to pay -- were not used
 2    for insurance?
 3         A.    Correct.
 4         Q.    If you turn to the next page, it says
 5    "Malpractice."
 6               Do you see that in the -- close to the bottom?
 7         A.    Yes.
 8         Q.    You see it says, "Losses from asserted claims
 9    which arise in programs funded by the Indian Health
10    Service are the responsibility of the Federal Government
11    under the Federal Tort Claims Act.  It is uncertain
12    whether FTCA coverage extends to programs or services
13    provided by Bristol Bay that are not specifically
14    addressed under the Indian Health Service's contract"?
15         A.    Yes.
16         Q.    Do you see that?
17         A.    Yes.
18         Q.    And that's referring back to the uncertainty
19    issue about exactly what would the FTCA cover?
20         A.    Yes.
21         Q.    And it would -- this was prepared by Bristol
22    Bay; right?
23         A.    Yes.
24         Q.    So Bristol Bay is saying it's uncertain whether
25    FTCA coverage is going to extend to certain things?
```

EXHIBIT __Q__
Page _24_ of _29_

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 85

```
 1        A.    Yes.
 2        Q.    And it would be reasonable for Bristol Bay to
 3   think that because that's what Mr. Thogersen advised 638
 4   contractors should be told?
 5              MR. POMEROY:  Objection.  Calls for a legal
 6   conclusion.
 7              THE WITNESS:  Yes.
 8   BY MR. PROCTOR:
 9        Q.    If Bristol Bay had added new facilities at
10   Bristol Bay in a relevant period of time, you would
11   expect its liability insurance premiums to increase?
12              MR. POMEROY:  Objection.  Incomplete
13   hypothetical.
14              THE WITNESS:  I assume so.
15   BY MR. PROCTOR:
16        Q.    Generally, if you add facilities to a liability
17   policy, the premiums are going to go up?
18        A.    Yes, I assume so.
19        Q.    Are you aware through today or through 2004,
20   when you were last involved, Bristol Bay continued to
21   purchase liability coverage from third-party insurers?
22        A.    I'm not aware.
23              (Exhibit L was marked for identification.)
24   BY MR. PROCTOR:
25        Q.    I have marked as Exhibit L a letter from -- you
```

EXHIBIT___Q___
Page 25 of 29

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

Page 86

1    see on the back page it is Robert Bundy and Kenneth

2    Roosa to Lori Wing?

3        A.    Yes.

4        Q.    You see in the second page -- actually, I'm

5    sorry, go back to the first page.

6              You see it says it's in regards to Wilson

7    versus United States?

8        A.    Yes.

9        Q.    And you see in the second page at the very top

10   it says, "Accordingly, I am formally tendering this

11   claim to Continental Insurance Company"?

12       A.    Yes.

13       Q.    You understand this letter is where -- this is

14   the United States tender of the claim to Continental?

15       A.    Yes.

16             MR. POMEROY:    Objection.    The letter speaks for

17   itself.

18             THE WITNESS:    Sorry.

19   BY MR. PROCTOR:

20       Q.    In the last paragraph -- the last full

21   paragraph on the second page you see that Mr. Roosa

22   writes, "Under these circumstances --" in the middle of

23   that paragraph, "Under these circumstances the United

24   States is also an insured"?

25       A.    Yes.

EXHIBIT  Q
Page 26 of 29

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

Page 87

1       Q.   You never thought that the United States was an

2    insured under Bristol Bay's policies; right?

3            MR. POMEROY:  Objection.  Calls for a legal

4    conclusion.

5            THE WITNESS:  Yes.

6    BY MR. PROCTOR:

7       Q.   And you see right above that Mr. Roosa writes,

8    "By operation of the Indian Self-Determination and

9    Education Assistance Act, any tort action against

10   Bristol Bay or any of its employees is deemed an action

11   against the United States"?

12      A.   Yes.

13      Q.   That's not true; right?  Not all actions

14   against Bristol Bay would be deemed actions against the

15   United States under the FTCA?

16           MR. POMEROY:  Objection.  Calls for a legal

17   conclusion.

18           THE WITNESS:  Yes.

19   BY MR. PROCTOR:

20      Q.   Below that you see Mr. Roosa writes, "Any other

21   conclusion would inevitably result in the insurer being

22   unjustly enriched, as the insurer would collect a

23   premium and yet would have no potential liability."

24           Do you see that?

25      A.   Yes.

EXHIBIT Q
Page 27 of 29

Ayotte & Shackelford                PSCSR@AOL.COM                760-340-2181

United States of America v. CNA Financial Corporation                    Deborah Segelhorst

Page 90

```
 1        Q.   Do you remember who it was that called?
 2        A.   No, I don't.
 3        Q.   When you learned that the United States was
 4   saying that it was an insured under Continental's policy
 5   issued to Bristol Bay, what did you think about that?
 6   Did that surprise you?
 7        A.   I -- I don't recall anybody saying that to me.
 8        Q.   You weren't told exactly what the case was
 9   about?
10        A.   Correct.
11        Q.   You were just asked for paperwork?
12        A.   Correct.
13        Q.   Are you aware now that the United States
14   threatened to sue Bristol Bay in 1999 claiming that
15   Bristol Bay should have had the United States listed as
16   an insured on its insurance policies?
17        A.   No, I'm not.
18        Q.   Would that surprise you if that happened?
19        A.   I guess not.
20        Q.   It wouldn't surprise you if the United States
21   would do that?
22        A.   Well, again, not knowing the circumstances, no.
23   I don't know.
24        Q.   Does -- well, you testified that you never
25   thought that the United States was covered under Bristol
```

EXHIBIT ___Q___

United States of America v. CNA Financial Corporation

Deborah Segelhorst

Page 91

```
 1    Bay's third-party insurance policies and so -- right?
 2        A.   Right.  Correct.
 3        Q.   And so, presumably, you wouldn't think that the
 4    United States would go and threaten to sue Bristol Bay
 5    for not having it covered under its third-party
 6    insurance policies?
 7        A.   Correct.
 8        Q.   I mean, you were the contracting officer.  You
 9    never told Bristol Bay, "Hey, you should be listing the
10    United States as an insured"?
11        A.   Right.
12             MR. PROCTOR:  Can we go off record for about
13    two minutes?  I think I might be done.
14             THE VIDEOGRAPHER:  We are off the record at
15    3:03 p.m.
16             (Recess was taken.)
17             THE VIDEOGRAPHER:  We are back on the record at
18    3:05 p.m.
19             (Exhibit M was marked for identification.)
20    BY MR. PROCTOR:
21        Q.   You see that I have marked as Exhibit M a
22    letter from Robert Bundy to Parry Grover --
23        A.   Yes.
24        Q.   -- dated February 1999?
25        A.   Yes.
```

EXHIBIT Q
Page 29 of 29