Marcus R. Clapp
Matthew K. Peterson*
Craig F. Stowers*
Thomas V. Van Flein*
John J. Tiemessen
Michael C. Kramer

Legal Assistants
Judy L. Holder
Lewis E. Baker*

# Clapp Peterson Stowers
### Attorneys at Law

711 H Street, Suite 620
Anchorage, Alaska 99501-3442
Telephone: (907) 272-9272
Fax: (907) 272-9586

1603 College Road, Suite 200
Fairbanks, Alaska 99709-4175
Telephone: (907) 479-7776
Fax: (907) 479-7966

Reply to Anchorage

May 28, 1997

<u>Via Telecopy (206) 587-7618</u>
<u>Original by U.S. Mail (Overnight) EI299912726US</u>

Mr. Ray Faccenda
CNA Insurance Companies
P. O. Box 240111
Seattle, Washington 98124-9611

Re:   U.S. Attorney's Tender of Defense of Federal Tort Claim
      Insured:    Bristol Bay Area Health Corporation
      Claimant:   United States, pursuant to its F.T.C.A. liability to Lori Wilson
      Case Name:  Wilson v. United States, A94-488 Civ. (HRH)
      CNA File No.: 751-7-A3892
      Our File No.: 647-464

      Continental GL Policy No. 93 CBP 06114933-94
      Continental GL Policy No. HMA 9500648-4

Dear Ray:

Enclosed is my opinion letter in the above-referenced matter. I had hoped to send it last week, but was waiting for additional information from Lori Wing at Brady & Company, the broker for these policies. Unfortunately, Ms. Wing had a family emergency and departed Alaska last week, and won't be back until next week. I therefore have been unable to reconfirm with her some of the factual information she provided, but I was able to confirm some of it through another source. In any event, I am reasonably confident of the factual information that underlies the opinion, so I am sending the opinion letter for your review and use. I will follow up with Ms. Wing next week to make doubly certain she can testify to the facts should the need arise.

Sincerely,

Craig F. Stowers

CFS:dagz

BBHC 001728

EXHIBIT A
Page 1 of 13

Marcus R. Clapp
Matthew K. Peterson*
Craig F. Stowers*
Thomas V. Van Flein*
John J. Tiemessen
Michael C. Kramer

Legal Assistants
Judy L. Holder
Lewis E. Baker*

**Clapp Peterson Stowers**
Attorneys at Law

711 H Street, Suite 620
Anchorage, Alaska 99501-3442
Telephone: (907) 272-9272
Fax: (907) 272-9586

1603 College Road, Suite 200
Fairbanks, Alaska 99709-4175
Telephone: (907) 479-7776
Fax: (907) 479-7966

Reply to Anchorage

May 28, 1997

<u>Via Telecopy (206) 587-7618</u>
<u>Original by U.S. Mail (Overnight) EI299912726US</u>

Mr. Ray Faccenda
CNA Insurance Companies
P. O. Box 240111
Seattle, Washington 98124-9611

Re:  U.S. Attorney's Tender of Defense of Federal Tort Claim
    Insured:    Bristol Bay Area Health Corporation
    Claimant:    United States, pursuant to its F.T.C.A. liability to Lori Wilson
    Case Name:    Wilson v. United States, A94-488 Civ. (HRH)
    CNA File No.:    751-7-A3892
    Our File No.:    647-464

Continental GL Policy No. 93 CBP 06114933-94
Continental GL Policy No. HMA 9500648-4

Dear Mr. Faccenda:

    You have asked our law firm to provide CNA Insurance Companies with a legal opinion answering the question whether the United States Government is entitled to a defense and indemnity in a Federal Tort Claims Act action as an additional or implied insured under the two above-referenced Continental Insurance Company general liability insurance policies issued to Bristol Bay Area Health Corporation ("BBAHC"). It is our opinion that CNA has no duty under the above-referenced policies to defend or indemnify the United States.

I. Summary

    It is uncontested that Bristol Bay Area Health Corporation's negligence caused the Federal Torts Claims Act plaintiff, Lori Wilson, to suffer severe personal injuries. In accordance with the Federal Tort Claims Act and the Indian Self-Determination and



Clapp
Peterson
Stowers

Mr. Ray Faccenda
May 28, 1997
Page 2

Educational Assistance Act, the torts of BBAHC, while acting as a contractor for the Indian Health Service/Public Health Service, are deemed to be the torts of the United States, and the injured plaintiff's exclusive remedy is to bring her claim against the United States Government in the federal court. Thus, the United States is the defendant in the federal action, and has been found liable by summary judgment to the plaintiff for the injuries she sustained.

We understand that the United States Attorney's Office made a written tender of defense to CNA on February 20, 1997. (We also understand that the United States has on several previous occasions made written demands for defense and indemnity to CNA, and these previous tenders have been denied.) On May 15, 1997, the plaintiff's attorney made a $4.6 million demand for settlement, and that demand appears to be within a range that the court could realistically award in damages. The United States Attorney's Office notified CNA of the settlement demand on May 16, 1997. The United States has threatened to bring an action against CNA for bad faith denial of coverage if CNA determines not to accept the tender of defense and pay its policy limits. Each policy carries a single occurrence limit of $1 million, and the United States has taken the position that it is an insured under both policies. Yesterday, on May 27, the Assistant United States Attorney defending the action called and wrote me a letter, stating that he intends to begin negotiating a settlement with the plaintiff's attorney, and he has given CNA a last opportunity to enter the case, take over the settlement negotiations, and pay under the general liability policies.

It is our opinion that neither of the two referenced general liability insurance policies create in CNA a duty to defend or indemnify the United States in this case. Neither of the policies name the United States as an insured, nor do the facts pertaining to the issuance of the policies suggest that the United States was intended to be an insured under the policies. We do not think that the authorities cited by the United States support the proposition that the government is an additional insured or an implied insured under the policies. Further, one of the policies expressly excludes from coverage the premises where the plaintiff was injured.

From our factual investigation, it appears that the policies were obtained in recognition that although most of BBAHC's liabilities would be covered by the Federal Tort Claims Act (F.T.C.A.), there was a small risk that there might be rare instances where the F.T.C.A. would not apply to cover liability arising out of torts committed by BBAHC. Therefore, the two Continental polices were purchased to provide protection from liability in those rare cases where the United States (or a court) might determine that the liability was not covered by the F.T.C.A. We have been informed that the premiums charged for the policies were relatively small, reflecting the relatively small

BBHC 001730

EXHIBIT A
Page 3 of 16



Mr. Ray Faccenda
May 28, 1997
Page 3

risk being insured against. We have found no cases where a court has held that the United States is an additional insured or an implied insured under a general liability policy in the circumstances presented in this case. Based on our conclusion that there is no duty under the polites for CNA to defend and indemnify the United States, we recommend that CNA deny the tender of defense by the United States. Our detailed analysis follows.

II.   Contextual Background: The Indian Self-Determination Act

In 1975, the United States Congress enacted the Indian Self-Determination and Education Assistance Act, also known as Public Law 93-638 (" § 638 "). The terms of the Act are set forth at 25 U.S.C. § 450, et seq., as amended. The Congressional declaration of policy states that Congress recognizes the obligation of the United States to respond to the Indian people's need for self-determination by assuring maximum Indian participation in the planning, conduct, and administration of educational and other programs and services (including health care programs and services) for the benefit of Indians and Native Alaskans. 25 U.S.C. §450a, as amended. The Secretary of Health and Human Services was authorized to enter into contracts (" § 638 contracts ") with any tribal organization to carry out any or all of his functions, authorities and responsibilities under the Indian Self-Determination Act. 25 U.S.C. § 450g (later repealed and transferred). Under these provisions, the federal government, through the Public Health Service and the Indian Health Service, has contracted with health care facilities to provide health and related services to Indians and Alaska Natives.

Your insured, Bristol Bay Area Health Corporation, is a health care facility located in Dillingham, Alaska. Pursuant to P.L. 93-638 and 25 U.S.C. § 450g, BBAHC has contracted with the United States Public Health Service - Alaska Area Native Health Service "to provide a health service system for the Alaska Native People who live in the Contractor's regional area." U.S. Contract No. 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, dated October 1, 1987, p. 3, §1, Scope of Work. As such, BBAHC is a § 638 tribal contractor with the Indian Health Service/Public Health Service.

Pursuant to its § 638 contract, one of the services BBAHC provides is alcohol treatment services to Alaska Natives. BBAHC's Alcohol Transition Center, also known as Jake's Place, is a resident alcohol treatment facility.

BBHC 001731



EXHIBIT A
Page 4 of 13

5-28-1997 9:19AM   FROM CLAPP PETERSON 907 272 9586         P.6



Mr. Ray Faccenda
May 28, 1997
Page 4

III. Factual Background: The Injury

On November 27, 1993, the staff and residents of Jake's Place held a party and dance to celebrate the residents' successful completion of their alcohol treatment program. Dillingham residents were invited to attend.

The party was held in the lounge, dining area, and in the kitchen of Jake's Place. The lights were dimmed. One of the children present, Lori Wilson, then aged seven, requested a drink of juice from a family friend, Blanche Kallstrom, who was in the kitchen. There were several pitchers of juice, cups, and cookies on the counter next to the sink. Ms. Kallstrom poured a drink from one of the pitchers sitting on the counter. The pitcher contained a red liquid, which appeared to be juice. Lori ingested the liquid, and sustained severe chemical injuries to her esophagus, stomach, and gastrointestinal tract. The liquid was discovered to be a caustic, industrial cleaner/disinfectant named Ecolab Ultra Klene, which contained sodium hydroxide.

Upon investigation, it was discovered that the residents of Jake's Place were using the Ultra Klene as a dishwashing detergent, and that sometime prior to the party, a BBAHC employee or resident had transferred the Ultra Klene from a five-gallon industrial container into a pitcher to make it easier to pour the cleaner into the dishwashing machine. Though someone had placed some masking tape on the pitcher and had written "poison" on the tape, and though a BBAHC employee had previously observed the pitcher containing the caustic cleanser and had directed someone to put the cleanser into a safer container, nothing had been done, and Ms. Kallstrom did not realize she was not pouring juice when she served Lori Wilson on the night of the party. Lori sustained severe esophageal and gastrointestinal injuries, has undergone multiple surgeries and other procedures, and will require significant and possibly lifelong follow up care. (Incidentally, sodium hydroxide is classified as a hazardous material by the Federal Occupational Safety and Health Act. According to one CNA investigation report, it appears that BBAHC's staff at Jake's Place did not receive training with respect to compliance with federal hazardous materials standards, including container labeling, hazardous material inventory updates, and hazardous materials records keeping.)

IV. Procedural Background: The Federal Tort Claims Act

Lori Wilson originally sued BBAHC for her injuries in the Alaska Superior Court. BBAHC was defended by CNA-appointed counsel pursuant to one of the above-referenced GL policies. BBAHC filed a motion to dismiss on the grounds that plaintiff's

BBHC 001732



EXHIBIT A
Page 5 of 13



Mr. Ray Faccenda
May 28, 1997
Page 5

exclusive remedy was against the United States Government in federal court, pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671 et seq. The Alaska court and the plaintiff agreed, and the case was dismissed without prejudice. The case was refiled against the United States in the United States District Court for Alaska in Anchorage. This result obtained because the Federal Tort Claims Act, in conjunction with the Indian Self-Determination and Education Assistance Act, makes the United States directly liable for the torts of BBAHC and its employees, while acting within the scope of their duties as § 638 contractors.

Summary judgment on the issues of negligence and causation has been ordered against the United States, so the only remaining issue in the underlying case is damages. Lori Wilson's attorney recently made a demand for settlement in the amount of approximately $4.6 million. Without being privy to the details of the medical/damages case, it does not appear that the amount demanded is beyond the boundaries of reason, though we suspect the plaintiff's attorney has set forth his best case for damages. It is clear that Lori has suffered extraordinarily serious injuries, that she has experienced severe pain and suffering, that she will require significant, and probably lifelong medical follow-up, and that she is at significant risk for further complications. She and her family have been required to travel on multiple occasions, and will need to travel in the future, from Dillingham to Anchorage, and to the Lower 48, to obtain necessary medical and other care and therapy. In contrast to the sympathetic position that she occupies, the failure of BBAHC to properly store and safeguard the caustic industrial strength cleaner, particularly after it was recognized by a BBAHC employee as presenting a serious risk of harm, creates a foreseeable probability that the court will make a significant multi-million dollar award of damages to the plaintiff. (Parenthetically, even if CNA were required to pay its $1 million policy limit plus Alaska Rule 82 attorney's fees and costs, Lori's damages far exceed this amount and the United States would remain liable for paying the balance.)

The United States Attorney tendered the case to CNA for defense and coverage under one and later under both general liability polices on January 6, 1995, June 6, 1995, February 20, 1997, March 20, 1997, and May 27, 1997. CNA, through counsel appointed to defend BBAHC in the state court action, declined the government's 1995 tenders of defense. Assistant U.S. Attorney Roosa called me yesterday to report that he was prepared to engage in settlement discussions with the plaintiff, and wanted to give CNA a final opportunity to settle the case.

V.    Legal and Factual Analysis

BBHC 001733




EXHIBIT A
Page 6 of 13

The United States makes the following arguments why CNA has a duty under one or both policies to accept the government's tender of defense and to provide indemnity. First, the United States asserts that federal courts have consistently held that the fact that an insured is entitled to coverage by the United States pursuant to the Federal Tort Claims Act does not excuse the insured's insurance company from responsibility for an otherwise meritorious, covered claim. As discussed below, we disagree with this overly broad assertion by the United States. The cases cited by the United States do not state the asserted proposition, and we have found no case where the court has held that the insurer of a § 638 contractor is required to provide a defense and to indemnify the United States for liabilities that would otherwise be covered under the Federal Tort Claims Act.

The cases primarily relied upon by the United States are <u>Government Employees Insurance Company v. United States</u>, 349 F.2d 83 (10th Cir. 1965), cert. denied 382 U.S. 1026 (1966) ("<u>GEICO</u>"), and <u>Dorcas v. Swanson</u>, No. A93-0129 Civ. (Unpub. Order, U.S. District Court for District of Alaska, October 12, 1994). In <u>GEICO</u>, the United States was found to be an additional insured under an automobile liability insurance policy, which defined who was an "insured" to include the named insured and "any person or organization legally responsible for the use" of the automobile. The owner and operator of the automobile indicated in the application for insurance that he was a government employee, and that the intended use of the automobile was for personal and government business. The court held that the insurer was bound to know at the time that it issued the policy that only the United States was liable for the torts committed by its employees acting within the scope of their employment, that the insurer therefore knew that the named insurer could not be sued for liability caused by his negligence while performing his duties as a government employee, and that by insuring a government employee for the use of his vehicle on government business, the insurer obligated itself to pay on behalf of the United States in a Federal Tort Claims action. Thus, the language of the policy in defining who was an insured, plus the facts and conditions under which the policy was issued, and the provisions of the Federal Tort Claims Act, dictated the conclusion that the United States was an "additional insured" under the policy definition of the term "insured." A number of other courts have reached similar conclusions in the context of automobile liability insurance policies.

The United States Attorney's Office argues that in <u>Dorcas</u>, U.S. District Court Judge Holland (who is assigned as the judge in the instant case) ruled that Allstate Insurance Company was required to defend and indemnify the United States on the basis of an insurance policy issued to the insured even where the insured had no liability. <u>Dorcas</u> is entirely distinguishable from the instant case. In <u>Dorcas</u>, the Court held simply that the Federal Deposit Insurance Corporation was an insured under the

BBHC 001734

EXHIBIT A
Page 7 of 13



Mr. Ray Faccenda
May 28, 1997
Page 7

policy because the policy expressly provided that any person or organization acting as the named insured's property manager was an insured, and that the FDIC was acting as the named insured's property manager following the default on the mortgage by the named insured.

In this case, the general liability policies do not contain a definition of who is the "insured" that can reasonably be read to include the United States. The Commercial General Liability Coverage Part Declarations for both policies indicate that BBAHC is the Named Insured, and that it is an "Organization (Other than Partnership or Joint Venture)." The Commercial General Liability Coverage Forms (CG 00 01 11 88) for both policies state:

   1. Insuring Agreement

      a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" . . . to which this insurance applies. . . .

Thus, the crux of the issue is to determine who is the insured. The CGL Coverage Form answers this question as follows:

   Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. . . .

   The word "insured" means any person or organization qualifying as such under WHO IS AN INSURED (SECTION II).

Section II - WHO IS AN INSURED, provides in pertinent part:

   1. If you are designated in the Declarations as:

   . . .

      c. An organization other than a partnership or joint venture, you are an insured. Your executive officers and directors are insureds, but only with respect to their duties as your officers and directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   2. Each of the following is also an insured:

BBHC 001735

EXHIBIT A
Page 8 of 13



Mr. Ray Faccenda
May 28, 1997
Page 8

>   a. Your employees, other than your executive officers, but only for acts within the scope of their employment by you. . . .

• There are no other provisions that expressly state or reasonably suggest that the United States is an insured under the policies. Unlike the broadly encompassing automobile liability policy definition of who is an insured ("any person or organization legally responsible for the use") cited in the GEICO line of cases, there is no similar encompassing definition of the insured in the general liability coverage forms. From the plain language of the policy, we conclude that CNA would have a duty to pay those sums which BBAHC and its employees become legally obligated to pay, however, inasmuch as BBAHC and its employees could not as a matter of law be held to be liable to the plaintiff in this case, and because the United States is not a named insured under either of the policies, CNA has no duty to defend or indemnify the United States.

The United States further asserts that the United States is an implied insured under the general liability policies, arguing that it would be unfair and against public policy to allow CNA to disavow providing a defense and coverage where the risk was anticipated and substantial premiums were not only paid, but were paid by federal dollars provided to BBAHC under its § 638 contracts. The government's reasoning is as follows: Continental Insurance Company knew at the time that it issued the two GL policies to BBAHC that the torts of BBAHC's employees who act within the scope of a § 638 contract are covered by the Federal Tort Claims Act. Continental also knew that a claimant's exclusive remedy for torts committed by BBAHC's employees acting within the scope of a § 638 contract is against the United States under the Federal Tort Claims Act. Thus, the government argues that Continental sold general liability policies under which it knew it had no risk of liability unless it were required to defend and indemnify the United States, yet Continental received substantial premiums for issuing the GL policies. To now permit CNA to deny defense and indemnity by shifting liability to the United States under the Federal Tort Claims Act would be to give the insurer an unfair windfall for selling insurance for no real risk at all. Moreover, the government argues that there is no exclusionary language in either of the GL policies excluding defense or coverage for the United States' liability under the Federal Tort Claims Act. For all of these reasons, the United States asserts that it is an additional insured under the policies. We disagree with these arguments, for the following reasons.

We have spoken with Lori Wing of Brady & Company, who is the broker who sold the two GL policies at issue. Ms. Wing has extensive experience in providing insurance to § 638 contractors, including BBAHC. Ms. Wing informs us that BBAHC has long been aware that the torts that its employees might commit while acting within the scope of their duties under a § 638 contract would be covered by the Federal Tort

BBHC 001736



EXHIBIT A
Page 9 of 13


Clapp
Peterson
Stowers

Mr. Ray Faccenda
May 28, 1997
Page 9

Claims Act. However, BBAHC also recognized that not all of its services and programs are provided under its § 638 contracts. BBAHC also provides services and programs that are conducted outside of § 638 contracts, and which are funded by non-§ 638 (and indeed, non-federal) sources. Liabilities arising from these non-§ 638 services and programs would not be covered by the United States. There has also been the concern that a tort might be committed by BBAHC in a borderline case where § 638 might or might not be implicated, and the United States might take the position that it was not responsible for defending and covering liability for that tort under the Federal Tort Claims Act because BBAHC was not acting in the scope of a § 638 contract. Thus, after internal deliberations, and upon advice of its counsel, BBAHC elected to purchase general liability insurance to cover those cases where Federal Tort Claims Act coverage was not or might not be available.

Ms. Wing explained that the two above-referenced Continental Insurance Company policies were specifically sold to provide general liability insurance under these rare but foreseeable circumstances. Thus, Continental policy HMA 9500648-5 was purchased to provide general liability insurance covering BBAHC's hospital and dental clinic operations in cases where liability might be incurred under non-§ 638 contract circumstances. Continental policy 93 CBP 06114933-94 was purchased to provide general liability insurance for all other BBAHC premises and activities in cases where liability might be incurred in non-§ 638 contract circumstances. These two policies were designed and intended to supplement each other, but not to provide overlapping coverage. The CBP policy contains an exclusion that specifically excludes from coverage all hazards in connection with the ownership, maintenance, and use of the Alcohol Transition Center (Jake's Place), and the HMA policy insures hospital and dental clinic premises, and was calculated based on square footage that includes Jake's Place.

According to Ms. Wing, and contrary to the government's assertions, the premiums charged for these two policies were relatively small, and do not reflect the substantial cost of risk that would have been charged if the policies were intended to provide defense and indemnity to the United States for § 638 liabilities under the Federal Tort Claims Act. The premiums are small because BBAHC's exposure to liability for non-Federal Tort Claims Act torts is relatively rare. The premium charged for the HMA policy, which was calculated on square footage that included Jake's Place, was only $19,346. This premium purchased a $2 million general aggregate limit; a $2 million products limit; a $1 million personal and advertising injury limit; a $1 million each occurrence personal injury/property damage limit; a $50,000 fire damage limit; and a $1 million employee benefits liability. The premium for the CBP policy, which insured BBAHC maintenance and warehouse facilities, single and multiple family

BBHC 001737

EXHIBIT A
Page 10 of 13

Clapp
Peterson
Stowers

Mr. Ray Faccenda
May 28, 1997
Page 10

dwellings, apartment buildings, dormitories, and which provided for similar or somewhat higher limits than the HMA policy, and which also provided additional coverages, including, for example, commercial automobile coverage and commercial property coverage, was $43,480. These premiums are also relatively small for the coverage and limits they purchased. If BBAHC had sought to purchase general liability insurance to cover Federal Tort Claims Act liabilities, the premiums would have been much larger, reflecting the true cost of insuring against that increased degree of risk.

The United States also relies on an Alaska Supreme Court case, Stewart-Smith Haidinger, Inc. v. Avi-Truck, Inc., 682 P.2d 1108 (Alaska 1984), for the proposition that the United States is an implied insured where the risk assumed by Continental is exactly the same whether the insured is BBAHC or the United States. Under this reasoning, it is argued that Continental issued general liability policies to cover liabilities arising on covered BBAHC's premises from the negligence of its employees during a covered period of time. In this context, the government argues that the insurer is unjustly enriched having collected a premium paid by BBAHC with funds provided by the United States, yet being exposed to no potential liability. As discussed above, these assertions are factually incorrect, and on this basis distinguish BBAHC's case from that cited above.

In Stewart-Smith, the Alaska Supreme Court held that where the risk to the insurer was unchanged and where a third party is within a class intended to be benefited by the parties to an insurance contract, a third-party beneficiary insurance contract may be implied at law. The court based its conclusion on the principle that before a third party right in a contract will be recognized, the parties to the contract must intend that at least one purpose of the contract is to benefit the third party. In our case, neither BBAHC nor Continental intended that the general liability coverage would cover the risk of liabilities covered by the Federal Tort Claims Act. To the contrary, the intention of the parties to the contracts was to cover the small risk of liability arising in cases where the Federal Tort Claims Act would not apply.

There is an additional reason why the United States should not be held to be an implied insured in this case. Had the United States wished to be a beneficiary of BBAHC's general liability insurance policies, or had the United States wanted to require BBAHC to obtain general liability insurance as a condition of receiving § 638 contracts, it could have so specified in its § 638 contracts with BBAHC. The Indian Self-Determination Act's provision authorizing the Secretary of Health and Human Services to enter into § 638 contracts also expressly authorizes the Secretary to require liability insurance as a prerequisite to the contract if he so chooses:

BBHC 001738

EXHIBIT A
Page 11 of 13



Mr. Ray Faccenda
May 28, 1997
Page 11

> The Secretary of Health and Human Services is authorized to require any tribe requesting that he enter into a contract pursuant to the provisions of this subchapter to obtain adequate liability insurance . . . .

25 U.S.C. § 450g(c); see also 25 U.S.C. § 450f(c) (identical provision pertaining to the Secretary of the Interior's authority to make § 638 contracts and to require liability insurance). As far as we have found, there is no requirement in any of BBAHC's § 638 contracts with the Indian Health Service/Public Health Service that BBAHC obtain liability insurance for the benefit of the United States. The United States' failure to require that BBAHC obtain general liability insurance for the benefit of the United States should serve as an additional reason to deny the United States' claim that it is an implied insured or an implied third party beneficiary of BBAHC's Continental general liability polices.

VI.    Recommendation

Based on the foregoing factual understanding and legal analysis, we conclude that CNA has no duty under either of the two policies to defend or indemnify the United States. We recommend that if CNA determines to again respond to the United States' tender by denying the tender, CNA should provide the United States with a reasonably detailed explanation, as suggested by the foregoing. This may accomplish two purposes. First, the explanation may disabuse the United States of some of its erroneous factual assumptions, and may serve to persuade the United States not to file an action against CNA for its refusal to accept the tender. As far as we can determine, no case has been reported where the government has sought to obtain indemnity from a § 638 contractor's general liability insurance company. Thus, although there is a superficial attraction underlying the government's arguments and rationale, there is also a substantial degree of uncertainty, and the government cannot be sure that it will prevail in a bad faith action against CNA. An explanation might convince the government not to make this case the test case.

Second, an explanation should serve to help persuade a court that CNA's denial of coverage was not done in bad faith, should the United States elect to file an action against CNA. Obviously, we perceive no basis in law or fact to conclude that CNA's prior determination not to defend and indemnify the United States was done in bad faith, and to the contrary, we believe that there are good reasons why CNA need not defend and indemnify the United States under the language of the policies and the facts as we understand them to be.

BBHC 001739



**Clapp Peterson Stowers**

Mr. Ray Faccenda
May 28, 1997
Page 12

    If you have any questions about this opinion letter, or if we may be of further service, please call on us. We will be happy to draft a letter to the Assistant United States Attorney setting out CNA's response, if you think that would be appropriate.

    Sincerely,

Clapp, Peterson & Stowers

By: _____
    Craig F. Stowers

CFS/smw

BBHC 001740

EXHIBIT A
Page 13 of 13