> (15) fail to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

The bad faith standard applied by the District Court in this case is rooted in both common law and the Alaska statute. But the former is similar in word and concept to the statutory standard. (The District Court's reasoning and orders most closely coincide with standards 4 and 15, enumerated above.) Specifically, the District Court has held that "a plaintiff must show that the defendant-insurer lacked a reasonable basis for denying benefits of the policy and the defendant-insurer had knowledge that no reasonable basis existed to deny the claim or acted in reckless disregard for the lack of a reasonable basis for denying the claim." *Preliminary Order*, September 4, 2001 at 21, citing *Hillman v. Nationwide Fire Ins. Co.* 855 P. 2d 1321, 1324 (Alaska 1993).

Case law citing bad faith and statutory bad faith (unfair claims settlement practice acts) complement each other from a public policy standpoint. Both "forums" provide appropriate remedies. The regulator charged with enforcing the bad faith statute has a toolbox of remedies—monetary fines, disapproval of the insurance product being marketed, or even suspension of the insurer's license to operate (a potentially fatal blow). Judicial remedies range from equitable remedies to punitive damages.

Punitive damages, as opposed to mere compensatory damages, are necessary to ensure that insurance contract provisions are honored. If an insurer engages in bad faith and the cost of that conduct is only paying the insured that which is owed under the insurance contract, then there will be a perverse incentive to engage in bad faith behavior on the chance that the insurer's bad faith may go unchallenged. Thus, public policy requires that bad faith behavior be punished. The standards for imposing punitive damages are very rigorous. Consequently, the Alaska statutes address the matter directly:

AS 09.17.020—Punitive Damages—states in pertinent part:

> (b) The fact finder may make an award of punitive damages only if the plaintiff proves by clear and convincing evidence that the defendant's conduct
>> (1) was outrageous, including acts done with malice or bad motives; or
>> (2) evidenced reckless indifference to the interest of another person.
>
> (c) At the separate proceeding to determine the amount of punitive damages to be awarded, the fact finder may consider
>> (1) the likelihood at the time of the conduct that serious harm would arise from the defendant's conduct;
>> (2) the degree of the defendant's awareness of the likelihood described in (1) of this subsection;
>> (3) the amount of financial gain the defendant gained or expected to gain as a result of the defendant's conduct;
>> (4) the duration of the conduct and any intentional concealment of the conduct;

EXHIBIT _A_
Page _1_ of _8_

First, Nationwide relied on a policy exclusion while Continental relied on a policy omission. Second, Nationwide's denial was based on a "reasonable interpretation" (ultimately in *Hillman v. Nationwide* the exclusion was invalidated on public policy and statutory grounds) and Continental's was not. In fact, the District Court pointed out that the Ninth Circuit held that Continental's interpretation was "incorrect." Third, Continental had a duty to defend and failed to discharge that duty. Fourth, Continental's claim of "subjective intent" in excluding acts that fell within the Federal Tort Claims Act was simply not supported by the evidence. (The District Court points out in its *Preliminary Order*, September 4, 2001, "…Continental's reliance on the subjective testimony of witnesses obscures the correct legal analysis. The question is not whether BBAHC and Continental intended to include the United States, specifically as an insured. Instead, the question is whether the United States is in the class intended to be benefited." *Preliminary Order*, September 4, 2001 p. 14.) Fifth, Nationwide's denial was stated consistently from the beginning as opposed to Continental's "post hoc rationale first fully articulated in litigation over the rejection of the insureds' tenders." (*Order from Chambers,* July 12, 2005, pp. 14-16)

Having found that Continental's rejection was neither reasonable nor "fairly debatable," the District Court goes on to delineate the conduct that constitutes bad faith—i.e. the lack of a reasonable basis for denying coverage, and "the knowledge that no reasonable basis existed to deny the claim." In its earlier *Preliminary Order*, September 4, 2001, the District Court reviewed the unreasonable delays in response to the tenders from the United States, the inadequacy of the rejection explanation, the conflict of counsel Friderici, and the inadequacy of the explanation by new counsel Stowers. (*Preliminary Order,* September 4, 2001 at 24)

In its Final Order issued on September 18, 2001, the District Court additionally addressed Continental's substantive arguments that the FTCA relieved Continental from coverage. For example, Continental made the representation that BBAHC got insurance because "it was not sure that the FTCA would cover everything." (*Final Order*, September 18, 2001 at 4) The District Court states that this as an example of Continental's incorrect citations, absent citations (conclusory statements for which Continental provided no citation), and misrepresentations or half truths." (*Final Order,* September 18, 2001 at 4) The District Court went on to point that Continental's material misstatements about BBAHC officer Clark contradicted his actual statements. (See Deposition of Robert Clark.) And on the important issue of whether there was a reduction in premiums due to "less coverage" because of the FTCA, the District Court found none and concluded: "There are no contemporaneous documents objectively verifying any intent to exclude acts or omissions covered by the FTCA." (*Final Order,* September 18, 2001 at 6) Nor, the District Court goes on to say, was there any "intent" to exclude acts also covered by the FTCA. (*Final Order,* September 18, 2001 at 7) Despite Continental's unverifiable claims and misstatements about a reduction in premiums, it was in fact increasing premiums! Not only did Continental fail to reduce premiums (as it claimed to have done), it raised them. Attachment F shows the policies, the passage of the FTCA and the increase in premiums to BBAHC.

EXHIBIT A
Page 2 of 8

**Conclusion:** Here lies the first order of good faith in insurance claim settlement—prompt and reasonable acknowledgment of the existence of coverage. Continental failed to be prompt. (See Section D below.) Continental failed to provide a reasonable explanation for denial of coverage, because, as the District Court found, there is no reasonable explanation. Instead of delivering on its promise of coverage, Continental engaged in all manner of stealthy behavior designed to mislead and frustrate the valid claim of its insured. It did so deliberately, without regard for the damage its insured would suffer, and without regard for the regulatory and legal consequences Continental might suffer. Continental also lied in this case when it stated that it had reduced BBAHC's premiums when in fact it had raised them. It did these things without any regard for its duty to uphold the integrity of insurance.

**B.    Continental knowingly allowed a conflicted attorney to represent its interest.**

The District Court in its *Preliminary Order*, September 4, 2001 recognized the conflict that counsel for Continental (actually CNAF) brought upon himself: "As retained counsel for BBAHC, Friderici owed BBAHC his full, undivided loyalty and allegiance. There is some question concerning the ethical propriety of Friderici's responding on behalf of the insurer, when he represented the insured BBAHC." (*Preliminary Order*, September 4, 2001 at p. 21-22)

Continental received timely warning of Friderici's conflict and should have retained other counsel. James Friderici was a lawyer with Delaney, Wiles, Hayes, Reitman and Brubaker. He was retained by Continental to represent BBAHC in the suit filed by the injured Lori Wilson. In what appears to be his first written communication with the insurer Continental, he cites the conflict that his participation could potentially create: "As we discussed, once we represent the insured, we can no longer advise you on coverage." (Letter from Friderici to William Hutson, May 10, 1994 at p. 4. BBAHC 001194.) Despite identifying his potential conflict, Mr. Friderici goes on to state that his firm will advise Continental on what the exposure is, and Continental continued to rely upon Friderici's advice.

By May 16, 1994, Mr. Friderici had filed an appearance as an attorney for BBAHC with the Alaska state court. It is at this point, according to his own words, that Mr. Friderici should have stopped counseling Continental on this case.[5] Despite his indisputable conflict, here is a log of Friderici's activities subsequent to the time that he filed his appearance on behalf of BBAHC.

---

[5] A very strong position can be taken that Mr. Friderici was conflicted at the time of his first communication with Continental. He was retained to represent BBAHC which is staffed by employees of the United States. Therefore, as soon as he was retained he was representing the United States and he should not have consulted with Continental at all. In fact, in its most recent order the District Court stated: "It is difficult to understand how Continental would admit a duty to defend its employees but not the United States itself."

EXHIBIT A
Page 3 of 8

Finally, an email from Greg Steele to Steve Garrett dated April 28, 1997 refers to the fact that Continental needs new coverage counsel and Friderici should not be allowed to represent BBAHC any longer.

**Conclusion:** The facts and circumstances around the conflict of Continental's attorney James Friderici are an integral part of the evidence that led the District Court to find that Continental acted in bad faith. First, the District Court referenced the ethical problems facing Mr. Friderici. Second, the District Court found that the rationale for rejection of the tenders was not an adequate explanation of the denial: "it appears that Friderici (BBAHC's litigation counsel) rejected tender even though his client (BBAHC) had not reached any conclusion regarding whether the United States was an implied insured under the policy." (*Preliminary Order*, September 4, 2001 at 22) The District Court contrasted this with the position of the United States, which was "carefully crafted and well-supported." (*Preliminary Order* at 22) Finally, the District Court found that replacement counsel Stowers' response was so unacceptable that Mr. Stowers must have had the facts misrepresented to him by Continental, or that he conducted an inadequate investigation. Thus, the case law standard of bad faith was violated. So too, the statutory standards were violated.

At a minimum, the above-referenced conduct is conclusive evidence of violations of AS 21.136.125 (4), (5) (13), and (15). An insurer must not:

(4) refuse to pay a claim without a reasonable investigation of all of the available information and an explanation of the basis for denial...

(5) fail to affirm or deny coverage of claims within a reasonable time...

(13) delay investigation or payment of claims...

(15) fail to promptly provide a reasonable explanation...

My experience regulating the insurance industry leads me to conclude that Continental's conduct here is outrageous and malicious. It clearly demonstrates reckless indifference to the interest of its insured.

Continental and Mr. Friderici in his capacity as Continental's attorney acted in concert and persisted until well after Friderici identified his potential conflict of interest. Notwithstanding his conflict of interest, he continued to advise Continental after appearing in court on behalf of BBAHC. This was the event that he said would put him in conflict.

Continental was aware of these facts at all times. Not only did Friderici fail to promptly resolve his conflict of interest, he advised Continental to (unlawfully) conceal the existence of the insurance policy that covered Jake's Place. (Section C of this report.) Indeed, Continental's Fredirici responded in writing to the tender without mentioning the

EXHIBIT A

Page 4 of 8

**D.**    **Continental repeatedly and deliberately failed to reply to tenders by the United States**

Time (along with cash flow) is extremely important in the business of insurance. Insurance companies' profits in part come from investments accumulated policyholder premiums between the time they are received and the time claims are paid. In general, the longer policyholder premiums are retained, the more profitable an insurance company will be. Insurers' natural incentive to retain policyholder funds as long as possible is counterbalanced by regulatory requirements that mandate prompt claims handling. Even a casual reading of the Unfair Claims Practices Act will suffice to underscore the emphasis of prompt and timely action in handling claims.

Therefore, the front line of regulation revolves around timeliness. The first or second item on any bad faith list is the failure to respond in a timely manner. The Alaska Unfair Claims Settlement Practices Act (AS 21.36.125) contains numerous references to the need to avoid undue delay and to always provide a prompt and timely response to the insured. An insurer must not:

(2)    fail to acknowledge and act <u>promptly</u> upon communications regarding a claim arising under an insurance policy; [emphasis supplied]

(3)    fail to adopt and implement reasonable standards for <u>prompt</u> investigation of claims; [emphasis supplied]

(5)    fail to affirm or deny coverage of claims <u>within a reasonable time</u> of the completion of proof-of-loss statements; [emphasis supplied]

(6)    fail to attempt in good faith to make <u>prompt</u> and equitable settlement of claims in which liability is reasonably clear; [emphasis supplied]

(13)    <u>delay</u> investigation or payment of claims by requiring submission of unnecessary or substantially repetitive claims reports and proof-of-loss forms; [emphasis supplied]

(15)    fail to <u>promptly</u> provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement. [emphasis supplied]

Timeliness is invoked in six of the bad faith provisions in the Alaska Unfair Claim Practices Act. The tender attempts by the United States were discussed extensively in the pleadings and reviewed in the *Preliminary Order*, September 2001. In its order the District Court noted the multiple tenders by the United States, and Continental's failure to respond or the inadequacy of the response. In fact, the District Court used the term "dilatory" in describing Continental's actions.

15

The United States first tendered to Continental January 6, 1995. Thirty-three days later on February 13, 1995, Continental, through its counsel Friderici, rejected the tender. The District Court stated: "Friderici neither cited nor discussed any relevant case law. Friderici and Continental did not advise the United States that there was a separate policy covering Jake's Place." (*Preliminary Order*, September 4, 2001, at 22)

According to the District Court, approximately 108 days later, as of June 1, 1995, BBAHC, Continental's insured stated through its counsel that it had not yet reached a conclusion about whether the United States was an insured.

On June 6, 1995, having discovered the HMA policy that covered Jake's Place without any help from Continental, the United States tendered to Continental. The District Court pointed out that the United States "set forth its position in a carefully crafted and well-supported letter citing both treatises and case law." (*Preliminary Order*, September 4, 2001 at 22)

On June 8, 1995, Friderici answered, stating he was not authorized to respond but would forward the letter to Continental.

Three months later, on October 3, 1995, after inquiries from the United States about the whereabouts of its tenders, Continental responded. Once again, Continental rejected the tender of the United States, relying on Friderici's original letter. At this point, according to the District Court, Continental had failed for ten months to complete its investigation with regard to this tender thereby negating any "timely" response.

Sixteen months later, on February 20, 1997, and over two years after the original tender, the United States tendered once again. This tender took place when the United States was in final negotiations with the Lori Wilson family. Twenty-eight days later Continental acknowledged receipt of the tender, but did not otherwise respond.

The burden fell to the United States to once again contact Continental. It did so on May 16, 1997. Another month elapsed and on June 19, 1997, Continental's new counsel, Mr. Stowers, rejected the tender. The District Court concluded that Mr. Stowers must have had the facts misrepresented to him or conducted an inadequate investigation.

Regardless of the reason(s), the fourth good faith tender of the United States was ultimately rejected, too. The whole process of the four tenders and the final rejection consumed 2-½ years.

**The Kallstrom Case**

Continental's bad faith and bad motive continued unabated. Continental flagrantly denied tenders in the Wilson case. Additionally, Continental never really responded to tenders in a second matter. Ms. Kallstrom was the woman who served Lori Wilson the caustic dishwashing liquid. When Continental failed in its duty to defend the claim against the United States, it proceeded against Ms. Kallstrom. Ms. Kallstrom counter-sued for

16

EXHIBIT _A_

Page _6_ of _8_

**Conclusion:** The District Court unequivocally found that the failure to respond in a timely fashion was part of Continental's bad faith. (*Preliminary Order*, September 4, 2001 at 22-24) And, in the instance of the delayed tenders, the District Court addressed the punitive damages standard: "A jury could find that Continental's rejection of the United States' tenders was outrageous or done with reckless indifference." (*Preliminary Order*, at 17)

Continental's behavior at a minimum is a violation of AS 21.36.125 (2), (3), (5), (6), (13), and (15). Altogether, it does not seem that Continental's behavior is inadvertent or the result of carelessness or ineffective business control (any or all amounting to bad faith). Rather, it has been thoroughly demonstrated that Continental has acted deliberately and repeatedly in a manner calculated to frustrate and wear down its insured.

Does the lack of response or the delay in responding to tenders add to Continental's outrageous conduct that is otherwise laced with malice or bad motives? One would have to conclude, "yes." Two and one half years to receive a denial that is never adequately supported by a proper analysis is clearly unconscionable.

In the situation surrounding the Kallstrom case, there had been a ruling that the United States was an insured, and yet Continental ignored the direct and specific retenders of Kallstrom once more. Its behavior is intentional, reprehensible and completely beyond the standard of care for the insurance industry.

E.    **Continental compelled its insured to litigate for recovery**

A great concern of regulators is that an insurance company, which has unequal bargaining power in relation to the insured, can simply drag its feet on a claim. This will require the insured to file a lawsuit or give up on the claim because the insured does not have the resources to take the insurance company to court. Delay tactics, unreasonable rejections of coverage, non-responsiveness are the things that force an insured to litigation. These tactics are considered a hallmark of bad faith. The AS 21.36.125 provides: An insurer may not:

> (7)    engage in a pattern or practice of compelling insureds to litigate for recovery of amounts due under insurance policies by offering substantially less than the amounts ultimately recovered in actions brought by those insureds.

> (8)    compel an insured or third-party claimant in a case in which liability is clear to litigate for recovery of an amount due under an insurance policy by offering an amount that does not have an objectively reasonable basis.

Continental has engaged in continuing dilatory behavior from the beginning of the case up to and through the findings by the Ninth Circuit and District Court (finding of bad faith), and still has not accepted tender from the United States or settled this matter. It has

18

87-year old widow or a small Alaska businessperson. Mr. Friderici would simply delay until she were dead or the small business ran out of money to pursue litigation.

These egregious behaviors of delay and concealment forced the United States to litigate this case more than seven years at an enormous expense to the taxpayers of this country. This is a classic violation of claims handling standards and specifically AS 21.36.125 (7) and (8). Was the conduct outrageous with malice and bad motives or done with reckless indifference with regard to the interest of others? Yes!

The conduct was clearly deliberate. Mr. Friderici sought to wait out the United States and hope it would not sue. Second, the motive was to deny the ability of the United States to collect on the claim. What is clearly apparent is the belief that the United States was too large and bureaucratic to bother protecting the interests of a rural native-Alaskan health clinic. Continental believed it could get away with this behavior. It is this egregious behavior that should be punished.

## F.    Continental failed in its duty to defend.

The duty to defend with a reservation of rights when an insurer believes there is no coverage is a concept that rises out of the common law and is generally not contained in insurance statutes. Nevertheless, many courts have found a breach of the duty to defend to be an element of bad faith. The District Court in this case raised the issue in its *Preliminary Order*, September 4, 2001: "...Continental's own 30(b)(6) witness later testified that Continental did have a duty to defend even if it did not have a duty to indemnify." (*Preliminary Order*, at 24) Courts have made failure to defend an element of bad faith and subject to punishment (punitive damages), because otherwise there would be an incentive to do what Continental did to the United States over and over. In *Insurance Law, 3rd Edition, Robert H. Jerry II*, explains the importance of good faith adherence to the duty to defend:

> If the only damages for which the insurer can anticipate being held liable
> are the costs the insured incurs in hiring counsel that the insurer did not
> provide, which is the cost the insurer would have incurred had it
> performed its duty, the insurer has few reasons not to breach the promise it
> made to the insurer. p. 886

The treatise goes on to say that if an insured gives up on an insurer's duty to defend because it is too expensive for the insured to go after the insurer, again, the insurer might profit from failing to discharge its duty to defend. This kind of insurer behavior is deterred by the threat of punitive damages. In the case of *Tibbs v. Great American Insurance Co.* 755 F. 2d 1370, 1375 (Ninth Circuit 1985), the court upheld the imposition of punitive damages for failing the duty to defend.

**Conclusion:** Continental's conduct in this instance—refusing to defend both the Wilson and Kallstrom cases—was an outrageous act done with bad motive. Continental could

EXHIBIT ___A___

Page __8__ of __8__