Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
         vs.                        )   No. A98-285 CV (JWS)
                                    )
CNA FINANCIAL CORPORATION AND THE   )
CONTINENTAL CASUALTY COMPANY d/b/a THE )
CONTINENTAL INSURANCE COMPANY,      )
                                    )
                    Defendant.      )

VIDEO-TAPED DEPOSITION UPON ORAL EXAMINATION

OF

DEBORAH SENN

9:08 A.M. - 12:18 P.M. & 1:21 P.M. - 5:07 P.M.

Wednesday, January 11, 2005

600 University Street, Suite 320

Seattle, Washington

LORRAINE M. MILLAY, CCR/RPR

EXHIBIT _A_

Page _1_ of _21_

SEATTLE DEPOSITION REPORTERS
www.seadep.com    (206)622-6661 * (800)657-1110    FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                          January 11, 2006

Page 20

1      administrative proceeding even in any insurance issue in a

2      court or commission that's venued in Alaska?

3   A  I don't believe so.

4   Q  How long have you been a -- how long has, has your primary

5      work been serving as an expert witness?

6   A  Since 2001.

7   Q  And how come you -- I guess withdraw that.

8         Prior to 2001 you were a partner at a law firm?

9   A  Yes.  That's correct.

10  Q  And what was the name of that law firm?

11  A  At the time it was Bergman, Senn, Pageler & Frockt.

12  Q  And what kind of law practice was it?  Litigation?

13  A  Yeah.  They did litigation.  They, they did personal injury.

14     They did some asbestos.  I was hired to do insurance work.

15  Q  On the plaintiff's side?

16  A  Plaintiff's side, yes.

17  Q  So suing insurance companies in terms of the insurance work?

18  A  Well, I mean I was -- you know, we looked at anything that

19     came along, but, but I represented several plaintiffs in

20     cases against insurance companies.

21  Q  During your time at that law firm did you ever represent an

22     insurance company?

23  A  No, I don't believe so.  I hesitate because I've had calls

24     from insurance agents, groups to represent them, and I think

25     that -- I think in one case I turned down because I felt

EXHIBIT  A

SEATTLE DEPOSITION REPORTERS    Page 2 of 21
www.seadep.com        (206)622-6661 * (800)657-1110    FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 23

1   A   Yes.

2   Q   Different matters?

3   A   Right.

4   Q   How many different matters would you say you have right now

5       at one -- at this particular moment in time?

6   A   I have, I don't know, maybe between five and 10.  Some of

7       them have been sitting for several years --

8   Q   Okay.

9   A   -- and are on appeal.

10  Q   Okay.

11  A   Some I'm, some I'm retained and I'm still waiting for them

12      to tell me what they'd like me to do.

13  Q   Okay.  So you have between five and 10 matters sort of on

14      your desk right now?

15  A   Right.

16  Q   They're in various levels of activity?

17  A   Right.

18  Q   And throughout your time as a, as a consultant with your own

19      company you've been retained in about 25 to 30 different

20      matters, total?

21  A   Yeah.

22  Q   And you've been deposed as an expert witness approximately

23      15 times?

24  A   Correct.

25  Q   Have your, have your hourly rates changed at all during the

EXHIBIT  A

SEATTLE DEPOSITION REPORTERS  Page 3 of 21
www.seadep.com        (206)622-6661 * (800)657-1110   FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                              January 11, 2006

1          I shall further examine Continental's bad faith in

2      light of the standards set forth in Alaska Statutes and the

3      Alaska Administrative Code in order to address the precise

4      nature and degree of Continental's bad faith - whether

5      Continental's bad faith was outrageous and in reckless

6      disregard of the rights of the insured."

7          So I was very clear about this.  The judge has found in

8      the District Court opinion, has made findings of bad faith.

9      In my opinion, I also talk about the Alaska statute which in

10     some instances is a -- maybe a broader reading of bad faith

11     than common law bad faith.

12         And I used the Alaska statute as sort of a measuring

13     stick, a good analogy, because I've done that in all the

14     cases of bad faith that I've been involved in, for the acts

15     of Continental.

16         So things that I feel were bad faith that come under

17     the statute, and I'll give you an example, and once again

18     the statute is a measuring stick, of forcing a -- an insured

19     to litigation is not something cited by Judge Sedwick in his

20     exposition of common law bad faith.

21         So basically I built my opinion based upon the law of

22     the case, which is Judge Sedwick's findings about bad faith,

23     I cited some additional instances and behaviors that I think

24     were a problem based on my regulatory background and bad

25     faith, and then I addressed the issue of how outrageous and

EXHIBIT   A

www.seadep.com        (206)622-6661 * (800)657-1110   FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 95

1    A   Right.

2    Q   And we'll get into the details of that in a minute.  Is that

3        a fair way of stating that?

4    A   Yeah.  Sure.

5    Q   Now there are other -- there are other, I think you said,

6        aspects of this case which also, you believe, constitute bad

7        faith, other acts that occurred that you believe constitute

8        bad faith that I'm gathering are not set forth in the

9        Court's orders of those three that I've mentioned?

10   A   Let me check.

11   Q   Okay.

12   A   Because I said there was one, I gave an example, but now I'm

13       thinking that the Court actually did reference it as well.

14       Give me a minute.

15                               (Pause in proceedings.)

16   A   Well, if you'll turn to page 7, it says -- which is entitled

17       Report Organization, and I have the sections in my report

18       divided into A through H, I would say that A, B, C, D are

19       based upon -- and F.

20   Q   (By Mr. Tayback)  I'm sorry.  A, B, C, D and F?

21   A   Yes.  Are clearly findings of bad faith that is the law of

22       this case, that the Court discussed at great length.  Okay?

23          So the -- G is the, you know, the claims handling

24       guidelines which is kind of a different section, but it sort

25       of embellishes the wrongful conduct.  All right?

EXHIBIT A
Page 5 of 21
SEATTLE DEPOSITION REPORTERS
www.seadep.com          (206) 622-6661 * (800) 657-1110   FAX: (206) 622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 96

1          But so, let's go to F.  I'm sorry.  Not F, because -- I

2     mean E, because the judge talked about the failure of a duty

3     to defend and said it was a primary duty, et cetera.

4          "Continental compelled its insured to litigate for

5     recovery."  Those words are not contained in the findings of

6     good faith, bad faith that the judge uses because he cites

7     failure to provide a prompt and reasonable explanation for

8     its denial of coverage, that's kind of a catchall, the

9     common law catchall he uses.

10          But if you go to my discussion which --

11   Q  Your discussion under E?

12   A  Under E.

13   Q  Which is page --

14          MR. STONE:  Eighteen.

15   Q  (By Mr. Tayback)  -- 18.

16   A  Page 18.  I say in the one, two, third, fourth line, "Delay

17     tactics, unreasonable rejections of coverage,

18     non-responsiveness are the things that force an insured to

19     litigation," and "These tactics are considered a hallmark of

20     bad faith."

21          So the things that Continental did which forced the

22     United States to litigation are all elements of bad faith

23     that have been found in this case, No. 1.

24          And No. 2, the judge used the word dilatory in

25     describing Continental's behavior, and I make a reference to

EXHIBIT  A

SEATTLE DEPOSITION REPORTERS    Page 6 of 21
www.seadep.com         (206) 622-6661 * (800) 657-1110   FAX: (206) 622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                        January 11, 2006

Page 97

1    that on page 18 at the bottom.

2        And then I go through a list of things that

3    Mr. Friderici did which were designed to, you know, push the

4    United States to litigation.

5        And so, I conclude that that principle of compelling

6    the insured to litigate for recovery, which is a statutory

7    bad faith principle, is clearly violated by virtue of the

8    acts of bad faith that the judge has found.

9        So I suppose that -- I mean, I don't know the answer to

10    this question, but you could get to court and say that is

11    not the law of the case, and the judge has made the findings

12    on bad faith and you can't argue anymore bad faith and

13    therefore you can't talk about that, although I certainly

14    can talk about all the underlying findings of bad faith that

15    amounted to that behavior.

16        So I think that that's the only element of bad faith

17    that I cite based on the statutory measuring stick that

18    isn't contained under the common law principle enunciated by

19    Judge Sedwick as a law of the case.  But let me just once

20    again say the things that amount to it --

21    Q  You think come from the opinions --

22    A  Come from the opinion.

23    Q  -- elsewhere in the opinions?

24    A  Yes.  Clearly are things cited in the opinion.

25    Q  Okay.  But other than that one, everything else you think --

EXHIBIT  A
Page  7  of  21

SEATTLE DEPOSITION REPORTERS
www.seadep.com    (206) 622-6661 * (800) 657-1110    FAX: (206) 622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 107

1    A    Right.  But I didn't know independent research, I was not

2         retained for that.

3    Q    Does it matter to you at all in your analysis of bad faith

4         as to whether or not it was genuinely debatable as to

5         whether or not the United States was an implied insured?

6    A    I am relying on the law of the case.  And the Ninth Circuit,

7         a very venerable Court, has found that the United States is

8         an implied insured, so that is where my analysis begins.

9             If the United States was -- is not an implied insured,

10        then Continental would not be able to commit bad faith

11        because the U.S. wasn't an insured.

12            But the point is, the law of the case is that the U.S.

13        is an implied insured.  And I have not spent any time

14        establishing an independent opinion because (A) I wasn't

15        asked to do that, and (B) it's the law of the case.

16   Q    And my question isn't is it the law of the case that they

17        are an implied insured.  My question is, did it matter at

18        all to your analysis as to whether or not that question

19        about whether they were in fact an implied insured was a

20        close question, fairly debatable?

21   A    You know, the term fairly debatable comes out of the Hillman

22        case and it has to do with bad faith.  And the judge's

23        argument -- you know, I don't know if the standard was

24        fairly debatable in the implied insured cases.  I have to go

25        back and take a look.

EXHIBIT  A
Page  8  of  21

cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                          January 11, 2006

Page 108

1          So I don't -- the concept you're talking to me is a
2      concept that was used in the Hillman case, it had to do with
3      whether or not their denials or failure to accept tender
4      could be construed as a good faith denial, and that's where
5      the term fairly debatable comes from.
6    Q  So you haven't spent any time looking at or -- it doesn't
7      figure into your analysis and your opinion as to whether or
8      not the question about whether the United States was an
9      implied insured was fairly debatable, you just didn't --
10   A  No.
11   Q  -- you didn't consider that?
12   A  No.
13   Q  Did -- you read the Ninth Circuit opinion?
14   A  I did.
15   Q  Did you read Judge Kleinfeld's descent?
16   A  I have.
17   Q  Do you disagree with Judge Kleinfeld's descent?
18   A  I haven't read it for quite some time.
19   Q  Well, I'm not going to give you a pop quiz on what he says,
20     but just -- I mean, it was a descent.  He found that he
21     didn't think the United States should have been an implied
22     insured in his descent?
23   A  I agree with the majority opinion of the Ninth Circuit.
24   Q  And does that mean that you disagree then with the descent?
25   A  Yeah.  Except I haven't looked at it in so long, I'd have to

EXHIBIT ___0___

SEATTLE DEPOSITION REPORTERS
www.seadep.com        (206)622-6661 * (800)657-1110    FAX: (206)622-6236

cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 114

1   A   Well, but if I decide -- I don't, I don't venture onto a

2       topic that my client hasn't -- that's not, that's not the

3       proper question.  I don't venture onto a topic in my report

4       that my client hasn't agreed I should address that topic.

5   Q   Okay.  And so, so your client, the United States --

6   A   So that is not what I said.  I didn't -- but go ahead.

7   Q   I'm sorry.  Your client, the United States, said

8       Continental's corporate structure is something that they

9       wanted you to offer an opinion on?

10  A   Well, I raised the issue to the United States.

11  Q   And they concurred they wanted you to offer an opinion about

12      it?

13  A   Well, to put this information in there so that if I have to

14      speak about the issue of the corporate structure I'm, I'm

15      prepared and I've laid the groundwork to do it.

16  Q   Did you do any legal research into what in fact -- well, do

17      you have any evidence that -- I think you made a reference

18      to Farmers setting up an elaborate corporate structure to

19      avoid liability, I think that's what you said.

20  A   That's been my experience and my opinion, yes.

21  Q   Okay.  Do you have any evidence that CNA or Continental has

22      structured their corporation to avoid liability?

23  A   No.  In fact, up until Mr. Lohr's testimony, it seemed like

24      everything was on the up and up in terms of their corporate

25      structure, particularly based on the deposition by

EXHIBIT   A

SEATTLE DEPOSITION REPORTERS   Page 10 of 21
www.seadep.com       (206)622-6661 * (800)657-1110   FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 116

1   Q  That's not my word.  I just -- I'm asking you.

2   A  Okay.  He's -- you're just playing word games with me.

3          Mr. Lohr has proffered an opinion in his report that if

4      there is any punitive damages, they only should come from

5      the Alaska portion of Continental's business.

6          And since Mr. Boysen testified in deposition that he

7      couldn't even break it out, I think that, that Mr. Lohr's

8      testimony has gone off in the wrong direction.

9   Q  And what does that -- well, I guess, first of all, you wrote

10     this report, including this section, before you ever saw

11     Mr. Lohr's report; right?

12  A  That's correct.

13  Q  And so, when you wrote this, you didn't have any re -- I

14     think you'd said you didn't have any reason to think there

15     was anything --

16  A  That's why I only wrote a paragraph.

17  Q  -- askew.  So is it your intention to offer more opinion on

18     this subject than is set forth in this report?

19  A  I think that it -- I think it lays the ground work for me to

20     offer an opinion on this subject if it comes up.

21  Q  Okay.

22  A  And Mr. Lohr has opened the door, and I -- disappointingly.

23  Q  And what does -- what does the -- the fact that CIC has no

24     employees, what does that have to do with anything that

25     Mr. Lohr said in his report?

EXHIBIT   A

SEATTLE DEPOSITION REPORTERS   Page  11  of 21
www.seadep.com       (206)622-6661 * (800)657-1110   FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 117

1   A   Why is it that the -- why is it that Continental Insurance

2       is selling insurance to people from a company that has no

3       employees?

4   Q   My question is --

5   A   It's a shell.

6   Q   My question is, what difference does it make to you and your

7       opinion?

8   A   Well, because I've seen in litigation this kind of corporate

9       structure used to avoid liability.

10  Q   But do you see -- the fact that CIC has no employees, is

11      that anything that's being used in this case to avoid

12      liability?

13  A   If the company goes and argues that, that only the Alaska

14      portion of Continental's business should be subject to the

15      punitives, then I think it opens the door to their net worth

16      and their entire corporate structure --

17  Q   I guess --

18  A   -- and my experience with corporate structure.

19  Q   So your experience would be that, that companies -- not CIC

20      in particular, but companies like CIC use corporate

21      structures to avoid liabilities?

22  A   I -- no.  My experience is, I have seen companies that have

23      created shells and isolated assets to avoid punitive

24      damages, and I would hope that that would not happen in this

25      case.  And I don't think, up until Mr. Lohr's testimony,

EXHIBIT A

SEATTLE DEPOSITION REPORTERS   Page 12 of 21
www.seadep.com        (206)622-6661 * (800)657-1110   FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 135

1      from Mr. Friderici.  I think you said it was from

2      Mr. Hutson.

3   A  Well, the other one I mentioned was from Mr. Hutson.

4   Q  Yeah.  This one --

5   A  This one is from Friderici.

6   Q  I believe that this one is from Mr. Friderici --

7   A  Okay.

8   Q  -- the one you're describing.

9   A  Okay.

10  Q  So there's those two letters which both --

11  A  That's correct.  It's a January 20th, 1995, letter.

12  Q  So there's those two letters which relate to the issue that

13     you've described in your report as the, the failure to

14     identify to the United States the existence of an additional

15     policy issued to Bristol Bay; is that right?

16  A  Correct.

17  Q  Now you're aware that as of certainly up to and including

18     January 20th, 1995, and for some period of time after that

19     the United States was contending that they were an implied

20     insured?

21  A  I believe so.

22  Q  And as of that time do you know whether there was any case

23     anywhere in the United States in which the United States had

24     been found to be an implied insured on any insurance

25     contract ever?

EXHIBIT ___

SEATTLE DEPOSITION REPORTERS Page 13 of 21
www.seadep.com        (206)622-6661 * (800)657-1110   FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                   January 11, 2006

Page 136

```
 1    A   I did not make that investigation.  I don't know the answer
 2        to that.
 3    Q   Do you think that, just as a general proposition, an
 4        insurance carrier owes the same duties to the purchaser of
 5        its insurance policy that it does to someone who's not a
 6        purchaser?
 7    A   At the beginning of my testimony I state the following on
 8        page 3 at the bottom, "The business of insurance is one
 9        affected by the public interest, requiring that all persons
10        be actuated by good faith, abstain from deception, and
11        practice honesty and equity in all insurance matters.
12            Upon the insurer, the insured, their providers, and
13        their representatives rests the duty of preserving inviolate
14        the integrity of insurance.
15            'All persons' means everyone without respect to
16        technical knowledge (expert and unsophisticated), wealth and
17        income (rich and poor), or role (insured or insurer).  An
18        insurer's duty of good faith does not vary depending on the
19        wealth or circumstances of the insured."
20            The law of this case is that the United States is an
21        implied insured, it is owed all the duties that are owed to
22        an insured.
23    Q   You understand that the law of this case didn't exist in
24        January 20th of 1995 on that point; right?  You understand
25        that?
```

EXHIBIT    A

cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                              January 11, 2006

1   A   I understand that the judge had not entered his order, nor

2       had the Ninth Circuit.

3   Q   And so -- I mean that's what the law of the case is, it's a

4       reference to a particular order issued on a particular date

5       and time, and it didn't exist as of January 20th, 1995;

6       right?

7   A   That's correct.  Yes.

8   Q   So my question to you is a more general one which is without

9       respect to the law of the case as it exists now.  Does an

10      insurer owe the same duty to non-purchasers of its policy

11      that it owes to its purchasers or are the duties different?

12      Just in general.

13  A   In general -- in general I would say, just if you take that,

14      an isolated statement, the duties, you know, may be

15      different, but I, I can see where you're going here.

16          You know, you're saying at the time Mr. Friderici or

17      Mr. Hutson, you know, did not accept that the United States

18      was an insured, but that is not the law of this case.

19          The United States is an implied insured, and so all the

20      conduct in this case is under the umbrella of the fact the

21      United States is an implied insured.

22          MR. TAYBACK:  I move to strike everything after

23      the answer "they may be different."

24  A   And let me give you something else to strike, sir.  Standing

25      alone --

EXHIBIT A

SEATTLE DEPOSITION REPORTERS
www.seadep.com      (206)622-6661 * (800)657-1110    FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                      January 11, 2006

Page 138

1    Q   (By Mr. Tayback)   Is this responsive to my question?

2    A   Well, standing alone, this is not how you conduct the

3        business of insurance, hiding policy.

4    Q   So let me ask you.  If I call your insurance carrier and

5        say, "I'm Chris Tayback and I think I have a claim that I

6        should probably be covered by Ms. Senn's policy.  Can you

7        give me her insurance information?"

8            Do you think that carrier, your carrier, has an

9        obligation to give me, a non-named insured, your policy

10       information?  I think it can be answered yes or no.

11   A   Well, let me go back to my -- because I addressed the very

12       example that you talk about.

13   Q   Can you answer it yes or no?

14   A   Well, the answer is that there is a -- there was an absolute

15       -- the United States was not some guy like Mr. Lohr walking

16       down 5th Avenue in Anchorage and said, 'Give me the

17       information about the policy.'

18           The United States was arguably the embodiment of BBAHC

19       and its employees, and there was every reason to believe

20       that the United States had a legitimate claim.

21           Because if -- if that wasn't the case, then the judge

22       would have found that it was reasonable, the denial was

23       reasonable.

24   Q   You understand, don't you, that to make a determination

25       about bad faith you've got to look at what the conduct was

EXHIBIT _A_

SEATTLE DEPOSITION REPORTERS Page _16_ of _21_
www.seadep.com      (206) 622-6661 * (800) 657-1110   FAX: (206) 622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                          January 11, 2006

Page 139

 1        at the time, not --

 2    A   That's correct.

 3    Q   -- not as you -- not sitting back kind of saying, hey --

 4    A   That's correct, but --

 5    Q   -- hindsight's perfect.

 6    A   -- but if the U.S. is an insured, then you have to look at

 7        it in light of the fact the U.S. is an insured.

 8    Q   That they've ultimately been determined to be an implied

 9        insured, that's what you mean; right?  That's what you mean;

10        right?

11    A   Yeah, but you're -- you know what, Mr. Tayback, you're

12        re-litigating the law of this case with your argument.

13            The United States is an implied insured.  It has to be

14        treated like an insured.  That conduct -- if it was not an

15        insured, that conduct would be irrelevant because there

16        couldn't be bad faith.

17            But they are an insured and it has to go back in light

18        of the status of the United States.  And furthermore, let me

19        remind you that, that the judge in his opinion referred to

20        Continental's reasons for denial as ex post facto creations.

21    Q   You're now on a different issue.  Okay?  So I want to keep

22        you back on the things you just were talking about, which is

23        the letter that you identified of April 6th, 1994, to Ertle

24        from Hutson, and the letter of January 20th, 1995, from

25        Friderici to Hutson --

EXHIBIT __H__

SEATTLE DEPOSITION REPORTERS     Page __17__ of __21__
www.seadep.com     (206) 622-6661 * (800) 657-1110   FAX: (206) 622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 150

1      what you asked me.

2   Q   Okay.  Have you looked to see whether it was disclosed to

3      Bristol Bay, the existence of both policies?

4   A   It seems to me that my examination of the letters shows that

5      these same guys did not call up Bristol Bay and say, by the

6      way, there's that -5 policy.

7   Q   Do you know whether or not Bristol Bay originally tendered

8      it under both policies?

9   A   It's possible.  I --

10  Q   You don't know?

11  A   I don't know.

12  Q   Okay.  So this is not a case, and I believe you'll agree

13     with me on this, this is not a case in which the carrier

14     failed to disclose the existence of a policy to the

15     purchaser of that policy?

16  A   I don't know the answer to that.  I'd have to go back and

17     look.

18  Q   But it's not a basis of your opinion because you don't have

19     any idea?

20  A   Once again, I have to go back and look at the letters.  I

21     don't recall right now.

22  Q   Well, I mean, I'll tell you that there's nothing about that

23     in this report anywhere.

24  A   Okay.

25  Q   And, and it would be in this report if that was something

EXHIBIT __A__

Page __18__ of __21__

SEATTLE DEPOSITION REPORTERS
www.seadep.com        (206) 622-6661 * (800) 657-1110   FAX: (206) 622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                                    January 11, 2006

Page 151

```
 1       that occurred.  That would clearly be wrong, wouldn't it, to

 2       fail to disclose to its purchaser?

 3    A  It is wrong to fail to disclose to its insured, whether it's

 4       a purchaser or an implied insured.

 5    Q  And have you ever had any other case where you've dealt with

 6       an implied insured?

 7    A  No.

 8    Q  Have you ever -- and I think you've already said you're not

 9       aware of any case that exists anywhere holding the United

10       States as an implied insured?

11    A  I said I haven't done that investigation.

12    Q  And do you know -- do you have an opinion about whether if

13       the United States -- if Mr. Stone called and said, I'd like

14       to know Ms. Senn's -- any, any malpractice insurance policy

15       she might have to your care -- to your carrier, would your

16       carrier have a duty to tell Mr. Stone who that is and what

17       policies you might have?

18    A  You know, once again, the United States has been found to be

19       an implied insured.

20    Q  Now?

21    A  And there was -- and there was a -- you know, the United

22       States was not the man on the street coming up to these

23       guys.  Remember, and I want to cite you to -- I'm going to

24       cite you to Footnote 5 on page 10.

25    Q  Of your report, you're talking about?
```

EXHIBIT  *A*

Deborah Senn                                    January 11, 2006

Page 179

1   Q  How about the reasonableness of the explanation offered in

2      Mr. Friderici's letter to the U.S. and Mr. Stowers' letter

3      to the U.S. respectively, do you have any opinion about the

4      reasonableness of the explanation other than what the Court

5      has already stated in its orders?

6   A  The law of the case is that the explanation was not

7      reasonable.

8   Q  Okay.  And so, then the answer is no, you have no opinions

9      other than what the Court said?

10   A  I did not -- I did not conduct an independent investigation,

11      but I certainly, certainly could have asked to.

12   Q  Okay.  But you haven't, and so I'm just --

13   A  That's correct.

14   Q  I want to know where you stand right now.

15   A  That's correct.

16         MR. TAYBACK:  I'd like to have this marked as the

17     next exhibit in order.  This is Mr. Friderici's letter to

18     the U.S. dated, February 13th, 1995.

19         MR. STONE:  Is there an extra one?

20         MR. TAYBACK:  There is not, but you can look --

21     I'm not going to ask any questions about it.  I'm just going

22     to have it marked and have her identify it.

23         (Exhibit No. 2 marked.)

24         MR. TAYBACK:  Actually I'll mark this as

25     Exhibit 3, too.  This is Mr. Stowers' letter.  That's two,

EXHIBIT _A____

SEATTLE DEPOSITION REPORTERS
www.seadep.com      (206) 622-6661 * (800) 657-1110    FAX:  (206) 622-6236

cfe5ee7e-209a-4c65-a406-a069d5297898

Deborah Senn                                    January 11, 2006

Page 199

1   A   Yes.

2   Q   And did you, did you research the concept of an implied

3       insured?

4   A   No.  As I told you earlier, I did not research that.

5   Q   And so, this analysis about him not finding any case

6       anywhere in which the United Statess was found to be an

7       implied insured --

8   A   I did not research.

9   Q   Do you think it's unreasonable, his position on that?

10  A   I haven't asked -- been asked to offer an opinion on it, but

11      if I need to I will.

12  Q   Well, I'm asking you now.  Do you -- you don't have an

13      opinion right now?

14  A   On the issue of the implied insured in that letter, no.

15  Q   Do you have an opinion on when, when a insurance carrier

16      needs to issue a reservation of rights versus just to reject

17      the tender or defend under a reservation of rights?  That's

18      right.  I may have left out that word.  Let me rephrase the

19      question.

20          Do you have an opinion on whether -- on when an

21      insurance carrier is required to defend a case under a

22      reservation of rights versus just rejecting it?

23                              (Pause in proceedings.)

24  A   Well, I refer in Section F on page 20 of my report and I

25      note that in this case the duty to defend -- first of all,

EXHIBIT A

SEATTLE DEPOSITION REPORTERS
www.seadep.com          (206)622-6661 * (800)657-1110   FAX: (206)622-6236
cfe5ee7e-209a-4c65-a406-a069d5297898