# EXPERT REPORT

**in re**

*United States of America v. CNA Financial Corporation, et al.*

**Case No. A98-285 CV (JWS)**

# by

# Douglas J. Serdahely

**December 22, 2005**

46601v1

200065

Exhibit ___1___
Page ___1___ of __49__ pages

# TABLE OF CONTENTS

SCOPE OF ENGAGEMENT ............................................................................ 3

PROFESSIONAL BACKGROUND ................................................................. 3

BILLING RATE ................................................................................................ 3

MATERIALS REVIEWED AND CONSIDERED ........................................ 3

PRIOR EXPERT TESTIMONY ..................................................................... 4

SUMMARY OF OPINIONS ............................................................................ 4

DISCUSSION ..................................................................................................... 4

I.  BAD FAITH CLAIMS ................................................................................ 4

A. Applicable Standard of Law ....................................................................... 4

B. Nature of Continental's Investigation and Analysis of USA's Tenders and Claims. .......... 5

    1.  Mr. Friderici's Investigation, Analysis and Advice. ........................ 7

    2.  Mr. Stowers' Investigation, Analysis and Advice. ......................... 9

    3.  Continental's Reliance on Advice of Coverage Counsel. ............. 10

C. Reasonable Reliance on Broker's Information. ...................................... 12

D. Existence of a Fairly Debatable, "Close" Question of Law of First Impression .............. 16

E. Failure to Defend Under Reservation of Rights. .................................. 21

F. Tender of Kallstrom's Claim. .................................................................. 22

II. Punitive Damages Claims ......................................................................... 25

A. Applicable Standard of Law. .................................................................... 25

B. Absence of Outrageous, Malicous or Reckless Conduct by Continental. .......................... 26

- 2 -

200066

Exhibit __1__
Page __2__ of __49__ pages

## SCOPE OF ENGAGEMENT

Counsel for CNA Financial Corporation and The Continental Casualty Company d/b/a Continental Insurance Company ("Continental"), Guess & Rudd, P.C., and their predecessor counsel, Dorsey & Whitney, L.L.P., engaged me to review the record in *United States of America v. CNA Financial Corporation, et al.*, Case No. Case No. A98-285 CV (JWS), as well as related documents and materials, and to render expert legal opinions on (1) whether Continental had, under Alaska law, engaged in bad faith conduct in denying and responding to the United States of America's ("USA" or "Government") tenders of defense relating to the Lori Wilson and Blanche Kallstrom claims, and (2) whether in so doing, such conduct gave rise to any punitive liability.

My analysis, discussion and opinions are set forth below in the instant report.

## PROFESSIONAL BACKGROUND

My educational and professional background is set forth in my professional resume, attached hereto as Exhibit A.  In my legal career, I have been actively involved in the private practice of law, and have served as a Superior Court Judge, in Alaska for over 30 years.

## BILLING RATE

For this engagement, I am using my standard professional billing rate of $325 per hour.

## MATERIALS REVIEWED AND CONSIDERED

In preparing this report, I have reviewed over 140 principal documents relating to this case; Judge Sedwick's orders and the Ninth Circuit's decision in this case; decisions of Judge Holland, the Ninth Circuit and the Alaska Supreme Court in the Kallstrom case; relevant insurance policies; various tenders of defense letters from the USA and responses thereto from Continental and its counsel; advice letters from Continental's coverage counsel to Continental; internal forms, documents and records from Continental's files including various correspondence and memoranda; and relevant federal and Alaska legal authorities, statutes and legal literature.  A partial list of such documents and materials reviewed is attached hereto as Exhibit B.

I have also reviewed the transcripts of numerous depositions taken in this litigation, and exhibits discussed in such depositions, including the depositions of Robert Clark, Crystal Brown, William Hutson, Deborah Wyatt Brown, S. Bobo Dean, Lori Wing, Erin Finn, and others.

46601v1

200067

Exhibit ___1___
Page __3__ of __49__ pages

## PRIOR EXPERT TESTIMONY

While I have been retained as a legal expert in a number of cases over the years since I left the Superior Court bench, I have testified in only one case, *Larry Compton, as Trustee in Bankruptcy for Rae Jean Bonham v. Richard Hompesch*, Case No. 4FA-97-2519.

## SUMMARY OF OPINIONS

1.    On the basis of my review of the foregoing materials, documents, testimony, and legal authorities, it is my opinion that in denying the Government's tenders of defense regarding the Lori Wilson claim, Continental had a reasonable basis, both in fact and law, for such denials and thus did not, under Alaska law, act in bad faith in so doing. In this regard, it is my opinion that the underlying legal question, namely whether the Government was an "implied additional insured" under the applicable policy, was, under Alaska law, a novel question of law which was "fairly debatable" and "close" and on which learned and experienced judges and insurance counsel could, and did, disagree.

2.    I am of the further opinion that Continental's actions regarding the Government's tenders of the Kallstrom claim were reasonable under the circumstances and thus did not, under Alaska law, constitute bad faith on Continental's part.

3.    Finally, it is my opinion that Continental's responses to the tenders of the foregoing claims cannot fairly or objectively be characterized as "outrageous" or "malicious" or as manifesting any reckless indifference, and thus, should not, as a matter of law, subject Continental to a punitive liability under Alaska law.

These opinions, and the bases therefor, are discussed in detail below.

## DISCUSSION

## I.    BAD FAITH CLAIMS

### A.    Applicable Standard of Law

The standard in Alaska for establishing "bad faith" liability in a "first-party" insurance context is addressed in *Hillman, et al. v. Nationwide Mutual Fire Insurance Company*, 855 P.2d 1321 (Alaska 1993) ("*Hillman II*"). Relying on authorities from other jurisdictions, including *Noble v. National American Life Insurance Co.*, 128 Ariz. 188, 624 P.2d 688 (1981) and *Anderson v. Continental Insurance Co.*, 85 Wis. 2d 675, 271 NW 2d 368 (Wis. 1978), the Alaska Supreme Court in *Hillman II* held that in order to establish a claim for bad faith, a claimant must show (1) the absence of a reasonable basis for the insured to deny the benefits of the policy and that the insurer had knowledge that no reasonable basis existed to deny coverage under the policy or (2) that the insurer acted in reckless disregard of the lack of a reasonable basis for denying the benefits of the policy. The tort of bad faith is thus an

- 4 -

200068

Exhibit ___1___
Page __4__ of __49__ pages

intentional one. *Id.* at 1324. Whether there was an absence of a reasonable basis to deny a claim must be evaluated on the basis of an objective standard. *Id.*

In addition, citing *Noble* and *Anderson* with approval, the Alaska Supreme Court in *Hillman II* also instructed that an insurance company may still challenge claims which are "fairly debatable." *Id.*

The central question in this bad-faith litigation, then, is whether Continental had a reasonable basis for denying the tenders of defense by the USA of Lori Wilson's personal injury claim on the basis that the USA was not a named insured or implied additional insured under Continental's insurance policies insuring Bristol Bay Area Health Corporation ("BBAHC") and its alcohol abuse facility known as "Jake's Place." An important related question is whether Continental's denials of the USA's tenders were "fairly debatable" under Alaska law, i.e., whether the question of the USA's status as an "implied insured" under such policies was a "close" question of law.

As summarized above, Continental and its coverage counsel, in my opinion, conducted a reasonable investigation into and analysis of the USA's tenders and claims, and had a reasonable basis, both in fact and in law, for denying the USA's tenders of defense of the Wilson claim under the policies. I further conclude that the underlying legal question in this case, of whether under Alaska law, the USA was an implied additional insured under such policies, was a "fairly debatable" and a "close" question of law, on which learned and experienced judges and attorneys could, and did, differ. It is thus my opinion that in denying the Government's tenders, Continental did not act in bad faith.

## B.    Nature of Continental's Investigation and Analysis of USA's Tenders and Claims.

More specifically, after Wilson's personal injury action against BBAHC in state court was dismissed, and reinstated in federal court against the Government, the USA first tendered the defense of such claim to Continental on January 6, 1995. In so doing, the USA apparently tendered the defense under the wrong policy (Policy #93 CEP 06114923-94).

In response to such tender, Continental promptly retained competent Alaska insurance counsel to evaluate the tender and claim, and to provide it with a coverage opinion regarding the tender. The counsel retained for this task was Mr. James B. Friderici of the Anchorage law firm of Delaney, Wiles, Hayes, Reitman & Brubaker, Inc. Later, as will be discussed, Mr. Friderici and his law firm were replaced by another competent and experienced Alaska insurance attorney, Mr. Craig F. Stowers, then of the law firm of Clapp, Peterson, Stowers.[1]

---

[1]  Mr. Stowers is currently serving as an Alaska Superior Court Judge in Anchorage.

- 5 -

200069

Exhibit ___
Page __5__ of __49__ pages

Both Mr. Friderici and Mr. Stowers, and their law firms, are highly regarded in the Anchorage legal community as attorneys and law firms who and which possess extensive experience and expertise in the area of insurance law, including insurance defense litigation and insurance coverage advice. As Judge Sedwick observed in his original Preliminary Order, dated September 4, 2001, "both lawyers … enjoy good reputations in this legal community." *Id.* at 24. Thus, Continental's initial response to the Government's tender, in retaining competent insurance counsel to evaluate and opine on the tenders and related coverage issues, was both prompt and reasonable, in my view.[2]

---

[2] A question concerning the ethical propriety of Mr. Friderici rendering a coverage opinion to Continental is raised in Judge Sedwick's Preliminary Order dated September 4, 2001. *Id.* at 4, 6. Citing the case of *Chi of Alaska, Inc. v. Employers' Reinsurance Corp.*, 844 P.2d 1113 (Alaska 1993), Judge Sedwick noted that retained counsel for an insured owes such insured full allegiance and must be independent from the insurer. *Id.* Previously, Mr. Friderici had been retained to represent the insured, BBAHC, in the state court tort litigation brought by Ms. Wilson. In that capacity, Mr. Friderici did zealously represent BBAHC's interests and was successful in obtaining a dismissal of that suit on June 23, 1994. (*See* Order of Superior Court Judge Joan H. Woodward, dated June 21, 1994). Wilson's subsequent suit in federal court named the USA only and thus, BBAHC was never a party to that federal action. With the dismissal of Wilson's state court case, litigation involving BBAHC was concluded. Presumably Mr. Friderici's attorney-client relationship with the insured, BBAHC, was likewise concluded with the dismissal of the state action -- some months before the USA made its first tender of defense to the insurer on January 6, 1995. Mr. Friderici was thus not simultaneously representing both the insured and the insurer at the time when Mr. Friderici rendered his coverage opinion to Continental.

More importantly, when Mr. Friderici provided Continental with his coverage opinion, it appears that he was of the view that there was no difference of legal positions between BBAHC and Continental regarding whether the USA was an additional insured under the policies. He noted in his May 31, 1995, letter to Robert K. Stewart, BBAHC's corporate counsel, that "he would not provide coverage advice to either Bristol Bay Area Health Corporation or Continental if there were a dispute between the two concerning coverage." (CNA 000426-27). When Mr. Stewart indicated that he could not recall in a prior telephone conversation advising Mr. Friderici regarding BBAHC's position on this issue, Mr. Friderici, in his letter of June 2, 1995, to Mr. Stewart, explained that he kept notes of his telephone conversations with Mr. Stewart and that "you stated at that time that was the corporation's position that it preferred the United States not be an additional insured under the policy." (CNA 000579-80). Mr. Stewart also shared this view with Mr. Roosa. *See* Roosa Depo. at 70. When Mr. Stewart later advised Mr. Friderici that BBAHC had not taken a final position

(*… Continued*)

- 6 -

200070

Exhibit ___1___
Page __6__ of __49__ pages

## 1.    Mr. Friderici's Investigation, Analysis and Advice.

Mr. Friderici undertook to investigate and analyze the USA's first tender of defense. In connection with his investigation and analysis, Mr. Friderici discussed the tender with Continental's Claims Manager, Mr. Hutson, and apparently with the independent broker who had located the insurance, Ms. Lori Wing. Ms. Wing recalled discussing the matter with Mr. Friderici. Wing depo. at 196-97. Mr. Friderici was also familiar with the underlying facts surrounding Ms. Wilson's personal injury claim as a result of his past work with the defense of BBAHC in the state litigation. Further, Mr. Friderici carefully reviewed the language and terms of the insurance policies issued to BBAHC. In addition, Mr. Friderici conducted substantial legal research on applicable case law, including cases cited by the USA in its tender letter, as well as relevant Alaska and federal authorities. Specifically, he analyzed and found distinguishable the authorities cited by the USA in support of its tender, including *Government Employees Insurance Co. v. United States*, 349 F.2d 83 (10th Cir 1965) (the "*GEICO*" case) and *Dorcas v. Swanson,* (the "*Dorcas*" case) Case No. A93-0129 Civ (D. Ak October 12, 1004), as well as other federal cases. Similarly, Mr. Friderici reviewed and analyzed the lead Alaska Supreme Court authority on the so-called "implied insured" doctrine in Alaska, namely *Stewart-Smith Haidenger, Inc. v. Avi-Truck, Inc.*, 682 P.2d 1108 (Alaska 1984).

Mr. Friderici wrote Mr. Hutson a detailed coverage opinion letter on January 20, 1995, wherein he discussed his research, analysis and conclusions. (CNA 000562-566). According to Mr. Friderici's billing records, he spent in excess of 33 hours reviewing the USA's tender of defense and Continental's insurance policies, investigating the matter, conducting legal research, and preparing an opinion letter to Continental regarding coverage. Of this time, Mr. Friderici spent over 22 hours researching and analyzing the legal authorities cited by the USA in its tender, including Alaska authorities discussing the "implied insured" doctrine. (DW–000003-0000009). The significant amount of time Mr. Friderici spent on legal research and the analysis of the foregoing authorities is important because the underlying issue presented by the Government's tenders was one of first impression.

---

on whether it regarded the USA as an implied additional insured under the policies, Mr. Friderici unequivocally stated that "we will not provide any opinion to either Bristol Bay Area Health Corporation or Continental concerning coverage" and immediately withdrew from his engagement with Continental as coverage counsel. *Id.*

Under the foregoing facts and circumstances, I do not find any ethical impropriety with the conduct of Mr. Friderici.

46601v1

200071

Exhibit ____1____
Page ___7___ of __49__ pages

Continental reviewed Mr. Friderici's opinion letter, and based on this legal advice, directed Mr. Friderici to reject the USA's tender of defense. Accordingly, on February 13, 1995, Mr. Friderici sent Mr. Roosa, the Assistant US Attorney handling the claim for the USA, a letter rejecting the tender of defense on Continental's behalf. In this letter, Mr. Friderici advised that Continental had concluded that the USA is not an insured under the policy, citing the definitions section of the policy regarding "insureds" under the policy. In addition, Mr. Friderici indicated that he had examined the authorities cited in Roosa's tender letter and had concluded that such authorities did not apply to this case and that the United States was not an implied insured under the policy. Further, he cited the USA to an express exclusion under the policy for bodily injury and discussed the same in his letter. In short, in his letter, Mr. Friderici fully explained Continental's position, analysis, and rationale for rejecting the USA's first tender.[3]

Ultimately, on June 6, 1995, the USA made a second tender of defense, this time under the correct policy (Policy HMA 9500648-5). In support of the second tender, the USA cited the same authorities it had previously cited in the first tender, specifically including the *Avi-Truck* case, as well as two other treatises on insurance law. (CNA 000342-345). This time Continental responded directly to the USA's second tender, through a letter dated October 3, 1995, by Continental's Claims Manager, Mr. Hutson. In his letter, Mr. Hutson advised that Continental had received legal opinions on coverage as it pertained to both policies, and reiterated the conclusion reached by Mr. Friderici in the first rejection letter of February 13, 1995. While Mr. Friderici's letter referred to the first policy, Mr. Hutson relied on Mr. Friderici's legal analysis of the same authorities cited by the USA in its first tender letter and Mr. Friderici's conclusion that BBAHC is not a defendant in the current action and that "the United States is not an insured under the respective policies."

---

[3] A question is raised in Judge Sedwick's Order From Chambers dated, September 18, 2001, regarding the fact that the tender was made by the USA under the "wrong" policy, and that Mr. Friderici failed to advise the USA that another policy might provide coverage. It is undisputed that the USA had both policies in its possession a month before it issued its first tender of defense to Continental. *See* letter of Robert K. Stewart, dated December 9, 2004, transmitting both policies to Mr. Roosa. (A115). *See also* Roosa Depo. at 36 (acknowledging his office had the two policies in their possession as of December 1994). Mr. Roosa also acknowledged that it was his "mistake" to make the tender under the first or wrong policy. *Id.* at 19. I know of no authority requiring Mr. Friderici or Continental to advise the USA, a huge governmental institution represented by a large staff of sophisticated and experienced civil attorneys, that it was tendering the defense under the wrong policy. Tendering the defense under the correct policy was the USA's and Mr. Roosa's responsibility.

- 8 -

200072

Page 8 of 49

## 2.    Mr. Stowers' Investigation, Analysis and Advice.

The USA made its third tender of defense of the Wilson claim on February 20, 1997, in a letter to an official of a successor entity to Continental. In that letter, Mr. Roosa again cited the same legal authorities previously included in earlier tender letters, specifically including the *Avi-Truck* case. Shortly after receiving this letter, Continental retained Alaska attorney Craig F. Stowers as new coverage counsel to advise it in connection with this third tender. As noted, Mr. Stowers and his law firm were and are well-regarded as experienced and expert insurance counsel in Alaska.

Mr. Stowers undertook his own investigation and analysis of the USA's third tender. According to Mr. Stowers' billing records, he spent over 40 hours of professional time investigating, reviewing and analyzing the Government's third tender, the provisions of the relevant insurance policy, underlying facts and federal and Alaska authorities. Among other activities, Mr. Stowers had numerous telephone calls with employees of the broker, Brady & Company, which located the policies on behalf of BBAHC. His billing records reflect telephone calls to Lori Wing and Julie McCarty of Brady & Company during the months of May and June of 1997. Thus, for example, his billing entry for May 20, 1997, reflects a "telephone call to Lori Wing (Brady & Company), long discussion regarding genesis of Section 638 Contracts and Liability Coverage by Federal Tort Claim Act v. GCL Insurance I." Similarly, on May 27, 1997, Mr. Stowers' billing entry reflects "telephone call to Brady & Company (Julie McCarty) regarding background facts." And on June 11, 1997, Mr. Stowers' billing entry reflects "long telephone call to Lori Wing to review factual statements in letter to US Attorney." (CP-406-13). This entry is confirmed by what appears to be hand-written notes from Mr. Stowers' file, dated "06/11," indicating a "tct [telephone call to] Lori Wing," and noting that Ms. Wing "confirms each sentence and fact stmts [statements] attrib [attributable] to Lori." (CP-00380). His billing entry on the next day, June 12, 1997, also reflects a "telephone call from Section 638 expert." This entry appears to be confirmed by Mr. Stowers' hand-written note of "6/12" regarding a "tct Barbara [at] Berkley," Barbara Karshmer, an attorney who represented tribes and tribal organizations and specialized in Indian Rights law and Section 638 contracts. Mr. Stowers' notes appear to be recording Ms. Karshmer's comments during their call, including her statement that, "I don't know of any auth [authority] Just [Justice] Dept [Department] used for its proposition." (CP00376-78).

Mr. Stowers then drafted and sent to Continental his coverage opinion letter on May 28, 1997. The letter was a twelve-page, detailed analysis and discussion of the Government's third tender of defense, underlying facts, policy language, and relevant Alaska and federal authorities. In this regard, Mr. Stowers' letter observed, "We have found no cases where a court has held that the United States is an additional insured or an implied insured under a general liability policy in the circumstances presented in this case." *Id.* at 3. Nor did the USA cite any such cases in its tender letters or in any subsequent communications. Indeed, in his recent deposition, Mr. Roosa had no recollection of ever citing such a case. Roosa Depo. at 32. This important legal question was unquestionably one of first impression.

- 9 -


200073

Exhibit 1

page 9 of 49 pages

Later in his letter, Mr. Stowers analyzed the authorities primarily relied upon by the USA in support of this and its prior tenders of defense, including the "GEICO" case and the "Dorcas" case, and concluded that they were inapposite. *Id.* at 7. Similarly, Mr. Stowers also analyzed and discussed the lead Alaska Supreme Court case regarding the implied insured doctrine in Alaska, the *Avi-Truck* case, also relied upon by the Government in its several tenders. He concluded that "neither BBAHC nor Continental intended that general liability coverage would cover the risk of liabilities covered by the Federal Tort Claims Act" and that under *Avi-Truck*, the Government was not an additional implied insured under the policies. Further, Mr. Stowers discussed in detail facts provided to him by Lori Wing, the broker who sold the policies in question to BBAHC. *Id.* at 8-9. Finally, in concluding that Continental had no duty under the policies to defend or indemnify the USA, Mr. Stowers recommended that Continental provide the United States with a "reasonably detailed explanation" about its decision to reject the tender. *Id.* at 11. (BBAHC 001729-40).

### 3.    Continental's Reliance on Advice of Coverage Counsel.

Continental reasonably relied upon Mr. Stowers' thoughtful coverage opinion letter and analysis, and followed his recommendations to reject the tender and to provide the Government with a "reasonably detailed explanation" explaining the basis for its rejection of the tender.

Pursuant to Continental's authorization, Mr. Stowers sent Mr. Roosa a nine-page letter on June 19, 1997, rejecting the Government's third tender of defense, and explaining in detail the basis for the rejection. This letter essentially tracked the detailed coverage opinion letter which Mr. Stowers had previously provided to Continental, and again analyzed applicable federal law, underlying facts, and legal authorities cited and relied upon by the Government (including the *GEICO, Dorcas and Avi-Truck* cases), analyzed the language and provisions of the policy, and discussed the relevant underlying facts provided to him by Ms. Wing.

In light of the investigations, analyses, and legal opinions of its two coverage counsel, particularly the thorough and detailed opinion letter of Mr. Stowers, I conclude that Continental conducted a reasonable investigation and analysis of the Government's three tenders of defense of the Wilson claim, relied upon competent and experienced coverage counsels' advice and in so doing, had a reasonable basis on which to deny the tenders.

Moreover, through Mr. Stowers' lengthy letter of June 19, 1997, to Mr. Roosa, rejecting the Government's third tender, Continental did in fact articulate its rationale and basis for rejecting the Government's tender and for the denial of coverage. In this regard, I respectfully disagree with the observation of Judge Sedwick in his Order From Chambers dated July 12, 2005, wherein he stated that "the failure to set forth an adequate explanation for rejecting the tenders is a fundamental difference between the case at bar and *Hillman II.* *Id.* at 16. Not only did Continental articulate its rationale and basis for rejecting the tender, in so doing, it went considerably beyond what the insurer did in *Hillman II* in denying

- 10 -

200074

Exhibit _____
page \_\_10\_\_ of \_\_49\_\_ page

coverage in that case. In *Hillman II,* the insurer, through its adjustor, simply advised the insured that the insurer had no liability for the claim. As the decision recites, "Maury Hafford, Nationwide's local adjustor, indicated that Nationwide had no liability." 855 P.2d at 1322. While the denial was later defended on the basis of coverage exclusions in the policy in question, it is not apparent from the decisions in *Hillman I* and *II* that such rationale was ever communicated to the insured/claimant in that case, let alone communicated in the same detail which was contained in Mr. Stowers' letter to Mr. Roosa. Indeed, while Nationwide obtained an opinion from its coverage counsel that "the question of coverage appears to be a roughly 50/50 proposition," the adjustor "did not relay the attorney's opinion to [the insured]." *Id.* The *Hillman II* Court further rejected the insured's argument that the insurer in that case was guilty of bad faith because it denied coverage before making *any* investigation of the facts or law, and because it violated its own internal guidelines and policies in numerous ways. *Id.*[4]

---

[4] The Court in *Hillman II* rejected the insured's other claims of alleged acts of bad faith in the following manner:

> "The Hillmans argue that they presented evidence showing that Nationwide denied coverage before making *any* investigation of the facts or the law and that Nationwide made subsequent, formal denials of coverage without having conducted significant investigation. They also argue that Nationwide's agents violated its guidelines and policies, which are intended to guarantee fair, honest and reasonable claims handling. Among others, this included violating the company policy requiring local adjustors to consult with higher echelons in the company before denying a death claim; failing to resolve all reasonable doubts about coverage in favor of the policy holder; withholding from the file any explanation for which the policy holder was required to sign a nonwaiver agreement; obtaining a legal opinion just to "paper the file" and for the main purpose of denying the claim; failing to provide a policy holder with a previously promised letter from Nationwide's attorney regarding coverage; lying to the policy holder about whether that letter was available; and "stonewalling" the claim for four years because of vindictiveness toward the Hillmans' attorneys. Finally, the Hillmans argue that even after Nationwide had given its personnel the authority to concede coverage and settle the underlying case for the $50,000 policy limits, its Regional Claims Attorney unilaterally decided

*(... Continued)*

46601v1

200075

Exhibit __1__
page __11__ of __49__ pages

By contrast, in this case, Continental, through its coverage counsel, did conduct a thorough investigation of the USA's claim before denying its tenders.

Significantly, the Alaska Supreme Court in *Hillman II*, held that the denial of coverage by the insurer in that case could not, *as a matter of law*, constitute bad faith on the part of the insurer.

### C.   Reasonable Reliance on Broker's Information

Moreover, the reliance by Mr. Stowers and Continental upon the factual statements provided by Ms. Lori Wing, was reasonable. To begin with, Ms. Wing was not, and never has been, an employee of Continental. Rather, she was employed by Brady & Company, the independent insurance brokerage firm which located the insurance policies at issue. Nor does it appear that Ms. Wing had any apparent bias or ultimate motive not to testify truthfully in this litigation. Similarly, from my review of the record, neither Ms. Wing nor Brady & Company had any vested interest in the outcome of this litigation. Further, BBAHC was Ms. Wing's client, which had followed her to her new firm, and it is apparent that she wanted to be helpful and responsive to this client in order to maintain the client relationship. Additionally, Ms. Wing had substantial experience in the insurance brokerage industry, having worked there since the early 1980's and risen to an executive position at Brady & Company. Wing Depo. at 10 *et seq.* I find no reason for coverage counsel to have questioned or been skeptical about the credibility of Ms. Wing or the accuracy of her statements.

In both her Declaration and deposition, Ms. Wing consistently testified that in locating insurance for BBAHC, amendments to the Section 638 federal statutory scheme made the Government liable under the Federal Tort Claims Act (FTCA) for negligence of the employees of Native or Indian owned health care facilities such as BBAHC. As a result, she was attempting to obtain, and believed she did obtain, insurance that addressed only the "gaps" or "gray areas" of potential liability exposure of BBAHC not covered by the FTCA. Thus, in her Declaration, dated December 1, 1998, Ms. Wing testified that "BBAHC and its counsel instructed us that BBAHC did not desire insurance coverage that would duplicate protection from liabilities provided by the United States under Section 638 and the FTCA."

---

not to do so.

In our view none of these facts suffice to raise a factual question as to whether Nationwide's denial of coverage lacked a reasonable basis." *Id.* at 1325.

- 12 -

46601v1

200076

*Id.* at 3. She noted further that "we were concerned that the United States would not extend Section 638/FTCA Coverage to potential liability arising from housing assistance provided by the BBAHC to its employees" and that "BBAHC personnel advised us that we should obtain liability insurance to only cover these risks." *Id.* In her deposition, Ms. Wing noted several state funded programs in which BBAHC was engaged, that is, activities which were not federal in nature and which would not be covered by the FTCA. Wing Depo. at 55-56. And she further testified in her deposition that both BBAHC, and its Washington, DC Indian Rights lawyer, Mr. Bobo Dean, of the Dean Straus & Wilder firm, "believed that there were some gray areas in the Federal Tort Claim Act" and that this was a "concern to the corporation" meaning BBAHC.[5] Wing Depo. at 70-71; *see also Id.* at 93. Similarly, Ms. Wing testified that she had personally met with Mr. Dean and BBAHC's CEO, Mr. Robert Clark, and that "we discussed the Federal Tort Claim Act and the need for some protection for the corporation in the event the Federal Tort Claim Act did not pay." Wing Depo. at 96-97, 101. Ms. Wing also discussed with Mr. Dean a memorandum which Mr. Dean's law firm prepared on February 8, 1991, for his firm's Native clients, entitled "FTCA and General Liability Insurance" wherein, among other things, it discussed problems in finding an insurance broker who could quantify degrees of exposure for Native operations which fell outside of the FTCA coverage. Ms. Wing believed that she likely provided Continental with a copy of Mr. Dean's memorandum. Wing Depo. at 206.

Finally, Ms. Wing noted that when she first began working with BBAHC in attempting to find insurance addressing "gray areas," BBAHC was just discontinuing its medical malpractice insurance. BBAHC previously had bought such insurance from Medical Indemnity Corporation of Alaska ("MICA") and its premium at that time, which included medical malpractice insurance, was over $400,000, according to Ms. Wing. Wing Depo. at 81. Under subsequent coverage from Continental, which excluded medical malpractice insurance, the premium for the limited coverage was dramatically reduced to under $20,000, which Ms. Wing believed reflected "a relatively low exposure" and was a "cheap premium." Wing Depo. at 82-83. Mr. Stowers expressly discussed and relied on Ms. Wing's information in both his coverage opinion letters to Continental (document number) and in his June 19, 1997, letter to Mr. Roosa, rejecting the third tender. (A 584-592).

---

[5] This concern was well-founded, as evidenced by a federal official's questioning of whether the FTCA even covered the personal injury claim of Ms. Wilson. Thus, in a memo from HHS Regional Counsel Gary Thogerson to PHS Claims Officer Art Simon, dated April 11, 1994, regarding Ms. Wilson's claim, Mr. Thogerson stated, "The circumstances and location of the incident ... lead me to question whether or not the FTCA applies in this case." (A2034).

46601v1

200077

Exhibit ___
page ___ 13 of 49 ___ pag.

Continental's underwriter, Ms. Deborah Wyatt Brown, who was the underwriter for the policy in effect at the time of the Wilson accident, (Wyatt Brown Depo. at 9) testified in a manner consistent with the testimony of Ms. Wing. Thus, Ms. Wyatt Brown testified that she "intended to provide coverage for the general liability portion of the risk involving [BBAHC] employees while performing duties not in their capacity -- as a federal employee" and that it was her understanding that at the time BBAHC was covered by the Federal Tort Claims Act. *Id.* at 38-39. As a result, "Continental would not be underwriting general liability, for all of their general liability exposure." Id. at 39; *see also* Wyatt Brown Depo. at 64; 161. In this connection, Ms. Wyatt Brown testified that she understood that BBAHC's funding came "partly from the Federal Government and partly from the State of Alaska," indicating that certain of BBAHC's activities involved State programs which would not be covered by the FTCA. *Id.* at 162, 173. She further testified that she never had an understanding that anyone intended the USA to be an insured under BBAHC's policy. *Id.* at 164. The USA was not a named insured under the policy or additional insured under the policy and it was not her intent that the USA should be a named insured or an additional insured under the policy. *Id.* at 165. No one from BBAHC had communicated to Ms. Wyatt Brown that the USA was to be a named an insured or an additional insured under the policy. *Id.* at 165-66. Ms. Wyatt Brown testified that BBAHC's premium was lower than premiums assessed to other, non-Native, facilities or companies because part of BBAHC's exposure was covered by the FTCA and because BBAHC had a good loss record. *Id.* at 74; 78-80. She further testified that had she intended to underwrite an account which covered the entire general liability exposure, "we would have debited the account" meaning, that the premiums would have been substantially higher than what they were. *Id.* at 177. At the time she wrote the policy in question, Ms. Wyatt Brown made no further premium reduction because she believed a reduction in rate had already been made for BBAHC when Continental underwrote this account because the exposure was limited, i.e., partly covered by the FTCA and partly by the policy. *Id.* at 176-77.

To the same affect is the testimony of Crystal Brown, an Assistant Vice President of Underwriting for Continental. Ms. Brown reviewed the deposition testimony of Ms. Wyatt Brown, as well as documents from the underwriting files. Ms. Brown observed that the instant policy was an "accommodation piece" i.e., the only primary policy Continental wrote in Alaska in 1989 through 1995, since Continental was not seeking to do business in Alaska at the time. Brown Depo. at 22; 70-71. Ms. Brown testified that she thought Ms. Wyatt Brown understood, from information provided by the broker, that as a result of the FTCA applying to BBAHC, there would be certain portions of the policy that would be covered by the FTCA and that Continental's intent was to only cover those areas of exposure which fell outside of the act, i.e., that they would be providing "sleep coverage" or extra protection coverage. *Id.* at 33. Ms. Brown also testified that Continental "would not have written this policy if it was not for the FTCA" because "Continental was not targeting business in Alaska." *Id.* at 53; 71. In support of her opinion, Ms. Brown testified that Ms. Wyatt Brown had given BBAHC a reduction or downward deviation in standard premiums to reflect the

- 14 -

200078

Exhibit 1
page 14 of 49 page

limited exposure under the FTCA, the good loss record BBAHC had and the likelihood that
there would be limited future losses under the limited coverage. *Id.* at 29. BBAHC's
premiums of $16,000 per year for 1990-91, $16,346 for 1991-92, and $19,346 for 1993-94,
were well below Continental's normal minimum premium of $25,000 per year (*id.* at 19, 22
and 71) and such reductions constituted a "generous credit" to the insured.[6] *Id.* at 48-49.
And while, according to Ms. Brown, it would have been possible for Continental to include
an exclusion for the USA in the applicable policies, Ms. Brown testified that it was not
common to include an exclusion in a policy that excluded entities which were not identified
in the policy or on endorsements to the policy, if such entities had no corporate or financial
interest in or relationship with the insured, such as corporate affiliates. *Id.* at 75-76.

In reviewing the record, and the testimony of Ms. Wing, Ms. Wyatt Brown and Ms. Brown, I
find the testimony of the three witnesses to be generally consistent and supportive of the
notion that the independent broker, and Continental's underwriter, believed, at least, that in
issuing the policies in question, at the low premiums charged, particularly for the year in
which the Wilson injury occurred, Continental was providing limited or "sleeper" (extra
protection) coverage for BBAHC for acts or events of employees which were not covered
under the FTCA. I find no reason in the record to disbelieve these witnesses or conclude
they their testimony was insincere or not credible or that they were lying.[7] Their testimony

---

[6] In his Orders From Chambers, dated September 18, 2001, and July 12, 2005, Judge
Sedwick expressed concern over the fact that BBAHC's premiums increased from $13,000
to $19,346, rather than decreased, between 1989 and 1994. (Docket 61 at 9; Docket 166 at 9
n.31) The premium which was charged for 1989 was for a "short term policy" which ran
less than a full year. Brown Depo. at 19. The premiums for the next two years remained the
same at approximately $16,000 (with 1991-92 going up $788 for the addition of the "Jakes
Place" facility under the policy.) The premium for 1993-94 increased to $19,346 because
"30 additional facilities were added this year," according to Ms. Brown. Brown Depo. at 46.
The increase in the premiums is thus explained by the addition of other facilities under the
policy during this period.

Moreover, I am advised that the insurers who provided the same coverage to BBAHC after
Continental discontinued writing such coverage charged BBAHC comparable rates for this
coverage. If accurate, such rates would be additional evidence that the premiums charged by
Continental for BBAHC's limited exposure during this period were appropriate for such
coverage.

[7] To find that Continental had acted in bad faith in this matter, one would have to conclude
that all three of these witnesses were intentionally lying and that the insurer had engaged in a
scheme to defraud BBAHC of an extremely modest premium of $16,000 per year, a highly

(*... Continued*)

- 15 -

200079

Exhibit  1
page  15  of  49  pages

appears to be supported by the very modest premiums charged BBAHC for such coverage ($16,000 - $19,000). The absence of written documentation in the Continental files of an intent to cover areas not covered by the FTCA is not dispositive of this issue, in my view, but simply means that there is an absence of cumulative evidence on the point. I likewise find reasonable Ms. Brown's explanation that normally, Continental would not have included in the policy an express exclusion for an organization or entity that had no financial interest or relationship whatsoever with the insured, such as the USA in this question. It apparently never occurred to Continental, or its underwriter, that some court, somewhere, ten years in the future, would hold that the USA was an implied additional insured under the policy.

In my view, it was reasonable for Messrs Friderici and Stowers to have relied on the information provided to them by the broker, Ms. Wing, regarding the scope of coverage at issue, the parties' intent with respect to such limited coverage, and the modest premiums charged for such limited coverage. In turn, it was, in my view, reasonable for Continental to have relied on the coverage opinions of its outside counsel during the tenders.

### D.    Existence of a Fairly Debatable, "Close" Question of Law of First Impression

In addition to investigating and analyzing the Government's claim in a reasonable manner, and providing the USA with a detailed explanation supporting its rejection of the tender, Continental and its coverage counsel were faced with a novel, and in my opinion, "close" or "fairly debatable" underlying question of law, namely, whether the USA would be deemed under Alaska law to be an "implied additional insured" under the policies written for BBAHC. Another way of stating this important question is, whether the Alaska Supreme Court would extend the "implied insured" doctrine, initially recognized in the *Avi-Truck* case, to the circumstances of this case. As Mr. Stowers stated in his June 19, 1997, rejection letter to Mr. Roosa, "we have found no cases where a court has held that the United States is an additional insured or an implied insured under a general liability policy in the circumstances presented in this case." *Id.* at 2 (A8585). As noted above, Mr. Roosa admitted, in his recent deposition, that he "had no recollection of citing any such [case]." Roosa Depo. at 32. At the time Mr. Stowers and Continental addressed this issue, then, the legal question was truly one of first impression and the USA's theory that it was an implied insured under the policy, was a novel, untested one.

Nor was it readily predictable at the time whether the Alaska Supreme Court would extend

---

implausible proposition. I respectfully do not believe that the record supports such a conclusion.

200080

46601v1

Exhibit ____
page ___16___ of ___49___ pages

the so-called "implied insured" doctrine to the facts and circumstances of this case. The several other decisions in which the Court had discussed the doctrine dealt with unrelated circumstances and facts. In *Avi-Truck*, a casualty liability case involving aircraft hull insurance, the Alaska Supreme Court held that the owner of the aircraft, which was not named in the hull insurance policy, was nevertheless an implied insured under the policy. In so doing, the Court discussed two prior cases, *Alaska Insurance Company v. RCA Alaska Communication, Inc.*, 623 P.2d 1216 (Alaska 1981) and *Olympic, Inc., et al. v. Providence Washington Insurance Company of Alaska*, 648 P.2d 1008 (Alaska 1982). In *RCA*, another casualty/property damage case, the Court held that a commercial tenant of a warehouse was an implied insured under the landlord's fire insurance policy, at least for purposes of the refuting the landlord's subrogation claim against the tenant. By contrast, in *Olympic*, a liability case involving a wrongful death claim out of a fire incident, the Court refused to hold that a landlord was an implied insured of the tenant's fire insurance policy in that case. Later, in *Great American Insurance Company v. Bar Club, Inc.*, 921 P.2d 626 (Alaska 1996), another fire damage case, the Court followed its holding in *Olympic* and declined to extend the implied insured doctrine to a commercial landlord under a commercial tenant's fire insurance policy. Significantly, none of these cases addressed the question of whether a large governmental entity – indeed the federal Government itself – should be an implied insured under a general liability policy insuring an Indian health care facility in rural Alaska.

Not surprisingly, attorneys and judges addressing this novel question of law have reached differing conclusions. Thus, while Mr. Roosa contended the implied indemnity doctrine extended to the federal Government, Messrs Friderici and Stowers – experienced insurance counsel – reached a contrary conclusion. In a note which apparently was sent to Mr. Roosa from his superior at the US Attorney's Office, Mr. James Torgeson, Mr. Torgeson apparently found Mr. Stowers' analysis in his letter denying the tender to be "persuasive." (A583). Similarly, after considering the issue in this litigation, Judge Sedwick initially concluded that the USA qualified as an implied additional insured under the relevant insurance policy (Order From Chambers, dated September 18, 2001, at 9), but later, following the principles enunciated in *Olympic*, reached an opposite conclusion and held that the United States was *not* an implied insured under the policy. (Order From Chambers, dated March 23, 2003, at 5-6). To the same effect, on appeal, the Ninth Circuit panel considering the issue was divided with two panelists concluding that the USA was an implied insured under this policy and that the Alaska Supreme Court would have extended such doctrine to the Government in this case, and with one judge, Judge Andrew Klienfeld, reaching an opposite conclusion. (Memorandum in Case No. 03-35446 and No. 03-35534, dated October 20, 2004).

Judge Kleinfeld stated in his dissent, "The case is close, but I am not satisfied that the Alaska Supreme Court would extend the implied insured doctrine to this case. The district court got it right, in my view." *Id.* In his dissent, Judge Klienfeld analyzed the relevant Alaska authorities, namely *Avi-Truck*, *Olympic*, and *RCA*, and distinguished those cases on the basis that *Avi-Truck* and *RCA* were casualty insurance cases, while *Olympic* was a liability

- 17 -

200081

Exhibit    1
page   17   of   49   page

insurance case. Following the rationale of *Olympic*, Judge Klienfeld concluded that Continental in this case had not agreed to insure risks attributable to the United States, and that "[a]n insurer might prefer not to issue issuance to the United States at all because of the complexity of transactions with the federal government, and the required involvement of its legal department to assure all applicable federal laws are satisfied."[8] *Id.* He further observed that, "for all we know Bristol Bay engages in other activities for which it needs liability insurance, and for those activities the Act does not substitute the United States as the liable party."[9] Judge Kleinfeld thus concluded that "[t]he difference is too great for me to agree that the Alaska Supreme Court would follow its casualty insurance case, *Avi-Truck*, in preference to its liability insurance case, *Olympic*." He further observed that, "If the United states wanted coverage under Bristol Bay's liability policy, it could have contracted for it and policed performance by requiring a copy of the insurance certificate, just as a bank with a mortgage assures that it is covered by a homeowner's life insurance policy. It did not." *Id.* Of significance is the fact that Judge Klienfeld practiced law as a private attorney in Alaska for many years, and that as I understand it, his practice included insurance law. Moreover, he was a United States District Court Judge for the District of Alaska for a number of years before being appointed to the Ninth Circuit and had numerous occasions to discern and apply Alaska law in diversity jurisdiction cases. In short, Judge Kleinfeld was at least as well qualified, if not more qualified, than the other panelists to predict whether the Alaska Supreme Court would extend the implied insured doctrine articulated in *Avi-Truck* to the facts and circumstances of this case.

In light of the foregoing, it is my opinion that the underlying legal issue presented in this case was a "close" one and was "fairly debatable." Under *Hillman II*, wherein the insurer was held to be not liable for bad faith, *as a matter of law*, the Court relied heavily on the fact

---

[8]   Risks attributable to the USA could well exceed risks attributable to BBAHC. Suppose, for example, it was an HHS visiting official, not a BBAHC employee, who left the pitcher of toxic detergent on the counter at Jake's Place on the night of Ms. Wilson's injury. It takes little imagination to identify risks attributable to the USA which are not attributable to BBAHC.

[9]   Judge Kleinfeld's supposition that BBAHC may be engaged in activities which would not be covered by the FTCA and for which liability insurance was needed was also correct. *See* Wing Depo. at 54-56 (discussing BBAHC's receipt of state funding, for such state projects as water sampling and early childhood development programs, as well as funding for local grants), and notes from Mr. Stowers' telephone interview of Ms. Wing ("BB does do work under State and Borough that is outside of scope of fed 638 K"; "-also they do work on their own that is outside the scope of 638 K.") (CP-00408).

46601v1

200082

Exhibit  1
page  17  of  49  pages

that its decision in *Hillman I* (wherein the policy exclusion was held to be invalid on public policy grounds) was decided by a split vote of that court. Thus, the Court explained:

> "Two of the five members of this Court disagreed that the exclusion was invalid.... *See also State Farm Mut. Auto Ins. Co. v. Bass*, 231 Ga. 269, 201 SE.2d 444, 445 (1973) (where appellate court was divided on interpretation of uninsured motorist statute, 'insurer was legally justified in litigating the issue and cannot, as a matter of law, be liable ... for bad faith.'" *Id.* at 1326.

In reaching this conclusion, the Court relied on other authorities that held that where courts are split or have disagreed with one another regarding an insurer's obligation to provide coverage under a policy, the insurer cannot, as a matter of law, be liable for bad faith. *Id.* at 326, n.9, *citing Bass*, Aetna Casualty and Surety Co. v. Superior Court, 161 Ariz. 437, 778 P.2d 1333 at App. 1989); *Hanson v. Prudential Insurance Co. of America*, 772 F.2d 580 (9th Cir. 1985) (applying California law). In *Bass*, an intermediate court of appeals divided 6-3 on the interpretation of a statute governing uninsured motorist claims, and the state supreme court granted certiorari to resolve the issue, the Georgia Supreme Court held that the insurer was justified in litigating the issue and could not, as a matter of law, be held liable for the statutory penalty for bad faith...." 201 SE.2d at 445. Similarly in *Aetna*, another uninsured motorist claim by a separated spouse, the trial court granted the insurer's motion for summary judgment on the coverage question, the intermediate court of appeals affirmed the trial court's decision, but the state supreme court reversed the court of appeals' decision, finding that a fact question existed as to the claimant's reasonable expectations regarding coverage under the policy. 778 P.2d at 1335. On remand, the court of appeals stated:

> "Regardless of the eventual outcome of this question on appeal, the fact that two courts agreed that plaintiff was not covered by the policy, after hearing the comments of counsel for both parties, clearly demonstrates that the insurance company had a reasonable basis for denying the claim. *State Farm v. Bass*, 231 Ga. 269, 201 SE.2d 444 (1973). Therefore, the insurance company cannot be held liable for bad faith and the issue should not be presented to the jury. The insurance company's conduct in this case, as a matter of law, did not constitute bad faith."

And in *Hanson*, the Ninth Circuit upheld the district court's determination that the insurer in that case had not acted in bad faith, relying upon *Safeco Insurance of America v. Guyton*, 692 F.2d 551, 557 (9th Cir. 1982) (where policy dispute involved genuine legal issue concerning liability, insurer could not have been acting in bad faith by refusing to pay claim). 772 F.2d at 584.

46601v1

200083



The teaching, then, of *Hillman II*, and the cases relied on therein regarding split court decisions on controlling questions of law relating to an insurer's obligations under applicable insurance policies, is that the insurer cannot, as a matter of law, be held to be liable for bad faith in denying claims where the underlying questions of law are "close" or "fairly debatable." That is, where learned and experienced judges and courts disagree on the applicable, underlying question of law, as is the case here, the insurer could not have been found to have lacked a reasonable basis for denying a claim under a policy or to have acted recklessly. This policy makes good sense and is sound, in my opinion.

Moreover, in my view, the foregoing principle enunciated in *Hillman II* and cited cases is an *objective* standard, not a subjective standard. Thus, it is not determinative that the insurer did not expressly cite to split or competing decisions of courts in denying a claim under its policy. Indeed, the insurers in *Hillman*, *Bass*, and *Aetna*, did not cite to, nor could they have cited to, subsequent split judicial decisions in denying claims in those cases. In this regard, I respectfully disagree with Judge Sedwick's conclusion, in his Order From Chambers, dated July 12, 2005, that Continental's reliance on the fairly debatable legal defense is merely a "*post hoc* rationale" or that an unarticulated reasonable explanation for denial of the claim by the insurer is irrelevant. *Id.* at 16. In my view, respectfully, as a matter of sound public policy, where experienced and learned judges and counsel cannot agree on the underlying legal question, and reach differing or split decisions, the insurer should not be exposed to bad faith liability for having made a difficult decision regarding coverage, even if the insurer's interpretation of the close legal question is ultimately wrong. The fact that experienced judges, courts and counsel subsequently disagree on the same controlling question of law is, in other words, <u>objective</u> evidence that the question was "close" and "fairly debatable" in the first instance. Certainly, neither insurers nor their coverage counsel have "crystal balls" which enable them to predict, with 100% certainty, how difficult and novel questions of controlling law will ultimately come out at the end of trial and appellate court litigation. Were they to be held to such a standard, insurers and coverage counsel would become ultimate guarantors of the outcomes in unpredictable litigation, and the standard of bad faith liability would then become a strict liability standard rather than one requiring the absence of a reasonable basis or recklessness for a denial of a claim. In my view, this is neither contemplated nor required by applicable Alaska authorities governing bad faith claims. In other words, an insurer can get a close or fairly debatable legal question of coverage "wrong," and still not have acted in bad faith in denying a claim.[10] Under Alaska law, all that the insurer and its coverage counsel are required to do is to have a reasonable basis, in

---

[10] *See* Hause, Clark and Boulderan, "Good Faith as a Matter of Law – An Update on an Insurance Company's 'Right to be Wrong,'" Tort Trial & Insurance Practice Law Journal, Summer 2004 (39:4).

- 20 -

200084

fact and in law, for their denial of a claim tendered under their policies. In this case, I conclude that Continental had such a reasonable basis to deny the Government's several tenders of defense of the Wilson claim.

### E.    Failure to Defend Under Reservation of Rights.

In his Order From Chambers, dated September 18, 2001, Judge Sedwick apparently found that Continental's 30(b)(6) witness, Crystal Renee Brown, admitted that Continental had a duty to defend (if not necessary indemnity) BBAHC employees acting in their FTCA capacity and that this was tantamount to an admission that Continental had a duty to defend the USA as well. Order From Chambers, dated September 18, 2001, at 10. The Court reiterated this concern in its Order From Chambers, dated July 12, 2005, at 17, *citing Chi of Alaska, Inc. v. Employer's Reinsurance Corp.*, 844 P.2d 1113 (Alaska 1993). *Id.* at 17, n.54. ("Continental's own personnel believed it had a duty to defend.") The implication of these comment is that Continental may have acted in bad faith by not defending the USA under a reservation of rights. Again, I respectfully disagree with the Court's opinion.

First, a careful review of Ms. Brown's deposition testimony does not support the conclusion that Continental, through Ms. Brown, admitted that it had a duty to defend the USA in this case. Specifically, in response to a question which asked her to assume that BBAHC was a named party under the policy, all that Ms. Brown admitted was that Continental would, under such circumstances, be obliged to defend BBAHC or its employees under the policy. Brown Depo. at 77, 79. She was correct in this regard.

If BBAHC was a named insured under Continental's policy, and if BBAHC or its employees were sued for acts covered under the policy, Continental would have a duty to defend BBAHC in such suit. Indeed, this is precisely what Continental did when Ms. Wilson sued BBAHC in state court. In so testifying, however, Mr. Brown did not admit that Continental also had a duty to defend the USA under the facts and circumstances of this case. In this case, the USA was not a named insured under the policy and, in my view, Continental had a reasonable legal basis on which to contest the status of the USA as an implied additional insured and to deny the USA's tenders of defense.

Nor, in my view, does the *Chi* case stand for the proposition that an insurer has an absolute duty to defend an unnamed, putative insured in every instance in which the putative insured claims it is entitled to coverage under a policy. In *Chi*, there was no issue as to whether the owner of a vessel on which a seaman was injured was the insured under the applicable policy; the owner was undisputedly a named insured under the policy. Rather, the issues presented in *Chi* were whether the insurer had misrepresented the policy limits of the policy to the insured and whether coverage for a claim of intentional misconduct on the part of the insured (as opposed to negligence and contract claims) was excluded under the policy. Thus, in *Chi*, the insurer proposed, and the case proceeded for some time, with two counsel representing the insured: retained insurance counsel for the defense of the covered

- 21 -

200085

Exhibit ___1___
Page ___21___ of ___49___ pages

negligence and contract claims under the policy, and personal defense counsel for the insured for the defense of the arguably uncovered intentional tort claim. The insurer in that case agreed to defend the action in this manner under a reservation of rights. In *Chi*, the Alaska Supreme Court noted that conflicts of interest may be presented between the insured and the insurer where alternative theories of negligent and intentional torts were plead, and where negligent acts were covered by the policy but intentional acts were not. *Id.* at 1115. Ultimately, the Court held that the best solution in circumstances such as *Chi* was to allow the insured to retain independent counsel at the insurer's expense to defend the action. This is not the circumstance in this case. The main question in this case is whether the Government was an implied insured under the policy at all. Unlike the vessel owner in *Chi*, it is undisputed in this case that the Government was not a named insured under the policy. Accordingly, in my view, *Chi* is inapposite.

In any event, neither *Chi*, nor any other Alaska authority of which I am aware, imposes on insurers an absolute duty to defend unnamed putative insureds - strangers to an insurance policy who were not explicitly named as an insured under the policy – in all circumstances and to defend the same under a reservation of rights. In my view, Continental had a reasonable basis in fact and law for declining to defend or indemnify the USA on the Wilson claim, and did not act in bad faith in doing so.

### F.     Tender of Kallstrom's Claim.

The USA also contends that Continental acted in bad faith by not responding to USA's tenders of defense in the Kallstrom case. Again, I respectfully disagree.

In May of 1995, the USA filed a third-party complaint against Blanche Kallstrom in the federal litigation commenced by Ms. Wilson. In its third-party complaint, the Government alleged that Ms. Kallstrom negligently poured a drink for Ms. Wilson from a pitcher located in the kitchen which contained dishwater detergent. The Government sought contribution, indemnity, and fault allocation against Kallstrom in its third-party claim.

Ms. Kallstrom answered the Government's complaint and filed a counterclaim against the USA for negligent infliction of emotional distress. The USA moved to dismiss this counterclaim and on February 12, 1998, Judge Holland granted the USA's motion and dismissed Ms. Kallstrom's claim and directed that final judgment be entered on such claim.

In April of 1998, Ms. Kallstrom appealed the final judgment in that action to the Ninth Circuit. While her appeal was pending, the Ninth Circuit, on September 19, 1999, *sua sponte* issued an order certifying to the Alaska Supreme Court a novel question of Alaska law that the Ninth Circuit believed would be determinative of Kallstrom's claim. Specifically, the Ninth Circuit asked the Alaska Supreme Court to advise whether under Alaska law, a plaintiff who has not suffered physical injury, may recover damages for the negligent infliction of emotional distress from a defendant, where the plaintiff was without

- 22 -

200086

Exhibit ___1___
page ___22___ of ___49___ pages

any negligence on her part but had become the unwitting instrument through which the defendant, because of its negligence, caused the injury to an innocent victim.

Oral argument was held on the certified question before the Alaska Supreme Court on October 10, 2000. It then took the Alaska Supreme Court nearly two and one-half years to respond to the certified question. On March 15, 2002, the Alaska Supreme Court finally ruled that Ms. Kallstrom did not have a claim for NEID. As a result, the Ninth Circuit affirmed Judge Holland's ruling on June 6, 2002, and dismissed Ms. Kallstrom's claims and appeal.

While the Government previously tendered the defense of the Kallstrom claim to Continental, the claim was most recently tendered to Continental on October 30, 2001, in a letter from Mr. Roosa to Continental's then outside counsel, Mr. Evan Schwab of the Dorsey & Whitney law firm. (CNA 001391). Continental did not respond to the Government's tenders of the Kallstrom claim before the Alaska Supreme Court issued its decision and the Ninth Circuit dismissed the appeal.

With respect to the earlier tenders, on February 20, 1997, and July 8, 19998, such tenders were made during a period of time in which Continental had, with the input of its coverage counsel, concluded that the USA was not an additional implied insured under its policies, and had rejected the Government's tenders of the Wilson claim. As a result, the Government sued Continental. Moreover, nothing of substance was occurring in the Kallstrom litigation subsequent to Kallstrom's appeal of the adverse judgment to the Ninth Circuit in April of 1998, and during the pendency of the Ninth Circuit's referral of the certified question to the Alaska Supreme Court. As Ms. Erin Finn, Continental's Rule 30(b)(6) witness, testified in her deposition, "there was basically nothing going on other than awaiting a ruling from the Alaska Supreme Court" and that the Kallstrom appeal was "in front of the Alaska Supreme Court for approximately 16, 17, 18, months at that time." Finn Depo. at 16; *see also id.* at 25. Mr. Roosa likewise acknowledged that there was no activity occurring in the Kallstrom case following oral argument before the Alaska Supreme Court. Roosa Depo. at 88-89. As Ms. Finn testified, "it wasn't as if the United States government is banging on the door, jumping up and down." *Id.* at 25. Moreover, Mr. Roosa apparently communicated to Continental's outside counsel, Mr. Treptow, also of Dorsey & Whitney, that Mr. Roosa felt the USA had a "dead bang winner" in the appeal pending before the Alaska Supreme Court. *Id.* There was thus no urgency for Continental to respond to the Government's initial tenders.

Following the issuance of Judge Sedwick's Order From Chambers, dated September 18, 2001, wherein he held for the first time that the USA was an implied additional insured under the policy, Continental began changing its approach to the Government's tender of defense dated October 30, 2001. Now, for the first time, Continental and its counsel were aware of a court order holding that the USA was an implied additional insured under its policy. In Ms. Finn's view, even after Judge Sedwick's order was issued, "there were still

- 23 -

200087

coverage issues" because the Kallstrom claim "may or not be covered under the policy under Alaska law where, in terms of the policy, there must be bodily injury." Finn Depo. at 19. So there were additional issues Continental needed to investigate.

Moreover, in October 2001, Continental was changing its outside counsel, and Dorsey & Whitney had just been retained. According to Mr. Treptow, the new attorneys required adequate time to review the complex record and files in the matter. Mr. Treptow recalls first focusing on the latest tender around December 2001. In addition, Continental was apparently having ongoing settlement discussions with the Government regarding this litigation and participated in a mediation in December of 2001. The mediation, however, proved to be unsuccessful. *Id.* at 26, 30. According to Ms. Finn, Continental was hopeful that the case would resolve in the December mediation. When did not, Continental focused more intently on responding to the Kallstrom tender. *Id.* at 36.

Accordingly, Mr. Treptow and Mr. Roosa had at least two discussions in January 2002 about logistical issues regarding Continental's possible acceptance of tender of defense regarding the Kallstrom claim and the merits of the appeal before the Alaska Supreme Court. The logistical issues included whether the Government would want to continue on as defense counsel, or have Continental retain an additional law firm to handle the defense. *Id.* at 17. Regarding the merits of the appeal before the Alaska Supreme Court, Mr. Treptow and Mr. Roosa discussed the unusually long period of time it was taking that court to decide the issue and the potential significance of such delay. During this time, Continental, through Mr. Treptow, also began to contact experienced Alaska counsel and inquire whether they would be willing to accept an assignment to take on the defense of the Kallstrom claim on behalf of the Government. Thus, Mr. Treptow contacted Anchorage attorney Mike Corey and asked him about his willingness and availability to take on such defense. While initially interested, Mr. Corey apparently later advised that his law firm was not interested in doing so. *Id.* at 21-22. Thereafter, Mr. Treptow talked to another experienced Anchorage insurance defense counsel, Mr. Nelson Page of the Burr Pease & Kurtz law firm, who apparently agreed to defend the United States in the Kallstrom claim.

At the same time, Continental began actively considering the possibility of accepting the USA's tender of defense of the Kallstrom claim under a reservation of rights. *Id.* at 22, 38, 41.

It thus appears from the record that in the first several months of 2002, Continental was moving in the direction of accepting the USA's tender of defense under a reservation of rights. Before Continental finalized and forwarded an acceptance letter to Mr. Roosa, however, the Alaska Supreme Court and Ninth Circuit issued their decisions resolving the Kallstrom case in the Government's favor, and rendering the issue of the Government's tender of defense regarding that claim became moot. As Ms. Finn testified, Continental never formally accepted the tender of defense because the USA was successful in the Kallstrom appeal. *Id.* at 24.

- 24 -

200088

In light of the circumstances regarding the Kallstrom claim, the absence of any rejections of the tenders, the lengthy period of inactivity during the litigation as a result of pending appellate proceedings, and the fact that Continental was actively moving in the direction of accepting the tender under a reservation of rights in March 2002, I find that Continental did not act in bad faith with respect to this matter.

## II.    PUNITIVE DAMAGES CLAIMS

### A.    Applicable Standard of Law.

In analyzing the Government's claim for punitive damages, it is important to note that the Alaska Supreme Court has instructed that evidence which gives rise to a finding of an insurer's bad faith liability does not automatically lead to an additional finding of punitive liability on the insurer's part. The two claims are legally different and distinct and have different standards of proof and jurisprudential policies and purposes. Thus, in *State Farm Mutual Automobile Insurance Co. v. Weiford*, 831 P.2d 1264 (Alaska 1992), the Alaska Supreme Court affirmed a verdict awarding the insured $18,000 in compensatory damages for bad faith liability of the insurer, while it reversed and vacated an award of $1.2 million dollars in punitive damages against the insurer. The Court in that case held that although there was sufficient evidence to raise a jury question as to bad faith liability, there was insufficient evidence to present a jury question on punitive liability. *Id.* at 1266.

In so holding, the Alaska Supreme Court took the opportunity to reiterate the objectives and legal standards which apply to punitive damages generally under Alaska law. Thus the Court stated:

> "Punitive damages have a two-fold purpose: 'To punish the wrongdoer and to deter the wrongdoer and others like him from repeating the offensive act.' ... Since these objectives go beyond the primary purpose of tort law to provide just compensation for the wrong done, '*punitive damages are not favored in law*. They are to be *allowed only with caution and within narrow limits*.' ... Consistent with this approach we have limited punitive damages to cases where the wrongdoer's conduct could fairly be characterized as '*outrageous, such as acts done with malice or bad motives or reckless indifference to the interests of another*.' ... Malice may be inferred if the acts exhibit '*a callous disregard for the rights of others*.' ... However, '*where there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice*, '*the trial court need not, and indeed should not, submit the issue of punitive damages to the jury*....'" (citations omitted) (emphasis added).

- 25 -

200089

*Id.* The Alaska Supreme Court in *Weiford* expressly noted that "not all conduct which amounts to bad faith is sufficiently outrageous to warrant an award of punitive damages." *Id.* Thus, the principal question in the instant case, whether or not the district court and or jury find bad faith liability on the part of Continental, is whether Continental's conduct in denying or responding to the USA's tenders of defense of the Wilson and Kallstrom claims can be fairly and objectively categorized as "outrageous, such as acts done with malice or bad motives or reckless to the interest of another." *Id.* If the facts in this case cannot be so categorized, then, as the Court in *Weiford* held, "the trial court need not, and indeed should not, submit the issues of punitive damages to the jury." *Id.*[11]

### B.     Absence of Outrageous, Malicious or Reckless Conduct by Continental.

I incorporate by reference herein the facts, law, analyses, discussions and opinions set forth in Part I of this report. On the basis of the same facts, law and information discussed above, it is my opinion that Continental's conduct in considering, analyzing and rejecting the Government's tenders of defense of the Wilson claim, and its conduct regarding the Kallstrom claim in this case cannot be fairly and objectively categorized as "outrageous," or as acts done with malice, bad motives or reckless indifference to the interests of the Government. Rather, as detailed above, it is my opinion that Continental, and its coverage counsel, acted reasonably and had a reasonable basis, both in fact and in law, to deny the tenders of defense in the Wilson claim, and in responding to the Kallstrom claim.

Moreover, under Alaska's Tort Reform Act, the Government must prove that Continental's actions in denying its tenders of defense were outrageous by "clear and convincing" evidence. AS 09.17.020(b). Plainly, this is a higher standard of proof than the "preponderance of evidence" standard of proof necessary to establish liability for bad faith. In other words, the "bar" for proving conduct that gives rise to punitive liability is substantially higher than the standard for proving compensatory damages liability for bad faith acts. This is particularly true when the policy underlying the function of punitive damages is considered, namely that "punitive damages are not favored in law" and that "they are to be allowed only with caution and within narrow limits." *Weiford* at 1266. I do not

---

[11] In *Weiford*, the evidence included a note in the insurer's claims file from a supervisor that might have been reflective of a bad or evil motive. Nevertheless, because the insurer in fact made reasonable settlement offers to the insured, the Alaska Supreme Court found that "while the file note might be reflective of a bad motive, since the offer in question was reasonable, the note cannot independently form the basis for a punitive damages award" and held that as a matter of law, the punitive damages verdict in that case had to be reversed and vacated. *Id.* at 1268.

200090

46601v1

believe the Government can meet the "clear and convincing" standard of proof on this record.

In this case, I find nothing about the conduct of Continental or its coverage counsel that qualifies as outrageous, malicious or reckless conduct, which could be established by clear and convincing proof, so as to give rise to punitive liability. This is so, even though Continental ultimately reached the incorrect result in evaluating the underlying close and fairly debatable legal question and in predicting how an appellate court might ultimately decide such issue. Accordingly, it is my opinion that the USA's punitive damages claims should, as a matter of law, be rejected by the Court and not be submitted to the jury.

DATED this 22nd day of December 2005.

Douglas J. Serdahely

46601v1

200091



## Professional Profile

www.pattonboggs.com



**Douglas J. Serdahely**
Partner
Anchorage Office
907.263.6310
dserdahely@pattonboggs.com

**Practice Areas**
Litigation
Environmental, Health and Safety
Antitrust

**Education**
Harvard Law School, J.D., 1972

Northwestern University, B.A., *highest distinction*, Phi Beta Kappa, 1968

**Bar and Court Admissions**
United States Supreme Court
U.S. Court of Appeals for the 9th Circuit

# Douglas J. Serdahely

## Experience

Douglas Serdahely, managing partner of Patton Boggs' Anchorage office, concentrates his practice in complex civil litigation involving environmental and antitrust issues.

Mr. Serdahely represents, among others, ExxonMobil Corporation in the Exxon Valdez Oil Spill litigation in Alaska. He has also advised ExxonMobil Production Company, Sea River Maritime Inc., Safeway Inc., Tesoro Alaska Company, Marathon Oil Company, Travelers Insurance Company, Matanuska Electric Association, Anchorage Police and Firemen, and various energy, transportation and fuel distribution companies in Alaska. Mr. Serdahely has also served as the liaison counsel to more than 40 defendants in a $1 billion class action brought by 4,000 Alaska fishers. Mr. Serdahely also maintains an active antitrust practice, including representation of various companies in major mergers and acquisitions in Alaska. In addition, he has served as a settlement mediator in over 1,000 state and federal civil actions, as well as an arbitrator and special master in civil actions.

Prior to joining the firm, Mr. Serdahely was a litigation partner at Anchorage office of Bogle & Gates. Additionally, Mr. Serdahely served as an Alaska Superior Court Judge from 1981 to 1989, and during his tenure on the Alaska bench, Mr. Serdahely also served as presiding judge of the Third Judicial District, and as a *pro tem* panelist on the Alaska Court of Appeals and Alaska Supreme Court.

## Professional Affiliations

Member, Patton Boggs Management Committee

Alaska Bar Association

District of Columbia Bar Association

200092

EXHIBIT A
Page 1 of 1

EXHIBIT B
Page 1 of 21

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | R |
|---|---|---|---|---|---|---|---|---|---|
| 001 | BBH000180 | BBH000182 | 08/03/1988 | Rhonda McLeod | Lori K. Wing | | | Letter of 8/3/88 from Wing to Rhonda McLeod, BBAHC – items 3 and 4 talk about new FTCA provisions – "there remains [sic] some unanswered questions" and "some ambiguity as to where the protection for the premises and products liability is actually provided" – "if the Federal Government is providing the premises and products liability, then the insurance cost to BBAHC will be substantially reduced". | 41 |
| 002 | BC000466 | BC000469 | 03/02/1989 | Kim McCavera | Lori Wing | | | Fax transmittal from Wing to McCavera advising that PL 93-638 does not provide the hospital liability, only the medical malpractice. This is in response to McCavera's correspondence of 2/28/89. | 3 |
| 003 | BC000460 | BC000461 | 03/09/1989 | Kim McCavera | Lori Wing | | | Fax transmittal from Wing to McCavera in response to McCavera's 3/9/89 fax, advising that she she is trying to place GL coverage; advising that FTCA covers malpractice. | 3 |
| 004 | BC000436 | BC000438 | 03/22/1989 | Ray Hollinger | Lori Wing | | | Fax transmittal to Ray Hollinger of MU Hall from Wing stating "Continental has quoted hospital – GL on an occurrence basis with $1M each/$2 M aggr at less than $12,000 annual. Needless to say I have bound." | 3 |
| 005 | BBH000005 | BBH000008 | 06/24/1989 | Robert Clark | Lori K. Wing | Jay Toth | | Letter of 6/24/89 from Lori Wing to Robert Clark re: scope of coverage for BBAHC – says CIC policy "is a very limited coverage" because it covers liability only on a named peril basis. | 4 |
| 006 | BC002240 | BC002241 | 09/22/1989 | Kim McCavera | Lori K. Wing | | | Correspondence from Wing to Kim McCavera of CIC – Healthcare advising that "remember, that physicians and dentists who actually are employees of BBAHC fall within the scope of the Federal Tort Claims Act, PL93-638." | 3 |

200093

EXHIBIT B

Page 2 of 21

| Binder Tab # | Begin Bates | End Bates | Date | To | From | CC | Bcc | Description | Re |
|---|---|---|---|---|---|---|---|---|---|
| 007 | BC 002397 | BC 002398 | 10/13/1989 | Larry Sorensen | Lori K. Wing | | | Letter of 10/13/89 from Wing to Larry Sorensen re: trying to purchase umbrella insurance for BBAHC – all tribal contractors in Alaska have concerns because no one can figure out exactly what FTCA covers | 57 |
| 008 | BC 002395 | BC 002396 | 10/17/1989 | John Fontana | Lori K. Wing | | | Correspondence from Wing to Fontana. The letter states that FTCA was enacted in 1987, and in essence stated that P.L. 93-638 contractors would no longer be required to carry medical malpractice insurance. Wing raises concerns about whether FTCA would cover (1) incidental claims arising from incidental funding sources (2) auto incidents; (3) if an FTCA claim was presented, to what extent would BBAHC need to provide a defense. "Until the FTCA has been tried in court and precedent set they are very skeptical of the extent of coverage provided to them," same letter is also sent to Larry Sorensen of Corporate Marketing Services. | 37 |
| 009 | BC 002788 | BC 002789 | 10/05/1990 | Robert Brown | Lori K. Wing | | | Letter from Wing to Robert Brown (BBAHC) re insurance package for Fiscal Year 1991. Wing states "I would like to meet with you and Jay to discuss the extent of the coverage and the continuing ambiguities associated with the FTCA." | 38 |
| 010 | BC 000379 | BC 000409 | 12/17/1990 | | Rollins Burdick Hunter of Alaska, Inc. | | | BBAHC Register of Insurance dated 12/17/90 prepared by Rollins Burdick Hunter. Handwritten notes with respect to CID Health Care HRA 9930048 -2 state "Review with Govt /Tribal Immunity Considerations – Scope of Contract May Not Extend To FTCA" "Employee of BBAHC covered". | 34 |
| 011 | BC 003317 | BC 003317 | 07/16/1991 | Kris Lampl | Candace Sager | | | Fax of 7/16/91 from Candace Sager, Industrial Indemnity to Kris Lampl re: what policy covers certain premises – says it's possible they're covered by FTCA "which, I must admit I don't fully understand". | 39 |

200094

EXHIBIT B
Page 3 of 21

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | Redact |
|---|---|---|---|---|---|---|---|---|---|
| 012 | BC 000354 | BC 000355 | 09/03/1991 | John F. Roskopf | Lori Whig | Carl Brady | | Correspondence from Whig to John F. Roskopf, VP of Rollins Burdick Hunter Co. Whig advises that since FTCA was passed, her office has actively searched for a liability policy that would provide indemnification to their 533 contractor clients that are subject to FTCA; unfortunately, she has been somewhat unsuccessful in locating a medical malpractice and/or general liability and/or difference in conditions policy that would protect contractors in areas that may not be covered under the FTCA. She states that she met with Dean who advised her that the original intention of FTC Ams not for USA to "current expense" all FTCA claims; rather, the original intent was for Interior Dept. to purchase a liability program for exposures under FTCA and 93-638, but that to date, the Interior Dept. has been unable to secure this coverage. Suggest that Rollins should contact Interior Dept. and PHS and offer their services. | 34 |
| 013 | BC 001878 | BC 001888 | 07/17/1992 | Liz Hartshorn | Art Stanford | | | Letter of 7/7/92 from Art Stanford, Norcal underwriter, CFO of BBAHC re: we cannot write the professional liability coverage you request because NORCAL does not have the capacity to insure rather indefinable risks and would actually have no way of developing an appropriate rate for such exposures – could be a reference to the ambiguity in BBAHC's coverage under the FTCA (1878). | 35 |

200095

EXHIBIT B
Page 4 of 21

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | Redim |
|---|---|---|---|---|---|---|---|---|---|
| 014 | BC 001891 | BC 001922 | 07/30/1992 | NAS Insurance Services | Lori K. Wing | | | Letter of 7/30/92 from Wing to Maurice Skly, NAS Insurance Services, re: BBAHC's needs -- "The Federal Government by the FTCA has promised (somehow) to defend and indemnify the contractors for any liability claims..." Goes on to say "Unfortunately, the wording is somewhat ambiguous as to exactly what the contractor will be indemnified and defended for". Since we don't always know if the government will "make good on its promise," BBAHC wants to purchase a defense cost reimbursement policy (1691-92). | 39 |
| 015 | BC 001889 | BC 001890 | 08/06/1992 | Liz Harshorn | Lori K. Wing | | | Letter of 8/6/92 from Wing to Harshorn re: we're working to "address the liability exposures that may not be considered part of the FTCA" -- talks about the need to be ready in case the FTCA does not respond to a claim (1889-90). | 38 |
| 016 | BC 001872 | BC 001877 | 09/14/1992 | Lori K. Wing | Bruce C. McKay | | | Notes of 9/14/92 by Lori Wing (?) of conversation with Perry Grover of Davis Wright re: "BBAHC based" -- says FTCA defending BBAHC? | 38 |
| 017 | BC 001843 | BC 001871 | 09/23/1992 | CNA | Lori K. Wing | | | Letter of 9/23/92 from Wing to CNA re: trying to bind a liability policy that will cover BBAHC for risks not covered by FTCA | 57 |
| 018 | | | 09/30/1992 | | | | | Bauer's notes from his review of the CNC underwriting file. | 50 |
| 019 | BC 001168 | BC 001182 | 09/27/1993 | Robert Clark | Lori K. Wing | | | Letter from Wing to Robert Clark re BBAHC's Property and Casualty Insurance Program for Fiscal Year 1994; letter notes that CNC policy provides liability insurance at the Hospital, Dental Clinic and Alcohol Transition Center. | 35 |

200096

32   49

| Binder Tab # | Begin Bates | End Bates | Date | To | From | CC | Bcc | Description | Rcln |
|---|---|---|---|---|---|---|---|---|---|
| 020 | BC 000026 | BC 000035 | 09/30/1993 | | | | | BBAHC application for Hospital Professional Liability and General Liability Coverage – Claims Made requested for coverage effective 9/30/93. Box is checked yes next to whether "This hospital agreed to hold harmless or indemnify other under contract." Application notes (BC 000032) that coverage provided by FTCA under PL 93-638; however, appears to be referring to malpractice. | 34 |
| 021 | CNA 000543 | CNA 000548 | 01/12/1994 | Continental Insurance Company | Julie A. Mearty | Bristol Bay Area Health Corp (Attn Daryl Richardson) | | Letter attaching details of incident at Insureds treatment facility Dillingham, Alaska. | |
| 022 | BBHC 001281 | BBHC 001281 | 01/24/1994 | Julie A. McCarty | Randi R. King | Daryl Richardson | | Letter acknowledging receiving report on claimant Lori D. Wilson. | |
| 023 | CNA 000540 | CNA 000541 | 02/11/1994 | Robert K. Stewart | William W. Hutson | | | Letter requesting Investigate report conducted on behalf of BBAHC (no attachment). | |
| 024 | CNA 000534 | CNA 000538 | 02/15/1994 | William W. Hutson | Robert K. Stewart | | | Letter transmitting Davis Wright Tremaine's investigation report regarding incident involving injury to Lori Wilson. | |
| 025 | BBHC 001231 | BBHC 001234 | 02/17/1994 | John Kurtz | William W. Hutson | | | Letter regarding coverage and investigation at Bristol Bay Area Medical Center. | |
| 026 | CNA 000516 | CNA 000523 | 02/18/1994 | | | | | Initial File Reado/Major Reserve Report of Lori Wilson. | |
| 027 | BBHC 001229 | BBHC 001230 | 02/18/1994 | John Kurtz | William W. Hutson | | | Letter regarding obtaining information from Bob Stewart's office. | |
| 028 | BBHC 001226 | BBHC 001228 | 02/24/1994 | John Browne | William W. Hutson | Mike Cox | | Letter serving as initial notification to Corporate claims of Lori Wilson. | |
| 029 | BBHC 001224 | BBHC 001225 | 03/18/1994 | Bill Hutson | George Erde | Mike Cox | | Letter regarding coverage under the GL portion of policy limits. | |
| 030 | CNA 000466 | CNA 000468 | 03/28/1994 | BBAHC | Marilyn Wilson | U.S. Attorney's Office, Department of Health & Human Services | | Letter of 3/26/94 from Marilyn Wilson to BBAHC, U.S. Atty, and U.S. HHS making federal tort claim. | 14 |
| 031 | CNA 000489 | CNA 000492 | 04/07/1994 | William Hutson | Robert K. Stewart | Robert Clarke Darnell Richardson | | Letter transmitting claim for damage, injury or death, standard form 95, received by BBAHC (no attachments). | |

200097

EXHIBIT B
Page 6 of 21

| Binder Tab # | Begng Bates | End Bates | Date | To | From | CC | Bcc | Description | Redn |
|---|---|---|---|---|---|---|---|---|---|
| 032 | BBH 000970 | BBH 000970 | 04/07/1994 | Gary Thogenson | Robert K. Stewart | Robert Clark, Darrel Richardson | | Letter of 4/7/94 from Robert Stewart to Gary Thogenson, HHS, transmitting FTCA claim of Marilyn Wilson. | 48 |
| 033 | A 2034 | A 2034 | 04/11/1994 | Art Simon | Gary J. Thogenson | | | HHS memorandum from Gary Thogenson to Art Simon, PHS claims officer. Thogenson notes that circumstances and location of incident lead him to question whether FTCA applies. | 25 |
| 034 | CNA 000493 | CNA 000495 | 04/19/1994 | George Erie | William W. Hutson | | | Memo regarding reservation of rights. | |
| 035 | BBHC 001204 | BBHC 001204 | 04/20/1994 | Robert K. Stewart | William W. Hutson | | | Letter confirming receipt of form 95 that formally presents a claim under the Federal Tort Claims Act. | |
| 036 | BBHC 001782 | BBHC 001785 | 04/21/1994 | | | | | Complaint in re Marilyn Wilson individually and as parent and natural guardian of Lori Dee Wilson, a minor vs. Bristol Bay Native Corporation, an Alaska Corp and Bristol Bay Area Health Corporation. | |
| 037 | CNA 000825 | CNA 000827 | 04/23/1994 | Gary Thogenson | Perry Grower | Barrell Richardson; Cristy Witter Tildenc; Robert K. Stewart | | Letter requesting that the U.S. attorney be requested to undertake defense of Wilson lawsuit on behalf of BBAHC and the government. | |
| 038 | CNA 000482 | CNA 000483 | 04/29/1994 | William W. Hutson | Robert K. Stewart | Robert Clark; Darrel Richardson | | Letter advising that Marilyn Wilson has sued BBAHC and Bristol Bay Native Corporation in Alaska Superior Court and has served discovery requests on BBAHC, and transmitting same (no attachments). | |
| 039 | CNA 000469 | CNA 000469 | 05/03/1994 | William W. Hutson | George Erie | Mike Cox | | Letter regarding Continental's various liability issues. | |
| 040 | CNA 000477 | CNA 000477 | 05/04/1994 | Jim Friderid | William Hutson | | | Letter confirming assignment of case to Jim Friderid and transmitting billing agreement and attorney outline. | |
| 041 | CNA 000471 | CNA 000475 | 05/10/1994 | William Hutson | James B. Friderid | | | Letter advising that Bristol Bay Native Corporation does not appear to be an insured and providing legal analysis regarding various issues. | |
| 042 | CNA 000461 | CNA 000463 | 05/16/1994 | James Friderid | William Hutson | Darrel Richardson; Robert K. Stewart | | Letter transmitting Delaney, Wiles appearance and answer for BBAHC. | |

200098

34 of 49

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | R |
|---|---|---|---|---|---|---|---|---|---|
| 043 | CNA 000468 | CNA 000467 | 05/17/1994 | Robert J. Clark | William W. Hudson | Jim Friderid; Bob Stewart | | Letter acknowledging receipt of pleadings filed in Wilson matter and advising that defense of the case has been assigned to Jim Friderid. | |
| 044 | CP 00631 | CP 00631 | 05/19/1994 | Jim Friderid | Bill Hutson | | | Message note of 5/19/94 from Hutson to Friderid re: "We need to know what role the FTCA will play in this case. What contribution & whose subrogation rights". | 43 |
| 045 | CNA 000457 | CNA 000459 | 06/01/1994 | William Hutson | James B. Friderid | Darrel Richardson; Robert K. Stewart | | Letter of 6/1/94 from Friderid to Hutson re: contract between U.S. and BBAHC, advising that U.S. is proper defendant and recommending moving for summary judgment on the ground. | 16 |
| 046 | BBHC 001174 | BBHC 001179 | 06/03/1994 | William Hutson | James B. Friderid | Darrel Richardson; Robert K. Stewart | | Letter of 6/3/94 from Friderid to Hutson re: filing of motion for summary judgment and advising that plaintiff is likely to oppose it but that "legally we are correct" and "should ultimately prevail". | 16 |
| 047 | CNA 000521 | CNA 000522 | 06/16/1994 | Office of the General Counsel, DHHS | James B. Friderid | William Hutson; Darrel Richardson; Robert K. Stewart | | Letter requesting that the U.S. defend BBAHC in the lawsuit. | |
| 048 | CNA 000842 | CNA 000843 | 06/21/1994 | | Joan Woodward | | | Order dismissing with prejudice all claims against BBAHC. | |
| 049 | BBHC 000178 | BBHC 000178 | 06/20/1994 | | | | | Unknown notes -- but claims must be pursued against federal government, which "can't get recourse against Continental or Bristol Bay". | 16 |
| 050 | BBHC 001165 | BBHC 001166 | 06/23/1994 | William Hutson | James B. Friderid | Darrel Richardson; Robert K. Stewart | | Letter of 6/23/94 from Friderid to Hutson advising that Luce is not opposing motion for summary judgment on ground that U.S. is proper defendant. | 16 |
| 051 | BBHC 000175 | BBHC 000175 | 07/15/1994 | Mike Cox | William W. Hutson | Debra Wyatt Brown; Jim Baldyga | | Letter of 7/15/94 from Hutson to Mike Cox, Sr. VP, CIC, advising that Wilson matter is closed because plaintiffs must pursue claim under FTCA -- says "this was a terrible case" with clear liability and exposure above policy limit. | 16 |
| 052 | A271 | A278 | 10/14/1994 | United States Attorney General | L. Anna Luce | | | Summons to United States Attorney General with attached complaint. | |

200099

EXHIBIT B
Page 6 of 21

| Binder Tab # | Begin Bates | End Bates | Date | To | From | CC | Bcc | Description | Re. |
|---|---|---|---|---|---|---|---|---|---|
| 053 | A117 | A118 | 12/07/1994 | Kenneth S. Roosa | Robert K. Stewart | Bobo Dean, Parry Grover, Robert Clark, Darrel Richardson | | Letter confirming that DOJ agrees that activities at Jake's Place are covered by FTCA under the P.L. 93-638 contract between BBAHC and the IHS; Roosa is looking into respective obligation of the U.S. and Continental Insurance. | |
| 054 | A115 | A116 | 12/09/1994 | Kenneth S. Roosa | Robert K. Stewart | Bobo Dean, Parry Grover, Robert Clark, Darrel Richardson | | Letter transmitting copies of the GL portion of the CBP policy and the entire HMA policy. | |
| 055 | CNA 000338 | CNA 000338 | 01/06/1995 | Lori Wing | Robert C. Bundy, Kenneth S. Roosa | | | Letter tendering claim to Continental Insurance Company. | |
| 056 | BBHC 001150 | BBHC 001150 | 01/09/1995 | Randi King | Julie A. McCarty | | | Fax to Continental sending letter from U.S. tendering liability to BBHC. | |
| 057 | BBHC 001149 | BBHC 001149 | 01/12/1995 | William Hudson | Julie A. McCarty | | | Fax confirming Hudson receiving 01/09 letter from Roosa to Brady & Co., Handwritten reply by Hudson confirming receipt and will defend the allegation. | |
| 058 | CNA 000562 | CNA 000566 | 01/20/1995 | William Hudson | James B. Friderid | Greg Hence | | Letter confirming conversation regarding U.S.'s tender against the Wilson claim and transmitting 01/20/1995 letter from Jim Friderid to William Hudson regarding coverage under both policies. | |
| 059 | BBHC 000065 | BBHC 000065 | 01/31/1995 | KW | | | | Notes from KW re: discussion with Lori Wing – no need for professional liability coverage b/o FTCA covers Indians & non-Indians. | 13 |
| X60 | CNA 000339 | CNA 000339 | 02/01/1995 | Lori Wing | Kenneth S. Roosa | Robert K. Stewart | | Letter requesting response to tender of defense. | |
| X61 | BBHC 001137 | BBHC 001138 | 02/02/1995 | Kenneth S. Roosa | James B. Friderid | William Huson, Julie McCarty, Darrel Richardson, Robert K. Stewart | | Letter regarding representation of Continental; don't communicate any further with Brady & Co regarding tender. | |
| X62 | CNA 000340 | CNA 000341 | 02/13/1995 | Kenneth Roosa | James B. Friderid | William Hudson, Julie McCarty, Darrel Richardson, Robert K. Stewart | | Letter rejecting tender of defense of Continental Policy # 93 CBP 00114833-94 and stating that the U.S. is not and insured under that policy. | |
| X63 | CNA 000569 | CNA 000570 | 02/13/1995 | William Hudson | James B. Friderid | Maria Dellinger | | Letter transmitting Continental's response to the U.S. attorney denying tender of defense of Wilson claim. | |

EXHIBIT B
Page 2 of 21

| Binder Tab # | Begin Bates | End Bates | Date | To | From | CC | Bcc | Description | R. |
|---|---|---|---|---|---|---|---|---|---|
| 084 | CNA 000844 | CNA 000846 | 05/01/1995 | | | | | Third Party Complaint in re Marilyn Wilson vs. United States of America ; United State of America vs. Blanche Kallstrom. | |
| 085 | BBHC 001125 | BBHC 001125 | 05/08/1995 | Jim Friderici | William W. Hutson | | | Letter questioning if the government will continue to pursue the case of Lori Wilson vs. Bristol Bay Area Health Center and Continental Insurance Company. | |
| 086 | BBH 000979 | BBH 000979 | 05/12/1995 | Kenneth S. Roosa | Robert K. Stewart | Perry Grover, Robert Clark, Darrel Richardson | | Letter of 6/12/95 from Stewart to Roosa re: agreement that U.S. will not serve complaint on Kallstrom until BBAHC has had opportunity to discuss matter with her. | 48 |
| 087 | CNA 000571 | CNA 000573 | 05/25/1995 | William Hutson | James B. Friderici | Maria Delfinger, Robert K. Stewart | | Letter discussing anticipated course of action of case. | |
| 088 | A 5983 | A 5987 | 05/26/1995 | | | | | U.S. responses to Wilson's discovery requests — says U.S. is not a party to an indemnity agreement that would affect its liability. | 51 |
| 089 | CNA 000576 | CNA 000576 | 05/30/1995 | James B. Friderici | Robert K. Stewart | William Hutson, Robert Clark, Darrel Richardson, Perry Grover | | Letter returning copy of Stewart's Confidential correspondence to Hutson regarding the U.S. tender of defense. | |
| 070 | CNA 000426 | CNA 000427 | 05/31/1995 | Robert K. Stewart | James B. Friderici | William Hutson, Darrel Richardson | | Letter inquiring whether BBAHC believes it should respond to the U.S.'s tender of defense, rather than Continental responding to same. | |
| 071 | CNA 000574 | CNA 000576 | 06/01/1995 | James B. Friderici | Robert K. Stewart | William Hutson, Robert Clark, Darrel Richardson, Perry Grover | | Letter stating that "BBAHC has not yet formed a final opinion whether the United States is an insured person" under the general liability policy and transmitting copy of third-party complaint. | |
| 072 | CNA 000579 | CNA 000580 | 06/02/1995 | Robert K. Stewart | James B. Friderici | William Hutson, Darrel Richardson | | Letter advising that Delivery, Wilas is unaware of Third-Party Complaint against Blanche Kallstrom. | |
| 073 | CNA 000342 | CNA 000345 | 06/05/1995 | James Frederidi | Kenneth S. Roosa | | | Letter regarding tendering defense of claim under policy # HMA 9500048-5. | |
| 074 | CNA 000623 | CNA 000624 | 06/05/1995 | William Hutson | James B. Friderici | Maria Delfinger, Darrel Richardson, Robert K. Stewart | | Letter transmitting Kenneth Roosa's 06/05/1995 re-tender of defense to Continental. | |

2000101

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | R |
|---|---|---|---|---|---|---|---|---|---|
| 075 | BBHC 001102 | BBHC 001102 | 00/08/1995 | Kenneth S. Roosa | James B. Friderici | William Huteon, Julie McCarty, Darrel Richardson, Robert K. Stewart | | Letter regarding receipt of earlier letter of 8/8/95 and will be forwarded to Continental Insurance company. | |
| 076 | BBHC 001637 | BBHC 001637 | 08/14/1995 | Darrel Richardson | William W. Hutson | Jim Friderici | | Letter regarding tender of defense. | |
| 077 | CNA 000347 | CNA 000348 | 08/13/1995 | Bill Hutson | Kenneth S. Roosa | | | Letter regarding lack of response to sent on tender of defense and advising that the U.S. will take appropriate action to protect its rights under policies of A4 CSP 001114033 and # HNA 00000485.5. | |
| 078 | CNA 000424 | CNA 000424 | 10/23/1995 | Darrel Richardson | William W. Hutson | | | Letter of 10/2/95 from Hutson to Darrel Richardson, Kanakanak Hospital, re: my letter of 8/14/95 and again requesting that you approve Friderici's continued representation of BBAHC. | 1½ |
| 079 | BBHC 001514 | BBHC 001514 | 10/23/1995 | Ken Roosa | William W. Hutson | | | Letter regarding 9/13/95 letter regarding tender of claim to Continental Insurance Company. | |
| 080 | BBHC 001888 | BBHC 001888 | 01/05/1996 | | Continental Insurance Health Care | | | Handwritten note regarding telephone call with Friderica and case set for trial. | |
| 081 | BBHC 001752 | BBHC 001752 | 04/23/1996 | Michael Ragan | Bill Hutson | April Trob | | E-mail regarding case leaves, denial of coverage and summary judgment motion. | |
| 082 | BBHC 001825 | BBHC 001825 | 07/26/1996 | James B. Friderici | Jennifer E. Taylor | Todd Blondo | | Letter regarding case management and rejection of tender of defense by the United States. | |
| 083 | CNA 000414 | CNA 000416 | 08/16/1996 | Jennifer E. Taylor | James B. Friderici | | | Letter transmitting copies of prior correspondence regarding coverage and selected materials from the insured and the U.S. regarding coverage. | |
| 084 | A 1668 | A 1670 | 12/12/1996 | | | | | Affidavit of Blanche Kallstrom and Statement of Blanche Kallstrom. | 2S |
| 085 | CNA 000390 | CNA 000392 | 02/20/1997 | Jennifer Taylor | Kenneth S. Roosa | | | Letter regarding tendering Wilson claim to CNA and offering initial tender of Blanch Kallstrom claim. | |

2000102

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | R |
|---|---|---|---|---|---|---|---|---|---|
| 086 | DW 000447 | DW 000447 | 02/20/1997 | | | | | Handwritten notes referencing (1) a phone call with Roosa in which Roosa indicated he feels USA is an additional insured under Alaska law (2) spoke with Jim Friderici (3) a statement that "sue for bad faith if we don't accept tender" "9th circuit case that allows punitive". | 40 |
| 087 | BBHC 001818 | BBHC 001818 | 03/18/1997 | Jennifer E. Taylor | Kenneth S. Roosa | | | Letter regarding no knowledge of CNA's current filed in the Wilson claim. | |
| 088 | BBHC 001818 | BBHC 001818 | 03/18/1997 | Kenneth S. Roosa | Jennifer E. Taylor | | | Letter regarding receipt of 2/20/97 letter regarding tender by the U.S. to CNA. | |
| 089 | BBHC 001814 | BBHC 001814 | 04/18/1997 | Steven Garrett | Howard Greene | | | Memo regarding concern of tender from the U.S. Department of Justice and forwarding claim. | |
| 090 | BBHC 001798 | BBHC 001798 | 04/28/1997 | Gregory Allen Steele | Steve Garrett | Ray Faccenda | | E-mail regarding authorization to obtain coverage counsel and recap of case. | |
| 091 | BBHC 001797 | BBHC 001797 | 04/30/1997 | Craig Stowers | CNA | Attorney | | Instructions from CNA to Stowers asking "Do we owe the U.S. an acceptance of their tender?" | 17 |
| 092 | CNA 000357 | CNA 000355 | 05/15/1997 | Ken Roosa | L. Armes Luce | | | Settlement Demand Letter. | |
| 093 | CNA 000354 | CNA 000354 | 05/16/1997 | Ray Faccenda | Kenneth S. Roosa | | | Fax regarding latest tender of defense, third party complaint filed by the United States against Marilyn Wilson and attachment of demand letter from Armes Luce. | |
| 094 | CP 00248 | CP 00248 | 05/20/1997 | Craig Stowers | Julie A. McCarty | | | Letter of 2/20/97 from Julie McCarty (Brady & Co. (Lori Wing)) to Stowers enclosing GL portion of policy – note on bottom says "Lori Wing handles 83s throughout the state CNA Health Pro – Chicago – Lori thinks no way gov't can be brought in". | 42 |
| 095 | BBHC 001287 | BBHC 001818 | 05/21/1997 | | | | | CNA, File Activities report on Wilson litigation – entry for 5/21/97 reports a call from Craig Stowers – "He said that he believes our position is clear and that it would upset the whole body of law if the Gov't's position prevailed." | 17 |

2000103

| Binder Tab # | Baging Bates | End Bates | Date | To | From | CC | Bcc | Description | Re |
|---|---|---|---|---|---|---|---|---|---|
| 102 | CNA 000377 | CNA 000383 | 09/29/1997 | | | | | Stipulation for Compromise Settlement Pursuant to 28 USC 2877. | |
| 103 | 000340 | 000342 | 08/21/1998 | | Hobbs Straus Dean & Walker | | | General memo of 8/21/98 by Hobbs Straus re most tribes, insurers, and brokers don't understand scope of FTCA coverage, and many tribes perceive federal government's application of FTCA under § 833 not to be uniform; adds that DOI's position is that if tribe purchases insurance that duplicates FTCA, the insurer has to indemnify the government to avoid a "windfall" to insurer. | 65 |
| 104 | | | 08/21/1998 | | | | | Summons and Complaint issued to CNA Financial Corporation. | |
| 105 | 000340 | | 10/05/1998 | Jim H. Bauer | A. Richard Dykstra | Kenneth Roosa | | Letter from Richard Dykstra (Stafford Frey Cooper, Seattle) to Jim Bauer advising that he would like to retain Bauer on behalf of his client the US Attorney for Alaska. He is asked to research the various rating classifications that were used in the policy, and then report whether there is support for CIC's argument that policy not intended to cover ordinary risks of bodily injury at the site, but only intended to apply when BBAHC operating outside of the federal contract. | 10 |

200105

EXHIBIT B
Page 14 of 21

| Binder Tab # | Begin Bates | End Bates | Date | To | From | CC | Bcc | Description | Red |
|---|---|---|---|---|---|---|---|---|---|
| 106 | USA 000074 | USA 000075 | 11/11/1998 | Kenneth B. Roosa | Robert K. Stewart | Robert Clark, Darrell Richardson | | Letter from Stewart to Roosa re confirmation of a discussion on 11/10/98 and a meeting on 10/23/98 in which USA requested that (i) BBAHC copy Frederica's entire file and turn it over the USA; (ii) BBAHC allow USA's attorneys to speak freely with BBAHC employees concerning their acquisition of insurance (i.e., discussion with brokers and/or underwriters); (iii) BBAHC copy the broker's file and turn it over the USA; (iv) BBAHC to advise the USA whether there were any other liability files in effect regardless of who was the named insured. In the same meeting, Robert Bundy reserved USA's rights against BBAHC based on USA's position that BBAHC had a duty under the 638 contract to indemnify USA by obtaining insurance coverage and naming it as an additional insured. Stewart advises that and BBAHC will conduct an investigation regarding to any indemnity obligation prior to formulating a position with respect to the four requests. Estimates investigation will take 30 days. | 55 |
| 107 | | | 12/01/1998 | | | | | Declaration of Lori Wing dated 12/1/98 re: government's interpretation of the statute as an insured and BBAHC's duty to indemnify government are wrong. | 55 |
| 108 | 000343 | 000345 | 12/20/1998 | | Hobbs Straus Dean & Walker | | | General memo of 12/20/98 from Hobbs Straus re: meeting with DOJ re: tribal risk management issues – talks about DOJ's policy of tendering claims to insurers when it strikes FTCA coverage is duplicative.   This has caused considerable problems for tribes and their insurance brokers/carriers in attempting to design "gap" or "umbrella" insurance policies, the premiums of which are based on covering claims falling outside the scope of FTCA coverage. It also appears to contradict the intent of Congress which made FTCA coverage the "exclusive means of redress" under P.L. 93-638*. | 55 |

200106

45 of 49

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | Red |
|---|---|---|---|---|---|---|---|---|---|
| 109 | BBH 001938 | BBH 001940 | 01/26/1999 | Gary Thogersen, Robert Clark, Robert Stewart | S. Bobo Dean | | | Letter of 1/26/99 from Bobo Dean to Thogersen re BBAHC is very concerned that U.S. is demanding indemnification -- we think this is incorrect interpretation of law -- "Indeed, the position apparently taken by the U.S. Attorney would defeat the purpose of the extension of FTCA protection to tribal contractors under Public Law 83-638." | 47 |
| 110 | BBH 001935 | BBH 001937 | 02/00/1999 | Parry Grover | Robert C. Bundy | | | Letter of 2/8/99 from Robert Bundy, US Atty, to Parry Grover, Denis Wright, demanding indemnification of government by BBAHC in light of CIC's refusal to cover U.S. | 47 |
| 111 | USA 000068 | USA 000096 | 04/23/1999 | Kenneth S. Roosa | Parry Grover | H. Sally Smith, Robert J. Clark, Darrel Richardson, Robert K. Stewart, Robert C. Bundy | | Letter from Parry Grover to Roosa re meeting at Denis Wright's office on 5/4/99. | 58 |
| 112 | | | 04/24/1999 | Dave Maibach | Julie A. Mathews-McCarty | | | Letter from Julie McCarty to Dave Maibach (CNA HealthPro Claims Supervisor) enclosing Wing's 3/17/99 letter to April Mincak (CNA Health Pro) enclosing Robert Clark's 3/2/99 letter to Wing requesting tender to all potentially responsible insurance of Robert Bundy's 2/8/99 demand on behalf of the USA against BBAHC. | 10 |
| 113 | | | 05/24/1999 | Lori K. Wing | David C. Maibach | John R. Neeleman, Robert Stewart | | CIC's 5/24/99 denial of BBAHC's 3/17/99 tender because (1) CIC was specifically informed that purpose of insurance was to cover claims not covered by FTCA (2) USA's claim that BBAHC breached its agreement with USA is without merit (3) Clause 19 does not constitute an insured contract. | 10 |
| 114 | BBH 001941 | BBH 001942 | 06/09/1999 | David C. Maibach | Robert K. Stewart | Robert Clark, John Neeleman, Lori Wing | | Letter of 6/9/99 from Stewart to David Maibach, CNA HealthPro re BBAHC now believes U.S. is covered under policy and CNA's denial of tender is incorrect. | 47 |

200107

Exhibit 1
Page 43 f 49 pages

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | Redi |
|---|---|---|---|---|---|---|---|---|---|
| 115 | | | 08/22/1999 | David C. Maulbetsch | Robert K. Stewart | Robert Clark, John Neeleman, Lori Wing | | Letter from Stewart to David Maulbetsch. Stewart writes that CNA Health/Pro's wrongful denial of defense and indemnity of the USA lender is a material breach discharging BBAHC from any further duties including obligation to notify CNA if USA sues BBAHC. | 10 |
| 116 | | | 08/22/1999 | Robert K. Stewart | David C. Maulbetsch | | | Letter from David Maulbetsch to Stewart Maulbetsch writes that they disagree with characterizations in Stewart's letter and requests that BBAHC keep us apprised of significant developments, in particular if USA files suits against BBAHC. | 10 |
| 117 | | | 07/22/1999 | Jeffrey Axelrad | Robert C. Bundy | | | Letter from Bundy to Axelrad, requesting clarification and if necessary modification of authorization previously granted by former Assist. Atty. General Frank Hunger. Letter states that Hunger authorized the Alaska US Atty to pursue claims against CIC, and that in the course of pursuing those claims it was learned that BBAHC is obligated by contract to indemnify the USA against claims arising out of the contract. Letter states USA is negotiating with BBAHC for an assignment of its rights against CIC, but that BBAHC will require that USA enter into a covenant not to sue BBAHC if BBAHC is to sign a confession of judgment, which will require USA to compromise its claims for indemnity against BBAHC in an amount that exceeds the US Attorney's authority. Letter requests authorization to enter into such an agreement. | 10 |
| 118 | | | 07/28/1999 | Tribal Leader and Other Interested Parties | U.S. Department of the Interior | | | Attached exhibit to CIC's motion to dismiss – Memo of 7/28/99 from U.S. Public Health Service to tribal leaders endorsing Internal Agency Procedures Handbook on FTCA claims. | 04 |
| 119 | | | 07/29/1999 | Elizabeth J. Glanzarco | Jeffrey Axelrad | Judge Robert Bundy, U.S. Attorney | | Letter from Jeffrey Axelrad (Director Torts Branch) to Elizabeth Glanzarco enclosing a letter from Bundy and asking for Glanzarco's views on the matter. | 10 |

200108

Exhibit 1
Page 44 of 49 pages

EXHIBIT B
Page 17 of 21

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | Red |
|---|---|---|---|---|---|---|---|---|---|
| 120 | | | 02/14/2000 | John S. Delvin | Robert K. Stewart | Robert Clark, Ken Roosa | | Letter from Stewart to Delvin; Stewart refers to CIHA Health/hra denial of BBAHC's tender of the demand made by the USA (via Robert Bundy's 2/9/99 letter) as a "wrongful denial." | 10 |
| 121 | | | 04/03/2000 | Kenneth S. Roosa | Richard Dykstra | Linda Lamb | | Letter of 4/3/00 from Richard Dykstra, Stafford Frey Cooper to Roosa enclosing report and exhibits prepared by Bauer in reviewing premium ratings on CIO's policies. | 50 |
| 122 | 000145 | 000000157 | 05/02/2000 | Duke McCloud | B. Bobo Dean | Robert Clark, Robert Stewart, Tim White | | Letter of 5/2/00 from Bobo Dean to Duke McCloud, HHS Office of General Counsel, re: U.S. Atty's demand that BBAHC indemnify government—calls the demand "clearly inconsistent with the federal law relating to liability insurance." 4. Last page says: "By requiring that any liability policy acquired by a tribal contractor to protect itself from claims which may fall outside the scope of the FTCA must also insure the United States the federal government would defeat the purpose of the Congress in extending FTCA coverage to tribal contractors under the ISDEAA. No reduction in premium cost could be justified in that case." | 55 |
| 123 | 000156 | 000160 | 05/03/2000 | Duke McCloud | Dean | | | Letter of 5/3/00 from Dean to McCloud again saying that the government's position in making OGC defends the purpose of the FTCA & corrective action is necessary if that is in fact the government's position. | 55 |
| 124 | 000144 | | 06/28/2000 | B. Bobo Dean, Hans Walker | Mark Van Norman | | | Letter of 6/28/00 from Dean to Mark Van Norman, DOJ's Office of Tribal Justice re: government's suit against CIG shows that Congressional intent in extending FTCA is "clearly not being carried out". | 55 |
| 25 | 000203 | 000213 | 07/12/2000 | | Michael Willis | | | Testimony of Michael Willis, Hobbs Straus, before Senate Committee on Indian Affairs—criticizes the government's actions re: BBAHC and CIG and urges Committee to tell DOJ that its position is wrong. | 55 |

200109

Exhibit 1
Page 45 of 49 pages

EXHIBIT B
Page 13 of 21

| Index Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description | Redvel |
|---|---|---|---|---|---|---|---|---|---|
| 28 | | | 10/18/2000 | Kenneth Roosa | Linda J. Lamb | | | Linda Lamb's 10/18/00 report; her conclusions include that "policy provided Primary General Liability insurance coverage for all non-medical/professional liability related exposures for the specific premises listed on the policies from 1959 through 1994" and "there is no indication in the underwriting file that the Underwriter lowered the premiums in anticipation of a reduced liability exposure resulting from any type of Government immunity or any assumption of liability by the United States." | 10 |
| 127 | CNA 001391 | CNA 001391 | 10/30/2001 | Evan Schwab | Kenneth B. Roosa | | | Letter regarding U.S. formally tendered defense of claims asserted against U.S. by the third party defendant and counter-claimant. | |
| 128 | | | 05/09/2001 | John R. Neeleman | Beth Berger-Zerman | | | E-mail of 5/9/01 from Beth Ann Berger Zerman, CNA HealthPro, to Neeleman, asking him to fax 3/00/00 disposition notice for Crystal Brown to Sean Hanlin, RDB, also e-mails between Neeleman and Claire Fox, Lane Powell paralegal. | 12 |
| 129 | | | 05/25/2001 | Sean Hanlin, Beth Ann Berger Zerman | John R. Neeleman | | | Fax of 5/25/01 from Fox to Hanlin, attaching 3/00/(0) notice. | 12 |
| 130 | | | 10/04/2001 | | | | | Agreement of 10/4/01 between BBAHC and U.S. assigning BBAHC's right to insurance proceeds to government. | 03 |

200110

| 135 | CNA 001421 | | | |
| | CNA 001423 | 08/12/2002 | Ken Roosa | John A. Treptow |
| 136 | CP 00405 | | | |
| | CP 00410 | 05/20/0000 | Craig Stowers | |

Later regarding CNA, may to CNA's opposition to the U.S. cross-motion for summary judgment. CNA not replying to U.S. tender of defense in the Katstrom case.

Notes of telephone call w/ Wing on 6/20
- "BB/AHC philosophy has been to purchase ins, but maj of actions are FTCA covered"
- Suggests calling Barbara Krantzmar – atty from Berkeley who studies § 838 contracts
- "BB is frightened whether it should get ins or go bare"
- "She was annoyed and has never seen anything like this"
- "Agree w/ philosophies"
- "That's why BB's premiums are so low"
- "In fact, BB is being sold med mal pd. $5000 w/ $1 [?] deduct b/c exposure so low"
- "19,346 – in 03 this was very cheap for what was being ins?"
- "FTCA says we'll indem w/i scope of duties of K – BB does do work under state K [?] that is outside of scope of fed 638 K – also they do work on their own that is outside scope of 638 K"
  o "This is reason why BB bought ins"
  o "BB's attys have recommended BB buy ins b/c of risk that fed govt might deny FTCA coverage"
- "This case will have huge impact if CNA rules over on this – it will affect all 638's all over county"
- "US Govt not our tear"
- "We sent some to BB re Q&A surveys as to what FTCA will do for you and what it won't – exposure mtx. [Retention] costs look low – Fed Govt took $ out of [?] for purchasing these types of policies"
- "BB felt uncomf not being insur., so it did anyway"

200111

EXHIBIT B
Page 26 of 21

| Binder Tab # | Begng Bates | End Bates | Date | To | From | CC | Bcc | Description | Rea |
|---|---|---|---|---|---|---|---|---|---|
| 137 | DW 001093 | DW 001093 | 05/27/0000 | Craig Stowers | Roosa | | | Notes of 6/27 telephone call between Stowers (?) and Roosa (?DS)<br>a. "BBAHC's all comes from U.S."<br>b. They are a health corp that admin hosp for fed govt."<br>c. "Ken knows of no other authority either than what is cited & no case on point" | 41 |
| 138 | CP 00379 | CP 00380 | 06/11/0000 | Craig Stowers | | | | Notes of telephone call w/ Lori Wing on 6/11 -- says "confirms each assistance's fact stuff (?) attrib. to Lori" -- I think these last two entries are Stowers's notes when he's working on his coverage opinion. | 42 |
| 139 | CP 00375 | CP 00376 | 06/12/0000 | Craig Stowers | | | | Notes of a telephone call w/ Barbara on 6/12 -- note says she's at Berkeley and gives phone no. (373-70)<br>• "I represent tribe & tribal organizations like BBAHC and county"<br>• "I am a consent to Geo W. Univ. doing study on Insur. & FTCA"<br>• "When we (Geo. W. Univ.) met w/ Justice Dept & BIA & HHS, this Q came up w/ Ins.co. ordered to defend & cost"<br>• "Dept of Justice position is they are payor of last resort & if there is Ins., Ins co must pay"<br>• "We said Ins co are getting lower cost policies b/c they understand U.S. will pay FTCA"<br>• "In future -- Ins co needs to write exclusion in policies"<br>• "I don't know of any such. Just. Dept used for its preparation"<br>• "It concerns me -- It will change how tribes get insurance" | 42 |
| 140 | BBHC 001679 | BBHC 001679 | 00/00/0000 | | | | | CNA's claim file notation regarding no coverage for U.S., no claim against Bristol Bay, potential claim if U.S. demands they are an insured. | |
| 141 | BBHC 001759 | BBHC 001759 | 00/00/0000 | | Jim Frederici | | | Handwritten notes regarding representation of Bristol Bay, tender to defense, opinion on coverage, no coverage, new tender by U.S. | |
| 142 | BBHC 001758 | BBHC 001758 | 00/00/0000 | | | | | Handwritten notes regarding summary judgment on Bristol Bay and tender to U.S. case. | |

200112

Exhibit 1
Page 48 of 49 pages

EXHIBIT  B
Page 21 of 21

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 143 | BBHC 001287 | BBHC 001316 | 00/00/0000 | | | | | File Activities Report and Policy HMA 9500/848-5. |

200113