# EXPERT WITNESS REPORT OF
# ROBERT N. WAINSCOTT

## The United States of America, Plaintiff vs. CNA Financial Corporation and the Continental Casualty Company dba The Continental Insurance Company

Exhibit _____ 2 _____

Page __1__ of _65_ pages

200000

## EXPERT WITNESS REPORT OF ROBERT N. WAINSCOTT
## USA VS. CONTINENTAL INSURANCE COMPANY

### INTRODUCTION

This report contains my opinions regarding whether or not punitive damages should apply, under Alaska law, in the case entitled <u>The United States of America, Plaintiff vs. CNA Financial Corporation and the Continental Casualty Company dba The Continental Insurance Company.</u>

The above captioned case is filed in the United States District Court for the District of Alaska and has a designated case number of <u>A98-285 CIV.</u>  My review of the materials related to this case was done on the behalf of the defendant at the request of their counsel.

The above captioned lawsuit for punitive damages arises from an underlying federal court action entitled <u>Marilyn Wilson, Individually and as Parent and Natural Guardian of Lori Dee Wilson, a Minor vs. United States of America,</u> case number <u>A94 488 CIV.</u>

The case was originally filed in the Alaska Superior Court as <u>Marilyn Wilson, Individually and as Parent and Natural Guardian of Lori Dee Wilson, a Minor vs. Bristol Bay Native Corporation, an Alaskan Corporation, and Bristol Bay Area Health Corporation, an Alaskan Corporation</u>, case number <u>3AN-94-3341 CIV</u>.

The State case was dismissed and plaintiffs re-filed in the Federal Court, with the U.S.A. as the sole defendant, pursuant to federal statutes.  The underlying Federal Court case was dismissed after a settlement was reached with the plaintiff.

Prior to forming my opinions I reviewed the list of materials attached to this report and designated as appendix A.  Appendix B to this report is my C.V., my fee schedule and a list of cases in which I have testified during the past four years.  I have not authored any recent publications.

The opinions reflected in this report were formed after reviewing the disclosed materials listed in appendix A and discussions with Lori Wing, the insurance broker for Bristol Bay Area Health Corporation.  I reserve the right to revise or extend my opinions to encompass information obtained from additional materials which may be made available to me in the future.

### SCOPE OF REPORT

On July 8, 2005, the Federal District Court found that Continental acted in bad faith in denying the United States tenders and that a jury could find that

200001

1

Exhibit ___ 2 ___

Page _2_ of _65_ pages

Continental's rejections of those tenders were outrageous or done with reckless indifference. The court granted the United States' motion to present a case for punitive damages to a jury.

To form my opinion on whether or not Continental's actions warrant a finding of bad faith and an award of punitive damages, I have reviewed the history of the transaction of the purchase of insurance and the actions of the parties during the course of the claim. I have also reviewed statutory language, legal opinions, and the documents listed in Appendix A on the issue of punitive damages.

During the last seventeen years, I have testified as an expert witness in the issues of bad faith and punitive damages in both Alaska State and Federal Courts. My experience with complex claims and coverage issues includes thirty seven years as a staff adjuster and in management positions for INA/Alaska Pacific Assurance/Cigna. My report and analysis encompass that experience.

## SYNOPSIS OF ACCIDENT

Bristol Bay Area Health Corporation (hereafter referred to as B.B.A.H.C.) was, and is, the owner of a building in the Bristol Bay Area that is utilized for drug and alcohol rehabilitation. That facility is known as Jake's Place.

A year prior to the accident, Jake's Place was added by midterm endorsement to a policy originally issued by Continental Insurance Company in 1989, and renewed annually thereafter. The policy number was HMA 9500648-5, and it was in effect when the underlying loss occurred.

On November 27, 1993, the B.B.A.H.C. hosted a party at Jake's Place to celebrate a month of sobriety and graduation of the first patients in the program's fledgling drug and alcohol abuse program. Members of the general public were invited to attend and join in the celebration
.
Among those in attendance was an eight year old girl by the name of Lori Dee Wilson.

At some point in the evening, Lori Wilson requested a drink. Blanche Kallstrom, another guest at the party, poured Lori a glass of liquid which she believed to be a fruit flavored beverage.

The liquid in question was contained in a two quart plastic opaque pitcher and located in the kitchen area. Blanche was unaware that the liquid in the pitcher was an industrial strength dish liquid containing sodium hydroxide. Subsequent to ingesting the liquid, Lori Wilson suffered serious injury to her esophagus and stomach lining.

Some weeks prior to the party, an employee of B.B.A.H.C. noted the inappropriate storage of the cleaner in a pitcher and recommended that the liquid

be moved to a more fitting container. Apparently they were unable to find a container that would be more suitable, and elected to leave the cleaner in the pitcher. One of the residents of Jake's Place printed out a label that read, "Dish Liquid/Do Not Drink", or words to that effect, and taped the label to the pitcher. It is unclear if the label was still intact, and if it was, what condition it was in on the night of November 27, 1993.

## STATE COURT ACTION – WILSON VS. B.B.A.H.C.

On November 28, 1993, B.B.A.H.C. reported the accident to their attorney, Robert Stewart of Davis, Wright and Tremaine. Following a personal investigation by Mr. Stewart into the facts of the accident, Mr. Stewart advised B.B.A.H.C. to file the matter in an "incident folder".

At that time it was known that Lori Wilson had suffered serious injury and that she had been flown first to Anchorage, and later to Seattle, for treatment. It is unclear why Mr. Stewart elected to advise his client in this manner. No claim had been made against B.B.A.H.C. at the time that Mr. Stewart made his recommendation to file the matter as an incident.

On January 12, 1994, Mr. Stewart, on behalf of his client, B.B.A.H.C., reported the accident to their broker, Lori Wing.

On January 25, 1994, Mr. Stewart, telephoned Continental Insurance Company and advised them that the Wilsons were being represented by Ames Luce, a prominent plaintiff attorney in Anchorage.

Continental Insurance did not raise any late notice defenses, but accepted the claim and began an investigation into the underlying facts. The investigation was directed by Continental's Regional Claims Director, William W. Hutson.

Mr. Hutson contacted Bob Stewart and then assigned the case to John Kurtz, a Continental Insurance Loss Adjuster in Spokane, Washington. Mr. Kurtz was given detailed instructions for conducting a complete investigation. A reserve of $475,000 was established on February 1, 1994. Continental did not issue a Reservation of Rights, but accepted coverage for their named insured, B.B.A.H.C.

On April 18, 1994, counsel for the Wilsons, Ames Luce and his partner Paula Jacobson filed a lawsuit In the Anchorage District of the Alaska Superior Court. Named as defendants in that suit were Bristol Bay Native Corporation and Bristol Bay Area Health Corporation. (Bristol Bay Native Corporation received a voluntary dismissal when it became clear they had no culpability in the accident.)

On April 20, 1994, Mr. Hutson acknowledged receipt of the Form 95 FTCA submitted by Mr. Stewart.

200003

2    3

Page 4 of 65

On April 23, 1994, Parry Grover (partner of Robert Stewart, personal attorney for B.B.A.H.C.), tendered the defense of this lawsuit to Gary Thogerson, Attorney for the U. S. Department of Health and Human Services.   The suit was tendered to the U. S. Department of Health and Human Services because the accident resulted from services being performed by B.B.A.H.C. in their capacity as a P.L.93-638 contractor.  As a contractor to the Indian Health Services, B.B.A.H.C. was entitled to coverage under the 1991 revision of the Federal Tort Claims Act.

On April 26, 1994, the suit was tendered to William Hutson for Continental Insurance Company by Robert Stewart.  Mr. Stewart requested that Continental provide a defense and indemnification for B.B.A.H.C. under all applicable coverage.

Continental Regional Claims Manager, William Hutson, instructed Attorney James Friderici to file an appearance on behalf of B.B.A.H.C.

Mr. Friderici contacted Parry Grove and learned that B.B.A.H.C. was operating under a P.L.93-638 contract when the accident occurred.

On May 16, 1994, Mr. Friderici wrote to Mr. Hutson.  He advised Mr. Hutson that the P.L. 93-638 contract had been updated by amendment and was subject to 1990 25 U.S.C. 450 f (d).  Under 1990 25 U.S.C. 450 f (d), employees of any Indian Contractor are considered employees of the Public Health Service in the Department of Health and Human Services while they are performing under any 638 contract.  The Federal Tort Claims Act is the exclusive remedy for claimants who bring actions against the contractor and its employees subject to 28 U.S.C. 2679.

On June 1, 1994, Mr. Friderici advised Mr. Hutson that under amendment # 65, effective October 1, 1993, Native Contractors can not be sued directly; suits must be brought against the United States.

Mr. Friderici drafted a motion for Summary Judgment and advised Continental this was the safest and fastest way to have B.B.A.H.C. dismissed from the lawsuit.  Mr. Friderici was convinced that the amended F.T.C.A. was put in place to protect Native contractors from litigation, but he felt that the plaintiff would resist proceeding against the U.S.A. in Federal Court because the Federal Court does not award pre-judgment interest and attorney fees would be limited to 25%.

On June 21, 1994, Judge Woodward granted the Motion for Summary Judgment and dismissed the State action.  The U.S.A. had not responded to the April 23, 1994, tender of defense, (Friderici June 23, 1994 letter).

200004

2      4

5  of  65

**FEDERAL COURT ACTION – WILSON VS. UNITED STATES OF AMERICA**

On October 14, 1994, the plaintiff re-filed the action in the Anchorage Federal District Court naming the United States of America as the sole defendant.

On December 7, 1994, Robert Stewart directed a letter to Ken Roosa, Assistant U.S. Attorney, confirming Roosa's agreement that the actions leading to the claim were subject to the P.L.93-638 contract and covered by the Federal Tort Claims Act.

It is at this juncture, that Mr. Roosa, Assistant U.S. Attorney, raised the question of whether or not the U.S.A. has rights to coverage under any contracts of insurance B.B.A.H.C. may have had in place when the loss occurred. In a letter dated December 7, 1994, Mr. Roosa requested that Mr. Stewart provide him with copies of any liability policies in effect on the date that Lori Wilson was injured.

On December 9, 1994, Mr. Stewart responded to Mr. Roosa's request by sending him the general liability portions of the CBP policy and a complete copy of the HMA policy. The policies provided to Mr. Roosa on that date were 93 CBP 06114933-94 and HMA 9500648-5.

On January 6, 1995, Robert Bundy, U.S. Attorney and Mr. Roosa, Assistant U.S. Attorney tendered the claim to Continental Insurance under policy number 93 CBP 06114933-94. The tender was made to Lori Wing, who was the broker for B.B.A.H.C. It is unclear why they failed to tender the claim under the HMA policy, as they clearly had possession of both policies on that date. Ms. Wing directed the tender to Randi King at Continental Insurance Claims on January 9, 1995.

On January 20, 1995, Jim Friderici provided Bill Hutson with a detailed opinion on coverage under the policy for the U.S.A. It was Mr. Frederica's opinion that neither the HMA nor CBP policy provided coverage to the U.S.A. Mr. Friderici notes that the U.S.A. had only tendered the loss under the CBP policy.

On February 1, 1995, Mr. Roosa wrote a letter to Lori Wing advising her that he had not yet received a response to his January 6, 1995 tender.

On February 2, 1995, Mr. Friderici directed a letter to Ken Roosa, advising Mr. Roosa that the tender by the U. S. A. was under consideration.

On February 13, 1995, Mr. Friderici provided Mr. Roosa with a letter rejecting the tender made on January 6, 1995 under policy 93 CBP 06114933-94. He presented two reasons for the rejection. First, the U.S.A. was not a named insured, additional insured, or any other described insured under the policy. Second, Jake's Place, where the accident took place, was specifically excluded under the policy for which coverage had been tendered.

200005

On February 13, 1995, Mr. Friderici wrote to Mr. Hutson. In the letter Mr. Friderici outlined that he expected the U.S.A. to sue Continental in an attempt to secure coverage. Mr. Friderici's contemporary comments on that date are significant for two reasons. First, it reflects that the parties were aware that they would be dealing with the legal horsepower and resources of the most powerful country on earth. Secondly, it demonstrates that both Friderici and Continental Insurance believed their position to be not just viable, but rock-solid.

On May 1, 1995, the U.S.A. third partied Blanche Kallstrom into the action. It does not appear that the U.S.A. consulted with, or obtained permission from, B.B.A.H.C. prior to taking that action.

On May 30, 1995, Bob Stewart advised Jim Friderici that B.B.A.H.C. had not yet determined whether or not they considered the U.S.A. an "insured person" under the Continental policy. In the letter Mr. Stewart contends that he is of the opinion that, under the circumstances, it would be a conflict of interest for Mr. Friderici to advise Continental on coverage issues.

On May 31, 1995, Mr. Friderici responded to Mr. Stewart's letter. Mr. Friderici expressed surprise at the position in the May 30, 1995 letter. Mr. Friderici related that his notes, on May 24, 1994, at 11:28 A.M., reflected a conversation with Mr. Stewart in which Mr. Stewart advised him that the corporate position of B.B.A.H.C. was that the U.S.A. not be considered an insured under the Continental policy. Until he received Mr. Stewart's May 30, 1995, letter Mr. Friderici felt the interests of Continental and B.B.A.H.C. were aligned, that no conflict existed and he had proceeded accordingly. (It should be noted that there appears to be a typo in this letter with the May 24, 1994 reference. The conversation was confirmed to have taken place on May 24, 1995, six days before Mr. Stewart's letter.)

It now appears that B.B.A.H.C's change in position and uncertainty about including the U.S.A. as an insured was prompted by threats by the U. S. Attorney. The U.S.A. had threatened to sue B.B.A.H.C. for their failure to provide for indemnification of the U.S.A. or name the U.S.A. as an additional insured under the policy. I will address this matter in detail later in the report.

On June 2, 1995, following receipt of the information from Mr. Stewart that there may be a conflict of interest between the B.B.A.H.C. and Continental Insurance Company regarding coverage issues, Mr. Friderici notified the parties that he would no longer provide advice on coverage to either party.

On June 6, 1995, Ken Roosa directed a letter to James Friderici tendering the claim under Continental policy number HMA 9500648-5. In that letter Mr. Roosa states that he was unaware that the second policy existed when he made the original tender. Based upon contemporary evidence, this statement is patently

untrue. Mr. Roosa received both policies from Mr. Stewart on December 9, 1994, along with a cover letter directing Mr. Roosa to contact Mr. Friderici if he required any additional information regarding policies issued by Continental Insurance.

On June 8, 1995, Mr. Friderici sent the tender to Bill Hutson. In a letter accompanying the tender he explained that he could not address coverage issues because of a possible conflict of interest between Continental Insurance and B.B.A.H.C. On that same date, Mr. Roosa was advised by Mr. Friderici that he was no longer authorized to respond to issues related to coverage.

On September 13, 1995, Mr. Roosa wrote a letter to Mr. Hutson inquiring about the status of his second tender (June 6, 1995). In this letter, Mr. Roosa again denied that he had knowledge of the second policy at the time of the initial tender on January 6, 1995.

On October 3, 1995, Mr. Hutson formally rejected the U.S.A. tender, emphasizing reliance upon the opinions set forth in the February 13, 1995, rejection of the January 6, 1995 tender.

After the October 3, 1995, rejection of the tender, Continental Insurance received no further communication from the attorneys for the U.S.A. until February 20, 1997. On that date, Mr. Roosa directed a letter to Jennifer Taylor of the Continental Claims Department outlining the claim and prior rejections of tenders.

In the February 20, 1997, letter, Mr. Roosa acknowledged that the claim arose from the negligence of B.B.A.H.C. employees acting within the scope of their employment under a P.L.93-638 contract. Mr. Roosa conceded that the U.S.A. is correctly named as the only defendant and that the U.S.A. was defending the lawsuit. Mr. Roosa made a third tender of the claim to Continental in this letter. The tender was made only under the 93 CBP 06114933-94 policy which clearly excludes Jake's place. Mr. Roosa did not include the second General Liability policy, HMA 9500648-5, in the tender letter. Neither policy contained any reference to the U.S.A. as an additional or intended insured. This letter expanded the previous tender to include counter claims brought by Blanche Kallstrom. Ms. Kallstrom counter sued the U.S.A. after the United States third partied her into the litigation.

On March 18, 1997, Jennifer Taylor directed a response to Mr. Roosa regarding the third tender. She advised Mr. Roosa that she would respond to the tender following a reasonable time to review all of the issues.

On May 16, 1997, Ken Roosa followed up on his February tender by directing a letter to Ray Faccenda at Continental. He advised Mr. Faccenda that he had not received a response to his third tender. He also informed Mr. Faccenda of the receipt of a demand letter from plaintiff counsel Ames Luce, and attached a copy

of the demand letter to the May 16 correspondence.

On May 27, 1997, Mr. Roosa sent a letter to Craig Stowers of Clapp, Peterson, and Stowers, (local counsel retained by Continental Insurance).  That correspondence contained a tender and a demand to take over responsibility for claim and relevant settlement negotiations.  Mr. Roosa qualified the tender by advising, that while they expect Continental to provide the full defense and indemnification, the "constraints of 28 USC-517 prohibit the U.S.A. from relinquishing all control of the defense".  Although the February 20,1997, tender is only made to the CBP 06114933-94 policy, the rejection letter addressed both policies.

On June 19, 1997, Mr. Stowers, at the direction of Continental Insurance Company, sent Mr. Roosa a detailed nine page letter outlining the case, the policies, and the contracts.  Mr. Stowers concluded that, as stated in response to previous tenders, the policies issued by Continental Insurance provided no coverage for the U.S.A.  Mr. Stowers' letter accentuates the complete lack of any reference in either policy to a provision of coverage for the U.S.A. as a named insured, additional insured, or any other insured under the definitions of the policies.  The letter further stressed that the CBP policy specifically excludes the location of the accident, Jake's Place.

On July 25, 1997, the U.S.A. entered into settlement negotiations with the plaintiff counsel and the underlying claim was settled with the Wilsons for a total payout of $2,800,000.

## PRESENT LITIGATION – U.S.A. VS. CONTINENTAL INSURANCE CO. ET AL

On August 14, 1998, the U.S.A. filed suit in the Federal District Court against CNA Financial Corporation and Continental Casualty Company; D/B/A The Continental Insurance Company.

On September 4, 2001, the U.S. District Court in Anchorage issued a preliminary ruling granting the motion from the U.S.A. and finding that the U.S.A. was an implied insured under the policy.  In that decision, at Page 9, the court recognized that the United States was not named as an insured anywhere in the policy language.

On March 28, 2003, the Federal District Court in Anchorage reconsidered the 2001 decision and reversed the 2001 decision.  The court granted Continental's Motion for Summary Judgment, finding that there was no coverage for the United States under Continental's policy.  In that decision, at Page 6, the court, relying upon Olympic vs. Providence Washington, found that the United States was not an insured under the implied insured doctrine of Alaska law.

200008

8

The U.S.A. appealed that decision to the 9th Circuit where it was reversed and remanded. The 9th Circuit found the United States to be an "implied insured" under the Continental Contract. In their decision, at Page 3, the court stressed the issue of equity. They expressed concern that to decide otherwise would result in a windfall for Continental and that to rule otherwise would allow Continental to escape liability for protection they were paid to provide.

On July 8, 2005, the Federal District Court found that Continental acted in bad faith in denying the United States tenders and that a jury could find Continental's rejection of those tenders outrageous or done with reckless indifference. The court granted the United States' motion to present a case for punitive damages to a jury.

## INTENTION OF THE PARTIES: HISTORY OF THE FTCA AND THE PURCHASE OF INSURANCE AS RELATES TO B.B.A.H.C.

The records I reviewed reflect a tumultuous course of events which began in the late 1980's and early 90's when the Federal Government extended the FTCA act to provide coverage for P.L. 93-638 contractors.

On October 17, 1989, the broker for Bristol Bay Area Health Corporation wrote to Gerald Sullivan and Associates to discuss the placement of a portion of her client's coverage. In that letter she states:

"In December of 1987, the U.S. government enacted the Federal Tort Claims Act (FTCA) which, in essence, state that P.L. 93-638 contractors no longer would be required to carry medical malpractice insurance, as the funding for any claims, medical malpractice, would come directly from the U.S. government.

The FTCA has been studied and reviewed by BBAHC's attorneys and other representatives. It has been decided that while the purpose of the FTCA was well intended, it also placed the contractors, such as BBAHC in a precarious position. Some of the concerns of BBAHC are:

1. BBAHC receives funding from the IHS as well as the State of Alaska, Bristol Bay Borough and private insurance companies. While the IHS is the primary funding source, will the FTCA include any incidents/claims that may arise from any of these incidental funding sources?.....
3. If a claim were to be presented, to what extent would BBAHC need to provide a defense as there is no precedent set as to exactly where the FTCA begins or ends. This is the main concern of BBAHC. Until the FTCA has been tried in court and precedent set they are very skeptical of the extent of coverage provided to them."

Eventually the medical malpractice coverage extension was clarified, but the scope of the intended coverage for general liability, which was added in 1991, remained a problem.

On February 8, 1991, Mr. Dean, an attorney who represents many native organizations, including B.B.A.H.C., wrote a memo directed to Navajo School

200009

9

2

10 of 65

Clients regarding the FTCA and General Liability Insurance. The cover note to that memorandum says, in part:

"As reflected in the memorandum, the FTCA does not cover your entire operation, especially if your program receives funding from sources other than the BIA or IHS.......We hope you will use this memorandum as a tool to better evaluate your insurance needs."

The memorandum discusses insurance needs. In the memorandum Mr. Dean states:

"While we could argue from a policy standpoint that requiring contractors to maintain private liability insurance is contrary to what Congress intended when it extended the FTCA to self-determination contracts, the statutory language does not address all general liability insurance needs of contractors".

In his letter to Dr. Rhoades on July 3, 1991, Mr. Dean outlined exposures that may fall outside the FTCA, they include
- treatment of non beneficiaries for a fee
- a water safety program that was funded by the State of Alaska
- a "swing bed program" for long term care that was funded by Medicare, Veterans Administration, and private insurance
- Women, Infant, and Children program that is funded by the State
- Community Health Aid Program
- Environmental Health Services Program partially funded by the State
- Maternal/Child Care funded partially by the State
- various clinics partially funded by the State

Mr. Dean felt that one way to resolve the matter so that B.B.A.H.C. did not have to carry liability coverage for exposures outside the 93-638 contracts was to request that the scope of the act be clarified to cover all of the contractor's activities.

Dr. Rhoades of the Department of Health & Human Services, made it clear that was not a possibility when he wrote to Mr. Dean in August of 1991.

".......coverage is determined by the facts on a case-by-case basis. The basic test remains whether an employee was acting within the scope of their employment. An additional test, as to whether or not the employee was acting within the scope of the contract, is added to P.L. 93-638 contractors."

On September 3, 1991, Ms. Wing, a broker at RBH for B.B.A.H.C., wrote to the RBH office in Chicago regarding Public Law 93-638 and the FTCA.

"Since the Federal Tort Claims Act (FTCA) was passed by the United States Congress this office has actively searched for a liability policy that would provide indemnification for our clients that are subject to this act. Unfortunately, we have been somewhat unsuccessful in locating a medical malpractice and/or general liability and/or difference in conditions policy that would protect the contractors in areas that may not be covered under the FTCA.

200010

10

Recently, I was fortunate to personally meet with Mr. S. Bobo Dean of Hobbs, Straus, Dean and Wilder. In that meeting Mr. Dean advised me that the original intention of the FTCA was not for the United States Government to current expense any and all claims filed under the FTCA. The original intent was for the Department of the Interior to purchase a liability insurance program for exposures under the FTCA and the P.L. 93-638 contractors. To date, the Department of the Interior has been unable to secure this coverage."

On July 17, 1992, NORCAL insurance advised Ms. Wing that they could not provide coverage. Mr. Stanford stated:

"As I had surmised, NORCAL does not have the capacity to insure rather indefinable risks and would actually have no way of developing an appropriate rate for such exposures".

On July 30, 1992, she wrote to NAS Insurance Services.

"The Federal Government by the Federal Tort Claims Act has promised (somewhat) to defend and indemnify the contractors for any liability claims as a result of their scope of services under the P.L. 93-638 contract.

Unfortunately, the wording is somewhat ambiguous as to exactly what the contractor will be indemnified and defended for. For instance, if the negligent act were to be as a result of a program that is state funded and not federally funded would the government make good on its promise."

Among the solutions to the problem that was on the table for discussion was the possibility of self insurance with an excess policy. (August 6, 1992, Wing to Hartshorn, B.B.A.H.C.)

On September 10, 1992, Lori Wing wrote to representatives for insurance markets in Los Angeles, two offices in Seattle, Illinois, London, and three California offices. Clearly she was desperately searching for coverage for her client that was difficult to place. In those letters she stated:

"Bristol Bay Area Health Corporation, as one of several PL.93-638 contracts, is afforded some protection for their liability exposures under the Federal Tort Claims Act (FTCA). However, the FTCA will not respond to all exposures of BBAHC. This places them in the position of having to purchase insurance for those exposures not defined in the FTCA. Unfortunately, when the FTCA was passed the U.S. Government discontinued all funding for liability insurance".

B.B.A.H.C. President and CEO Robert Clark testified on page 27 of his deposition that the Federal Tort Claims Act provides coverage for the B.B.A.H.C. but the B.B.A.H.C. needed private coverage for claims that might not be subject to the FTCA. On page 48 and 49 of his deposition, Mr. Clark stated that the FTCA should cover everything but they aren't always sure so they have private insurance as well. On page 93 of his deposition Mr. Clark stated "I never had the idea that B.B.A.H.C. was required to have the U.S.A. as an additional insured."

Bobo Dean, attorney for B.B.A.H.C. and other native tribes, testified in his deposition that he attended a meeting with Lori Wing (broker for B.B.A.H.C.), the purpose of which was to establish the scope of the FTCA to determine the

coverage that the B.B.A.H.C. needed to purchase to insure themselves for claim that did not fall under the FTCA. (February 21, 2001 at page 31) Mr. Dean also testified that the purpose of the FTCA was to reduce the cost of insurance for the Indian Health Services. (February 21, 2001, at page 54).

On page 108, Mr. Dean testified that U.S.A. representatives and I.H.S. representatives were present at the annual negotiation sessions. According to Mr. Dean, neither the U.S.A. nor the I.H.S. ever asked for, or took the position that B.B.A.H.C. was required to indemnify the U.S.A. for payments made under the FTCA. Neither of those agencies asked the B.B.A.H.C. to purchase an insurance policy and name U.S.A. or I. H.S. as an additional insured.

On May 2, 2000, Mr. Dean wrote a letter to the Federal Government outlining the U.S .Attorney's threats against B.B.A.H.C. The memo, while written after the claim, certainly recaps what Mr. Dean and his client intended when they purchased the coverage from Continental.

"We understand that the insurance policy applicable in 1993 was obtained for the purpose of protecting BBAHC against claim outside the scope of the FTCA "

Mr. Dean went on to explain that after the implementation of the FTCA, the obligation to pay for insurance shifted.

"Since the federal government self-insures, agency budgets do not include funding for insurance."

He summarized by saying:

"By requiring that any liability policy acquired by a tribal contractor to protect itself from claims which may fall outside the scope of the FTCA must also insure the United States the federal government would defeat the purpose of the congress in extending FTCA coverage to tribal contractors under the ISDEAA."

Debra Patricia Wyatt Brown is a Continental underwriter who first began working on the B.B.A.H.C. account on June 24, 1991. On April 5, 2000, Ms. Brown testified that, when the policy was underwritten, she understood that B.B.A.H.C. was covered by the Federal Tort Claims Act for most General Liability exposures, and that the purpose of the Continental policy was to cover exposure not covered by the FTCA.

On page 74, Ms. Brown testified that premium rates for B.B.A.H.C. were lower than the rates for non-native groups because of the coverage afforded to them under the FTCA.

Lori Wing, broker for B.B.A.H.C., testified in her deposition that the language of the FTCA states:

"We will indemnify you for acts of employees, officers, etc" (page 71)

200012

2        12

13        65

On page 96 of her deposition she testified that she met with Bobo Dean and Robert Clark to discuss coverage that would apply for exposure that the FTCA might not cover.

On page 103 Ms. Wing testified as regards Exhibit L at page 8. This exhibit discusses the majority of the coverage for G.L. will be covered by FTCA and the problems inherent in finding an insurance carrier that would write coverage falling outside the coverage provided by the FTCA.

Darrel Richardson, Chief Financial Officer for B.B.A.H.C., testified on page 63 of his deposition that, until a meeting in May of 1999, he was unaware of anyone who believed that the U.S.A. should be an additional insured under the B.B.A.H.C. policy.

On page 66 of his deposition he testified that no one at B.B.A.H.C. ever advised Lori Wing that they believed the U.S.A. should be an additional insured under their policies of insurance.

## OPINION REGARDING INTENT OF THE PARTIES

An insurance policy is a contract. To form a contract there must be a meeting of the minds; an intent. The contract terms govern what the parties meant when the contract was formed, but intent is the basis from which the contract arises. Since what was intended to be covered is at the heart of this case, I wanted to look at the history of the placement.

Because an insurance contract is an adhesion contract, it was critical to know what the insured and broker asked for, to make sure they got what they wanted from the underwriter.

The records reflect that there was nothing in the history of the negotiations with the named insured, B.B.A.H.C., which show that it was the intent of the parties to provide coverage for the U.S.A. or claims falling under the FTCA. There was no "underwriting intent" to cover the U.S.A. by B.B.A.H.C., who paid the premium, their attorneys who advised B.B.A.H.C., their broker Wing, who marketed and placed the risk, or Continental, who assumed the risk,

The records reflect that B.B.A.H.C. considered the purchase of the Continental policy to be for the purpose of providing liability coverage for the B.B.A.H.C. for activities that fell outside the scope of the FTCA, activities involving private, local or state funding. The records reflect that B.B.A.H.C. sought legal advice on the need for a private policy to cover exposures not covered by the FTCA. The records reflect that they met with their broker and informed, Lori Wing, that the FTCA would cover that part of the risk which was related to 93-638 contracts, but they needed protection for risks related to funding from state, local and private grants.

200013

2          13

14  of  65

Bobo Dean, attorney for B.B.A.H.C. and other native tribes, testified in his deposition that he attended a meeting with Lori Wing (broker for B.B.A.H.C.), the purpose of which was to establish the scope of the FTCA to determine the coverage that the B.B.A.H.C. needed to purchase to insure themselves for claims that did not fall under the FTCA. Mr. Dean enumerated area of exposure that they were certain would fall outside the FTCA to Dr. Rhoades in 1991.

The full scope of that exposure was indefinable. The broker was asking insurance carriers to price and accept the risk of insuring a box full of something, but nobody could tell them what that something was or even what the box was made of. The only thing they were told was certain was that it didn't include exposures that would be covered under the 93-638 contracts. The broker had difficulty placing the risk; the markets were not interested in providing coverage for the B.B.A.H.C. because the risk could not be properly quantified as a result of the lack of clarity in the amendment to the FTCA.

Continental underwriters looked at the risk and quoted a price for which they would be willing to accept that risk. It was a real risk; any general liability loss falling within the Continental policy terms that the Federal Government refused to accept was their obligation. No one involved in the transaction was confused about what the contract was to cover.

B.B.A.H.C. could have chosen to reject the offer to insure their risk if they or their broker or their attorneys felt that the price was too high. They could have elected to self insure and carry an excess policy. Instead they chose to accept the Continental's quote to assume the risk of providing insurance for risks falling outside the 93-638 contracts.

The actions of the claims department with regard to B.B.A.H.C. confirm the possibility of the exposure that led to the purchase of the coverage. The U.S.A. had the right to decide what they would accept and what they would reject under the FTCA. If the Wilson claim had not been accepted as a FTCA obligation, Continental had the exposure. Continental accepted the coverage without a reservation of rights and defended B.B.A.H.C. until the Woodward court dismissed the case, finding it to be subject to the FTCA. The federal statute required the case be filed against the U.S.A. in Federal Court. Continental clearly thought that they had the exposure absent acceptance by the Federal Government.

One could make the argument that this loss occurred right after the amendment to the FTCA and that B.B.A.H.C. purchased the policy in an abundance of caution; that they believed everything would be covered by the FTCA but they wanted to make sure so they bought full coverage as well. The evidence I reviewed to arrive at my conclusions does not support that premise.

200014

2        14

15  of  65

It has now been almost fifteen years since the FTCA was amended. According to Ms. Wing, Continental did not provide coverage for the B.B.A.H.C. after the 1994-95 policy years. Subsequent to that date, the policy was written by Cigna Insurance for GL coverage only. The coverage was written at a rate comparable to that charged by Continental  Mindful of the issues raised in this litigation, the policies issued by Cigna always contained a specific exclusion for coverage or indemnification of the U.S.A.  Alaska National assumed the risk from Cigna. Those policies are written at a comparable premium to that charged by Continental and contain specific exclusions for coverage or indemnification of the U.S.A.

This evidence is significant because it reflects that the premium charged by Continental is the industry standard for the risk that Continental believed they were assuming; losses falling outside the coverage of the FTCA.

The fact that the U.S.A. was specifically excluded in subsequent policies is evidence that Judge Kleinfeld was correct when he talked about the identity of the parties being insured as a primary factor in whether or not a risk is accepted by a carrier.

Judge Kleinfeld, in his 9th Circuit dissenting opinion, recognized the importance of intent in the decision of the carrier to underwrite a policy when he said:

"premiums and issuance are both highly sensitive to the identity of the insured. Premiums can vary even for such small differences as a teenager going away to college, and carriers sometimes limit issuance to particular classes of insureds."

On the third page of his dissenting opinion he said:
"in our case, the insurer had not agreed to insure against the risks attributable to the United States. An insurer might take a different view of those risks, perhaps because of different litigation risks with the United States, rather than a local Native corporation, as the defendant. An insurer might prefer not to issue insurance to the United States at all because of the greater complexity of transactions with the federal government, and the required involvement of its legal department to assure that all applicable federal laws are satisfied."

In our discussions, Ms. Wing advised me that none of her markets would or will write a policy that includes the U.S.A. as an insured.

As discussed in Ms. Wing's letter of September 3, 1991, the Federal Government had attempted to obtain private insurance to cover all of the 93-638 contractors when the FTCA was amended and had been unsuccessful in doing so.

In Judge Kleinfeld's dissenting opinion he stated:
"As for whether the insurer was getting premiums without providing any real coverage after the amendments to the Indian Self-Determination and Education Assistance Act, for all we know Bristol Bay engages in other activities for which it needs liability insurance, and for those other activities the Act does not substitute the United States as the liable party."

200015

2                15

16   65

Judge Kleinfeld's opinion is supported by the transcript of a July 20, 2000, record of testimony before the Senate Committee on Indian Affairs. B.B.A.H.S. attorney testified as follows:

"BBAHC has also found that it remains difficult to define precisely what is and what is not covered by the FTCA, leaving gray areas of residual risk at the fringe. A conservative risk management approach (not ignorance or inertia as the GAO report suggests) provides incentives to ISDEAA contractors and compactors to obtain private insurance coverage for those gray areas as well as for those activities performed outside the ISDEE agreement. The difficulty of assessing the level of residual risk may be one of the reasons why premium rates have not been significantly reduced by ISDEAA contractors and compactors purchasing insurance coverage to supplement FTCA protection."

It is my opinion there was nothing in the placement of the risk that meets the guidelines for a finding of bad faith or an award of punitive damages. There was nothing in the records I reviewed which show that they were unreasonable or that there is clear and convincing evidence that their conduct was outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interests of others.


## EXPECTATION OF COVERAGE BY USA

Nothing in the documents that I reviewed demonstrate that the U.S.A. had any expectation of coverage under this contract for FTCA incidents before December 7, 1994.

Judge Kleinfeld said in his dissenting opinion:

"If the United States wanted coverage under Bristol Bay's liability policy, it could have contracted for it and policed performance by requiring a copy of the insurance certificate, just as a bank with a mortgage assures that it is covered by a homeowners fire insurance policy. It did not."

In my 50 years in claims I have handled thousands of claims for insureds who were required to indemnify a party under the terms of a contract. Based upon my experience in verifying coverage I found that the insurance industry has a uniform method for handling those needs. It is my experience that when a contract requires indemnification, the person requiring the indemnification makes it mandatory, as a condition of the contract, for insured to produce proof that the necessary coverage is in place. To accomplish this, the insured advises the agent of the requirement and the agent notifies the insurance carrier of the request. The insurance carrier would then review the contract to determine who was to be indemnified and the exposures. Assuming the carrier agreed to the increased risk, the additional premium for the exposure would be calculated, and the party would be added as an additional insured and provided with a copy of the policy. One of the reasons this is essential is that the party who is to be indemnified needs to be an additional insured on the policy to receive notification if the insured elects to decrease or cancel the applicable coverage.

There was nothing in the documents that I reviewed that reflected that the U.S.A. had ever asked for or received coverage for any FTCA claims from any 93-638 contractor after the act was amended.

While I have not yet read his deposition, I have been advised that Mr. Roosa testified on December 14, 2005, that he was unable to find any cases where the United States was an implied insured under a contract of insurance purchased by a P.L.93-638 contractor either before or after filing this lawsuit. He had no foundation for his decision to tender to Continental or badger B.B.A.H.C. In fact his actions were contrary to the very intent of the FTCA.

When the State suit was filed by the Wilsons against B.B.A.H.C. it was tendered to the U.S.A. The U.S.A. never responded. Had they expected coverage under Continental's policy, I believe they would have denied the tender and put forth their theories for coverage at that time.

And finally, according to the documents I reviewed, the U.S.A. suspended any funding to B.B.A.H.C. for liability insurance after the extension of the FTCA.

## OPINION REGARDING BAD FAITH AND PUNITIVE DAMAGES

In Alaska, the standard for a finding of bad faith is a preponderance of evidence. For the plaintiff to prevail there must a finding of more likely than not, or better than fifty percent chance.

For punitive damages to be awarded against Continental the United States must first show that Continental's actions met the test for bad faith.

In it's 1993 decision in Hillman vs. Nationwide, the court, relying on a Wisconsin case, Anderson v. Continental, said, "To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy ."

The standard for a finding for punitive damages is much higher, both by statute and judicial ruling. The standard for a finding of punitive damages is that it must be supported by clear and convincing evidence.

The Alaska Supreme Court has repeatedly ruled that punitive damages are not automatically awarded to a plaintiff even when a finding of bad faith exists. The burden of proof for the plaintiff is much higher.

The applicable statute on punitive damages for this case is from the 1986 tort reform. In 1993 the statute regarding punitive damages was found in Section 09.17.020. "Punitive damages may not be awarded in an action, whether in tort, contract or otherwise, unless supported by clear and convincing evidence." The tort reform statute of 1997 essentially codified judicial decisions to prior statutes

on punitive damages.

In its 2003 decision in <u>Great Divide vs. Carpenter</u> the court said:

"Since the advent of tort reform in 1986, punitive damages have been governed by statute. They may be awarded only on proof by clear and convincing evidence that a defendant's conduct was either outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interests of others."

In <u>Weiford vs. State Farm</u>, the Supreme Court vacated an award of punitive damages, while allowing the claim for compensatory damages, after a finding of bad faith.

In considering awards of punitive damages in such cases as <u>Great Divide</u> vs. <u>Carpenter</u>, <u>State Farm vs. Nicholson</u>, and <u>State Farm vs. Weiford</u>, the court stated that they do not favor punitive damages. The Alaska Supreme Court has found that punitive damages should only be awarded in extreme cases; cases which show outrageous behavior, acts done with malice or bad motives, or evidence of reckless indifference to the interests of others.

Continental's denial of coverage is reasonable. The 9th Circuit basis for coverage was not based upon an unreasonable reading of the policy, statutes or judicial decisions. The basis for finding coverage was equity. After reviewing the documents and the 9th Circuit decision I am left with the opinion that they did not have access to all of the underlying documents. The history of the negotiations, the involvement of a broker working on behalf of B.B.A.H.C., the involvement and advice of counsel, and the opportunity to reject the offer to provide coverage requested for a specific price don't support that finding. Following the advent of this litigation, subsequent carriers specifically excluded the U.S.A., but priced the risk comparably to Continental.

The Federal District Court has found that Continental acted in bad faith. It is my opinion that none of the records I reviewed meet the Anderson Court test for a finding of bad faith as outlined in Hillman.

All of the actions which followed Continental's reasoned decision to deny the tenders are based upon their interpretation of the policy, the statutes or Alaska Supreme Court decisions. Because the 9th Circuit decision was not based upon error in interpretation of coverage in these areas, I respectfully disagree with the Federal Court's finding of bad faith. I found no basis for bad faith in my review of the documents and no basis for an award of punitive damages.

My conclusions are supported in part by the 1993 decision in <u>Hillman vs. Nationwide</u>. The Federal Court ruled that Hillman did not apply. I respectfully disagree.

In Hillman the court, relying on the Wisconsin court in <u>Anderson vs. Continental</u>

200018

18

said:

"To show a claim for bad faith, a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. It is apparent, then, that the tort of bad faith is an intentional one...."

I saw several parallels between Hillman and this case. In both cases the carrier exercised care and formulated a reasonable interpretation of policy wording. Both cases involve judicial interpretation that changed the clear policy language. In both cases, two Judges wrote strong reasoned opposing opinions to the final decision, making it difficult to say that the carrier's conduct was unreasonable.

In Weiford vs. State Farm, the court, relying upon Providence Washington vs. City of Valdez, said punitive damages have a two-fold purpose:

"to punish the wrongdoer and deter the wrongdoer and others like him from repeating the offensive act."

In my career in claims I have received thousand of tenders for defense of cases. I never had a tender for an implied insured under a liability policy. This speaks to the infrequency of this type of coverage issue and is significant in that it speaks to the issue of determent as a basis for punitive damages.

Relying on Alaska Placer Co. V. Lee, the same court said:

"punitive damages are not favored in law. They are to be allowed only with caution and within narrow limits."

The Federal Court has found that bad faith existed in this case. It is my opinion that, even with a finding of bad faith, that the Alaska Supreme Court, if they agreed with the Federal Court finding, would decide the issue of punitive damages in the same way they decided Weiford vs. State Farm. The court concluded that State Farm's conduct:

"while justifying finding that insurer acted in bad faith, did not involve conduct that could be characterized as outrageous so as to support additional punitive damages award;"

In well reasoned opinions, Judge Kleinfeld, in his dissenting opinion, and Judge Sedwick, in his 2003 reversal, did not find the U.S.A. to be insured under the Continental policy. After a review of the documents listed in appendix A and the applicable tests in Alaska for an award of punitive damages, it is my opinion that the actions taken by Continental in refusing to accept tenders from the United States does not warrant a finding of bad faith and should not give rise to an award for punitive damages.

In the following section I will discuss the basis of forming that opinion. Much of the basis for my conclusion regarding coverage relies upon my reading of

statutory and case law, something I was required to do in my claims administration positions.

## INDUSTRY STANDARD FOR COVERAGE REVIEW

When an accident is reported, or a lawsuit is tendered, an insurance claims adjuster must review the claim to determine if there is coverage for the claim being submitted. The first step, of course, is to determine whether there is a contract of insurance and if that contract of insurance was effective when the loss occurred.

When it is confirmed that a contract of insurance was in force on the date of the event, it is my experience that the insurance industry standard in determining whether or not to provide coverage for a claim is a sequential three pronged review. The first prong is policy review, the second prong is statutory review, and the third prong is judicial review.

- POLICY REVIEW. Review of the policy language and conditions of the policy has three distinct steps.
    1. The first step is to determine if the party making the claim is an insured under the applicable policy and specific coverage being requested. If the party qualifies as an insured the process continues to the next step.
    2. The second step is to determine if the policy provides a grant of coverage. If the party making the claim is an insured for the coverage and coverage for the loss is available under the grants of coverage the process continues to step 3.
    3. The final step is to determine if exclusions apply.

    If the party making a claim is an insured under the policy and there is a grant of coverage for the type of claim being made and there are no exclusions that apply, the carrier does not need to go further. However, if any one of the steps result in the carrier believing that no coverage applies, the carrier must go further and look for coverage under the statutes and applicable case law.

    Generally a carrier will seek a legal opinion if the initial determination would result in a denial of coverage. The carrier would rely upon legal counsel to confirm the carrier's interpretation of the policy provisions as well as look for statutes that would provide coverage that would over ride the policy language.

- REVIEW OF THE STATUTES. If no coverage is available through a policy review, the second step is to review applicable statutes to determine if

200020
2
21    65

20

coverage of the policy has been broadened by the statutes or if the policy language is in conflict with the statutes.  If the statutes demand coverage, coverage is applicable even when the policy language would have excluded coverage.

- <u>REVIEW OF ALASKA SUPREME COURT DECISIONS</u>  If the policy does not provide coverage and the statutes do not broaden the policy to include coverage not found in the policy, the carrier looks to Supreme Court Decisions for guidance.

Looking at the policy, Continental found nothing in the policy language or conditions that would provide coverage for the U.S.A.  Continental asked for, and received, two legal opinions which confirmed their reading of the language. The Federal District Court recognized that interpretation as being correct when it said on page 9 of the September 2001 opinion, "The court recognizes that, as Continental argues, the United State is not named as an insured anywhere in the policy."

Looking at the statutes, Continental found nothing in the statutes that would provide coverage for the U.S.A.  The only applicable statute was the Federal Statute providing liability coverage for the B.B.H.A.C. for liability claims which occur while their employees are in the course and scope of their employment and are operating under a P.L. 93-638 contract.  The U.S.A. accepted the claim as falling under the extension of the FTCA statute.  It is this statute, and the acceptance of coverage under the act, that takes the coverage from the Continental policy and places the coverage under the FTCA.

Looking at Supreme Court Decisions Continental found nothing that would support a finding that the U.S.A. was an implied insured by judicial interpretation at the time that coverage was being sought.

Continental received two legal opinions on coverage.  Neither attorney found case law to support the proposition that policy language in a liability policy should be extended to include an implied insured.  Their research found an absence of case law supporting that proposition.

In fact, the Alaska Supreme Court, when it considered the implied insured doctrine in the context of liability insurance declined to apply it. <u>(Olympic Inc. v Providence Washington Insurance Company)</u>  While neither of the attorneys who researched the issue of implied insured cited this case, the point is that they found no case law that gave coverage to an implied insured for liability exposures.

The Federal District Court, in it's 2003 order, relied upon the Olympic case in reaching it's decision to reverse the 2001 order when it said:

"Now that it is clear the United States was not an insured under the implied insured doctrine of Alaska law, the test for Continental's duty to defend and indemnify turns on whether Bristol was legally obligated to pay damages as a result of the underlying claim. Of course, it was not. It follows that there is no insurance coverage under the policy."

It is my experience that the laws of our state are not constant. They can change as the court examines cases that come before them and the legislature revises statutes on tort reform. Given the constant state of flux, claim people with the best of intentions and good faith can make the wrong decision. It is imperative that insurance people make the best decision they can, a good faith effort, considering all of the information available when the decision is made.

That is why insurance carriers use the three pronged coverage determination approach. That is why Continental looked not only to their policy for guidance, but to the statutes and the Supreme Court cases in determining that the U.S.A. was not an insured under the policy. They sought legal opinions to help them reach a decision on their obligations. The records reflect they acted prudently. There is nothing in the records I reviewed that reflect that their conduct in reviewing the coverage issues was unreasonable or outrageous, done with malice or bad motives, or with evidence of reckless indifference to the rights of others.

In forming my opinions in considering whether or not Continental claims people acted reasonably, I examined the courts basis for a finding that the USA was an implied insured under the policy. It is my opinion that the court's finding of coverage for the U.S.A. is founded on the court's decision that to decide otherwise would fly in the face of equity, that it would create a "windfall" for Continental. They did not find that Continental claims people misinterpreted policy language, or ignored statutes or established case law when they made the decision that the U.S.A. was not an insured under the policy. In their decision, the 9th Circuit decision found coverage for the USA by expanding the prior Alaska Supreme Court interpretation of the implied insured doctrine to include liability policies.

The Court has found that U.S.A. was an implied insured under the policy. The finding is that Continental was wrong in their decision to deny coverage to the U.S.A. There is nothing in the records that reflect that Continental knew the U.S.A. to be an insured under their policy when the tenders were denied. The basis for their denial was supported by contractual provisions, statutes and case law.

In a July 8, 2005 decision on a motion, the Federal Court discussed "Continental's position is further undercut by the fact that it denied a defense as well as indemnity despite the fact that its own personnel believed it had a duty to defend". This reference is in regard to a witness that Continental produced as the person most knowledgeable in Underwriting.

200022
22
23   65

When I first read the questions being asked of Ms. Crystal Brown on May 9, 2001, at pages 75-82, the line of questioning and responses confused me. The transcript reflects confusion by deponent and counsel. Based upon his Orders from Chambers dated July 8, 2005, at pages 15 and 16, it appears that Judge Sedwick was also confused by the questions.

In this line of questioning, Ms. Brown is asked when Continental would have a duty to defend and indemnify an employee of B.B.A.H.C., referring to the case at hand.

Ms. Brown's response to this question on Page 82 is:

"Our policy would respond depending on the situation, and in this situation, it would only apply with respect to defending, not with indemnifying. "

The questions she was asked about the insurer's duty to defend and indemnify are not underwriting questions. They are claims handling questions and decisions. She was produced as the person most knowledgeable in underwriting, not claims.

In my fifty years of claims handling I have never known an underwriter to make a decision regarding providing coverage or a defense, either with or without a Reservation of Rights letter. That is, appropriately, a claims decision.

The correct answer to the question being posed is demonstrated in the manner in which Continental handled the claim. The policy that Continental issued was intended to, and did, respond to any claim against B.B.A.H.C. which was not covered by the FTCA.

When B.B.A.H.C. tendered the claim to Continental, Continental did not defend under a Reservation of Rights. They did not contest coverage. They provided a full defense and handled the claim like any other valid claim, including posting appropriate reserves, until such time as B.B.A.H.C. was dismissed from the case. Continental never advised B.B.A.H.C. there was no coverage under this policy, or that there was a question of coverage, because there was not. It was Continental's claim until such time as the U.S.A. determined it was an FTCA claim.

The documents I reviewed as to underwriting intent reflect that the B.B.A.H.C. purchased the Continental policy because they did not want to pay to defend or indemnify the uncertainty of coverage that the U.S.A. was providing under the FTCA. In addition to having exposures that were clearly not covered by the FTCA, without the Continental policy they were at the mercy of the Federal Government to agree to accept the claims that fell under the 93-638 contracts, "on a case by case basis". (Rhoades letter, August of 1991)

With the Continental policy, any issue of responsibility for the claim was between

the U.S.A. and Continental. It would have been inappropriate for Continental to defend the case under a Reservation of Rights until the U.S.A. accepted the claim as being covered by the FTCA.

If the U.S.A. had determined that the loss was not the result of negligence of an employee acting within the scope of their employment and under a 93-638 contract, (and therefore not subject to FTCA) Continental would have been obligated to defend and indemnify B.B.A.H.C. and then bring an action against the U.S.A. for recovery. B.B.A.H.C. assets would not be exposed, up to the limits of the policy, and they would not be obligated to litigate with the U.S.A. if they disagreed with the Attorney General's findings. B.B.A.H.C. would be out of the loop.

It is my opinion that absent being an insured under the contract, the U.S.A. was not owed a defense or indemnity. It would have been inappropriate to defend this claim under a Reservation of Rights letter when the decision had been made that no coverage existed for the U.S.A.

**CONFLICT OF INTERESTS**

It is my opinion that, given the underwriting intent expressed by the parties, the wording of the policy, and the law in effect prior to September 2001, Continental's voluntary acceptance of coverage for the U.S.A. would have placed them in conflict with the interests of their named insured, B.B.A.H.C.

B.B.A.H.C. needed, and continues to need, coverage from a private carrier for activities outside its contracts falling under the F.T.C.A. Even prior to the loss the broker had tremendous difficulty finding a carrier who would agree to insure them.

While I am not an underwriter, as a claims person I have witnessed the repercussion that payment of losses have on the insured's ability to find coverage and the rate that they pay for that coverage. The consequence to the insured may come in the form of a rate increase or a loss of a credit they received when there are no reported claims. Or it may come in the form of a cancellation notice, requiring the insured to attempt to find coverage elsewhere, generally at a higher premium than the old policy.

In my opinion, voluntarily accepting liability for a claim and providing coverage for a party who was not included as a defined insured under the policy language, underwriting intent, statutes or existing case law would have placed Continental in conflict with the interests of their named insured, B.B.A.H.C. and possibly given rise to an allegation of bad faith.

## BAD FAITH ISSUES AS ADDRESSED BY MS. SENN

Miss Senn's report is written with the proposition that all of the Continental Insurance employees who worked this file, Mr. Friderici, and Mr. Stowers

- all knew, or should have known, that the U.S.A. was an insured under the policy and deliberately set out to deprive an acknowledged insured of their rights under the policy or
- they acted carelessly, or recklessly in reaching their decisions.

It is my opinion that the evidence just does not support that conclusion.

Continental, Mr. Friderici, and Mr. Stowers all believed that Continental owned no duty to U.S.A. They believed the U.S.A. to be neither an insured nor a third party claimant. The records reflect that the decision to deny coverage to the U.S.A. was a carefully considered and reasoned decision. There is no evidence that it was unreasonable, done with malice, bad motives, outrageous behavior, or reckless indifference.

It is my opinion that the duty to an insured arises out of a contract obligation. After a thorough review of the policy, the statutes and judicial interpretation, none of the parties involved in the denial of the tenders believed that the USA was an insured under the policy.

Mr. Stowers, after his review of the coverage issues, was so certain that the USA had no status as an insured under the contract that, in his Letter of May 28, 1997, he suggested that CNA really owed no obligation to respond to the latest tender.

"We recommend that if CNA determines to again respond to the United States tender by denying the tender, CNA should provide the United States with a reasonably detailed explanation ".

Mr. Stowers prepared the detailed denial on their behalf. While the previous response to the tenders were not lengthy, the basis for the denial was clear, the U.S.A. was not an insured under the policy terms, they were neither a named insured, nor an additional insured, nor any other type of a defined insured under the policy terms, statutes or judicial interpretation at the time the tenders were being denied.

As for the intended insured B.B.A.H.C., their defense was accepted without reservation when the tender was made. Continental moved promptly to protect the interests of B.B.A.H.C. There is nothing in the records to suggest that they would have denied coverage if the Federal Government had decided that the B.B.A.H.C. was acting outside the scope of its employment under a 93-638 contract. The Woodward Court would not have dismissed the State Court action, and Continental would have continued providing both a defense and indemnity.

200025

2

25

26    65

It should be noted that the third party claimant, Ms. Wilson, was never harmed in this matter. Her claim was settled by the U.S.A.

While this case is not identical to the factual basis of the Hillman claim, there are many similarities. As outlined above, Continental made a "reasonable interpretation", of policy terms when it denied coverage to the U.S.A. on the grounds that the policy terms do not provide coverage for the U.S.A. as a defined insured. It is my opinion that the absence of coverage provisions is significant. From the claims prospective, the absence of coverage negates any further activity after denial.

It is interesting to note that Ms. Senn focuses her conclusions on the 2001 Federal Court decision and makes no reference to the language in the reversal of 2003. Certainly that decision, along with Judge Kleinfeld's dissenting opinion is evidence that a reasonable basis existed to deny the claim that the U.S.A. was an insured under the policy. This is right on point with Hillman.

Ms. Senn's conclusion that there was no reduction in premium for the General Liability after the PL 93-638 contracts went into place, ignores testimony of Crystal Brown, Deborah Brown and Lori Wing. The policy received a credit of 26%. It also ignores the reality, and the evidence cited earlier in this report, that no one could quantify what the risk was because the U.S.A. would not clarify what would be covered by the FTCA. The best evidence that the pricing was reflective of the risk that Continental thought they were accepting is that it is comparable to what was charged by succeeding carriers. The comparison of premium on a year by year basis seems a bit like comparing apples and oranges. The risk changed. The 1993 policy contained coverage for an additional thirty clinics and Jake's place.

Ms. Senn concludes that Continental failed to deliver on their promise of coverage to the U.S.A. The evidence says the U.S.A. had no expectation of coverage. When Continental tendered the defense of the State Court claim to the U.S.A., they never denied the tender or responded in any way. If the U.S.A. believed they were insured under the Continental policy they would have denied the tender and demanded indemnification when the State case was tendered in April of 1994. But perhaps Justice Kleinfeld said it best in his dissenting opinion. Judge Klienfeld clearly understood the intentions of the parties.

"If the United States wanted coverage under Bristol Bay's liability policy, it could have contracted for it and policed performance by requiring a copy of the insurance certificate, just as a bank with a mortgage assures that it is covered by a homeowners fire insurance policy. It did not."

Ms. Senn's report discusses a conflict of interest regarding Mr. Friderici's representation. In my experience, a conflict of interest would exist if Mr. Friderici had been retained to represent the interests and defend the U.S.A. while continuing to advise Continental on coverage issues. That never happened. At

200026

Exhibit _∂_

26

Page _27_ of _65_ pages

no point in time was an attorney ever appointed by Continental to defend the U.S.A. It is my opinion that if there is a conflict here, the conflict would be with B.B.A.H.C. who is not a party to this litigation.

It should be noted that unlike cases on conflict of interest regarding an attorney, like <u>Bayless and Roberts vs. Continental</u> and <u>Lloyds of London vs. Fulton</u>, Mr. Friderici was not giving advice on coverage to Continental on the insured he was assigned to defend, B.B.A.H.C. Rather he was giving advice to Continental regarding another party that was attempting to come under the cover of B.B.A.H.C.'s policy.

The records, as outlined above, reflect that Mr. Friderici removed himself from coverage issues on June 2, 1995, when he became aware of a potential conflict. Ms. Senn makes a point at page eleven of her report that Mr. Friderici had not bowed out of the case.

My understanding is that Mr. Friderici remained involved in the case after June of 1995, but that he had taken the position that he would no longer provide coverage opinions to either B.B.A.H.C. or Continental. He remained available to defend B.B.A.H.C.

On June 14, 1995, Mr. Hutson directed a letter to Darrell Richardson, the letter states," In trying to arrive at a decision concerning this matter, we will need to have Delany Wiles Law Firm in Anchorage, Alaska review this case as concerns coverage issues that may pertain to issues raised by the U. S. Attorney's office. I would appreciate you acknowledging receipt of this matter and giving us the okay to proceed on behalf of Bristol Bay Area Health Corporation to have Mr. Jim Friderici look at the coverage issue in this case so we can respond to this Tender of Defense"

The file does not reflect a response from Mr. Richardson. On October 3, 1995, Mr. Hutson directed a second letter to Mr. Richardson, again asking for permission to have Mr. Friderici involved. The letter attaches a copy of the June 14th correspondence and states, "I would appreciate your responding to this request. If I do not hear from you in the next two (2) weeks, I will assume that you do not have any problems with Mr. Jim Friderici continuing to represent the interest of Bristol Bay Area Health Corporation on the issues of coverage."

There is no indication that the insured either replied or objected. I am uncertain what the notes that Ms. Senn references actually record. If Mr. Friderici continued to give coverage advice to Continental without B.B.A.H.C. permission, it was certainly not a prudent move on his part.

A viable explanation of this entry is that Mr. Hutson contacted Mr. Friderici and Mr. Friderici advised him he could not discuss coverage without the permission of B.B.A.H.C., thus giving rise to Mr. Hutson's October 3, 1995, letter to B.B.A.H.C

200027

Exhibit __2__    27

Page __28__ of __65__ pages

If Mr. Richardson failed to respond, an argument can be made that the insured waived any conflict argument. That being said, it is still my opinion that a conflict, if one exists, does not involve the U.S.A. because Mr. Friderici was never assigned to represent their interests.

Ms. Senn characterizes employees of B.B.A.H.C. as employees of the Federal Government but fails to mention that they are only employees of the Federal Government when they are acting within the scope of their employment and performing under at 93-638 contracts.

Ms. Senn contends that Continental concealed coverage. The records reflect that Mr. Stewart provided Mr. Roosa with copies of both of the Continental policies on December 9, 1994. It is unclear why Mr. Roosa tendered the coverage in the manner in which he did, but the U.S.A. clearly had not only knowledge of, but copies of both policies with the transmittal of that letter. In addition, from the reasoned position of Continental they owed no duty to the U.S.A.; they were neither an insured nor a third party claimant.

Ms. Senn comments include discussions regarding the time it took to respond to the tenders of defense. The first tender was directed to Lori Wing on January 6, 1995. It was received by Continental on January 9, 1995. On February 2, 1995, Mr. Roosa was advised that the tender was under consideration. On February 13, 1995, the tender was rejected. It is my opinion that the response to the tender was timely. The complexity of the tender which was presented was dealt with in a thorough, prudent, and timely manner.

The second tender was made by Mr. Roosa on June 8, 1995 to Mr. Friderici. Mr. Friderici had removed himself from coverage issues due to a possible conflict of interest, and sent the matter on to Mr. Hutson, and so advised Roosa. At that time Mr. Hutson was attempting to get a waiver of conflict from B.B.A.H.C. (see letters of June 14, 1995 and October 3, 1995 to Darrell Richardson). Mr. Hutson did not reject the tender until October 3, 1995. It is my opinion that the tender of June 8, 1995, was simply a restatement of the earlier tender, a request for reconsideration of the same facts. While the response to the second tender was protracted, the U.S.A. was not prejudiced because the earlier timely response to the tender had provided reasons for denial that had not changed.

On February 20, 1997, Mr. Roosa directed a third tender to Continental. Ms. Taylor acknowledged receipt of the tender in a timely manner and advised Mr. Roosa that Continental would require a reasonable amount of time to reconsider his tender. The tender was sent to Mr. Stowers for a coverage opinion and Mr. Roosa was so advised. The records reflect that Mr. Stowers undertook extensive research and review of issues in the tender, and at the request of Mr. Hutson, responded to Mr. Roosa on June 19, 1997. It was Mr. Stowers opinion that it would not be necessary to even respond to the tender, because nothing had changed. While the time to respond to this tender is inordinately long, in light of

200028

28

Exhibit ___2___

29 of 65 pages

the denials of the previous tenders Mr. Rosa had no reason to believe that coverage would be offered and therefore was not prejudiced.

The fourth and final tender was sent to Continental on October 1, 2001, after Judge Sedwick's ruling. The tender was for the Kallstrom N.I.E.D. counterclaims, which were filed against the U.S.A. after she was third partied into the Wilson suit by the Attorney General. At that time the claim was under consideration by the Alaska Supreme Court and Continental was told by Mr. Roosa that there was nothing to do until the court issued its ruling. Mr. Roosa expected the result to be a "dead bang winner". The records reflect that Continental contacted two defense attorneys, but counsel was not assigned. In March of 2002, the Supreme Court denied the Kallstrom claim and it became a moot point. It appears that Continental relied upon Mr. Roosa's assurances that there was no rush to respond because there was nothing to be done. That was inappropriate, and the tender should have been accepted despite Mr. Roosa's assurances.

The U.S.A. had certain obligations to B.B.A.H.C. that would not have allowed them to relinquish the entire defense of this case to Continental. It is my opinion that delays in responding to the United States tenders did not prejudice the United States in any way. They could not have removed themselves from the case under any circumstance. In his tenders, Mr. Rosa wrote,
1/6/95. "Once you assume the defense of this case, the United States will continue its appearance in this case on an "Of Counsel" basis"
6/6/95 "Although 517 prohibits this office from relinquishing all control of the defense of the action"
5/27/97 "Although 517 prohibits this office from relinquishing all control of the defense of this action"

The 1994 internal correspondence Ms. Senn referenced at page 14 of her report are all entries before Continental knew that the claim fell under a 93-638 contract. If the Attorney General had made a finding that it was not an FTCA claim, Continental would have the exposure and be responsible for the coverage. The claim had a huge exposure for both damages and liability.

Ms. Senn is wrong when she states that Continental had an obligation to defend the U.S.A. when coverage did not apply. It is my opinion that when there is no coverage under a policy, an insurance carrier owes no duty to defend, under a "Reservation of Rights" or otherwise. If any of the records revealed that Continental or any of their attorneys believed the U.S.A. possibly had a valid claim for coverage, then it would have been appropriate to defend under a Reservation of Rights while they filed a declaratory action for a judicial reading. The issue here is that no one who looked at the coverage issue found any reason to provide a party who was not insured under the contract any coverage.

As a claims person who handled complex litigation I have written thousands of Reservation of Rights letters. I have never written a Reservation of Rights letter

200029

29

Exhibit 2

Page 30 of 65 pages

for someone who had no status as an insured under the policy. A Reservation of Rights letter is properly used to defend an insured in situations where there is a question about whether an insured has a grant of coverage for the allegation being brought. It is never used to provide a defense for someone who is not an insured.

The most frequent use of a Reservation of Rights letter arises when the insured is being sued and the complaint contains some allegations for which there are grants of coverage and some allegations for which no coverage is provided or coverage is specifically excluded. Typically the insurer provides a defense for all of the allegations, but the Reservation of Rights letter advises the insured that if the jury finds that they are liable for damages on the allegations which are not covered by a grant of coverage, the policy will not respond to that part of the judgment. For example, if the jury finds the insured committed an intentional tort, there would be no coverage under the policy for the intentional tort. Insurance policies cover negligent acts but exclude intentional acts.

Another example where a Reservation of Rights letter and defense would be appropriate is when there is a grant of coverage which extends the definition of an insured. One example of this kind of grant of coverage would be for a neighbor who sometimes borrows your car. While he is driving your car with your permission he would be an insured under your auto contract because there is a grant of coverage for such conditions, even though he would not be a insured under any other conditions. If he has an accident with your vehicle, and there is a dispute about whether or not he had your permission to drive the vehicle, the company would investigate the loss and defend the neighbor under a Reservation of Rights while they clarified the issue of whether or not he had your permission to drive the car.

The carrier would also provide a defense under a Reservation of Rights for an insured if the allegation being made against the insured falls outside the contract until the carrier completes a factual investigation into the allegation. For example, if a claimant makes a claim for contractual coverage, and there is no contractual coverage under the policy, the carrier may issue a Reservation of Rights while they do a factual investigation to determine if anything involved in the claim being made falls within coverage that is provided under the policy.

The Reservation of Rights letter would state, in part, "We will continue defending this matter under the Reservation of Rights as outlined in this letter until such time as we have sufficient information to make a determination about coverage. " In this case they had made the determination they needed to state their position on coverage, and a Reservation of Rights letter would have been inappropriate.

In the case at hand, the insured reported the accident six weeks after it occurred. Continental could have issued a Reservation of Rights letter to put the insured on notice that if Continental's rights were prejudiced by the late reporting that the

200030

Exhibit  2          30
31   of  65   pages

policy might not respond. They did not.

The coverage review by the claims people determined that the U.S.A. was not an insured under the policy and there was no grant of coverage, thus no duty was owed to the U.S.A under the B.B.A.H.C. policies of insurance. They confirmed their interpretation with two separate legal opinions. It is my opinion that nothing in the claims documents I reviewed relating to the denial of the tenders by the U.S.A. would support a finding of bad faith or an award of punitive damages. There was nothing in the records I reviewed which show an unreasonable basis for the denial or clear and convincing evidence that their conduct was either unreasonable, outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interests of others.

The State Division of Insurance is charged with regulating the conduct of carriers. To support the Division in the regulatory process, the statutes contain regulatory standards. Those standards are known as the Unfair Claims Practices Act. They set forth how the Division of Insurance expects admitted insurers to deal with first and third party claims.

The statute at 17(b) states "The provisions of this section do not create or imply a private cause of action for a violation of this section."

## ACTIONS OF THE FEDERAL GOVERNMENT

According to Mr. Dean in his deposition at page 27, the U.S. Attorney should have moved to intervene and dismiss the case in the State Court after the case was tendered to them in April of 1994. They did nothing.

Judge Sedwick pointed out in his 2005 ruling, in 1954, under <u>United States v Gilman</u>; the court found that Congress did not intend to allow the government to sue its employees for indemnification or contribution.

The records I reviewed reflect that while this case was being litigated, the United States put forth the position that they were entitled to indemnification under the 93-638 contracts. In pursuing their goal they threatened to sue B.B.A.H.C. for indemnification and placed them in an adversarial position with Continental. As a condition of dropping the claim for indemnification, they required .B.B.A.H.C. to agree to an assignment of rights.

The U.S.A. is not an insurance carrier but when they are protecting P.L. 93-638 contractors under the FTCA they are acting as one. Their actions are unsupportable.

## SUMMARY

200031

Exhibit _2_        31

_32_ of _65_ pages

It is my opinion the claims for bad faith in this case arise from one reasoned decision made by Continental claims people. That reasoned decision was that the United States was not an insured under their contract with B.B.A.H.C. and therefore had no rights under the insurance policy. The 9th Circuit found the United States to be an implied insured for reasons of equity. Based upon the information I reviewed I disagree with the 9th Circuit's finding.

The Federal Court found that all insureds, including implied insureds, have the same rights under the policy.

When Continental denied coverage to the United States, all of their subsequent actions are viewed as if they knew the United States was an intended insured and the claims staff knew them to be an insured from the first tender. Actions that would be supportable and proper if there were no coverage has legally been determined to constitute bad faith.

Reasonable minds can make different decisions about who is insured under a contract, what statutes apply, and the applicable judicial interpretation. Hillman vs. Nationwide stands for the proposition that making the wrong decision does not mean that the resulting conduct was unreasonable. If the carrier is found to have made an error, it does not follow that their actions were "outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interests of others."

In this case the two Judges who have the most experience with interpreting Alaska Law, understood and agreed with the reasoning behind Continental's denial of coverage, Judge Kleinfeld in his dissenting opinion, and Judge Sedwick when he reversed his earlier ruling and ruled in favor of Continental in 2003.

In my review of the underwriting history and the chronology of events, it is my opinion that Continental's actions were both reasonable and supportable.

The applicable statute on punitive damages for this case is from the 1986 tort reform. In 1993 the statute regarding punitive damages is found in Section 09.17.020. "Punitive damages may not be awarded in an action, whether in tort, contract or otherwise, unless supported of clear and convincing evidence." The tort reform statute of 1997 essentially codified judicial decisions to prior statutes on punitive damages.

As recently as its 2003 decision in Great Divide vs. Carpenter the court said:

"Since the advent of tort reform in 1986, punitive damages have been governed by statute. They may be awarded only on proof by clear and convincing evidence that a defendant's conduct was either outrageous, including acts done with malice or bad motives, or evidenced reckless indifference to the interests of others."

200032

32

Exhibit 2
Page 33 of 65 pages

The 9th Circuit has determined that the United States is an implied insured under the contract. The Federal Court had made a finding of bad faith. That is now the law of the case.

It is my opinion that the State statutes and the Alaska Supreme Court do not intend for punitive damages to be awarded when the defendant made reasoned decisions, which adhere to the accepted standards of conduct.

It is my opinion that, even with a finding of bad faith, the court should not allow this case to be presented to a jury on the issue of punitive damages. It is my opinion that the court should look to Weiford vs. State Farm in this matter.   In Weiford vs. State Farm, the Alaska Supreme Court vacated an award of punitive damages, while allowing the claim for compensatory damages, after a finding of bad faith. That court stated:

"For the above reasons we conclude that the evidence does not reasonably support a conclusion that State Farm was guilty of a gross breach of accepted standards of conduct which might be characterized as outrageous or malicious."

It is my opinion that the conduct of Continental was not outrageous, done with malice or bad motives, or show evidence of reckless indifference for the rights of others. It is my opinion that punitive damages should not be awarded in this case.


Robert N. Wainscott                         12/20/05

Robert N. Wainscott                         Date

**APPENDIX A**

200034

35    65

USA VS. CNA DOCUMENT GUIDE

## **VOLUME 1**

1) Letter from McCarty to King (CNA000543-548)
2) Letter from King to McCarty (BBHC 001281)
3) Letter from Hutson to Stewart (CNAOO54O-541)
4) Letter from Stewart to Hudson (CNA000534-538)
5) Letter from Hutson to Kurtz (BBHC 001231-1234)
6) Initial File Recap(CNA000S16-523)
7) Letter from Hutson to Kurtz (BBHC 001229-1230)
8) Letter from Hutson to Browne (BBHC 001228)
9) Memo from Ertle to Hutson (BBHC 001224-1225)
10) Memo from Hutson to Ertle (CNAQQ493-495)
11) Letter from Stewart to Hutson (CNAOO4B9-492)
12) Letter from Hutson to Stewart (BBHC 01204)
13) Wilsons State Court Complaint (BBHC 001782-001786)
14) Letter from P. Grover to G. Thogerson & Office of General Counsel, DHHS
    (CNA00625-627)
15) Letter from Stewart to Hutson (CNA00482-483)
16) Memo from Ertle to Hutson (CNAOO4G8-470)
17) Letter from Hutson to Friderici (CNA000476-477)
18) Letter from Friderici to Hutson (CNA 000471-475)
19) Letter from Friderici to Hutson (CNAOO461-463)
20) Letter from Hutson to Clark (CNA000466-467)
21) Letter from Friderici to Office of General Counsel, DENS (CNAOO621-00622)
22) order (CNA00842-843)
23) Summons and Complaint (A271-A278)
24) Letter from Stewart to Roosa (A117-I18)
25) Letter from Stewart to Roosa (AllS)
26) Letter from Roosa to Lori Wing (CNA 00336-00338)
27) Fax from McCarty to King (BBHC 1150)
28) Fax from McCarty to Hutson (BBHC 1149)
29) Letter from Friderici to Hutson (CNAOOS62-566)
30) Letter from Roosa to Lori Wing (CNA 00339)
31) Letter from Friderici to Roosa (EEl-IC 001137-1138)
32) Letter from Friderici to Hutson (CNA 000569-570)
33) Letter from Friderici to Roosa (CNA 000340-341)
34) Third Party Complaint (CNA000844-846)
35) Letter from Hutson to Friderici (BBHCOO112S)
36) Letter from Friderici to Hutson (CNA 000571-000573)
37) Letter from Stewart to Friderici (CNA 00576-578)
38) Letter from Friderici to Stewart (CNA00426—427)
39) Letter from Stewart from Friderici (CNA000574-575)
40) Letter from Friderici to Stewart (CNA00579-580)

200035

Exhibit 2     1
Page 36   of 65

41) Letter from Roosa to Friderici (CNA 00342-345)
42) Letter from Friderici to Hutson (CNA 00623-624)
43) Letter from Friderici to Roosa (A57) (BBHC 01102)
44) Letter from Hutson to Richardson (BBHC 001837)
45) Letter from Roosa to Hutson (CNA000347-348)
46) Letter from Hutson to Roosa (BBHC 001514)
47) Handwritten notes (BBHC 01866)
48) Email from Hutson to Ragan (BBHC 001752)
49) Letter from Taylor to Friderici (BBHC 001825)
50) Letter from Friderici to Taylor (CNA 000414-416)
51) Letter from Roosa to Taylor (CNA 000350-000352)
52) Letter from Taylor to Roosa (BENt 001518)
53) Letter from Roosa to Taylor (BBHC 001816)
54) Memo from Greene to Garrett (BBHC 001814)
55) 4/28/97 email from Garrett to Faccenda (EEI-IC 001798)
56) Letter from Luce to Roosa (CNA 000355-367)
57) Fax from Roosa to Faccenda (CNA 00354)
58) Letter from Roosa to Stowers (A606)
59) Letter from Stowers to Faccenda (CNA000249-261)
60) Letter from Stowers to Roosa (CNA 000368-000376)
61) Stipulation for Compromise Settlement Pursuant to 28
    U.S.C. Sec. 2677 (CNA 000377-383)
62) Summons and Complaint
63) Letter from Roosa to Schwab (CNA 1391)
64) Letter from Treptow to Roosa (CNA 1406-1407)
65) Letter from Treptow to Roosa (1421-1423)
66) Handwritten notes from unknown author (BBHC 001679)
67) Handwritten notes from unknown author (BBHC 001759)
68) Handwritten notes from unknown author (EBHC 001756)
69) CNA's File activity report (BEE-IC 001287-1318)
70) Policy - HMA 9500648-5 (9/30/93-94) (version produced by CIC)
    (BBHC 000129-168)
71) 93 CBP 06114933-93 (9/30/93-94) and HMA 9500648-5 (9/30/93-94) (version
    produced by USA) (A2315-2391)

## VOLUME TWO

-Second Amended Complaint
- USA Initial Disclosures
- Continental's Initial Disclosures
- Sedwick's Orders of
  9/4/01
  9/18/01
  6/28/02
  3/28/03
  7/08/05

200036

Exhibit  2
Page 37 of 65 pages

- Decision from Ninth Circuit dated 10/20/04
- Letter from Craig Stower's, 6/19/1997, to Ken Rosa regarding reason for rejecting tender of defense
- ACE Supreme Court Decision
- Weiford Supreme Court Decision
- Great Divide Supreme Court Decision
- Hillman Supreme Court Decision
- Indian Country Article on Compacting
- Deborah Senn Report


## VOLUME 3

Bristol Bay Key Documents 1-96 (see detail)

## VOLUME 4

Bristol Bay Key Documents 97-143 (see detail)

## VOLUME 5

- Bobo Dean Deposition and exhibits
- Clark Deposition and exhibits

## VOLUME 6

- Padgitt Deposition w/o exhibits
-Wing Deposition w/o exhibits
-Hartshorn Deposition with exhibits

## VOLUME 7

- Richardson Deposition with exhibits
- Lamb Deposition w/o exhibits
- Crystal Brown Deposition w/o exhibits

## VOLUME 8

-Deborah Wyatt Brown Deposition and exhibits

## VOLUME 9

- Huston Deposition and exhibits
- Baur Deposition and exhibits
- Finn Deposition with exhibits

**200037**

3

**OTHER DOCUMENTS**

-Supreme Court Decisions
-Statutory Language

200038

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 001 | BBH 000150 | BBH 000182 | 08/08/1988 | Rhonda McLeod | Lori K. Wing | | | Letter of 8/8/88 from Wing to Rhonda McLeod, BBAHC – items 3 and 4 talk about new FTCA provisions – "There remains [sic] some unanswered questions" and "some ambiguity as to where the protection for the premises and products liability is actually provided" – "If the Federal Government is providing the premises and products liability, then the insurance cost to BBAHC will be substantially reduced". |
| 002 | BC 000466 | BC 000469 | 03/02/1989 | Kim McCavera | Lori Wing | | | Fax transmittal from Wing to McCavera advising that P.L. 93-638 does not provide the hospital liability, only the medical malpractice. This is in response to McCavera's correspondence of 2/28/89. |
| 003 | BC 000460 | BC 000461 | 03/08/1989 | Kim McCavera | Lori Wing | | | Fax transmittal from Wing to McCavera in response to McCavera's 3/8/89 fax. Wing advising that the she is trying to place GL coverage; advising that FTCA covers malpractice. |
| 004 | BC 000435 | BC 000436 | 03/22/1989 | Ray Hollinger | Lori Wing | | | Fax transmittal to Roy Hollinger of MJ Hall from Wing stating "Continental has quoted hospital – GL on an occurrence basis with $1M occ/2M agg at less than $12,000 annual. Needless to say I have bound." |
| 005 | BBH 000005 | BBH 000008 | 08/24/1989 | Robert Clark | Lori K. Wing | Jay Toth | | Letter of 8/24/89 from Lori Wing to Robert Clark re: scope of coverage for BBAHC – says CIC policy "is a very limited coverage" because it covers liability only on a named peril basis. |
| 006 | BC 002240 | BC 002241 | 09/22/1989 | Kim McCavera | Lori K. Wing | | | Correspondence from Wing to Kim McCavera of CIC – Healthcare advising that "Remember, that physicians and dentists who actually are employees of BBAHC fall within the scope of the Federal Tort Claims Act, PL93-638." |

200039

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 007 | BC 002397 | BC 002398 | 10/13/1989 | Larry Sorensen | Lori K. Wing | | | Letter of 10/13/89 from Wing to Larry Sorensen re: trying to purchase umbrella insurance for BBAHC -- all tribal contractors in Alaska have concerns because no one can figure out exactly what FTCA covers |
| 008 | BC 002395 | BC 002396 | 10/17/1989 | John Fontana | Lori K. Wing | | | Correspondence from Wing to Fontana. The letter states that FTCA was enacted in 1987, and in essence stated that P.L. 93-638 contractors would no longer be required to carry medical malpractice insurance. Wing raises concerns about whether FTCA would cover (1) incidental/claims arising from incidental funding sources (2) auto incidents; (3) if an FTCA claim was presented, to what extent would BBAHC need to provide a defense. "Until the FTCA has been tried in court and precedent set they are very skeptical of the extent of coverage provided to them."; same letter is also sent to Larry Sorensen of Corporate Marketing Services. |
| 009 | BC 002768 | BC 002769 | 10/05/1990 | Robert Brown | Lori K. Wing | | | Letter from Wing to Robert Brown (BBAHC) re insurance package for Fiscal Year 1991. Wing states "I would like to meet with you and Jay to discuss the extent of the coverage and the continuing ambiguities associated with the FTCA." |
| 010 | BC 000379 | BC 000409 | 12/17/1990 | | Rollins Burdick Hunter of Alaska, Inc. | | | BBAHC Register of Insurance dated 12/17/90 prepared by Rollins Burdick Hunter. Handwritten notes with respect to CIC Health Care HMA 9050048-2 state "Review with Govt /Tribal Immunity Considerations -- Scope of Contract May Not Extend To FTCA" "Employee of BBAHC covered". |
| 011 | BC 003317 | BC 003317 | 07/16/1991 | Kris Lampl | Candace Sager | | | Fax of 7/16/91 from Candace Sager, Industrial Indemnity to Kris Lampl re: what policy covers certain premises -- says it's possible they're covered by FTCA "which, I must admit I don't fully understand". |

2000-40    41    2    65

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 012 | BC 000354 | BC 000355 | 09/03/1991 | John F. Roskopf | Lori Wing | Carl Brady | | Correspondence from Wing to John F. Roskopf, VP of Rollins Burdick Hunter Co. Wing advises that since FTCA was passed, her office has actively searched for a liability policy that would provide indemnification to their 638 contractor clients that are subject to FTCA; unfortunately, she has been somewhat unsuccessful in locating a medical malpractice and/or general liability and/or difference in conditions policy that would protect contractors in areas that may not be covered under the FTCA. She states that she met with Dean who advised her that the original intention of FTCA was not for USA to "correct expense" all FTCA claims; rather, the original intent was for Interior Dept. to purchase a liability program for exposures under FTCA and 93-638, but that to date, the Interior Dept. has been unable to secure this coverage. Suggest that Rollins should contact Interior Dept. and IHS and offer their services. |
| 013 | BC 001678 | BC 001688 | 07/17/1992 | Liz Hartshorn | Art Stanford | | | Letter of 7/7/92 from Art Stanford, Norcal underwriter, to Liz Hartshorn, CFO of BBAHC re: we cannot write the professional liability coverage you request because NORCAL does not have the capacity to insure rather indefinable risks and would actually have no way of developing an appropriate rate for such exposures" – could be a reference to the ambiguity in BBAHC's coverage under the FTCA (1878). |

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 014 | BC 001891 | BC 001922 | 07/30/1992 | NAS Insurance Services | Lori K. Wing | | | Letter of 7/23/92 from Wing to Maurice Sidy, NAS Insurance Services, re: BBAHC's needs -- "The Federal Government by the FTCA has promised (somewhat) to defend and indemnify the contractors for any liability claims...." Goes on to say "Unfortunately, the wording is somewhat ambiguous as to exactly what the contractor will be indemnified and defended for." Since we don't always know if the government will "make good on its promise," BBAHC wants to purchase a defense cost reimbursement policy (1891-92). |
| 015 | BC 001889 | BC 001890 | 08/06/1992 | Liz Hartshorn | Lori K. Wing | | | Letter of 8/6/92 from Wing to Hartshorn re: we're working to "address the liability exposure that may not be considered part of the FTCA" -- talks about the need to be ready in case the FTCA does not respond to a claim (1889-90). |
| 016 | BC 001872 | BC 001877 | 09/14/1992 | Lori K. Wing | Bruce C. McKay | | | Notes of 9/14/92 by Lori Wing (?) of conversation with Perry Grover of Davis Wright re: "BBAHC losses" -- says "FTCA defending BBAHC?" |
| 017 | BC 001843 | BC 001871 | 09/23/1992 | CNA | Lori K. Wing | | | Letter of 9/23/92 from Wing to CNA re: trying to bind a liability policy that will cover BBAHC for risks not covered by FTCA |
| 018 | | | 09/30/1992 | | | | | Bauer's notes from his review of the CIC underwriting file. |
| 019 | BC 001158 | BC 001162 | 09/27/1993 | Robert Clark | Lori K. Wing | | | Letter from Wing to Robert Clark re BBAHC's Property and Casualty Insurance Program for Fiscal Year 1994; letter notes that CIC policy provides liability insurance at the Hospital, Dental Clinic and Alcohol Transition Center. |

200042 Page 43 of 65

EXHIBIT 2

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 020 | BC 000028 | BC 000035 | 09/30/1993 | | | | | BBAHC application for Hospital Professional Liability and General Liability Coverage – Claims Made request for coverage effective 9/30/93. Box is checked yes next to whether "this hospital agreed to hold harmless or indemnify other under contract." Application notes (BC 000022) that coverage provided by FTCA under PL 93-638; however, appears to be referring to malpractice. |
| 021 | CNA 000543 | CNA 000546 | 01/12/1994 | Continental Insurance Company | Julie A. Mearry | Bristol Bay Area Health Corp (Attn Daryl Richardsen) | | Letter attaching details of incident at insured's treatment facility Dillingham, Alaska. |
| 022 | BBHC 001281 | BBHC 001281 | 01/24/1994 | Julie A. McCarty | Randi R. King | Daryl Richardsen | | Letter acknowledging receiving report on claimant Lori D. Wilson. |
| 023 | CNA 000540 | CNA 000541 | 02/11/1994 | Robert K. Stewart | William W. Hutson | | | Letter requesting investigative report conducted on behalf of BBAHC (no attachment). |
| 024 | CNA 000534 | CNA 000538 | 02/15/1994 | William W. Hutson | Robert K. Stewart | | | Letter transmitting Davis Wright Tremaine's investigation report regarding incident involving injury to Lori Wilson. |
| 025 | BBHC 001231 | BBHC 001234 | 02/17/1994 | John Kurtz | William W. Hutson | | | Letter regarding coverage and investigation at Bristol Bay Area Medical Center. |
| 026 | CNA 000516 | CNA 000523 | 02/18/1994 | John Kurtz | William W. Hutson | | | Initial File Recap/Major Reserve Report of Lori Wilson. |
| 027 | BBHC 001229 | BBHC 001230 | 02/18/1994 | John Kurtz | William W. Hutson | | | Letter regarding obtaining information from Bob Stewart's office. |
| 028 | BBHC 001228 | BBHC 001228 | 02/28/1994 | John Browne | William W. Hutson | Mike Cox | | Letter serving as initial notification to Corporate claims of Lori Wilson. |
| 029 | BBHC 001224 | BBHC 001225 | 03/16/1994 | Bill Huson | George Erbe | Mike Cox | | Letter regarding coverage under the GL portion of policy limits. |
| 030 | CNA 000488 | CNA 000488 | 03/28/1994 | BBAHC | Marlyn Wilson | U.S. Attorney's Office, Department of Health & Human Services | | Letter of 3/28/94 from Marlyn Wilson to BBAHC, U.S. Atty, and U.S. HHS making federal tort claim |
| 031 | CNA 000489 | CNA 000492 | 04/07/1994 | William Huston | Robert K. Stewart | Robert Clark; Darrell Richardsen | | Letter transmitting claim for damage, injury or death, standard form 95, received by BBAHC (no attachments). |

2000043

EXHIBIT 2
Page 44 of 65

Exhibit 2

Page 45 of 65

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 032 | BBH 000970 | BBH 000970 | 04/07/1994 | Gary Thogerson | Robert K. Stewart | Robert Clark, Darrel Richardson | | Letter of 4/7/94 from Robert Stewart to Gary Thogerson, HHS, transmitting FTCA claim of Marilyn Wilson. |
| 033 | A 2034 | A 2034 | 04/11/1994 | Art Simon | Gary J. Thogerson | | | HHS memorandum from Gary Thogersen to Art Simon, PHS claims officer. Thogersen notes that circumstances and location of incident lead him to question whether FTCA applies. |
| 034 | CNA 000493 | CNA 000495 | 04/18/1994 | George Erie | William W. Hutson | | | Memo regarding reservation of rights. |
| 035 | BBHC 001204 | BBHC 001204 | 04/20/1994 | Robert K. Stewart | William W. Hutson | | | Letter confirming receipt of form 95 that formally presents a claim under the Federal Tort Claims Act. |
| 036 | BBHC 001782 | BBHC 001785 | 04/21/1994 | | | | | Complaint in re Marilyn Wilson individually and as parent and natural guardian of Lori Dee Wilson, a minor vs. Bristol Bay Native Corporation, an Alaska Corp and Bristol Bay Area Health Corporation. |
| 037 | CNA 000825 | CNA 000827 | 04/23/1994 | Gary Thogerson | Parry Grover | Barrel Richardson; Crley Willer Tilden; Robert K. Stewart | | Letter requesting that the U.S. attorney be requested to undertake defense of Wilson lawsuit on behalf of BBAHC and the government. |
| 038 | CNA 000482 | CNA 000483 | 04/26/1994 | William W. Hutson | Robert K. Stewart | Robert Clark; Darrel Richardson | | Letter advising that Marilyn Wilson has sued BBAHC and Bristol Bay Native Corporation in Alaska Superior Court and has served discovery requests on BBAHC, and transmitting same (no attachments). |
| 039 | CNA 000468 | CNA 000469 | 05/03/1994 | William W. Hutson | George Erie | Mike Cox | | Letter regarding Continental's various liability issues. |
| 040 | CNA 000476 | CNA 000477 | 05/04/1994 | Jim Friderici | William Hutson | | | Letter confirming assignment of case to Jim Friderici and transmitting billing agreement and attorney outline. |
| 041 | CNA 000471 | CNA 000475 | 05/10/1994 | William Hutson | James B. Friderici | | | Letter advising that Bristol Bay Native Corporation does not appear to be an insured and providing legal analysis regarding various issues. |
| 042 | CNA 000461 | CNA 000463 | 05/16/1994 | James Friderici | William Hutson | Darrel Richardson; Robert K. Stewart | | Letter transmitting Delaney, Wiles appearance and answer for BBAHC. |

200044

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 043 | CNA 000466 | CNA 000467 | 05/17/1994 | Robert J. Clark | William W. Hutson | Jim Friderici; Bob Stewart | | Letter acknowledging receipt of pleadings filed in Wilson matter and advising that defense of the case has been assigned to Jim Friderici. |
| 044 | CP 00631 | CP 00631 | 05/19/1994 | Jim Friderici | Bill Hutson | | | Message note of 5/19/94 from Hutson to Friderici re: "We need to know what role the FTCA will play in this case. What contribution & whose subrogation rights". |
| 045 | CNA 000457 | CNA 000459 | 06/01/1994 | William Hutson | James B. Friderici | Darrel Richardson, Robert K. Stewart | | Letter of 6/1/94 from Friderici to Hutson re: contract between U.S. and BBAHC, advising that U.S. is proper defendant and recommending moving for summary judgment on this ground. |
| 046 | BBHC 001174 | BBHC 001179 | 06/03/1994 | William Hutson | James B. Friderici | Darrel Richardson, Robert K. Stewart | | Letter of 6/3/94 from Friderici to Hutson re: filing of motion for summary judgment and advising that plaintiff is likely to oppose it but that "legally we are correct" and "should ultimately prevail". |
| 047 | CNA 000821 | CNA 000822 | 06/16/1994 | Office of the General Counsel, DHHS | James B. Friderici | William Hutson; Darrel Richardson; Robert K. Stewart | | Letter requesting that the U.S. defend BBAHC in the lawsuit. |
| 048 | CNA 000842 | CNA 000843 | 06/21/1994 | | Joan Woodward | | | Order dismissing with prejudice all claims against BBAHC. |
| 049 | BBHC 000178 | BBHC 000178 | 06/23/1994 | | | | | Unknown notes – tort claims must be pursued against federal government, which "can't get recourse against Continental or Bristol Bay". |
| 050 | BBHC 001165 | BBHC 001166 | 06/23/1994 | William Hutson | James B. Friderici | Darrel Richardson, Robert K. Stewart | | Letter of 6/23/94 from Friderici to Hutson advising that Luce is not opposing motion for summary judgment on ground that U.S. is proper defendant. |
| 051 | BBHC 000175 | BBHC 000175 | 07/15/1994 | Mike Cox | William W. Hutson | Debra Wyatt Brown, Jim Baloyga | | Letter of 7/15/94 from Hutson to Mike Cox, Sr. VP CIC, advising that Wilson matter is closed because plaintiffs must pursue claim under FTCA – says "this was a terrible case" with clear liability and exposure above policy limit. |
| 052 | A271 | A278 | 10/14/1994 | United States Attorney General | L. Ames Luce | | | Summons to United States Attorney General with attached complaint. |

200045

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 053 | A117 | A118 | 12/07/1994 | Kenneth S. Roosa | Robert K. Stewart | Bobo Dean, Parry Grover, Robert Clark, Darrel Richardson | | Letter confirming that DOJ agrees that activities at Jake's Place are covered by FTCA under the P.L. 93-638 contract between BBAHC and the IHS; Roosa is looking into respective obligation of the U.S. and Continental Insurance. |
| 054 | A115 | A115 | 12/09/1994 | Kenneth S. Roosa | Robert K. Stewart | Bobo Dean, Parry Grover, Robert Clark, Darrel Richardson | | Letter transmitting copies of the GL portion of the CBP policy and the entire HMA policy. |
| 055 | CNA 000336 | CNA 000338 | 01/06/1995 | Lori Wing | Robert C. Bundy, Kenneth S. Roosa | | | Letter tendering claim to Continental Insurance Company. |
| 056 | BBHC 001150 | BBHC 001150 | 01/09/1995 | Randi King | Julie A. McCarty | | | Fax to Continental sending letter from U.S. tendering liability to BBHC. |
| 057 | BBHC 001149 | BBHC 001149 | 01/12/1995 | William Hutson | Julie A. McCarty | | | Fax confirming Hutson receiving 01/06 letter from Roosa to Brady & Co., Handwritten reply by Hutson confirming receipt and will defend the allegation. |
| 058 | CNA 000582 | CNA 000566 | 01/20/1995 | William Hutson | James B. Friderici | Greg Hance | | Letter confirming conversation regarding U.S.'s tender against the Wilson claim and transmitting 01/20/1995 letter from Jim Friderici to William Hutson regarding coverage under both policies. |
| 059 | BBHC 000065 | BBHC 000065 | 01/31/1995 | KW | | | | Notes from KW re: discussion with Lori Wing – no need for professional liability coverage b/c FTCA covers Indians & non-Indians. |
| 060 | CNA 000339 | CNA 000339 | 02/01/1995 | Lori Wing | Kenneth S. Roosa | Robert K. Stewart | | Letter requesting response to tender of defense. |
| 081 | BBHC 001137 | BBHC 001138 | 02/02/1995 | Kenneth S. Roosa | James B. Friderici | William Hutson, Julie McCarty, Darrel Richardson, Robert K. Stewart | | Letter regarding representation of Continental; don't communicate any further with Brady & Co regarding tender. |
| 082 | CNA 000340 | CNA 000341 | 02/13/1995 | Kenneth Roosa | James B. Friderici | William Hutson, Julie McCarty, Darrel Richardson, Robert K. Stewart | | Letter rejecting tender of defense of Continental Policy # 93 CBP 06114933-94 and stating that the U.S. is not and insured under that policy. |
| 083 | CNA 000569 | CNA 000570 | 02/15/1995 | William Hutson | James B. Friderici | Maria Dellinger | | Letter transmitting Continental's response to the U.S. attorney denying tender of defense of Wilson Claim. |

200046

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 064 | CNA 000844 | CNA 000846 | 05/01/1995 | | | | | Third Party Complaint in re Marilyn Wilson vs. United States of America ; United State of America vs. Blanche Kallstrom. |
| 065 | BBHC 001123 | BBHC 001125 | 05/08/1995 | Jim Friderici | William W. Hutson | | | Letter questioning if the government will continue to pursue the case of Lori Wilson vs. Bristol Bay Area Health Center and Continental Insurance Company. |
| 066 | BBH 000979 | BBH 000979 | 05/12/1995 | Kenneth S. Roosa | Robert K. Stewart | Parry Grover, Robert Clark, Darrel Richardson | | Letter of 5/12/95 from Stewart to Roosa re: agreement that U.S. will not serve complaint on Kallstrom until BBAHC has had opportunity to discuss matter with her. |
| 067 | CNA 000571 | CNA 000573 | 05/25/1995 | William Hutson | James B. Friderici | Maria Dellinger, Robert K. Stewart | | Letter discussing anticipated course of action of case. |
| 068 | A 5993 | A 5993 | 05/26/1995 | | | | | U.S. responses to Wilson's discovery requests – says U.S. is not a party to an indemnity agreement that would affect its liability. |
| 069 | CNA 000576 | CNA 000578 | 05/30/1995 | James B. Friderici | Robert K. Stewart | William Hutson, Robert Clark, Darrel Richardson, Parry Grover | | Letter returning copy of Stewart's Confidential correspondence to Hutson regarding the U.S.'s tender of defense. |
| 070 | CNA 000426 | CNA 000427 | 05/31/1995 | Robert K. Stewart | James B. Friderici | William Hutson, Darrel Richardson | | Letter inquiring whether BBAHC believes it should respond to the U.S.'s tender of defense, rather than Continental responding to same. |
| 071 | CNA 000574 | CNA 000575 | 06/01/1995 | James B. Friderici | Robert K. Stewart | William Hutson, Robert Clark, Darrel Richardson, Parry Grover | | Letter stating that "BBAHC has not yet formed a final opinion whether the United States is an insured person" under the general liability policy and transmitting copy of third-party complaint. |
| 072 | CNA 000579 | CNA 000580 | 06/02/1995 | Robert K. Stewart | James B. Friderici | William Hutson, Darrel Richardson | | Letter advising that Delaney, Wiles is unaware of Third-Party Complaint against Blanche Kallstrom. |
| 073 | CNA 000342 | CNA 000345 | 06/06/1995 | James Frederici | Kenneth S. Roosa | | | Letter regarding tendering defense of claim under policy # HMA 9500848-5. |
| 074 | CNA 000823 | CNA 000824 | 06/06/1995 | William Hutson | James B. Friderici | Maria Dellinger, Darrel Richardson, Robert K. Stewart | | Letter transmitting Kenneth Roosa's 06/06/1995 re-tender of defense to Continental. |

200047

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 075 | BBHC 001102 | BBHC 001102 | 06/06/1995 | Kenneth S. Roosa | James B. Friderici | William Hutson, Julie McCarty, Darrel Richardson, Robert K. Stewart | | Letter regarding receipt of enter letter of 6/6/95 and will be forwarded to Continental Insurance company. |
| 076 | BBHC 001837 | BBHC 001837 | 06/14/1995 | Darrell Richardson | William W. Hutson | Jim Friderici | | Letter regarding tender of defense. |
| 077 | CNA 000347 | CNA 000348 | 09/12/1995 | Bill Hutson | Kenneth S. Roosa | | | Letter regarding lack of response to sent on tender of defense and advising that the U.S. will take appropriate action to protect its rights under policies # 94 CBP 06114933 and # HMA 95009486-5. |
| 078 | CNA 000424 | CNA 000424 | 10/03/1995 | Darrel Richardson | William W. Hutson | | | Letter of 10/3/95 from Hutson to Darrell Richardson, Kanakanak Hospital, re: my letter of 6/14/95 and again requesting that you approve Friderici's continued representation of BBAHC. |
| 079 | BBHC 001514 | BBHC 001514 | 10/03/1995 | Ken Roosa | William W. Hutson | | | Letter regarding 9/1/95 letter regarding tender of claim to Continental Insurance Company. |
| 080 | BBHC 001856 | BBHC 001856 | 01/05/1996 | | Continental Insurance Health Care | | | Handwritten note regarding telephone call with Friderici and case set for trial. |
| 081 | BBHC 001752 | BBHC 001752 | 04/23/1996 | Michael Ragan | Bill Hutson | April Trob | | E-mail regarding case issues, denial of coverage and summary judgment motion. |
| 082 | BBHC 001825 | BBHC 001825 | 07/29/1996 | James B. Friderici | Jennifer E. Taylor | Todd Biondo | | Letter regarding case management and rejection of tender of defense by the United States. |
| 083 | CNA 000414 | CNA 000416 | 08/16/1996 | Jennifer E. Taylor | James B. Friderici | | | Letter transmitting copies of prior correspondence regarding coverage and selected materials from the insured and the U.S. regarding coverage. |
| 084 | A 1668 | A 1670 | 12/12/1996 | | | | | Affidavit of Blanche Kallstrom and Statement of Blanche Kallstrom. |
| 085 | CNA 000350 | CNA 000352 | 02/20/1997 | Jennifer Taylor | Kenneth S. Roosa | | | Letter regarding tendering Wilson claim to CNA and offering initial tender of Blanch Kallstrom's claim. |

200048

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 086 | DW 000447 | DW 000447 | 02/20/1997 | | | | | Handwritten notes referencing (1) a phone call with Roosa in which Roosa indicated he feels USA is an additional insured under Alaska law (2) spoke with Jim Friedrici (3) a statement that "sue for bad faith if we don't accept tender" "9th circuit case that allows punitive". |
| 087 | BBHC 001816 | BBHC 001816 | 03/18/1997 | Jennifer E. Taylor | Kenneth S. Roosa | | | Letter regarding no knowledge of CNA's current filed in the Wilson claim. |
| 088 | BBHC 001518 | BBHC 001518 | 03/18/1997 | Kenith S. Roosa | Jennifer E. Taylor | | | Letter regarding receipt of 2/20/97 letter regarding tender by the U.S. to CNA. |
| 089 | BBHC 001814 | BBHC 001814 | 04/18/1997 | Steven Garrett | Howard Greene | | | Memo regarding concern of tender from the U.S. Department of Justice and forwarding claim. |
| 090 | BBHC 001798 | BBHC 001798 | 04/28/1997 | Gregory Allen Steele | Steve Garrett | Ray Faccenda | | E-mail regarding authorization to obtain coverage counsel and recap of case. |
| 091 | BBHC 001797 | BBHC 001797 | 04/30/1997 | Craig Stowers | CNA | Attorney | | Instructions from CNA to Stowers asking "Do we owe the U.S. an acceptance of their tender?" |
| 092 | CNA 000355 | CNA 000357 | 05/15/1997 | Ken Roosa | L. Amee Luce | | | Settlement Demand Letter. |
| 093 | CNA 000354 | CNA 000354 | 05/19/1997 | Ray Faccenda | Kenneth S. Roosa | | | Fax regarding latest tender of defense, third party complaint filed by the United States against Marilyn Wilson and attachment of demand letter from Amee Luce. |
| 094 | CP 00248 | CP 00248 | 05/20/1997 | Craig Stowers | Julie A. McCarty | | | Letter of 5/20/97 from Julie McCarty (Brady & Co. (Lori Wing)) to Stowers enclosing GL portion of policy – note on bottom says "Lori Wing handles 833s throughout the state CNA Health Pro – Chicago – Lori thinks no way gov't can be brought in". |
| 095 | BBHC 001287 | BBHC 001318 | 05/21/1997 | | | | | CNA File Activities report on Wilson litigation – entry for 5/21/97 reports a call from Craig Stowers – "He said that he believes our position is clear and it would upset the whole body of law if the Gov't position prevailed." |

200049

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 096 | A606 | A606 | 05/27/1997 | Craig Stowers | Kenneth S. Roosa | | | Letter advising that is Continental fails to defend the U.S. in Wilson case, the U.S. will look to Continental for full indemnification of any judgment against it. |
| 097 | CNA 000249 | CNA 000261 | 05/28/1997 | Craig F. Stowers | Ray Faccenda | | | Faxed letter transmitting opinion letter regarding U.S. Attorney's tender of defense of federal tort claim. |
| 098 | BBHC 001728 | BBHC 001785 | 05/28/1997 | Ray Faccenda | Craig F. Stowers | | | Letter of 5/28/97 from Stowers to Faccenda, CNA, explaining why he believes CNA has no coverage obligation – note e-mail at 1752, dated 4/23/96 from Hutson to Michael Ragan re: underlying claim, government's tender of defense and indemnity – note also notes (author?) at 1759 re: according to Friderici, Stewart says that BBAHC is not a proper defendant and U.S. is not an insured under policy. |
| 099 | CNA 000398 | CNA 000376 | 06/19/1997 | Kenneth Roosa | Craig F. Stowers | | | Letter advising that CNA has no duty to defend nor indemnify the U.S. and declining U.S.'s tender of defense. |
| 100 | DW 000909 | DW 000909 | 06/19/1997 | Craig Stowers | Faccenda | | | Fax of 6/19/97 from Faccenda to Stowers telling him to send disclaimer letter. |
| 101 | A 1311 | A 1314 | 07/25/1997 | Jeffrey Axelrod | Robert C. Bundy | | | Two page 7/25/97 correspondence from United States Attorney Robert C. Bundy to Jeffrey Axelrod, Director Torts Branch seeking approval for the settlement. In the letter, Bundy lays out the settlement terms and explains that he had hoped to settle for $2.5M, but during negotiations it became clear that was unattainable; he references prior June letter advising that court could award 3-3.5M at trial. He writes: We stand to recoup at least a large portion, and perhaps all of our settlement costs, through the reversionary aspect of the medical trust. In addition, we fully intend to explore the potential action against CNA, the general liability insurer of the 638 contractor whose negligence created this liability. CNA insured the 638 contractor for a million dollars; we hope to be able to recover at least that amount. |

2000050

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 102 | CNA 000377 | CNA 000383 | 08/28/1997 | | | | | Stipulation for Compromise Settlement Pursuant to 28 USC 2677. |
| 103 | 000340 | 000342 | 08/21/1998 | | Hobbs Straus Dean & Walker | | | General memo of 8/21/98 by Hobbs Straus re: most tribes, insurers, and brokers don't understand scope of FTCA coverage, and many tribes perceive federal government's application of FTCA under § 638 not to be uniform; adds that DOI's position is that if tribe purchases insurance that duplicates FTCA, the insurer has to indemnify the government to avoid a "windfall" to insurer. |
| 104 | | | 08/21/1998 | | | | | Summons and Complaint issued to CNA Financial Corporation. |
| 105 | | | 10/05/1998 | Jim H. Bauer | A. Richard Dykstra | Kenneth Roosa | | Letter from Richard Dykstra (Stafford Frey Cooper, Seattle) to Jim Bauer advising that he would like to retain Bauer on behalf of his client the US Attorney for Alaska. He is asked to research the various rating classifications that were used in the policy, and then report whether there is support for OIC's argument that policy not intended to cover ordinary risks of bodily injury at the site, but only intended to apply when BBAHC operating outside of the federal contract. |

200051

| Binder Tab # | Begin Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 106 | USA 000074 | USA 000075 | 11/11/1998 | Kenneth S. Roosa | Robert K. Stewart | Robert Clark, Darrell Richardson | | Letter from Stewart to Roosa re confirmation of a discussion on 11/10/98 and a meeting on 10/23/98 in which USA requested that (i) BBAHC copy Frederica's entire file and turn it over the USA; (ii) BBAHC allow USAO attorneys to speak freely with BBAHC employees concerning their acquisition of insurance (i.e., discussion with brokers and/or underwriters); (iii) BBAHC copy the brokers file and turn it over the USA; (iv) BBAHC to advise the USA, whether there were any other liability files in effect regardless of who was the named insured. In that same meeting, Robert Bundy reserved USA's rights against BBAHC based on USA's position that BBAHC had a duty under the 638 contract to indemnify USA by obtaining insurance coverage and naming it as an additional insured. Stewart advises that and BBAHC will conduct an investigation regarding to any indemnity obligation prior to formulating a position with respect to the four requests. Estimates investigation will take 30 days. |
| 107 | | | 12/01/1998 | | | | | Declaration of Lori Wing dated 12/1/98 re government's interpretation of its status as an insured and BBAHC's duty to indemnify government are wrong. |
| 108 | 000343 | 000345 | 12/30/1998 | | Hobbs Straus Dean & Walker | | | General memo of 12/30/98 from Hobbs Straus re: meeting with DOJ re: tribal risk management issues – talks about DOJ's policy of tendering claims to insurers when it thinks FTCA coverage is duplicated. This has caused considerable problems for tribes and their insurance brokers/carriers in attempting to design "gap" or "umbrella" insurance policies, the premiums of which are based on covering claims falling outside the scope of FTCA coverage. It also appears to contradict the intent of Congress which made FTCA coverage the "exclusive means of redress" under P.L. 93-638. |

200052

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 109 | BBH 001938 | BBH 001940 | 01/26/1999 | Gary Thogersen, Robert Clark, Robert Stewart | S. Bobo Dean | | | Letter of 1/26/99 from Bobo Dean to Thogersen re: BBAHC is very concerned that U.S. is demanding indemnification -- we think this is incorrect interpretation of law -- "Indeed, the position apparently taken by the U.S. Attorney would defeat the purpose of the extension of FTCA protection to tribal contractors under Public Law 93-638." |
| 110 | BBH 001935 | BBH 001937 | 02/08/1999 | Parry Grover | Robert C. Bundy | | | Letter of 2/8/99 from Robert Bundy, US Atty, to Parry Grover, Davis Wright, demanding indemnification of government by BBAHC in light of CIC's refusal to cover U.S. |
| 111 | USA 000066 | USA 000066 | 04/23/1999 | Kenneth S. Roosa | Parry Grover | H. Sally Smith, Robert J. Clark, Darrel Richardson, Robert K. Stewart, Robert C. Bundy | | Letter from Parry Grover to Roosa re meeting at Davis Wright's office on 5/4/99. |
| 112 | | | 04/29/1999 | Dave Maibach | Julie A. Mathews - McCarty | | | Letter from Julie McCarty to Dave Maibach (CNA HealthPro Claims Supervisor) enclosing Wing's 3/17/99 letter to April Mincus (CNA Health Pro) enclosing Robert Clark's 3/2/99 letter to Wing requesting tender to all potentially applicable insurance of Robert Bundy's 2/8/99 demand on behalf of the USA against BBAHC. |
| 113 | | | 05/24/1999 | Lori K. Wing | David C. Maibach | John R. Neeleman, Robert Stewart | | CIC's 5/24/99 denial of BBAHC's 3/17/99 tender because (1) CIC was specifically informed that expense of insurance was to cover claims not covered by FTCA (2) USA's claim that BBAHC breached its agreement with USA is without merit (3) Clause 19 does not constitute an insured contract |
| 114 | BBH 001941 | BBH 001942 | 06/08/1999 | David C. Maibach | Robert K. Stewart | Robert Clark, John Neeleman, Lori Wing | | Letter of 6/8/99 from Stewart to David Maibach, CNA HealthPro re: BBAHC now believes U.S. is covered under policy and CNA's denial of tender is incorrect. |

200053

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 115 | | | 06/22/1999 | David C. Maubetsch | Robert K. Stewart | Robert Clark, John Neeleman, Lori Wing | | Letter from Stewart to David Maubetsch; Stewart writes that CNA HealthPro's wrongful denial of defense and indemnity of the USA under is a material breach discharging BBAHC from any further duties including obligation to notify CNA if USA sues BBAHC. |
| 116 | | | 06/22/1999 | Robert K. Stewart | David C. Maubetsch | | | Letter from David Maubetsch to Stewart; Maubetsch writes that they disagree with characterizations in Stewart's letter and requests that BBAHC keep us apprised of significant developments, in particular if USA files suits against BBAHC. |
| 117 | | | 07/21/1999 | Jeffrey Axelrad | Robert C. Bundy | | | Letter from Bundy to Axelrad, requesting clarification and if necessary modification of authorization previously granted by former Assist. Atty. General Frank Hunger. Letter states that Hunger authorized the Alaska US Atty to pursue claims against CIC, and that in the course of pursuing those claims it was learned that BBAHC is obligated by contract to indemnify the USA against claims arising out of the contract. Letter states USA is negotiating with BBAHC for an assignment of its rights against CIC, but that BBAHC will require that USA enter into a covenant not to sue BBAHC if BBAHC is to sign a confession of judgment, which will require USA to compromise its claims for indemnity against BBAHC in an amount that exceeds the US Attorney's authority. Letter requests authorization to enter into such an agreement. |
| 118 | | | 07/28/1999 | Tribal Leader and Other Interested Parties | U.S. Department of the Interior | | | Attached exhibit to CIC's motion to dismiss – Memo of 7/28/99 from U.S. Public Health Service to tribal leaders enclosing Indemnal Agency Procedures Handbook on FTCA claims. |
| 119 | | | 07/29/1999 | Elizabeth J. Gianturco | Jeffrey Axelrad | Judge Robert Bundy, U.S. Attorney | | Letter from Jeffrey Axelrad (Director Torts Branch) to Elizabeth Gianturco enclosing a letter from Bundy and asking for Gianturco's views on the matter. |

200054

55

2

65

| Binder Tab # | Begin Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 120 | | | 02/14/2000 | John S. Devlin | Robert K. Stewart | Robert Clark, Ken Roosa | | Letter from Stewart to Devlin; Stewart refers to CNA HealthPro's denial of BBAHC's tender of the demand made by the USA (via Robert Bundy's 2/8/99 letter) as a "wrongful denial." |
| 121 | | | 04/03/2000 | Kenneth S. Roosa | Richard Dykstra | Linda Lamb | | Letter of 4/3/00 from Richard Dykstra, Stafford Frey Cooper to Roosa enclosing report and exhibits prepared by Bauer in reviewing premium ratings on CIC's policies. |
| 122 | 000145 | 000000157 | 05/02/2000 | Duke McCloud | S. Bobo Dean | Robert Clark, Robert Stewart, Tim White | | Letter of 5/2/00 from Bobo Dean to Duke McCloud, HHS Office of General Counsel, re U.S. Atty's demand that BBAHC indemnify government – calls the demand "clearly inconsistent with the federal law relating to liability insurance." a. Last page says: "By requiring that any liability policy acquired by a tribal contractor to protect itself from claims which may fall outside the scope of the FTCA must also insure the United States the federal government would defeat the purpose of the Congress in extending FTCA coverage to tribal contractors under the ISDEAA. No reduction in premium cost could be justified in that case." |
| 123 | 000158 | 000160 | 05/03/2000 | Duke McCloud | Dean | | | Letter of 5/3/00 from Dean to McCloud again saying that the government's position in suing CIC defeats the purpose of the FTCA & corrective action is necessary if that is in fact the government's position. |
| 124 | 000144 | 000144 | 06/28/2000 | S. Bobo Dean, Hans Walker | Mark Van Norman | | | Letter of 6/28/00 from Dean to Mark Van Norman, DOJ's Office of Tribal Justice re: government's suit against CIC shows that Congressional intent in extending FTCA is "clearly not being carried out". |
| 125 | 000203 | 000213 | 07/12/2000 | | Michael Willis | | | Testimony of Michael Willis, Hobbs Strauss, before Senate Committee on Indian Affairs – criticizes the government's actions re: BBAHC and CIC and urges Committee to tell DOJ that its position is wrong. |

2000055

| Binder Tab # | Beging Bates | End Bates Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|
| 126 | | 10/18/2000 | Kenneth Roosa | Linda J. Lamb | | | Linda Lamb's 10/18/00 report; her conclusions include that "policy provided Primary General Liability Insurance coverage for all non-medical/professional liability related exposures for the specific premises listed on the policies from 1989 through 1994" and "[t]here is no indication in the underwriting file that the Underwriter lowered the premiums in anticipation of a reduced liability exposure resulting from any type of Government immunity or any assumption of liability by the United States." |
| 127 | CNA 001391 | 10/30/2001 | Evan Schwab | Kenneth S. Roosa | | | Letter regarding U.S. formally tendered defense of claims asserted against U.S. by the third party defendant and counter-claimant. |
| 128 | | 05/09/2001 | John R. Neeleman | Beth Berger-Zerman | | | E-mail of 5/9/01 from Beth Ann Berger Zerman, CNA HealthPro, to Neeleman, asking him to fax 30(b)(6) deposition notice for Crystal Brown to Sean Hanifin, RDB, also e-mails between Neeleman and Claire Fox, Lane Powell paralegal. |
| 129 | | 05/25/2001 | Sean Hanifin, Beth Ann Berger Zerman | John R. Neeleman | | | Fax of 5/25/01 from Fox to Hanifin, attaching 30(b)(6) notice. |
| 130 | | 10/04/2001 | | | | | Agreement of 10/4/01 between BBAHC and U.S. assigning BBAHC's right to insurance proceeds to government. |
| 131 | CNA 001400 | 10/31/2001 | Erin Flinn, Dan Marsaill | Evan L. Schwab | John Treptow | | Letter enclosing letter dated 10/30/01 from Kenneth Roosa, tendering defense of the claims asserted against the U.S. by the third-party defendant and counter-claimant. |
| 132 | CNA 001403 | 01/24/2002 | Evan Schwab, Erin Flinn | John A. Treptow | | | Memo regarding the review the U.S. District Court's file in Wilson v. U.S., Kallstrom as well as the Ninth Circuit's opinion on the dismissal of Kallstrom's claim. |
| 133 | CNA 001404 | 02/01/2002 | Evan Schwab, Erin Flinn | John A. Treptow | | | Memo regarding tender of defense in Kallstrom v. U.S. |

200056

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 134 | CNA 001406 | CNA 001407 | 03/13/2002 | Ken Roosa | John A. Treplow | | | Letter regarding CNA accepting the U.S. of America's tender of the defense of the counterclaim in Wilson v. U.S. v. Blanche Kallstrom subject to the following reservation of rights. |
| 135 | CNA 001421 | CNA 001423 | 08/11/2002 | Ken Roosa | John A. Treplow | | | Letter regarding U.S. reply to CNA's opposition to the U.S. cross-motion for summary judgment, CNA not replying to U.S. tender of defense in the Kallstrom case. |
| 136 | CP 00405 | CP 00410 | 05/20/0000 | Craig Stowers | | | | Notes of telephone call w/ Wing on 5/20<br>• "BBAHC philosophy has been to purchase ins, but maj of actions are FTCA covered"<br>• Suggests calling Barbara Karstimer – atty from Berkeley who studies § 638 contracts<br>• "BB is frightened whether it should get ins or go bare"<br>• "She was annoyed and has never seen anything like this"<br>• "Agrees w/ philosophical"<br>• "that's why BB's premiums are so low"<br>• "In fact, BB is being sold med mal pd. $5000 w/ $1 [?] deduct b/c exposure so low"<br>• "19,346 – in 93 this was way very cheap for what was being hired"<br>• "FTCA says we'll indem w/l scope of duties of K – BB does do work under state & [?] that is outside of scope of fed 638 K – also they do work on their own that is outside scope of 638 K"<br>o "this is reason why BB bought ins"<br>o "BB's attys have recommended BB buy ins b/c of risk that fed govt might deny FTCA coverage"<br>• "this case will have huge impact if CNA rolls over on this – it will affect all 638's all over country"<br>• "US Govt not our ins"<br>• "We sent opns to BB re Q&A surveys as to what FTCA will do for you and what it wont – exposure mth. [therefore] costs kept low – Fed Govt took $ out of [?] for purchasing these types of policies"<br>• "BB felt uncomf not being insur, so it did anyway" |

2000057

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 137 | DW 001083 | DW 001083 | 05/27/0000 | Craig Stowers | Roosa | | | Notes of 9/27 telephone call between Stowers (?) and Roosa (1083)<br>a. "BBAHC's \$ all comes from U.S."<br>b. "they are a health corp that admin hosp for fed gov't."<br>c. "Ken knows of no other authority other than what is cited & no case on point" |
| 138 | CP 00379 | CP 00380 | 06/11/0000 | Craig Stowers | | | | Notes of telephone call w/ Lori Wing on 6/11 – says "confirms such sentence's fact stuff (?) attrib. to Lori" – I think these last two entries are Stowers's notes when he's working on his coverage opinion. |
| 139 | CP 00375 | CP 00378 | 06/12/0000 | Craig Stowers | | | | Notes of a telephone call w/ Barbara on 6/12 – note says she's at Berkeley and gives phone no. (375-78)<br>• "I represent tribes & tribal organizations like BBAHC and county"<br>• "I am a consult to Geo. W. Univ. doing study on insur. & FTCA"<br>• "When we (Geo. W. Univ.) met w/ Justice Dept & BIA & HHS, this Q came up w/ ins.co. ordered to defend G cont"<br>• "Dept of Justice position is they are payor of last resort & if there is ins., ins co must pay"<br>• "We said no co are getting lower cost policies b/c they understand U.S. will pay FTCA"<br>• "In future – ins co needs to write exclusions in policies"<br>• "I don't know of any such Just. Dept used for its proposition"<br>• "It concerns me – it will change how tribes get insurance" |
| 140 | BBHC 001679 | BBHC 001679 | 00/00/0000 | | | | | CNA's claim file notation regarding no coverage for U.S., no claim against Bristol Bay, potential claim if U.S. demands they are on insured. |
| 141 | BBHC 001759 | BBHC 001759 | 00/00/0000 | | Jim Frederici | | | Handwritten notes regarding representation of Bristol Bay, tender to defense, opinion on coverage, no coverage, new tender by U.S. |
| 142 | BBHC 001758 | BBHC 001758 | 00/00/0000 | | | | | Handwritten notes regarding summary judgment on Bristol Bay and tender to U.S. case. |

200058

| Binder Tab # | Beging Bates | End Bates | Date | To | From | CC | Bcc | Description |
|---|---|---|---|---|---|---|---|---|
| 143 | BBHC 001287 | BBHC 001318 | 00/00/0000 | | | | | File Activities Report and Policy HMA 9500848-5. |

200059

**APPENDIX B**

## CURRICULUM VITAE OF ROBERT N. WAINSCOTT

### *INSURANCE CLAIMS EXPERIENCE*

<u>1988 - Present</u>    Independent Claims Consultant/Expert Witness

Consulting on claims handling procedures and coverage issues related to First and Third Party claims, Contractual obligations, Fair Claims Practices Act, Bad Faith and Damages.

Qualified as an expert witness in Alaska Superior Court and Federal District Court in Alaska

From 1988-2005 retained as an expert witness or claims consultant in approximately 85 cases.

<u>1958 - 1995</u> Cigna Corporation Claims

Various claims positions within the Cigna Corporation, including predecessor company INA and affiliate Alaska Pacific Assurance Company.  Positions included Field Adjuster INA, Supervisor INA, Director of Liability Claims, Liability Claims Manager and Liability Claims Specialist.  Prior claims handling experience Included all of the lines of coverage issued by the company except worker's compensation.

Full time employee from 1958 - 1988.

From 1988–1995 employed as contract and part time employee in the capacity of Liability Claims Specialist responsible for the investigation and disposition of complex claims.

### *EDUCATION*

Bachelor of Science, Pennsylvania State University

### *INSURANCE RELATED EDUCATION/ACTIVITIES*

1965        INA Supervisory School
1966        Louis Alan Professional Management Program

**C.V. R.N.WAINSCOTT -PAGE 2**

1968- 1974 Arbitration Committee

1974-1976   American Education Institute-Law for the Claims Man
1977-1980   Chairman of the Alaska Committee of Insurance Arbitration
1980          Advanced Negotiations


1981-1983   Alaska Insurance Guaranty Association Claim Committees
1982   Dimensional Management Training
1983   Alaska Litigation Task Force
1985   CGL/ISO Workshop on Policy Coverage on Claims Made Policies
1985   Litigation Workshop
1986   Products Liability Law and Claims Handling Seminar


**Personal Information**

***Address:  23553 Lower Terrace Street***
                 ***Eagle River, Alaska 99577***

Phone:    (907) 694-2407

Fax    :    (907) 694-2428
Date of Birth:  11/05/32
Resident of State of Alaska since 1974

63    65

200062

2

ROBERT N. WAINSCOTT
23553 LOWER TERRACE STREET
EAGLE RIVER, ALASKA 99577
(907) 694-2407


LIST OF CASES FOR WHICH TESTIMONY WAS PROVIDED IN LAST 4 YEARS

Dickson vs. State Farm

Holderness vs. State Farm

Everidge vs. American Equity

Tush vs. Pharr

Mutz vs. Leader

2

64 ～ 65

200063

R.N WAINSCOTT

23553 Terrace Street
Eagle River, Alaska 99577

(907)694-2407
(907)694-2428 fax

## RATE SCHEDULE
### (Effective 01/03)

| | |
|---|---|
| Initial Discussion with counsel (up to one hour) | No Charge |
| Retainer | $1000 |
| Review of documents, meetings with counsel, preparation for trial and misc. | $150/hour |
| Deposition and Testimony Time | $150/hour |
| Travel Time (Outside Anchorage only) | $75/hour |

200064