IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CNA FINANCIAL CORPORATION | ) | |
| AND THE CONTINENTAL | ) | |
| CASUALTY COMPANY d/b/a | ) | |
| THE CONTINENTAL INSURANCE | ) | |
| COMPANY, | ) | Case No. A98-285 CV (JWS) |
| | ) | |
| Defendant. | ) | |

AFFIDAVIT OF ROBERT A. LOHR

I, ROBERT A. LOHR, being first duly sworn upon my oath, depose and state as follows:

1.    I have personal knowledge of the following facts unless otherwise indicated, and I am in all other ways competent to testify.

2.    From 1999 through 2003, I served as the Director of the Alaska Division of Insurance (ADOI or Division). As the highest officer in the ADOI, I was responsible for regulating the insurance industry in Alaska to protect insurance customers in Alaska. The Division's mission is to develop, interpret, and enforce the insurance

Exhibit __4__

Page __1__ of __39__ pages

200114

statutes and regulations; protect and educate the consumer; and enhance the insurance business environment.

3.    A key part of this responsibility is to attract and retain qualified insurers to the Alaska market. The Division also monitors the financial soundness of insurers, to ensure that they remain financially capable of paying valid claims. Each company is responsible for filing periodic financial statements with the Division and NAIC. The Annual Statement is an important regulatory monitoring tool for solvency.

4.    Other responsibilities included responsibility for insurer financial examinations and analyses, consumer protection, rate and form approvals, fraud investigation, and market conduct related matters.

5.    While Director, I served as a member of the National Association of Insurance Commissioners ("NAIC"), an organization responsible for formulating national insurance policy. I was an active member of the NAIC, where I served as a member of the Executive Committee and Vice Chair and Acting Chair of the 14-state Western Zone. Alaska chaired the "Blanks" Task Force that designs and revises the annual statement reporting forms which all regulated insurers in the country are required to submit. I also served as a member of the Internal Administration subcommittee responsible for overseeing NAIC operations, and as a member of the International Committee. I taught seminars on insurance regulation in Japan, India, Jordan, Croatia, Romania and Bulgaria.

Exhibit  4                                    **200115**

Page  2  of  39  pages

6.    Prior to my tenure as Director of the ADOI, I served as Executive Director of the Alaska Public Utilities Commission, which regulated the rates, services and practices of public utilities and pipeline carriers. I supervised the staff and advocated to and advised the Commission on a wide range of regulatory matters.

7.    I earned a Master's Degree in Public Administration from Harvard University's Kennedy School of Government and a Bachelor of Arts Degree in International Relations and Economics from Swarthmore College.

8.    The Division has both the statutory authority and the responsibility to administer and enforce Alaska Insurance Code Alaska Statutes, Title 21 and is authorized to invoke legal, equitable and other remedies to obtain compliance. My enforcement responsibilities included the Unfair Claim Settlement Practices Act (UCSPA), AS 21.36.125. I pressed for successful legislative amendments that strengthened the consumer protection features of this law and used that stronger statute to enforce insurer compliance.

I have been asked to address two primary issues in connection with the above-captioned matter from my background and experience as the highest officer in the State of Alaska responsible for the oversight and regulation of insurance in the State of Alaska. Those two questions are as follows:

Exhibit __4_____    **200116**

Page _3_ of _39_ pages

      A.     Whether Continental Insurance Company's conduct can fairly be characterized as meeting the standard in Alaska for the imposition of punitive damages and, if so,

      B.     What the financial records and filings pertaining to Continental Insurance Company's participation in the Alaska insurance market during the relevant time period indicate or suggest was Continental Insurance Company's profit or loss from those Alaska operations.

      I address these questions below.

A.     Whether Continental Insurance Company's   conduct
       can fairly be characterized as meeting the standard
       <u>in Alaska for the imposition of punitive damages</u>.

      To fairly evaluate and answer this question, I have had to consider the evidence relating to several key issues, including (1) the purpose and scope of the insurance coverage provided to Bristol Bay Area Health Corporation ("BBAHC") by Continental, (2) whether the premium paid to Continental constitutes a form of unjust enrichment or "windfall" if the policy did not insure the United States of America as an implied additional insured, (3) whether Continental had a reasonable basis for its denial of the tender of the Lori Wilson claim, including the question of whether Continental reasonably relied on the advice of competent counsel in rejecting that tender, (4) whether Lori Wilson suffered any harm or prejudice as a consequence of Continental's rejection of the tender of her claim by the United States, and (5) whether in connection with any of

Exhibit _____4_____

Page ____4 of _39_ pages

**200117**

these various issues there is any evidence suggesting that Continental's conduct was outrageous, or performed with malice or bad motives, or with recklessness, such that it can be fairly stated that Continental "was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or the bad faith denial of a claim -- such as death, grievous physical injury, or financial ruin." Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 24 (Texas 1994).

Mr. Kenneth S. Roosa, an Assistant U.S. attorney wrote on January 6, 1995 to Lori Wing, an independent insurance broker for Bristol Bay Area Health Corporation (BBAHC) and argued that U.S.A. was also an insured under the Continental policy. Roosa stated further that "any other conclusion would inevitably result in the insurer being unjustly enriched as the insurer would collect a premium with no remaining potential liability."

This statement indicates little understanding of the actual situation in the Bristol Bay Region of Alaska at the time of the Wilson claim in 1993. Mr. Roosa maintains this mistaken view of BBAHC's operations today.

> Q. Well, isn't it far from precise to say "any tort action"? Isn't it far from precise?
>
> A. It's not far from precise, when you consider the fact that **this is an agency or an entity which does practically nothing but work for the Indian -- for the Indian Health Service.** It's not far from accurate. I disagree with that characterization.

Exhibit 4

Page 5 of 39 pages

200118

Videotaped Deposition of Kenneth Roosa, December 15, 2005 at pg. 49. (emphasis added)

> Q.  Okay. Well, I -- with all due respect, I don't think you're the judge in this case. Let me just ask this. I thought you earlier said that you probably did say at some point to someone that all of BBAHC's money came from the U.S. I thought you earlier said that. The transcript will so say.

> A.  I -- I said I probably did say to someone at some point, but I don't -- I didn't say that I said it to whoever the author was of that, and that's what you're referencing.

Videotaped deposition of Kenneth S. Roosa, December 15, 2005, Pg. 51

Tribal contractors generally appreciated the congressional decision to amend the ISDEAA to extend the Federal Tort Claims Act's (FTCA) applicability to their P.L. 93-638 programs. The cost of the private liability coverage had severely taxed their administrative resources. After this act of Congress, a tort claim against a tribal contractor's federally funded program would be defended by the United States government.

Unfortunately, there were gaps and substantial uncertainties in the FTCA as applied to tribal contractors. For example, certain programs arguably fit under the scope of 638 contracts, but were funded by the State of Alaska.

Below are several programs that were at risk of going bare, or lacking liability coverage if the BBAHC had not carried a supplement insurance policy to the limited and unpredictable coverage provided by the FTCA:

Exhibit ___4___

Page ___6___ of ___39___

**200119**

| Total Dollars | Indirect Costs | Program Funded |
|---|---|---|
| | (Included in total) | |
| | | |
| $380,300 | $63,383 | Community Mental Heath Services |
| 42,750 | 6,946 | Togiak Clinic |
| 27,285 | 4,404 | Alcohol Safety Action Program |
| 52,144 | 8,691 | Family Planning |
| 300,976 | 51,824 | SOADA |
| 40,000 | 6,667 | Prematernal Case Management. |
| 292,900 | 50,434 | CHA Training % Supervision |
| 42,750 | 6,946 | Chignik Bay Clinic |
| 45,000 | 7,500 | Peer Counselor/Natural Helper Program |
| 25,200 | 4,341 | Water Safety Program |
| 63,390 | 10,174 | Supplemental Food WIC Program |
| 58,174 | 9,793 | |
| 295,026 | 49,171 | Rural Human Services |
| 109,200 | 17,232 | Remote Maintenance Worker |
| 47,276 | 5,253 | Infant Learning Program |
| $1,822,371 | $302,759 | 11.1% |

Also, tribal services provided to non-tribal beneficiaries were authorized by federal program officials, but which could raise problems if a tort claim were filed. Counsel to BBAHC advised it to maintain liability coverage for these areas surrounding the FTCA's coverage of the core. They also advised not to incur the expense of duplicating undisputed areas of FTCA coverage. BBAHC faced the risk of potentially catastrophic loss by having $1.8 million-plus worth of programs funded by the State of Alaska in 1992-1993. This funding program included $302,759 in indirect (administrative) funds from which the premiums for the Continental insurance policy were paid. Continental provided a policy for BBAHC to safeguard it from liability if the US Department of Justice, after evaluation, decided that a liability claim fell outside the scope of coverage. Unquestionably, BBAHC received value from its premium paid to Continental.

Exhibit 4

Page 7 of 39 pages

**200120**

Wing pointed out the difficulty she faced trying to find any insurer willing to write specific liability gap coverage. Not even the Secretaries of HHS or Interior could arrange private insurer coverage for FTCA risk, despite an express congressional mandate to do so.

Therefore, any tort claim that occurred during the policy period placed BBAHC at risk. The inherent uncertainty of the FTCA's case-by-case analysis by the Justice Department after an incident would be to either accept or deny responsibility to a claim could prove to be very harmful to the BBAHC. If the government declined to accept even a single serious claim under the FTCA, and it were not otherwise insured, it could have crippled BBAHC operations. It would be folly for small tribal governments to leave significant risks uncovered.

1.    Insurance Coverage of Real Risks
      Contradicts the Unjust Enrichment Theories.

This uncertainty exists whether or not any claim is made during a given policy period. When one buys insurance, one is buying risk protection. The insured pays a premium to the insurer whether or not a claim is ever filed. Some believe that, if one buys insurance coverage and nothing happens, the money is wasted. The "unjust enrichment" reasoning falls perilously close to this thinking.

Exhibit __4__

Page _8_ of _39_ pages

**200121**

The purpose of insurance is to transfer the risk of a fortuitous event with potentially catastrophic financial consequences to the insurer in return for a much smaller, predictable payment. The risk transfer occurs whether or not one hundred claims or no claims occur. This is also referred to as the "wraparound" feature of the Continental policy.

This wraparound coverage built around the FTCA was described as providing "sleep coverage," allowing the insured to sleep well at night, because the risks of operating the programs have been successfully managed. At this point, both insurer and insured knew that the proposed insurance coverage has done its job and made the prudent provision of public services possible. Thus, there is no unjust enrichment and both parties to the contract are sleeping well at night.

The Continental premium was reasonable for the reduced scope of coverage after FTCA became applicable to liability. (BC000436) Fax transmittal cover sheet dated March 22, 1989 from Lori Wing to Roy Hollinger at M.J. Hall stated:

> Continental has quoted hospital GL on an occurrence basis with $1 million Occ./$2 million Agg. at less than $12,000. Annual. Needless to say I have bound.

From her earliest contact with Bristol Bay Area Health Corporation (BBAHC), Lori Wing was immersed in discussions of the FTCA and it's effect on

Exhibit 4
Page 9 of 39 Pages

**200122**

BBAHC's insurance coverage. Ms. Wing sounded delighted with the premium quote from Continental.

Concerning rates, Ms. Wing's memorandum of March 22, 1989 is instructive.

2.    Scope of the Liability Coverage
      Under the Continental Policies

a.    The U.S.A. was not an intended
      party in the Continental policies.

It is undisputed that neither Continental insurance policy explicitly mentions the FTCA. Nor do they mention the United States as an insured. Thus, the intent of the parties to the insurance transaction is important to understanding what is covered.

b.    Effect of state statutes and
      regulation on determining the
      scope of insurance policies.

Statutes and regulations governing unfair insurance practices, are found at the state level, not the federal. As a result, there is no uniform national definition for insurance bad faith or standard for what constitutes unfair insurance practices. According to varying standards set by each state legislature and regulator, Unfair Insurance Claim Settlement Practices are generally defined as if the Insurer knowingly commits or performs with such frequency as to indicate a general business practice.

Exhibit __4__

Page 10 of 39

**200123**

If a policy contains ambiguous language as to exclusion (e.g., not specifying that FTCA claims were excluded from the coverage), the courts have interpreted this according to the reasonable expectations of the insured based on a lay reading of the policy language. The most reliable interpretation of intent comes from those who were present when the insurance coverage was developed. There is unanimous agreement of what the substance of the coverage was. The expectations of an implied insured to be identified after a serious claim is of no value in interpreting the intent of the real parties to the insurance contract in interpreting ambiguous language. In my opinion, allowing a stranger to intrude into policy interpretation is counter to contract law and legally inappropriate.

        c.     BBAHC's, Continental's, and U.S.A.'s
                  actual intent during the underwriting
                  of the private insurance policies.

The President and CEO of BBAHC testified at his deposition that "I never had the idea that BBAHC was required to have the USA as an additional insured." S. Bobo Dean, attorney for BBAHC in Washington, D.C., testified that U.S.A. representatives never asked for or indicated that BBAHC was required to indemnify USA for payments made under FTCA. The named insured, Bristol Bay Area Health Corporation (BBAHC), also stated that it had no intention to cover FTCA claims under the Continental policy.

**200124**

Mr. Dean, advised his client to retain coverage to cover any liability claims not covered by the FTCA and to have coverage to cover the extensive ambiguities in the FTCA coverage. He also recommended that BBAHC avoid the added expense of duplicate coverage for the same risk. An underwriter at Continental, Debra Patricia Wyatt Brown, understood that BBAHC was covered by the FTCA for general liabilities while the Continental policy covered liabilities that did not fall under FTCA. Mr. Dean also met with Ms. Wing and Mr. Clark to discuss coverage FTCA might not cover and the problems associated with trying to find an insurer to write a policy for coverage outside of the FTCA.

Continental officials stated that they never intended to cover the FTCA claims under the CPB or HMA policy. Continental also stated that they would not have written the policy if these claims had been included. They understood that the nature and size of the risk would change dramatically if all FTCA-covered torts tied to BBAHC were included in Continental's liability policy.

There could not possibly have been a better meeting of the minds on the nature of the coverage provided by the Continental Policy #HMA 9500648-4. Each party involved in the development of this coverage had a specific, consistent understanding of what the policy covered and what it did not. The contemporaneous record of statements and documents is strong, consistent and well aligned with the interests of the parties to the insurance at the time. Each party to the contract clearly knew what coverage they were buying and what the premium would be.

**200125**

4

12   39

3.    Continental's actions in this case do
not approach outrageous, malicious or
<u>recklessly indifferent behavior.</u>

a.    Continental did not act outrageously,
maliciously or recklessly indifferent
in failing to recognize the U.S.A.
<u>as an implied insured.</u>

Judge Sedwick initially held that it was bad faith for Continental not to
have considered or concluded that the United States was an implied insured.  Later, he
reconsidered the implied insured and bad faith rulings.  The Ninth Circuit reversed his
reconsidered decision.  In my opinion, however, Continental did not act in an outrageous,
malicious or recklessly indifferent manner Continental deciding at the time of the claim
that the U.S.A. was an implied insured would have required Continental to predict the
outcome of a future decision of the Alaska Supreme Court.  This is especially true since it
is still unknown how the court would rule on this question if presented with it in the
future.

In <u>Olympic Inc. v. Providence Washington Insurance Company</u>, the
Alaska Supreme court declined to extend the implied additional insured doctrine it had
previously adopted for a casualty policy.[1]  Therefore, in future, the court is at least as
likely to apply the <u>Olympic</u> exception as to find an implied insured under these facts.
This is a complex area of insurance law and Alaska appears to be the only state implying

---

[1] 648 P.2d 1008 (Alaska 1982).

**200126**

4

13 - 39

insureds in the commercial liability context.  Many aspects are still matters of first impression.

The district court correctly applies Alaska state insurance law to these questions in <u>Stewart-Smith v. Avi-Truck, Inc</u>.  He looks to the Alaska Supreme Court for guidance on whether coverage exists outside the FTCA for this tragic 1993 accident.

The holding in <u>Avi-Truck, Inc</u>. requires that the risk to the insurer of adding an implied insured must not be increased.[2]  The result of treating the U.S.A. as an additional implied insured would cause the risk to BBAHC to increase significantly by adding approximately 3 million federal government employees (in 1993) to the private insurance policy.  This idea was never contemplated by any party to the contract and would create a radical change in the coverage of the policy and the risk to the insured and the private insurer.[3]

Holding that the United States qualified as an "implied insured" in this case would turn one of the Alaska Supreme Court's key <u>Avi-Truck</u> standards on its head.  The expressed intent of both parties to the insurance contract was to cover contractual activities outside the scope of the 638 program and funding.  Second, the parties intended to provide gap coverage for gray areas that might not be covered by the FTCA.  The parties did not intend to duplicate coverage for unambiguous claims accepted by the

---

[2] 682 P.2d 1108 (Alaska 1984).
[3] Source: *U.S. Census Bureau, Governments Division,* Created: May 07 1993, last revised: March 24 2004, last visited December 17, 2005

**200127**

federal government under the FTCA. Therefore, determining that Continental's Policy #HMA 9500648-4 covered the claim of Lori Dee Wilson would significantly increase the risk beyond the amount for which the policy was underwritten.

>    b.    Coverage under Continental policies
>          did not include U.S.A. as an insured.

Continental's senior staff members agree that they never would have written a policy that covered claims against the United States under the FTCA because of the increased risk to the insured and the private insurer. For example, assume that an official of the Indian Health Service (IHS) paid a visit to BBAHC to monitor performance under the IHS P.L. 93-638 Contract. The IHS employee loses control of his vehicle on slippery roads and strikes a child, seriously injuring her. The Department of Justice determines that the accident occurred in the scope of the federal employee's employment, but also believes that BBAHC has overlapping coverage under a private commercial general liability policy, so it tenders the defense to the private insurer. Thus, BBAHC's risk under the private insurance coverage has increased.

>    c.    The claimant was not harmed by the business
>          dispute between the U.S.A. and Continental.

Continental accepted its duty to defend and handled the Wilson's state court complaint properly. They arranged to have it moved to the proper forum. The dispute between the United States and Continental over attempted tenders did not affect the handling of the claim with the claimant. Upon dismissal from state court of the

4

15        39

**200128**

Wilson's claim, the United States began settlement negotiations under the FTCA. It did not cause delay or inconvenience to the claimants. Even though the United States has argued that Continental should have handled the claim, it has not argued that the claim itself was poorly handled. After the claim occurred, the business dispute occurred over coverage. The accident of Lori Dee Wilson happened on November 27, 1993. The claim was filed April 5, 1994. The claim was settled by the U.S. Attorney in August 1997. The attorney for the Wilsons, Luce Ames, said it would be about a year before he would be ready to discuss settlement. (BBHC 001233) Continental ordered a full, timely investigation of the claim. See, 2/17/94 letter from William Hutson, Regional Claims Director for Continental Insurance Company to John Kurtz, Continental Loss Adjusting in Spokane.

> d.    Effects on Alaska insurance market.

The overly broad application of the "implied insured" doctrine would seriously harm the Alaska insurance market. In a thin, widely dispersed property/casualty insurance market like Alaska's, fraud or the inability to reject fraudulent claims could cause an insurer to exit the market. This would reduce the availability of coverage for insureds in the market. If there were no remedy for material misrepresentation or omission in Alaska, this would create an additional barrier to entry to the Alaskan insurance market. Insurance underwriting is based on the ability to accurately assess risk. Purporting to add an insured after a policy is written and, in this case, significantly increasing the risk by adding coverage never intended by either party

4

16    39

**200129**

to the contract renders underwriting decisions unreliable. It would be contrary to the public interest to make coverage so unpredictable, especially in a thin market.

Private insurers are experienced at evaluating and dealing with the risk of fortuitous events. That is what they do. However, when government, including the court system, rewrites policy language, or who is insured after a major claim, they handle this kind of risk poorly. They would decline similar risks in the future, and some would exit the market.

4.    A Tribal Contractor under P.L. 93-638 required
       Supplemental Insurance beyond the Quasi-Insurance
       Scheme of the FTCA. It would have been negligent
       <u>for BBAHC to have relied solely on FTCA coverage</u>.

Had Continental accepted tender from the United States it would have harmed BBAHC and 638 tribal contractors everywhere. It would mean that their good-faith efforts were being turned against them while trying to obtain coverage to cover non-federally funded programs integrally related to 638 program activities or to cover the gray areas in FTCA coverage (<u>See</u> CP handwritten notes, CP00405-410).

5.    Punitive damages are inappropriate in this case because there were no
       <u>outrageous, malicious or recklessly indifferent acts by the insurer</u>.

The denials of tender by Continental were consistent, generally timely, and clearly explained the basis for the denial.

4
17    39

**200130**

I believe that Continental had a reasonable basis for denying tender. Continental hired competent local counsel. I reviewed the complete file. It appeared to contain all the internal correspondence. Continental hired competent local counsel with expertise in the field. They asked the proper questions and relied on the advice they received. I saw no indication whatsoever in the record of this case to suggest that Continental told the United States anything different from the advice they received from the attorneys. The company's position on tender questions was based directly on what local counsel advised. In fact, the attorneys were instructed to communicate their findings directly to the government.

AS 09.17.020 sets the requirements for punitive damages. In any case, it is clear that outrageous, malicious or recklessly indifferent conduct did not occur.

Once again, in my opinion, the issue of tender was a business dispute that did not negatively affect the claimant in any way.

### Timeline for Tenders

Dec 7, 1994: BBAHC attorney Robert K. Stewart wrote to Kenneth S. Roosa, Asst. US Attorney, confirming that claim actions were subject to PL 93-638 and were covered by the Federal Tort Claims Act (FTCA).

December 7, 1994: Roosa asks for copies of Bristol Bay Area Health Corporation (BBAHC) liability policies.

Jan 6, 1995: Roosa tenders to Continental (Lori Wing - BBAHC's Broker) under CBP policy

Feb 13, 1995: James B. Friderici, counsel to BBAHC, rejects tender by Roosa on behalf of Continental.

4

18    39

**200131**

June 6, 1995: Roosa tenders defense to Friderici, local counsel to BBAHC, under Policy # HMA 9500648-5.

Feb 20 1997: Roosa tendered to Continental only under CBP policy and not HMA policy. Neither CBP or HMA policies contained any language intending USA. as an additional insured.

May 27, 1997: Roosa wrote to Craig Stowers (Continental's local counsel) informing a tender and taking on responsibility for claim and settlement negotiations.

June 19, 1997: Stowers wrote to Roosa informing there is no coverage for USA under Continental policies.


B.    What the financial records and filings pertaining to Continental
      Insurance Company's participation in the Alaska insurance
      market during the relevant time period indicate or suggest was
      Continental Insurance Company's profit or loss from those Alaska operations.


If, despite my opinion that punitive damages are unwarranted in this case, and punitive damages were to be found, I believe the proper measure of damages would be the Alaska earnings of Continental.


The schedule attached hereto as Exhibit A sets out Continental Insurance Company's premium volume by year for the most recent ten-year period. The result is that the average annual profit for Continental Insurance Company in Alaska has been approximately $339,105.


The premium and loss information is taken directly from Continental Insurance Company's Annual Statements filed with the Division and the NAIC. However, those statements do not contain profitability information by state. (See also,

**200132**

Deposition of Lawrence Boysen). The profitability information is for all insurance lines for the Alaska market for 2002. It includes investment earnings.

Alaska was not a target state for Continental. (Crystal Brown, Assistant Vice President of Underwriting), states in her deposition that she believes that the coverage was written as a "broker accommodation" because it did not meet the $25,000 minimum that Continental expects to generate from an account. It appears to her that the credit was developed to keep the premium at or under $16,000. Brown states firmly that Continental would never have written the coverage if the United States was an insured.

Continental was not targeting insurance business in Alaska. This was the only primary CGL policy they wrote.

The premium billed to BBAHC was well below Continental's minimum premium of $25,000 per year and it was done to accommodate the broker's request.

The Alaska Division of Insurance issued a certificate of authority for Continental Insurance Company and Continental Assurance Co. It approved Continental's rates in the state.

Alaska's premium tax is based on Continental's premium revenues in Alaska.

4

20   39

**200133**

The testimony of Lori Wing about "gray areas" in FTCA liability coverage is detailed and very credible. It was supported by the detailed legal analysis by S. Bobo Dean (D.C. law firm). She describes FTCA as providing medical malpractice coverage for professionals and pointed out that federal agencies prohibited subsequent expenditures for private medical malpractice coverage by 638 contractors like BBAHC.

According to Wing there was a similar prohibition on spending 638 funds on CGL coverage. In any case, it appears that the premium for the Continental liability policy was paid with non-federal funds.

### Answers to Other Questions

1.   What was Continental taking out of Alaska in 1993-1994?

Lawrence Boysen, a key finance official for Continental, said in his deposition that the company does not break it out business on a state-by-state basis. This is consistent with NAIC practice. Therefore, it is challenging to estimate profits on this basis.

Alaska's Unfair Claims Settlement Practices Act has no private right of enforcement. The Alaska Division of Insurance has statutory authority to ensure compliance by insurers and other regulated entities. It may use a variety of sanctions, such as fines and, ultimately, revocation of the insurer's certificate of authority in Alaska.

Set out below is the 1993 Alaska Statute.

4

21   39

**200134**

Section 21.36.125  UNFAIR CLAIM SETTLEMENT PRACTICES.

A person may not commit or **engage in with such frequency as to indicate a practice** any of the following acts or practices:

(1) misrepresent facts or policy provisions relating to coverage of an insurance policy;

(2) fail to acknowledge and act promptly upon communications regarding a claim arising under an insurance policy;

(3) fail to adopt and implement reasonable standards for prompt investigation of claims;

(4) refuse to pay a claim without a reasonable investigation of all of the available information and an explanation of the basis for denial of the claim or for an offer of compromise settlement;

(5) fail to affirm or deny coverage of claims within a reasonable time of the completion of proof-of-loss statements;

(6) fail to attempt in good faith to make prompt and equitable settlement of claims in which liability is reasonably clear;

(7) compel insureds to litigate for recovery of amounts due under insurance policies by offering substantially less than the amounts ultimately recovered in actions brought by those insureds;

(8) attempt to make an unreasonably low settlement by reference to printed advertising matter accompanying or included in an application;

(9) attempt to settle a claim on the basis of an application that has been altered without the consent of the insured;

(10) make a claims payment without including a statement of the coverage under which the payment is made;

(11) make known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

4

23  39

**200135**

(12) delay investigation or payment of claims by requiring submission of unnecessary or substantially repetitive claims reports and proof-of-loss forms;

(13) fail to promptly settle claims under one portion of a policy for the purpose of influencing settlements under other portions of the policy;

(14) fail to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

(15) offer a form of settlement or pay a judgment in any manner prohibited by AS 21.89.030.

(emphasis added)

The 1993 standards are significantly updated and strengthened from those that applied in 1993. More significantly, the threshold for committing a violation of the UCSPA was substantially more lenient in 1993 than it is now. The phrase highlighted above required a general practice of violations, not a single violation to warrant enforcement action by the Alaska Division of Insurance. To my knowledge, there has been no investigation in this case of other claims handled by Continental, let alone claims practices violations identified to support a finding that Continental has violated the UCSPA.

I am familiar with this statutory change because I testified as Director of Insurance in support of the new, tougher standard in 2000.

In State Farm Fire & Casualty Company v. Nicholson, 777 P.2d 1152, 1157 (1989), the Alaska Supreme Court described enforcement under the UCSPA:

4

23  39

**200136**

> Under, AS 21.36.125, entitled "Unfair claims settlement practices,"
> an insurance company only violates the chapter if it engages in
> certain proscribed acts "with such frequency as to indicate a
> practice." AS 21.36.125. Therefore, the potential $25,000 fine
> referred to by State Farm thus is not applicable unless the insurer is
> committing the unfair claim settlement practice with considerable
> "frequency." The civil penalty under AS 21.90.020 is also
> inapplicable absent "frequent" violations of the insurance code.
> At most, the Director of Insurance may impose a $1,000 penalty
> for an isolated act prohibited under the code. AS 21.36.320(c),(d).

Arguably, there was a reasonable basis for Continental to refuse to accept tender from BBAHC or the United States. In any case, no outrageous, malicious or recklessly indifferent conduct occurred. Continental consistently denied that the United States has any rights under the insurance policies it issued to BBAHC for the policy period covering the claim date. The coverage opinions were consistent with each other.

Continental sought coverage opinions from competent local counsel who researched the facts and case law carefully before recommending to Continental that it refuse tender of the case. Craig Stowers drafted coverage opinion dated June 19, 1997 to Assistant US Attorney Kenneth Roosa declining the United States' tender of defense and demand for immunity. He pointed out that the cases cited by Roosa either do not contain the proposition he asserted, or entirely distinguishable. He analyzed the insuring agreement to exclude the United States. He explains the intention of the parties. Mr. Stowers analyzes the facts of this case against Avi-Truck and distinguishes it because neither party to the insuring agreement intended to benefit the United States. Finally, he

**200137**

points out that the United States could have used the 638 contract to require the United

States to be made a beneficiary of BBAHC's private insurance policies, but never did so.

Mr. Roosa testified in his recent deposition that he does not recall

speaking to Mr. Stowers after receiving the letter, as follows:

> Q.    When you received this letter, did you take any steps to
>        determine who Mr. Stowers was, what his background
>        was?
>
> A.    I knew he was a partner with Randy Clapp.  I can read the
>        letterhead.  I read his opinion.
>
> Q.    Would you agree that, without going into the substance,
>        unless you want to, that he does address each of the cases
>        that you cite for the proposition that the United States
>        should be considered an insured?
>
> A.    His letter speaks for itself.  He does try to distinguish the
>        cases in his letter.
>
> Q.    Do you recall whether you spoke at any time with Mr.
>        Stowers about the contents of his letter?
>
> A.    I may have.  I don't recall.

Videotaped deposition of Kenneth S. Roosa, December 15, 2005, Pgs. 55-56.

In his original decision dated September 18, 2001 Judge Sedwick ruled

that the United States was an "additional implied insured" under the Continental

Insurance Company's liability policy covering Bristol Bay Area Health Corporation.

While he retained jurisdiction over the matter he reconsidered his decision in an order

4

25    39

**200138**

dated March 28, 2003, and instead granted Continental's motion for summary judgment, and vacated the earlier granting of summary Judgment to the United States.

Twice during the history of this case at least two judges have determined that there was no bad faith by Continental. This alone suggests that the decision to reuse to accept the tender was fairly debatable. In any case it was not outrageous, malicious or recklessly indifferent conduct.

<u>Response to Expert Report of Deborah Senn</u>

Deborah Senn filed an expert report in this case on November 22, 2005. A number of points she made require a response. She also was an active member of the National Association of Insurance Commissioners and served as Washington State's elected Commissioner of Insurance.

Ms. Senn's stated purpose in her report is to evaluate Continental Insurance Company's "conduct in its handling the underlying insurance claim at issue." Unfortunately, many of her conclusions lack legal foundation.

Mr. Wainscott's opinion also responds to her report at pp. 25-31, so this response will focus on other concerns.

**200139**

4

26    39

<u>The 1993 Statute is the Applicable Statute</u>

On page 5 of her report Ms. Senn states: "Here are the unfair claims settlement practices that are applicable." This is incorrect and misleading because the law she quotes is the current statute, which has been substantially amended since this claim occurred in 1993. Rather than quoting unfair practices statutes from various other states that have no applicability to a claim that occurred in Alaska, it would be more relevant to analyze the statute that was in place at the time. Please see pages 22-23 for discussion of the correct Alaska Statute.

Ms. Senn attaches CNA Pro's *Claims Handling Best Practices* to her report. She attempts to turn them into an indictment of Continental. The fact that the company has adopted, promulgated and follows these best practices is not a company failing, as she would have it. First, these best practices go beyond the regulatory standards set out in Alaska's unfair claims handling laws and regulations. Second, she quotes selectively from the best practices document. For example, the *Introduction* states:

> Of course, the circumstances of particular claims will differ and certain of these stages may not be applicable to a given claim depending on when and how it is resolved. Claims professionals should strive to move the investigation forward in as timely a manner as the individual claim situation permits. (CNA 015718)

4

27    39

**200140**

Under *Investigation* the manual states: "Because of the complexity of certain issues, some claims investigations may require months or even years to complete, while others may be completed in a relatively short time." Neither of these selections is pointed out in her report.

There is no private right of enforcement of these regulatory standards. The Alaska Division of Insurance is legislatively authorized and directed to implement, define, and enforce 21.36.125. It has done so.

Senn fails to mention reconsideration by the district court judge. Whether or not she agrees with it, the order was an important part of the history of the case and should not be edited out of the record without even a mention.

The District Court's finding of bad faith was limited. Many of Ms. Senn's conclusions fall well outside the scope of the judge's findings in this case and should be ignored.

## Conclusion

The federal courts have determined that Continental engaged in bad faith conduct in this case. I have reviewed the record and see nothing that approaches clear and convincing evidence of outrageous, malicious or recklessly indifferent conduct. As

4

28    39

**200141**

detailed above, Continental Insurance Company's conduct cannot fairly be characterized as meeting the standard in Alaska for the imposition of punitive damages. Continental Insurance Company's profit from Alaska did not exceed $340,000 per year averaged over the recent ten-year period, using the best regulatory financial information available.

Attached as Exhibit B are my CV and rate schedule. Also attached as Exhibit C is my list of cases I have testified or been deposed in for the last four years. Also attached as Exhibit D is the list of documents reviewed in this matter.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
Robert A. Lohr

SUBSCRIBED and SWORN TO before me this 22nd day of December, 2005.

_____
Notary Public in and for Alaska
My Commission Expires: 9 - 23 - 09

200142

Continental Insurance Company
Premium Volume in Alaska
1995-2004

| State/Year | Licensed? | Direct Premiums Written | Direct Premiums Earned | Direct Losses Paid (Deducting Salvage) | Direct Losses Incurred | Direct Losses Unpaid | Bates Page Reference |
|---|---|---|---|---|---|---|---|
| Alaska | Yes | | | | | | |
| 1995 | Yes | $ 5,195,373 | $ 6,835,274 | $ 4,746,064 | $ 4,402,471 | $ 10,181,681 | CNA 001695 |
| 1996 | Yes | 2,472,845 | 3,584,303 | 2,401,058 | 1,041,814 | 8,822,437 | CNA 001937 |
| 1997 | Yes | 1,562,206 | 1,727,568 | 2,368,812 | (551,632) | 5,901,993 | CNA 002199 |
| 1998 | Yes | 999,449 | 1,828,401 | 1,979,491 | 290,738 | 4,213,239 | CNA 002453 |
| 1999 | Yes | 1,549,085 | 804,935 | 2,370,284 | 3,868,974 | 5,711,931 | CNA 002699 |
| 2000 | Yes | 1,389,584 | 1,428,302 | 903,609 | 699,587 | 5,507,908 | CNA 002943 |
| 2001 | Yes | 1,831,085 | 1,660,314 | 1,475,807 | 773,746 | 4,805,846 | CNA 003178 |
| 2002 | Yes | 2,285,760 | 2,163,128 | 1,833,304 | 2,745,925 | 5,718,468 | CNA 003433 |
| 2003 | Yes | 2,215,430 | 2,533,970 | 821,484 | 2,255,303 | 7,152,287 | CNA 003725 |
| 2004 | Yes | 1,961,550 | 1,841,670 | 1,177,342 | 1,022,707 | 6,997,651 | CNA 003987 |
| | | | | | | | |
| TOTALS | | $ 21,462,367 | $ 24,407,865 | $ 20,077,255 | $ 16,549,633 | $ 65,013,441 | |
| Average Over 10 Years | | $ 2,146,237 | $ 2,440,787 | $ 2,007,726 | $ 1,654,963 | $ 6,501,344 | |

$ 339,105   15.8% profit on insurance transaction from 2002 NAIC Profitability Report (Alaska)
$ 339,105   **Estimated average profit for Continental Insurance Company**
             **in Alaska, based on 10 years of insurance regulatory reports.**

Sources: Annual Financial Filed with State Insurance Regulatory Agency
         Schedule T: Exhibit of Premiums Written, Allocated by States and Territories
         NAIC Profitability Report by State by Line of Insurance, page 38.

EXHIBIT A
Page 1 of 1

200143

4

30    39

**Robert A. Lohr**
2515 Telequana Drive
Anchorage, Alaska 99517
907-248-5432
907-223-9836 (cell)

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| Alaska Division of Insurance | Department of Community & Economic Development |
| Director | Anchorage, Alaska |
| | 1999-2003 |

Promote Alaskan business and protect the public by regulating the insurance industry in Alaska to ensure that a wide range of insurance products are available at affordable prices. Licensed only qualified, financially sound companies and approved or disapproved significant changes in their status. Considered the proposal by Premera Blue Cross to convert from non-profit to profit status. Montored the financial solvency of insurance companies. Ensured that only those qualified and of good character are licensed to engage in the insurance business. Supervised the consumer complaint function and ordered restitution where appropriate. Directed market conduct examinations designed to ensure industry compliance with insurance statutes and regulatons. Investigated possible criminal and adminstrative violations of the Insurance Code. Reviewed proposed policy language to determine that it is not misleading or ambiguous and review proposed rates to ensure that they are neither excessive, inadequate, nor unfairly discriminatory. Oversaw a staff of 55. Testified to legislative committees on proposed insurance legislation and worked with businsses, insurance companies, agents, brokers and the public to support passage of needed bills.

Held national insurance regulatory leadership positions, such as Executive Committee member of the National Association of Insurance Commissioners, a $55 million agency. Served as Vice Chair and Acting Chair of the 14-state Western Zone. Served on the Internal Administration Subcommittee and chaired the Database Fee Working Group that is responsible for the organization's primary revenue source and serves as a member of the Internal Administration subcommittee that oversees NAIC operations. Co-chaired the NARAB Working Group that dramatically streamlined agent/broker licensing nationally. Served a member of the International Committee, traveling to conduct training seminars and participated extensively in meetings of the International Association of Insurance Supervisors.

| | |
|---|---|
| Alaska Public Utilities Commission | Department of Commerce & Economic Development |
| Executive Director | Anchorage, Alaska |
| | 1991-1999 |

Under the direction of the Chair and the Commissioners, served as chief administrator of the staff of the Alaska Public Utilities Commission. Supervised the staff of the Commission that regulates the rates, services and practices of Alaskan public utilities and pipeline carriers. Advised the Commission on regulatory matters; upon request of the Commission, designated a staff team to formally participate as a party in contested cases. Maintained the administrative functions of the Commission. Testified on behalf of the Commission to the legislature. The position had principal

**200144**

EXHIBIT __B__
Page __1__ of __4__

responsibility for the implementation of Commission-established policy, short and long range plans and budgets.

Developed and obtained legislative enactment of the new revenue source for the Commission, the regulatory cost charge on utility gross revenues. This freed the APUC from its dependence on unrestricted general funds for its operations.

Bob Lohr & Associates                                        1986-1991
Owner & Principal Consultant                          Anchorage, Alaska

Provided technical assistance to non-profit organizations and businesses. Served as Executive Director for a Native association facing severe administrative difficulties, internal strife and bankruptcy. Developed and commenced implementation of action plan to ensure continued ability to operate successfully this association delivering $2 million per year worth of health and social services to local people.

*Obtained confirmation of board commitment to original goals of the organization
*Re-established internal communications
*Developed clear priorities
*Restored good relationships with funding sources
*Developed network of individuals and organizations concerned about the success of organization.

Advocacy Services of Alaska                               1989-1991
Executive Director                                          Anchorage, Alaska

Executive Director for the protection & advocacy agency for Alaska, which provides legal representation to persons with developmental disabilities and chronic mental illness. Developed new funding sources including the first non- governmental grants for this statewide agency. Expanded mandate of agency substantially and obtained corresponding expansion in scope of state grant.

Rural Alaska Community Action Program, Inc              1979-1986
Executive Director and other positions                 Anchorage, Alaska

Maintained funding for this major statewide non-profit with annual contracts in excess of $5 million. Established continued funding to meet Rural CAP's goal of rural economic development throughout Alaska.

Managed internal and external functions under the supervision of 21-member statewide board of directors; supervised a staff of 175. The position required a detailed knowledge of and interaction with the legislature, as well as state and federal agencies.

Addressed wide-ranging needs, including: village community development, energy weatherization), head start, natural resources, alcohol/drug abuse prevention

200145

EXHIBIT  B
Page  2  of  4

Established a statewide network of non-profit organizations concerning the issues of federal budget cuts and proposed restrictions on lobbying by grass roots organizations.

Business Manager, Energy Director and Deputy Director 1979-1982. Developed rural energy policy for Alaskan villages and persuaded Governor Hammond to adopt major provisions, developed administrative and program budgets to enable program to focus on priorities during a time of budget reductions; supervised all programs and internal operations of the agency.

Upper Tanana Development Corporation,                                    Executive Director
1975-1979                                                                       Tok, Alaska

Founded this regional development corporation serving the Upper Tanana region of eastern interior Alaska with the commitment to establish and operate education and social service programs. Worked with the board of directors to establish the first comprehensive senior citizen program in rural Alaska, as well as pre-school programs.

Developed grass roots movement to ensure local involvement in the gas pipeline planning process. Assessed the pros and cons for community residents, intervened in Federal Energy Regulatory Commission hearings on behalf of local villages. The planning group that grew out of this effort is now active representing local interests concerning other projects.

**EDUCATION**

Harvard University, Kennedy School of Government, Cambridge, MA, Master's Degree in Public Administration 1987-1988. Co-chair, Kennedy School Student Government.

Swarthmore College Swarthmore, PA 19081    B.A. Degree in International Relations and Economics, 1970

3          200146          EXHIBIT __B__
                                  Page _3_ of _4_

ROBERT LOHR

2515 Telequana Drive
Anchorage, AK  99517                                    (907) 223-9836
                                                        (907) 248-5647 Fax


## RATE SCHEDULE
## (Effective January 2004)


| | |
|---|---|
| Initial Discussion with counsel (up to one hour) | No Charge |
| Review of documents, meetings with counsel, preparation for trial | $225/hour |
| Deposition and Testimony Time | $275/hour |

EXHIBIT  B
Page 4 of 4

List of Cases
Bob Lohr & Associates

| 2003-2005 Case | Attorney | Law Firm |
|---|---|---|
| **Peter v. Progressive** | **Zipkin** | **Guess & Rudd** |
| **Sims v. Allstate** | **Weinstein** | **Sonnenschein** |
| **Truong v. Allstate** | **Bienstock** | **Steptoe & Johnson** |

**Bold = opinion offered**
**Bold = deposed**

200148

EXHIBIT C
Page 1 of 1

USA vs. CONTINENTAL
DOCUMENTS REVIEWED

## **VOLUME 1**

1) Letter from McCarty to King (CNA000543-548)
2) Letter from King to McCarty (BBHC 001281)
3) Letter from Hutson to Stewart (CNAOO54O-541)
4) Letter from Stewart to Hudson (CNA000534-538)
5) Letter from Hutson to Kurtz (BBHC 001231-1234)
6) Initial File Recap(CNA000S16-523)
7) Letter from Hutson to Kurtz (BBHC 001229-1230)
8) Letter from Hutson to Browne (BBHC 001228)
9) Memo from Ertle to Hutson (BBHC 001224-1225)
10) Memo from Hutson to Ertle (CNAQQ493-495)
11) Letter from Stewart to Hutson (CNAOO4B9-492)
12) Letter from Hutson to Stewart (BBHC 01204)
13) Wilsons State Court Complaint (BBHC 001782-001786)
14) Letter from P. Grover to G. Thogerson & Office of General Counsel, DHHS
    (CNA00625-627)
15) Letter from Stewart to Hutson (CNA00482-483)
16) Memo from Ertle to Hutson (CNAOO4G8-470)
17) Letter from Hutson to Friderici (CNA000476-477)
18) Letter from Friderici to Hutson (CNA 000471-475)
19) Letter from Friderici to Hutson (CNAOO461-463)
20) Letter from Hutson to Clark (CNA000466-467)
21) Letter from Friderici to Office of General Counsel, DENS (CNAOO621-00622)
22) order (CNA00842-843)
23) Summons and Complaint (A271-A278)
24) Letter from Stewart to Roosa (A117-I18)
25) Letter from Stewart to Roosa (AllS)
26) Letter from Roosa to Lori Wing (CNA 00336-00338)
27) Fax from McCarty to King (BBHC 1150)
28) Fax from McCarty to Hutson (BBHC 1149)
29) Letter from Friderici to Hutson (CNAOOS62-566)
30) Letter from Roosa to Lori Wing (CNA 00339)
31) Letter from Friderici to Roosa (EEl-IC 001137-1138)
32) Letter from Friderici to Hutson (CNA 000569-570)
33) Letter from Friderici to Roosa (CNA 000340-341)
34) Third Party Complaint (CNA000844-846)
35) Letter from Hutson to Friderici (BBHCOO112S)
36) Letter from Friderici to Hutson (CNA 000571-000573)
37) Letter from Stewart to Friderici (CNA 00576-578)
38) Letter from Friderici to Stewart (CNA00426—427)
39) Letter from Stewart from Friderici (CNA000574-575)

Exhibit 4

Page 36 of 39 pages

200149

EXHIBIT D
Page 1 of 4

40) Letter from Friderici to Stewart (CNA00579-580)
41) Letter from Roosa to Friderici (CNA 00342-345)
42) Letter from Friderici to Hutson (CNA 00623-624)
43) Letter from Friderici to Roosa (A57) (BBHC 01102)
44) Letter from Hutson to Richardson (BBHC 001837)
45) Letter from Roosa to Hutson (CNA000347-348)
46) Letter from Hutson to Roosa (BBHC 001514)
47) Handwritten notes (BBHC 01866)
48) Email from Hutson to Ragan (BBHC 001752)
49) Letter from Taylor to Friderici (BBHC 001825)
50) Letter from Friderici to Taylor (CNA 000414-416)
51) Letter from Roosa to Taylor (CNA 000350-000352)
52) Letter from Taylor to Roosa (BENt 001518)
53) Letter from Roosa to Taylor (BBHC 001816)
54) Memo from Greene to Garrett (BBHC 001814)
55) 4/28/97 email from Garrett to Faccenda (EEI-IC 001798)
56) Letter from Luce to Roosa (CNA 000355-367)
57) Fax from Roosa to Faccenda (CNA 00354)
58) Letter from Roosa to Stowers (A606)
59) Letter from Stowers to Faccenda (CNA000249-261)
60) Letter from Stowers to Roosa (CNA 000368-000376)
61) Stipulation for Compromise Settlement Pursuant to 28
    U.S.C. Sec. 2677 (CNA 000377-383)
62) Summons and Complaint
63) Letter from Roosa to Schwab (CNA 1391)
64) Letter from Treptow to Roosa (CNA 1406-1407)
65) Letter from Treptow to Roosa (1421-1423)
66) Handwritten notes from unknown author (BBHC 001679)
67) Handwritten notes from unknown author (BBHC 001759)
68) Handwritten notes from unknown author (EBHC 001756)
69) CNA's File activity report (BEE-IC 001287-1318)
70) Policy - HMA 9500648-5 (9/30/93-94) (version produced by CIC)
    (BBHC 000129-168)
71) 93 CBP 06114933-93 (9/30/93-94) and HMA 9500648-5 (9/30/93-94) (version
    produced by USA) (A2315-2391)

## VOLUME TWO

-Second Amended Complaint
- USA Initial Disclosures
- Continental's Initial Disclosures
- Sedwick's Orders of
  9/4/01
  9/18/01
  6/28/02
  3/28/03

Exhibit 4

Page 32 of 39 pages

200150  EXHIBIT D
        Page 2 of 4

- 2 -

7/08/05
- Decision from Ninth Circuit dated 10/20/04
- Letter from Craig Stower's, 6/19/1997, to Ken Rosa regarding reason for rejecting
  tender of defense
-  ACE Supreme Court Decision
-  Weiford Supreme Court Decision
-  Great Divide Supreme Court Decision
-  Hillman Supreme Court Decision
-  Indian Country Article on Compacting
-  Deborah Senn Report


## VOLUME 3

Bristol Bay Key Documents 1-96 (see detail)

## VOLUME 4

Bristol Bay Key Documents 97-143 (see detail)

## VOLUME 5

- Bobo Dean Deposition and exhibits
- Clark Deposition and exhibits

## VOLUME 6

- Padgitt Deposition w/o exhibits
-Wing Deposition w/o exhibits
-Hartshorn Deposition with exhibits

## VOLUME 7

- Richardson Deposition with exhibits
- Lamb Deposition w/o exhibits
- Crystal Brown Deposition w/o exhibits

## VOLUME 8

-Deborah Wyatt Brown Deposition and exhibits

## VOLUME 9

- Huston Deposition and exhibits
- Baur Deposition and exhibits
- Finn Deposition with exhibits

Exhibit 4
Page 38 of 39 pages

200151

EXHIBIT D
Page 3 of 4

**OTHER DOCUMENTS**

-Supreme Court Decisions
-Statutory Language
-NAIC Annual Statements for Continental Insurance Company
-NAIC Profitability Data for Alaska
-Deposition of Kenneth Roosa
-Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 24 (Texas 1994)

Exhibit 4  of 32  pages

EXHIBIT _D_
Page _4_ of _4_

200152