DEBORAH M. SMITH
Acting United States Attorney

RICHARD L. POMEROY
Assistant U.S. Attorney
222 West Seventh Avenue, #9
Anchorage, Alaska 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: richard.pomeroy@usdoj.gov

RICHARD R. STONE, SR.
Trial Attorney
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C. 20044
Phone: (202) 616-4291
Fax: (202) 616-5200
E-mail: richard.stone@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>   v.<br><br>THE CONTINENTAL CASUALTY COMPANY, dba THE CONTINENTAL INSURANCE COMPANY,<br><br>       Defendant. | Case No. 3:98-cv-285-JWS<br><br>**UNITED STATES' OPPOSITION TO CONTINENTAL CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT AT DOCKET 237; AND MOTION TO AMEND COMPLAINT** |

INTRODUCTION

Continental Casualty Company's Motion for Summary Judgment is based on three

unpersuasive arguments.  First, Continental Casualty asserts that because it was not a party to the

1993 insurance policy between Bristol Bay and Continental Insurance Company, it cannot be liable for its subsequent bad faith acts in breach of that contract. Dkt. 237 at 2. Second, Continental Casualty argues that there is no evidence supporting liability under an "alter ego" theory. Id. at 2. Finally, it argues that the United States did not adequately plead an "alter ego" liability theory in its complaint. Id. at 2-3.

Regardless of whether Continental Casualty was a party to the original contract, Continental Casualty cannot escape liability for the numerous bad faith acts performed by Continental Casualty employees while acting in the scope of their employment and controlling every aspect of the contract and this litigation to the exclusion of Continental Insurance. The thrust of Continental Casualty's argument is that it cannot be held liable for bad faith in its current handling of contracts that were entered into by Continental Insurance before the companies merged. Continental Insurance, however, now has no employees. Only Continental Casualty personnel manage anything for Continental Insurance. If Continental Casualty were correct, it would be able to manage all preexisting contracts for Continental Insurance in bad faith and not be subject to punishment for bad faith. At least since 1995, Continental Insurance has had no employees of its own; and, because every act performed under the label of Continental Insurance has been done by employees -- including directors and officers -- of Continental Casualty, it is liable for such acts pursuant to the "mere instrumentality" and the "alter ego" doctrines. Finally, the United States has provided Continental Casualty adequate notice of its claims and liability theories in accordance with the liberal notice pleadings requirements of the Federal Rules of Civil Procedure. Continental Casualty has been a defendant since the first complaint was filed. It is sued as "doing business as" Continental Insurance which

U.S. v. Continental
Case No. 3:98-cv-285-JWS          2

it is now certain is completely accurate. Further, Continental Casualty has controlled every

aspect of this litigation and cannot claim that it has not been on notice of all issues. Regardless,

the United States hereby affirmatively moves to amend its complaint to ensure that it has alleged

the bad faith acts that have arisen since the United States' Second Amended Complaint was filed

and has alleged that Continental Insurance is a mere instrumentality or alter ego of Continental

Casualty having no employees of its own and being fully controlled in every aspect by

Continental Casualty.

## BACKGROUND

### (I)    Facts and Issues Related to The United States' Numerous Tenders of Defense and Continental Casualty's Bad Faith Denials of Those Tenders

Continental Insurance Company and Bristol Bay entered into an insurance policy on

September 30, 1993, which lasted for a term of one year. Dkt. 57 at 3.

On October 14, 1994, Lori Wilson filed suit against the United States under the Federal

Tort Claims Act (FTCA) after suffering serious injuries when Blanche Kallstrom, a visitor to

Bristol Bay Area Health Corporation's (BBAHC) Alcohol Transition Center, "accidentally gave

[Ms. Wilson] a glass of commercial strength dishwashing liquid to drink when Wilson asked for

some juice." Dkt. 57 at 3. The United States moved to add Ms. Kallstrom as a third-party

defendant, whereupon she brought a counterclaim against the United States for negligent

infliction of emotional distress. Id. at 4. The United States first tendered defense of the Wilson

claims to Continental Insurance Company on January 6, 1995. Id. at 4.

In May 1995, "Continental Casualty and Continental Insurance became corporate

affiliates." Dkt. 237 at 3. From that time on, "all the [Continental Insurance] employees

U.S. v. Continental
Case No. 3:98-cv-285-JWS                3

[became] Continental Casualty Company employees," and the business of Continental Insurance was conducted and managed solely by employees of Continental Casualty. Exhibit 1, Finn Dep. at p. 46 lns. 18-22; p. 47 lns. 1-11; Exhibit 2, Boysen Dep. at p. 42 & Ex. 2, p. 8.

On June 6, 1995, the United States again tendered defense of the Wilson claims. On October 3, 1995, that tender was rejected. On February 20, 1997, the United States tendered defense of the Wilson claims for a third time, this time to CNA Healthpro, a successor to Continental Insurance. Dkt. 57 at 4. CNA Healthpro was not a "legal entity"; like Continental Insurance, it had no employees of its own; and, all of the work conducted in its name was done by employees of Continental Casualty. Exhibit 2, Boysen Dep., at p. 41 lns. 1-18. Ray Faccenda, an employee of Continental Casualty, had "primary responsibility for analyzing and responding to the United States' re-tender in 1997 of the claims brought by the Wilsons." Dkt. 235 (Faccenda March 7, 2006, affidavit). Mr. Faccenda hired attorney Craig Stowers to "assess the merits of the United States' claims." Id. The United States' tender to CNA Healthpro was rejected on June 19, 1997. Dkt. 57 at 4. The United States settled all claims with Ms. Wilson on August 28, 1997. Id.

On February 12, 1998, the district court dismissed Ms. Kallstrom's counterclaim against the United States, and she appealed to the Ninth Circuit. Dkt. 57 at 4-5. On July 8, 1998, the United States tendered defense of the Kallstrom counterclaim to Continental Casualty. Dkt. 228, Ex. 1.

On August 14, 1998, the United States filed the instant suit naming and serving defendants "CNA Financial Corporation and The Continental Casualty Company, dba The Continental Insurance Company." The complaint alleged "five claims for denial of coverage, failure to

U.S. v. Continental
Case No. 3:98-cv-285-JWS                    4

defend, bad faith, breach of the implied covenant of good faith and fair dealing, and unfair claims settlement practices." Dkt. 57 at 5.

On September 18, 2001, while the Kallstrom counterclaim against the United States was still pending, this Court ruled that the United States was "an additional implied insured entitled to the benefits of the relevant insurance policy," and that "Continental['s] repeated[] fail[ures] to accept tenders from the United States Continental" constituted acts of bad faith. Dkt. 61 at 9-10.

On October 30, 2001, United States counsel, Kenneth Roosa, retendered the Kallstrom claims, referencing "Judge Sedwick's ruling of September 18, 2001." Dkt. 227, Ex. 1. At least as of October 30, 2001, Erin M. Finn, Esquire, was an employee of Continental Casualty. Exhibit 1, Finn Dep. at p. 9 lns. 17-19. She was assigned to manage the litigation involving the United States' tenders of the Wilson and Kallstrom claims. Id. at p. 29 lns. 13-16. Her responsibilities included deciding whether to accept the United States' tenders pursuant to those claims. Id. at p. 34 lns. 12-18. Also sometime in October 2001, Continental retained the law firm of Dorsey & Whitney, and Ms. Finn began working with attorney John Treptow. Id. at p. 15 lns. 15-18; p. 16 lns. 19-20. According to Ms. Finn, she and Mr. Treptow discussed potential logistical consequences "if Continental Casualty Company were to accept the tender of defense of Kallstrom." (Emphasis added) Id. at p. 17 lns. 4-7. In addition, according to Ms. Finn, she "gave Dorsey & Whitney a list of . . . Continental Casualty approved counsel" to "determine if someone would be interested in taking on the defense of the United States." (Emphasis added) Id. at p. 17 lns.16-21.

Ms. Finn acknowledged that she was aware of this Court's September 18, 2001, finding that the United States was insured by Continental under the policy. Id. at p. 37 lns. 3-9. She

U.S. v. Continental
Case No. 3:98-cv-285-JWS                    5

stated, however, that "[e]ven in light of that [Court decision], there were coverage issues to be examined, because my understanding, Continental Casualty's understanding at the time was the only claim Kallstrom had was for emotional distress," and whether such damages were covered under the policy was "still an issue." (Emphasis added) Id. at p. 18 lns. 3-9. Ms. Finn also testified that she was aware of Mr. Roosa's October 30, 2001, retender letter, and that "there was no question in [her] mind that the United States was again retendering the Kallstrom case." Id. at p. 29 lns. 17-22; p. 30 lns. 1-20. Nevertheless, neither Ms. Finn, Mr. Treptow, nor anyone else on behalf of Continental Casualty or Continental Insurance ever accepted Mr. Roosa's October 30, 2001, retender of the Kallstrom claims. Id. at p. 34 lns. 12-18; p. 24 lns. 9-12.

## (II)   This Court's January 6, 2003, Order Concerning Discovery Requests Based on Theories of "Mere Instrument" and "Alter Ego"

On September 26, 2002, the United States served interrogatories on Continental Casualty Company seeking, among other information, the financial worth of CNA. *See* Dkt. 98, Ex. A ("Interrogatories").

On November 12, 2002, Continental Casualty Company moved for a protective order, asserting that the interrogatories improperly sought information concerning the financial worth of CNA, which at that point had been dismissed as a party to the action. Dkt. 98. Continental Casualty Company argued that, (i) before such information was discoverable, the United States first had to demonstrate that "the subsidiary was a 'mere instrument' or 'alter ego' of the parent corporation" and that, (ii) even if such a showing was made, Alaska law prohibits such discovery unless and until there is a determination that the plaintiff is entitled to punitive damages. Dkt. 101 at 4-5.

On January 6, 2003, this Court rejected both of Continental Casualty's arguments, and

required Continental Casualty to answer the interrogatories concerning CNA's financial worth.

Id. at 10.[1]  Regarding the applicability of the "Mere Instrument or Alter Ego" doctrine, this Court

stated that:

> The parties agree that, in general, a non-party parent corporation's finances are not relevant
> in assessing punitive damages against a subsidiary except where it is shown that the
> subsidiary was a 'mere instrument' or 'alter ego' of the parent corporation or that the parent
> corporation was aware of the misconduct. [citing *McCormick v. City of Dillingham*, 16
> P.3d 735, 744 (Alaska 2001); *Jackson v. General Electric Co.*, 514 P.2d 1170, 1172, 1173
> (Alaska 1973)].  The dispute here concerns the point at which the government must make
> this showing.  Continental argues that it must be shown before it can seek discovery.  The
> government, on the other hand, explains that there is evidence of such relationship and,
> furthermore, the materials it seeks might establish such a relationship.
>
> In this case, the government has the better argument.  The federal discovery rules do not
> require that the United States show the relationship; under the rules, the government need
> only show that its request is reasonably calculated to lead to admissible evidence.  The
> government has adequately demonstrated that the discovery requested might lead to
> admissible evidence concerning the relationship between CNA and Continental in light of
> the prior communications. [Citations omitted].

Dkt. 101, at 5.

Accordingly, the United States served on Continental Casualty Company a notice of

deposition of a 30(b)(6) witness(es), and Continental Casualty Company designated Lawrence

Boysen and Erin Finn to respond to the United States' notice.  Mr. Boysen was deposed on

November 1, 2005, Ms. Finn on November 8, 2005.  As will be seen below, their depositions

---

[1]  This Court granted the protective order "insofar as the request seeks discovery from
CNA," at that time a non-party, noting that the United States had previously communicated to
Continental Casualty Company "that 'this discovery does not apply to CNA' and explain[ed] that
it seeks only that information that Continental has or has access to 'related to CNA.'" Id. at 4 and
n.11.

establish for the first time in this case proof that the Continental Insurance Company has no employees and that Continental Casualty performs all physical acts for Continental Insurance using Continental Casualty employees.

**(III)  The Structural Relationship Since 1995 Between Continental Casualty and Continental Insurance**

According to Mr. Boysen, since 1995, Continental Insurance (as well as CNA Healthpro) has had no employees of its own, but rather is operated solely by employees of Continental Casualty Company.  Exhibit 2, Boysen Dep. at p. 42 lns. 3-13 & Ex. 2, p. 8.  In fact, Mr. Boysen himself is the "senior vice president and corporate controller" of Continental Insurance Company, while at the same time he is "an employee of Continental Casualty Company." Id. at p. 9 lns. 15-20.  Mr. Boysen also testified that, since 1995, Continental Casualty's officers and directors hold the same positions at Continental Insurance.  Id. at p. 56 lns. 1-4.

Further, while Mr. Boysen claimed that financial accounts and records corresponding to Continental Insurance Company do exist, he acknowledged that such accounts are maintained solely by Continental Casualty employees.  Id. at p. 45 lns. 9-22; p. 46 ln. 1; p. 92 lns. 6-18.  For example, Continental Casualty employees write checks on Continental Insurance Company bank accounts.  Id. at p. 45 lns. 6-9.  And, when Continental Insurance receives premiums, Continental Casualty employees make all decisions regarding how to invest them.  Id. at p. 92 lns. 6-18.

Without trying to state every way that Continental Insurance must function solely through Continental Casualty's employees, some examples are instructive.  Regarding day to day operations, employees of Continental Casualty design and price the insurance products sold by Continental Insurance.  Id. at p. 88 lns. 1-8.  Employees of Continental Casualty perform the

underwriting activities on behalf of Continental Insurance. Id. at lns. 10-18. Employees of

Continental Casualty "develop[] the sales strategy for products sold by Continental Insurance."

Id. at p. 89 lns. 5-17. Employees of Continental Casualty process[] and adjust[] claims for

insurance products sold by Continental Insurance." Id. at p. 89 lns. 18-22. They also "train[] the

sales force to sell insurance products sold by Continental Insurance." Id. at p. 93 lns 16-22; p. 94

lns. 1-5. Finally, even when Continental Insurance employs third parties to "write policies,

receive premiums from insureds, [or do anything else] that Continental Insurance Company

would have to do to operate as a company," the corresponding contractual agreements with the

third parties are authorized by officers of Continental Casualty. Id. at p. 86 lns. 1-22; p. 87 lns.

1-3.

On November 22, 2005, Deborah Senn, a former two-term Washington State Insurance

Commissioner, authored an expert report evaluating, among other things, insurance regulatory

standards (as defined by the National Association of Insurance Commissioners) and the conduct

of the employees of Continental Casualty. In doing so, Ms. Senn analyzed the corporate structure

of and relationships between CNA Financial Corporation, Continental Casualty, and Continental

Insurance. Ms. Senn concluded that "Continental Insurance Company [CIC] is a corporate shell

created, maintained and 100% owned by Continental Casualty Company [CCC]. Together they

comprise a unified insurance business enterprise. CIC has no employees - none. CCC designs

and markets the insurance products sold under the CIC label. CCC performs the underwriting

(decides who gets insurance). CCC receives premiums and invests money on behalf of CIC . . . .

CCC acts as the claims adjustor for CIC insureds. CCC negotiates insurance pooling agreements

on behalf of CIC. . . . Bad faith arises from human activity. Employees of CCC and contractors

retained by CCC personnel performed all of the acts, or today are responsible for all of the acts, described in this report. CCC provides business and legal leadership, training, and supervision for all of its employees and agents." Exhibit 3, Excerpt of Senn Expert Report at 3.

## LEGAL STANDARD

As this Court stated in its September 4, 2001, Preliminary Order, "summary judgment should be granted if there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact. [Citations omitted]. The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact. [Citation omitted] . . . All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant." [Citations omitted]. Dkt. 57, at 10-11.

## ARGUMENT

Continental Casualty's Motion for Summary Judgment is based on several unsupported arguments. First, Continental Casualty asserts that "'bad faith' stems from the breach of a covenant of good faith and fair dealing," and cannot occur "without a contract because the duties which are owed are owed only by the parties." Dkt. 237 at 2. Because, according to Continental Casualty, "the only contract at issue is an insurance policy between Bristol Bay and The Continental Insurance Company," not Continental Casualty, "there can be no bad faith liability" on the part of Continental Casualty. Id.

Next, Continental Casualty argues that it "is [not] liable under an alter ego theory" because "there is no evidence that Continental Insurance is a sham corporation or any evidence why the

U.S. v. Continental
Case No. 3:98-cv-285-JWS                    10

veil between the two companies can or should be pierced," and because the "government has not even alleged, let alone proven, that Continental Casualty is liable" under an alter ego theory. Id. at 2-3.

However, that Continental was not originally a party to the insurance policy involving Bristol Bay should not permit it to retain its distance and lack of privity when it takes over the contract to the exclusion of its subsidiary and acts as, and to the exclusion of, the original contracting party in handling litigation arising out of that contract. Claims of "bad faith" arise from human conduct - - here, that of Continental Casualty employees improperly rejecting the United States' numerous tenders without any independent input from any Continental Insurance employee. Just as all employers are responsible for acts of their employees acting within the scope of employment, so too is Continental Casualty liable for its employees' repeated and improper failures to accept the United States' tenders. Indeed, the most recent of those improper and bad faith failures occurred when Ms. Finn, while working for Continental Casualty, failed to promptly accept the tender or give reasonable notice why Continental Casualty would not do so after October 30, 2001. Dkt. 228. Continental Insurance, having no employees and therefore no voice in the decision, could not prohibit Ms. Finn from acting in bad faith regarding that tender. The United States has moved for summary judgment regarding that bad faith. Dkt. 228.

Continental Insurance is nothing more than a "mere instrumentality" or an "alter ego" of Continental Casualty. Continental Casualty, as well as Continental Insurance, is liable for the bad faith acts of their employees who have had sole authority to act with respect to this contract, whether the acts were performed under the label of Continental Insurance or Continental Casualty. The companies are one and the same regarding this contract, but each has had

U.S. v. Continental
Case No. 3:98-cv-285-JWS                11

employees that have acted in bad faith while the company that employed them acted as, or like, a party to the contract.

Finally, because the liberal "notice pleading" rules require only that parties' be given notice of the claims against them, Continental Casualty's argument that it should be dismissed from this action because the United States' pleadings were insufficient is disingenuous at best; indeed, the United States' complaint provided Continental Casualty more than adequate notice of the United States' claims, as evidenced by Continental Casualty's Motion for a Protective Order raising the "alter ego" doctrine and by this Court's January 6, 2003, ruling addressing that issue in particular. Additionally, since the discovery has been obtained, as of November 2005, plaintiff has accumulated sufficient evidence to show that Continental Casualty has treated Continental Insurance as a mere instrumentality and "alter ego."

### 1.   Continental Casualty is Liable for the Conduct of its Employees While Acting To Manage Litigation Arising out of the Contract and While Excluding Continental Insurance from Decisions About that Activity.

Assuming that a bad faith claim does "stem[] from the breach of a covenant of good faith and fair dealing," and cannot occur "without a contract," Continental Casualty acknowledges that here there is such a contract: originally "an insurance policy between Bristol Bay and The Continental Insurance Company." The Ninth Circuit and this Court hold that the United States is an insured under that contract. Even though Continental Casualty was not an original party to that insurance policy, Continental Casualty should still be liable for the bad faith acts of its own employees' who subsequently failed to accept tenders pursuant to the policy when managing the contract as if Continental Casualty were the party and to the exclusion of the original party insurer to the contract. Continental Casualty has stepped into the shoes of Continental Insurance,

U.S. v. Continental
Case No. 3:98-cv-285-JWS                 12

creating its own contractual relationship with the insured and affirmatively displacing the original

party insurer that it wholly owns.[2]  Indeed, the United States' "bad faith" claims are based on acts

and/or failures to act that occurred in large part <u>after</u> that policy's effective period.  In fact, all but

one of the improper rejections of the United States' tenders, most of which this Court has already

found constitute bad faith, occurred <u>after</u> May 1995 when Continental Casualty through its

30(b)(6) witnesses admits that its employees, and only its employees, operated, managed and

controlled Continental Insurance. This includes, according to Ms. Finn and Mr. Faccenda,

deciding whether to <u>accept or reject the United States' tenders</u>.  Thus, because the employees of

Continental Casualty continuously improperly denied the United States' tenders, Continental

Casualty should be liable for that conduct just as Continental Insurance would have been if it had

acted in bad faith while managing the policy as the original party when it had employees.

Continental cannot claim that it has no contractual relationship with the government if it has

---

[2]    Alaska courts have "adopted the Restatement (Second) of Agency [] rule that an employer will be held liable for both negligent and intentional torts of its employee, if the employee 'is acting within the scope of his employment.'" *Taranto v. North Slope Borough*, 909 P.2d 354, 358 (Alaska 1996), citing *Williams v. Alyeska Pipeline Service Co.*, 650 P.2d 343, 349 (Alaska 1982) (citing Restatement (Second) of Agency §245 (1958)).  Alaska courts also consider the factors listed in the Restatement when deciding whether an employee was "acting within the scope of his employment":

    (I) the conduct "is the kind he is employed to perform";
    (ii) the conduct "occurs substantially within the authorized time and space limits";
    (iii) the conduct was "actuated, at least in part, by a purpose to serve the master"; and
    (iv) "if force is intentionally used by the servent against another, the use of force is not unexpectable by the master."

*Taranto*, 909 P.2d at 358, citing Restatement (Second) of Agency §228 (1958).  Continental Casualty should be held liable for the acts of its employees performing the <u>original</u> insurer's responsibilities under the contract just like any insurer would be liable, especially when Continental Casualty has excluded Continental Insurance from the process and taken it over.

U.S. v. Continental
Case No. 3:98-cv-285-JWS                    13

displaced the original contracting insurer for the purpose of stonewalling the United States'

tenders. *See* Dkt. 237 at 4-5. Continental Casualty should be estopped from such claims.

Also, the United States here is not bringing an action against a third party to the contract as

Continental Casualty argues. *See* Dkt. 237 at 5-6. Continental Casualty's actions, it is now clear,

place it in the contract as a party to the exclusion of Continental Insurance. Further, Continental

Casualty is being pursued in its own right as a bad faith actor in the instant case, not exclusively

to get indirect liability for any "conduct of its late-acquired subsidiary." *See* Dkt. 237 at 6-19.

Both parties are responsible for the actual and for the punitive damages in this case and they can

apportion the damages among themselves.

Under Continental Casualty's reasoning, it could never be held responsible for bad faith of

its employees on any contract that Continental Insurance entered into before the merger. Since

Continental Insurance no longer has employees, it has no one to physically act in bad faith. This

would leave Continental Casualty free to act in any dastardly way that it desired toward insureds

regarding these Continental Insurance policies without recourse to punishment by those insureds.

Other courts have recognized the potential for abuse of the parent/subsidiary relationship

among acquiring insurers and the obviously unfair results that may be obtained by parent-

subsidiary structures similar to that of Continental Casualty and Continental Insurance. In

*Farmers Group, Inc., v. Trimble*, 768 P.2d 1243, 1247 (Col.Ct.App. 1988), overruled on other

grounds, *Goodson v. American Standard Ins. Co. Of Wisconsin*, 89 P.3d 409 (Colo. 2004), the

court held that, because Farmers Group, Inc. was the "management company for all of its

subsidiary and affiliated insurance companies," and accordingly "hired the claims adjustors and

maintained and managed the claims office . . . . [,] strict adherence to the general rule that liability for bad faith breach may be imposed only against a party to an insurance contract would permit Farmers to shield itself from liability through the device of a managements company and would deny defendant recovery from the party primarily responsible for his damages." Consequently, that court found Farmers Group, Inc. liable for bad faith breach even though it had not been a party to the underlying coverage contract. Id. Similarly, in *Delos v. Farmers Ins. Group, Inc.*, 93 Cal.App.3d 642, 652 (Cal.Ct.App. 1979), the court found Farmers Insurance Group, Inc. liable for bad faith breach of an insurance coverage contract to which it was not a party even though "for legitimate business considerations, the Group was formed to render management services for [its affiliates] for which it received a percentage of premiums paid by" the affiliates. The court reasoned that "[i]f we were to accept the Group's argument and adhere to the general rule that 'bad faith' liability may be imposed only against a party to an insurance contract, we would . . . permit the insurer to insulate itself from liability by the simple technique of forming a management company, but we would also deprive a plaintiff from redress against the party primarily responsible for damages." Id.

For the same reasons, regardless of whether the corporate relationship between Continental Casualty and Continental Insurance was formed for "legitimate business considerations," when Continental Casualty took over management, operations, and total control of Continental Insurance, including deciding whether or not to accept the United States' tenders, Continental Casualty operated a scheme to reject tenders in bad faith and attempt to shield itself from liability otherwise created by those bad acts. As in *Trimble* and in *Delos*, the United States would be

"deprive[d] . . . redress against the party primarily responsible for damages" if Continental

Casualty were to prevail on these contentions.[3]

### 2. Continental Casualty Also Should be Liable for Acts Performed Under the Label of Continental Insurance Because Continental Insurance is a "Mere Instrumentality" or "Alter Ego" of Continental Casualty

"There are a number of well-recognized exceptions to the rule that ordinarily the parent

corporation will not be held liable for the wrongs of its wholly-owned subsidiary." For example,

a "parent corporation may [] be liable for the wrongful conduct of its subsidiary when the

subsidiary is the mere instrumentality [or "alter ego"] of the parent. Liability is imposed in such

instances simply because the two corporations are so closely intertwined that they do not merit

treatment as separate entities." *Jackson v. General Electric Co.*, 514 P.2d 1170, 1172-73 (Alaska

1973).

Alaska courts consider various factors when deciding whether to "pierce the corporate veil"

and hold parent corporations liable for the acts of their subsidiaries. For example, courts

consider whether the "parent and subsidiary corporations have common directors or officers,"

whether the "subsidiary has substantially no business except with the parent corporation," and

whether the "directors or executives of the subsidiary do not act independently in the interest of

the subsidiary but take their orders from the parent corporation." *Jackson*, 514 P.2d at 1173. Not

---

[3] Continental states: "Even Ms. Senn, the Government's expert, admits that there is no evidence that Continental Insurance was structured to avoid liability." Dkt. 237 at 9, n. 16. However, Continental does not quote far enough. Ms. Senn also stated that "My experience is, I have seen companies that have created shells and isolated assets to avoid punitive damages, and I would hope that that would not happen in this case." Senn dep. At 117. Continental Casualty has through its motion now demonstrated that it has set up this scheme to avoid punitive damages when its employees who solely operate Continental Insurance act in bad faith.

all of the factors must be present "to conclude that the subsidiary is the mere instrumentality of

its parent. However, these factors all are present in the instant case. A parent corporation that

does not permit its subsidiary to exercise an individual status may not expect that the subsidiary's

independence will be recognized elsewhere." *Jackson*, 514 P.2d at 1173.

In support of its argument that Continental Insurance is more than a "mere instrumentality,"

Continental Casualty asserts: "[t]here is no evidence that Continental Insurance is

undercapitalized;" Continental Insurance "has its own bank accounts" and its "own books and

records;" also "[t] here is [] no evidence that Continental Insurance has failed to follow the

formal requirements of a corporation;" "[t]here is no evidence that Continental Insurance only

does business with its parent company;"[4] nor is there any evidence "that it has not paid its taxes

or filed appropriate corporate papers."[5] Dkt. 237 at 8-9. All of Continental Casualty's claims

concerning the purported independent entity named Continental Insurance, however, involve

mere formalities, and are completely devoid of any substantive evidence that Continental

Insurance actually "exercise[s] an individual status," as required by *Jackson*. Moreover, nowhere

---

[4] This claim is particularly remarkable considering the uncontested fact that Continental Insurance has no employees and thus cannot possibly do any business without Continental Casualty conducting that business.

[5] Continental Casualty also claims that "[t]here is no evidence that Continental Insurance's creditors are disadvantaged or that it is close to insolvency" nor "evidence that Continental Insurance has been used to defeat public convenience, justify wrong, commit fraud, or defend crime." Id. To the contrary, however, the Continental Casualty-Continental Insurance corporate relationship is right now being "used to . . . justify wrong," *i.e.*, Continental Casualty is attempting to use that corporate relationship to avoid liability for bad faith acts that its personnel clearly performed. Regardless, as the *Delos* court found, whether or not the deliberately formed corporate structure was intended for "legitimate business considerations" is not relevant to "alter ego" liability analysis. (Emphasis added)

does Continental Casualty even acknowledge, much less address, the fact most demonstrative of Continental Insurance's true status - - that Continental Insurance has no employees, and that, consequently, every single act in the name of Continental Insurance is performed by employees of Continental Casualty. As a result, even the factual assertions cited above that supposedly support Continental Insurance being an independent corporation, are completely dependent on Continental Casualty employees. Indeed, Continental Casualty's entire argument, just like Continental Insurance's entire existence, is based on form only, and completely lacks any substance whatsoever. Continental is clearly nothing more than a shell created out of mere formalities.

Any fair evaluation of the Continental Casualty-Continental Insurance corporate relationship demonstrates that Continental Insurance is no more than a "mere instrumentality" of Continental Casualty. At least as of May 1995, every single person named as an officer or director of Continental Insurance was also an officer or director of Continental Casualty. In fact, also as of that date, Continental Insurance had no employees whatsoever - - all of the business in the name of Continental Insurance was conducted and managed solely by employees of Continental Casualty. For example, regarding the day-to-day operations of Continental Insurance, Continental Casualty employees designed and marketed all insurance products sold in the name of Continental Insurance, Continental Casualty employees performed all underwriting done in the name of Continental Insurance. Continental Casualty employees received and invested all premiums in the name of Continental Insurance. Continental Casualty employees acted as claims adjustors in the name of Continental Insurance. And, Continental Casualty

employees negotiated all insurance pooling agreements in the name of Continental Insurance.

Even when third parties are employed to "write policies, receive premiums from insureds, [or

anything else] that Continental Insurance Company would have to do to operate as a company,"

all corresponding contractual agreements with the third parties are authorized by Continental

Casualty officers.

With respect to Continental Insurance's financial records, while "accounts" in the name of

Continental Insurance Company may exist in form, all such "accounts" are maintained solely by

Continental Casualty employees. Moreover, and particularly significant in this case, employees

of Continental Casualty, such as Mr. Faccenda and Ms. Finn, make the decision whether to

accept or reject defense tenders made pursuant to insurance policies to which Continental

Insurance was a party. And, since Continental Insurance has no employees, it can't evaluate or

challenge any decisions regarding tender rejections (or anything else for that matter), even if, as

in this case, such decisions rise to the level of bad faith.

Finally, and not surprisingly -- considering that Continental Insurance simply cannot do

anything because it has no employees -- even the attorneys in this lawsuit must have been hired

by Continental Casualty, and must try to represent the interests of both Continental Casualty and

Continental Insurance simultaneously. *See* Dkt. 232, at ¶ 1, Affidavit of Gregory G. Silvey. If,

as Continental Casualty now claims, Continental Insurance was in fact an independent entity (in

substance rather than merely in form), it would be in Continental Insurance's interest (although

obviously not in Continental Casualty's) to oppose this very motion. Indeed, Continental

Insurance might argue that, because Continental Casualty operates, manages, and completely

U.S. v. Continental
Case No. 3:98-cv-285-JWS            19

controls all business conducted by Continental Insurance, and because at least all but one of the bad faith acts were committed by Continental Casualty employees, this is not the typical "alter ego" situation where both parent and subsidiary are held liable, but rather, here, only Continental Casualty should be liable for the bad acts of its own employees.[6]  However, because Continental Insurance in fact does <u>not</u> "exercise an individual status" and <u>cannot</u> act independently of Continental Casualty, Continental Insurance also <u>cannot</u> take such legal positions contrary to the interests of Continental Casualty.

Indeed, as Ms. Senn correctly concluded in her expert report, Continental Insurance is nothing but a "corporate shell," and has been since May 1995.  Unlike in *Jackson*, where "a substantial amount" of the subsidiary's business was done with companies other than its parent, Continental Insurance <u>has done no such business whatsoever</u>.  Continental Casualty simply has not permitted Continental Insurance "to exercise an individual status [and] may not expect that [Continental Insurance's] independence will be recognized elsewhere."  Thus, because Continental Insurance has existed and still exists only as a "mere instrument" for Continental Casualty, the two companies do not "merit treatment as separate entities" and Continental Casualty should be liable for its own acts even if performed under the <u>label</u> of Continental Insurance Company.

_____

[6]  While this might be <u>argued</u> by Continental Insurance (if in fact it was an independent entity), the United States' position and overwhelming proof is still that <u>both</u> Continental Casualty and Continental Insurance are liable.  Continental simply uses its wholly owned subsidiary as a mere instrumentality or alter ego.

U.S. v. Continental
Case No. 3:98-cv-285-JWS                    20

3.    **The United States Has Provided Adequate Notice of its Claims, as Required by Fed. Rule Civ.P. 8(a)(2); However, the United States Hereby Moves for Permission to Amend the Complaint to Allege Mere Instrumentality, "Alter Ego" and all Other Necessary Similar Claims Against Continental Casualty Company.**

Rule 8(a)(2) "provides that a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Soreman N.A.*, 534 U.S. 506, 507 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 78 S.Ct. 99, 2 L.E.d.2d 80 (1957). "'[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Yamaguchi v. U.S. Dep't of the Air Force*, 109 F.3d 1475, 1481 (9th Cir. 1977), quoting *Conley*, 355 U.S. at 45-46, (*Yamaguchi* is unpublished, but is relied on in *Allied Signal, Inc. v. City of Phoenix*, 182 F.3d 692-97 (9th Cir. 1999) for this proposition).

Further, Federal Rule of Civil Procedure 15(a) in relevant part states "a party may amend the party's pleading . . . by leave of court . . .; and leave shall be freely given when justice so requires." The Supreme Court in *Forman v. Davis*, 371 U.S. 178, 182 (1962) stated that "leave to amend shall be freely given when justice so requires,' this is a mandate to be heeded." The rules "reject the approach that pleading is a game of skill" and "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957). The rule is to be interpreted with "extreme liberality." *United States v. Webb*, 655 F.2d 977 (9th Cir. 1981). The Ninth Circuit, in *Webb* also recognized that the guiding

"underlying purpose" of Rule 15 is "to facilitate decision on the merits, rather than on the pleadings or technicalities." Id. at 979. In defining the boundaries of the Rule, the Ninth Circuit has held "[o]nly where prejudice is shown or the movant acts in bad faith are courts protecting the judicial system or other litigants when they deny leave to amend a pleading." *Howey v. United States*, 481 F.2d 1187, 1191 (9th Cir. 1973); *United States v. Webb*, 655 F.2d at 979. Defendant can show no prejudice by the amendment in the instant case and certainly has no credible evidence or argument that the United States has acted in bad faith.

Continental Casualty's arguments that it should be dismissed from this action because the United States' complaint did not provide adequate "notice" of its claims are disingenuous at best. The United States' October 26, 1998, complaint alleged that certain named individuals committed bad faith acts by rejecting numerous tenders by the United States. Although the United States itself did not learn the details until the November 2005 depositions of Continental Casualty employees Mr. Boysen and Ms. Finn, obviously Continental Casualty was well aware that the individuals alleged in the complaint to have committed bad faith acts were employees of Continental Casualty (at least as of May 1995). Moreover, the United States served the complaint on Continental Casualty, and even named Continental Casualty as a defendant in the capacity of doing business as ("d/b/a/") Continental Insurance. From the moment the United States filed the complaint, more than seven years ago, Continental Casualty was on adequate notice of the United States' claims and in particular of the possible theories on which Continental Casualty's liability was based. Additionally, counsel hired by Continental Casualty personnel, and who report to Continental Casualty personnel, have permitted Continental Casualty to

exercise complete control of the defense of this case and thus it has been fully apprised of the United States' claims and cannot argue surprise.

Moreover, the United States made its reliance on the mere instrumentality and alter ego theories patent in its Opposition to Continental Casualty's Motion for a Protective Order.  As this Court stated more than three years ago, in its January 6, 2003, ruling, "[t]he parties agree that . . . a non-party parent corporation's finances are not relevant . . . except where it is shown that the subsidiary was a 'mere instrument' or 'alter ego' of the parent corporation or that the parent corporation was aware of the misconduct.  The dispute here concerns the point at which the government must make this showing." (Emphasis added) Dkt. 101 at 5. Indeed, that entire discovery dispute centered around the theory of "alter ego" liability.  Thus, even if Continental Casualty had not been put on notice by the United States' complaint, which it had been, Continental Casualty cannot claim that it is surprised or unfairly prejudiced by the "alter ego" argument after it filed its Motion for a Protective Order and the Court issued its January 6, 2003, ruling addressing the "alter ego" issue in particular.[7]

Thus, clearly Continental Casualty has had notice of the United States' claims in accordance with the "Federal Rules' liberal notice pleading standards," and Continental Casualty has not asserted nor can it assert that it has been prejudiced by the wording of the pleadings in the

---

[7]  Moreover, because Federal Rule of Civil Procedure 26(b)(1) permits discovery only of information that is "relevant to [a] claim or defense," this Court's January 6, 2003, ruling that the United States' entitlement to the discovery at issue was dependent on a claim of mere instrumentality or "alter ego," necessarily presumes that such a claim of mere instrumentality or "alter ego" had been alleged in the first place.

United States' complaint. Further, the United States has only recently completed discovery which revealed evidence that Continental Insurance Company has had no employees since 1995 and cannot act for itself. However, in an abundance of caution, the United States moves to amend to ensure that its claims against Continental Casualty are perfected. The United States moves to amend in an effort to conform the complaint to the evidence obtained during discovery. Whether it is necessary to do so or not, the United States respectfully requests leave to amend its complaint in compliance with Rule 15. A proposed amended complaint is lodged with this opposition and motion to amend. This Third Amended Complaint is modified to add a Sixth Cause of Action. Further, the introductory paragraph and "COMMON ALLEGATION" number two have been amended.

## CONCLUSION

For the foregoing reasons, the United States requests that this Court deny Continental Casualty's Motion for Summary Judgment and also permit the United States to amend its complaint.

Respectfully requested this 6th day of April, 2006, in Anchorage, Alaska.

DEBORAH M. SMITH
Acting United States Attorney

s/Richard L. Pomeroy
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
E-mail: richard.pomeroy@usdoj.gov
AK #8906031

s/Richard R. Stone, Sr.
Trial Attorney
U.S. Department of Justice
P.O. Box 888
Benjamin Franklin Station
Washington, D.C. 20044
Phone: (202) 616-4291
Fax: (202) 616-5200 fax
E-mail: richard.stone@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2006,
a copy of the foregoing UNITED STATES'
OPPOSITION TO CONTINENTAL
CASUALTY COMPANY'S MOTION
FOR SUMMARY JUDGMENT
AT DOCKET 237; AND MOTION
TO AMEND COMPLAINT
was served electronically on Gary A. Zipkin
and William Urquhart, and via U.S. mail on

Rebecca L. Ross
Ross, Dixon & Bell, LLP
55 West Monroe Street, Suite 3000
Chicago, IL 60603-5758

s/ Richard L. Pomeroy

U.S. v. Continental
Case No. 3:98-cv-285-JWS            25