1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

----------------------------------x

UNITED STATES OF AMERICA,         :

      Plaintiff,                 :

  vs.                             : Case No.

THE CONTINENTAL CASUALTY          : A98-285 CV (JWS)

COMPANY, dba THE CONTINENTAL      :

INSURANCE COMPANY,                :

      Defendants.                :

----------------------------------x


30(b)(6) DEPOSITION OF ERIN M. FINN

Washington, DC

Tuesday, November 8, 2005


REPORTED BY:

SARA EDGINGTON, RPR

Exhibit 1
page 1 of 14 pages

1   director of claims for our entertainment division,
2   and I did that for approximately two years. I then
3   was transferred to the Chevy Chase, Maryland,
4   location and became assistant vice president in
5   charge of real estate claims under our E&O
6   professional liability policy. I did that for
7   approximately two years.
8         In 2000 -- I believe it was around 2000,
9   between 2000 and 2001, I went back as claims
10   counsel, assistant vice president and claims counsel
11   working with Chris Borgeson. He was based in
12   Chicago.
13     Q    I believe you and I met with Chris
14   Borgeson once upon a time in my office, didn't we?
15     A    Actually, it was not. It was -- that was
16   Davis Carr.
17     Q    Okay; sorry. Are you still employed by
18   Continental Casualty Company?
19     A    Yes, I am.
20     Q    And are you still managing this case?
21     A    No, I'm not.
22     Q    Okay. Who is managing the case now?



Exhibit 1
page 2 of 14 pages

1  Mr. Stone, this happened right around September
2  11th. I believe oral argument occurred shortly
3  before or shortly after September 11th.
4      Q   The next day.
5      A   And I think you and Mr. Neeleman were
6  stranded in Alaska for a few days after that.
7      Q   11 days.
8      A   11 days. It was quite a long time. When
9  Mr. Neeleman notified CNA, I believe it was Beth Ann
10 Berger in Chicago, of the decision, it was close to
11 the end of September. At that time, Chris Borgeson,
12 my boss at the time, asked me to take a look at the
13 case and get involved in the case. I did.
14         Mr. Neeleman flew to Chicago. I met with
15 him. He explained what happened. We immediately
16 then sought the advice of another attorney, and
17 that's when we retained Dorsey & Whitney. At that
18 time -- that was in early October. At that time,
19 they basically -- at that time basically we had
20 decided we were going to go in to attempt to try to
21 resolve the case and to set up a mediation.
22         So the short answer is, you know, A, there

1  is no -- there was no roundtable discussion. It was
2  myself consulting with my direct manager, Chris
3  Borgeson, and consulting with new counsel, Dorsey &
4  Whitney.
5         With respect to the retender of the
6  defense, we were hopeful that we could resolve the
7  case with the government, which is what we attempted
8  to do when we mediated the case, you and I in
9  Anchorage, in December of that year. Those
10 discussions were not fruitful.
11        Dorsey then went back and reviewed the
12 Kallstrom case, and at that time, it's my
13 understanding that Kallstrom -- the pendency of
14 Kallstrom was up in front of the Alaska Supreme
15 Court for approximately 16, 17, 18 months at that
16 time. All briefing had been done. There was
17 basically nothing going on other than awaiting a
18 ruling from the Alaska Supreme Court.
19        I was working with John Treptow at Dorsey
20 at the time. My understanding is Mr. Treptow had
21 discussions directly with Ken Roosa of the U.S.
22 Attorney's Office in Alaska, talking in terms of

1   what the status of the case was. Mr. Roosa conveyed
2   to Mr. Treptow that he felt had a deadbang winner on
3   his hands; I believe, how he phrased it.
4           Also, we had talked about logistical
5   issues in terms of if CNA were -- if Continental
6   Casualty Company were to accept the tender of
7   defense from Kallstrom, how logistically that would
8   work, because it is the United States government,
9   would the U.S. government want to continue on as,
10  basically, defense counsel, or would we move this to
11  another law firm. I believe Mr. Treptow and Roosa
12  had discussions along those lines, and Mr. Roosa
13  indicated that he wished to be done with the case
14  and he would be okay if CNA brought in other
15  counsel.
16          At that time, I gave Dorsey & Whitney a
17  list of panel -- basically what is described as
18  panel counsel, Continental Casualty approved
19  counsel, and we made some phone calls to determine
20  if someone would be interested in taking on the
21  defense of the United States, at the same time,
22  reviewing the coverage issues involved, recognizing

19448
SE

1  that Sedwick had indicated that the U.S. government

2  was an implied additional insured under the policy.

3       Even in light of that, there were coverage

4  issues to be examined, because my understanding,

5  Continental Casualty's understanding at the time was

6  the only claim Kallstrom had was for emotional

7  distress damages, and that's still an issue, whether

8  emotional distress damages without bodily injury

9  would actually be covered under the policy.

10    Q    What is Continental Casualty Company's

11 duty to accept tender of the defense if defense is

12 properly tendered like in this case where you have

13 law of the case that says you have an insured who is

14 covered under the policy?

15         MS. ROSS:  I will object to the form.  It

16 calls for a legal conclusion on the part of the

17 witness.

18         MR. STONE:  Okay.

19         MS. ROSS:  You can answer.

20         MR. STONE:  No, let me address that.

21         BY MR. STONE:

22    Q    I want to know, first, what Continental

Exhibit 1
page 6 of 14 pages

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700      800-336-6646      410-684-2550

1   Kallstrom?

2       A   Yes, but Mr. Treptow had discussions,

3   telephone discussions with Mr. Roosa in January.

4       Q   But during that time, he never accepted

5   tender of the defense, even with the reservation of

6   rights, did he?

7           MS. ROSS:  Object to the form.  You can

8   answer.

9           THE WITNESS:  We never formally accepted

10  the tender of defense, because during this process,

11  the United States was successful in its case with

12  Ms. Kallstrom.

13          BY MR. STONE:

14      Q   And that was March of 2002?

15      A   March of 2002, yes.

16      Q   So that's more than five months after the

17  United States specifically retendered the Kallstrom

18  case; isn't that true?

19      A   Yes.

20      Q   So in the five months, you never accepted

21  tender of the defense, even with a reservation of

22  rights, did you?



```
 1        MS. ROSS:  I'll object to the form.  There
 2   have been thousands of documents produced to the
 3   United States government.  This witness is not
 4   required to have memorized each one of them, nor is
 5   she designated for this topic.
 6        To the extent you know the answer to the
 7   question, you can answer.
 8        THE WITNESS:  As I indicated, I haven't
 9   worked on this case since May of 2003, and in
10   preparation of today, I did not review the attorney
11   correspondence file.  So it's been quite some time.
12        BY MR. STONE:
13   Q    You were the manager of this litigation
14   for Continental, though, on October 30th, 2001;
15   isn't that correct?
16   A    That's correct.
17   Q    And the first letter dated October 30,
18   2001, in Exhibit 2, in the last sentence of the
19   major paragraph, specifically says "the United
20   States hereby re-tenders defense of the Kallstrom
21   claims to Continental under the same theories
22   articulated in the July 8, 1998 letter."
```



```
 1           MS. ROSS:  I think you misread the last
 2  word.  That's fine.
 3           MR. STONE:  How did I misread it?
 4           MS. ROSS:  You said the July 8, 1998,
 5  letter," as opposed to "tender."
 6           MR. STONE:  The last word in that
 7  is "tender."  I apologize.
 8           BY MR. STONE:
 9      Q    Were you provided this letter that
10  Mr. Roosa sent to Mr. Schwab at Dorsey & Whitney?
11           MS. ROSS:  You're talking about the
12  October 30, 2001, or July 8, 1998 letter?
13           MR. STONE:  The October 30.  Thank you.
14           THE WITNESS:  Yes, I believe I was.
15           BY MR. STONE:
16      Q    So there was no question in your mind at
17  that time that the United States was again putting
18  you on notice and retendering the Kallstrom case; is
19  that correct?
20      A    Yes, but at this time, I believe we had a
21  mediation date set in early December where we were
22  working on one, and we were hoping to settle the
```

1    A    Thank you.

2    Q    So let's look at the period -- let's just
3 deal with the date October 30, 2001, and for the
4 next six months after that, during which you did not
5 accept the tender of the defense even though it had
6 been retendered. Can we deal with that period,
7 six-month period, beginning October 30, 2001?

8    A    Yes.

9        MS. ROSS: Object to the form. You can
10 answer. You did.

11        BY MR. STONE:

12    Q    What were the procedures at that time
13 regarding whose responsibility it was to accept or
14 reject the tender of the defense when it came in to
15 Continental?

16    A    In 2001?

17    Q    Yes, ma'am.

18    A    It was my decision.

19    Q    Your decision.

20        So again, what would have been the
21 downside risk to Continental to accept the tender of
22 this defense in a case that had been, you believed,

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700    800-336-6646    410-684-2550

1   with each other during that entire period of time.
2           BY MR. STONE:
3       Q   But the United States at that time was
4   determined by law to be your insured; isn't that
5   true?
6       A   Implied additional insured.
7       Q   Right.  Be that as it may, an insured
8   under Alaska law at that time; correct?
9       A   Correct.
10          MS. ROSS:  Object to the form.  You can
11  and have answered.
12          BY MR. STONE:
13      Q   And do I understand that there was no
14  roundtable business discussion regarding the
15  acceptance or rejection of this tender of defense
16  that was made at least as late as October 30, 2001?
17      A   There was no roundtable in October of
18  2001, no.
19      Q   Well, my question would be, was there any
20  roundtable about this tender, whether it was October
21  or November or December or any time?
22      A   There was no roundtable discussions at

```
 1   entities.  And CNA Health Pro is not a legal

 2   entity; therefore, it doesn't show up on this

 3   chart.

 4        Q.   Is it affiliated with any of these

 5   entities that show up on this organizational

 6   chart?

 7        A.   The business that CNA Health Pro

 8   conducts, the insurance policies that it sells

 9   as part of that, its marketing is part of that

10   business unit may be written on the paper of one

11   of these insurance companies.

12        Q.   Does CNA Health Pro have employees?

13        A.   No.

14        Q.   So who does the work that has to be

15   done within CNA Health Pro?

16        A.   CNA Health Pro employees are or the

17   individuals who conduct that business are

18   employees of Continental Casualty Company.

19        MS. ROSS:  Can I can we go off the record for

20   one second?

21        MR. STONE:  Sure.

22                   (Whereupon, a discussion was had
```

```
 1  Wing, but that's February of '95.
 2          MS. ROSS:  And that's why I asked you to
 3  give a time frame.
 4          MR. STONE:  But Laurie Wing is not with --
 5          BY MR. STONE:
 6      Q   Any employees after 1995 that Roosa
 7  corresponded with would have been employees of
 8  Continental Casualty Company; is that fair to say?
 9      A   Post-merger, all of the individuals were
10  Continental Casualty Company employees.
11      Q   And was Friderici working for Continental
12  Insurance Company before the merger or Continental
13  Casualty Company before the merger?
14      A   My understanding is Bill Hutson -- in
15  1995, Bill Hutson was a Continental Insurance
16  Company employee who retained Friderici as coverage
17  counsel.
18      Q   So Continental Insurance Company had
19  employees before 1995, is that fair to say?
20      A   Continental Insurance Company.
21      Q   It did have employees before 1995?
22      A   Yes, it was a company.
```

1    Q    And then after 1995, all the employees
2    were Continental Casualty Company employees?
3    A    Post-merger, correct.
4    Q    So Bill Hutson worked for Continental
5    Insurance Health Care, it says here in the letter?
6         MS. ROSS:   What time frame are you talking
7    about?
8         MR. STONE:  That would be September 13th,
9    1995.  That's after the merger; right?
10        THE WITNESS:  After the merger, he would
11   have been a Continental Casualty Company employee.
12        BY MR. STONE:
13   Q    Okay.  Even if his address said
14   Continental Insurance Healthcare, that would still
15   be a Continental Casualty Company --
16   A    Correct.
17   Q    -- address essentially?
18        MR. STONE:  Is Ms. Finn here to speak to
19   any of the "contacts of any nature with excess
20   carriers, umbrella policy providers or other
21   similarly situated insurers who are, or may be,
22   responsible to pay all or any part of any recovery

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700        800-336-6646        410-684-2550