20116
SE

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


------------------------------x

UNITED STATES OF AMERICA,        :

      Plaintiff,               :

  vs.                              : Case No.

THE CONTINENTAL CASUALTY         : A98-285 CV (JWS)

COMPANY, dba THE CONTINENTAL     :

INSURANCE COMPANY,               :

      Defendants.              :

------------------------------x


ORIGINAL


30(b)(6) DEPOSITION OF ERIN M. FINN


Washington, DC

Tuesday, November 8, 2005


REPORTED BY:

SARA EDGINGTON, RPR


EXHIBIT E
Page 1 of 14

19448
SE

16

1   is no -- there was no roundtable discussion.  It was

2   myself consulting with my direct manager, Chris

3   Borgeson, and consulting with new counsel, Dorsey &

4   Whitney.

5           With respect to the retender of the

6   defense, we were hopeful that we could resolve the

7   case with the government, which is what we attempted

8   to do when we mediated the case, you and I in

9   Anchorage, in December of that year.  Those

10  discussions were not fruitful.

11          Dorsey then went back and reviewed the

12  Kallstrom case, and at that time, it's my

13  understanding that Kallstrom -- the pendency of

14  Kallstrom was up in front of the Alaska Supreme

15  Court for approximately 16, 17, 18 months at that

16  time.  All briefing had been done.  There was

17  basically nothing going on other than awaiting a

18  ruling from the Alaska Supreme Court.

19          I was working with John Treptow at Dorsey

20  at the time.  My understanding is Mr. Treptow had

21  discussions directly with Ken Roosa of the U.S.

22  Attorney's Office in Alaska, talking in terms of

EXHIBIT ___E___
Page _2_ of _14_

## ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646          410-684-2550

1   what the status of the case was.  Mr. Roosa conveyed

2   to Mr. Treptow that he felt had a deadbang winner on

3   his hands; I believe, how he phrased it.

4          Also, we had talked about logistical

5   issues in terms of if CNA were -- if Continental

6   Casualty Company were to accept the tender of

7   defense from Kallstrom, how logistically that would

8   work, because it is the United States government,

9   would the U.S. government want to continue on as,

10  basically, defense counsel, or would we move this to

11  another law firm.  I believe Mr. Treptow and Roosa

12  had discussions along those lines, and Mr. Roosa

13  indicated that he wished to be done with the case

14  and he would be okay if CNA brought in other

15  counsel.

16          At that time, I gave Dorsey & Whitney a

17  list of panel -- basically what is described as

18  panel counsel, Continental Casualty approved

19  counsel, and we made some phone calls to determine

20  if someone would be interested in taking on the

21  defense of the United States, at the same time,

22  reviewing the coverage issues involved, recognizing

EXHIBIT   E
Page   3   of   14

19448
SE

1    that Sedwick had indicated that the U.S. government

2    was an implied additional insured under the policy.

3             Even in light of that, there were coverage

4    issues to be examined, because my understanding,

5    Continental Casualty's understanding at the time was

6    the only claim Kallstrom had was for emotional

7    distress damages, and that's still an issue, whether

8    emotional distress damages without bodily injury

9    would actually be covered under the policy.

10       Q    What is Continental Casualty Company's

11   duty to accept tender of the defense if defense is

12   properly tendered like in this case where you have

13   law of the case that says you have an insured who is

14   covered under the policy?

15            MS. ROSS:  I will object to the form.  It

16   calls for a legal conclusion on the part of the

17   witness.

18            MR. STONE:  Okay.

19            MS. ROSS:  You can answer.

20            MR. STONE:  No, let me address that.

21            BY MR. STONE:

22       Q    I want to know, first, what Continental

1    Casualty Company expects of its counsel regarding

2    accepting tender of the defense. And then I'll ask

3    you for the legal duty -- your belief as to the

4    legal duty of Continental Casualty to accept the

5    tender of defense of this type of case.

6            So first, what is Continental Casualty

7    Company's procedure regarding accepting or rejecting

8    tender of defense in a case where a court has

9    already held that the insured is an insured of

10   Continental?

11           MS. ROSS:   I'm going to object to the form

12   of that question, but you can answer it.

13           THE WITNESS:  As I indicated before, even

14   in light of Judge Sedwick's opinion where he

15   indicated that the U.S. government was an implied

16   additional insured under the Continental Insurance

17   Company policy, there were still coverage issues.

18   The only claim by Kallstrom was for emotional

19   distress damages.  So that may or may not be covered

20   under the policy under Alaska law where, in terms of

21   the policy, there must be bodily injury.  So that

22   was an issue that we needed to investigate.

EXHIBIT___E
ACE-FEDERAL REPORTERS, INC. Page_5__of_14
Nationwide Coverage
202-347-3700          800-336-6646          410-684-2550

19448
SE

20

1          The other issue is to determine, you know,

2    what was happening in Kallstrom at that time, which

3    we did with discussions with Mr. Roosa of your

4    office.

5          And Kallstrom, our understanding is, had

6    been pending before the Alaska Supreme Court for

7    quite some time with nothing happening, just waiting

8    for the court to rule.  And I recall that Roosa had

9    indicated concern because it was taking so long.  He

10   thought that there was some division -- possibly

11   some division on the panel and could be the reason

12   for the delay in a ruling.

13          BY MR. STONE:

14     Q    Does Continental have a written procedure

15   that you're to follow whenever a case is tendered to

16   Continental by a purported injured?

17     A    Was there a written procedure at that

18   time?

19     Q    Yes, ma'am.

20     A    There were written claims procedures, yes,

21   in 2001.  I would actually -- I don't recall offhand

22   if -- as indicated, I mean, you tendered it.  We

19448
SE

21

1    reviewed it.  We looked at the Kallstrom case.  We

2    did everything in our power at that time,

3    communicated with Roosa.  I mean, it wasn't as if

4    the United States government is banging down our

5    door jumping up and down.  Roosa says look,

6    nothing's happening, the case has been pending for

7    quite some time, we've got a deadbang winner on our

8    hands.

9         Q    But you also said that he also voiced

10   concern to Mr. Treptow about why it was taking so

11   long in the state supreme court; right?

12        A    Yes.

13             MS. ROSS:  Object to the form.  You can

14   answer.

15             BY MR. STONE:

16        Q    But you never accepted tender of that

17   defense, did you?

18        A    Well, what happened is, is we talked with

19   counsel.  I actually spoke with a Mike Corey to

20   determine if he would be willing to accept taking on

21   the defense.  He initially had indicated that he was

22   interested.  I believe he talked to partners in his

19448
SE

22

1   firm and came back to us and said, you know, upon

2   second thought, I'm not interested.

3             Then we also talked to, I want to say,

4   Nelson Page of Burr, Pease, who had agreed to

5   accept -- to defend the United States in the

6   Kallstrom matter.  But again, what we were looking

7   at was possibly accepting the defense under a

8   reservation of rights due to the emotional

9   distress/lack of bodily injury component of that

10  claim.

11            Early in March, I believe March 16th, is

12  when the Alaska Supreme Court came down with its

13  decision, and the United States government did win

14  and indicated that Ms. Kallstrom did not have a

15  claim.

16      Q    But you never accepted tender of the

17  defense with the reservation of rights, either, did

18  you?

19      A    Well, John Treptow sent a letter, I

20  believe in June, to Mr. Roosa indicating that it was

21  his understanding that the United States was

22  successful.  Therefore, there was no -- there was

1   mean, you had sued Continental Casualty Company and

2   Continental Insurance Company.   There were ongoing

3   discussions.   There were ongoing settlement

4   discussions during this time, and the issue was

5   fully briefed before the Alaska Supreme Court.

6   Theoretically, even if we were to pick up the

7   defense, there was nothing to do.

8              BY MR. STONE:

9         Q     Well, what was your downside risk in

10  accepting the tender of defense from your insured at

11  that point?

12             MS. ROSS:   Object to the form on exactly

13  the same grounds, including the fact that she's not

14  designated for this topic.

15             You can answer if you have an opinion.

16             THE WITNESS:   I'm not sure what you mean

17  by "downside risk."   There was an issue of coverage.

18  The issue was -- the only issue in the Kallstrom

19  matter had to do with emotional distress damages,

20  which there was a serious issue of whether even if

21  you are an insured under the policy, whether there

22  was coverage.   So if we picked up the defense, it

19448
SE

27

1    would have been under a reservation of rights.

2        BY MR. STONE:

3    Q    And the reservation of rights would have

4    protected Continental on the issue of coverage?  You

5    had had an opportunity to litigate that; isn't that

6    true?

7    A    Yes.

8    Q    But you didn't accept it, and you didn't

9    reserve your rights?  You just did not accept tender

10   of the defense during that five-month period.

11       MS. ROSS:  Object to the form and on the

12   grounds previously stated.  To the extent you have a

13   personal opinion, you can provide it.

14       BY MR. STONE:

15   Q    Isn't that true?

16   A    Again, Mr. Treptow had discussions with

17   Roosa.  We were working trying to find counsel

18   willing to defend the United States government,

19   discussions logistically on how Continental would

20   handle this.  And once those issues were resolved,

21   we were notified that the United States government

22   was successful.  So did we formally accept the

EXHIBIT ___E___

ACE-FEDERAL REPORTERS, INC. Page _10_ of _14_

Nationwide Coverage

202-347-3700        800-336-6646        410-684-2550

19448
SE

28

1   defense?   No.   But we were working on it during that

2   entire time frame.

3        Q    Mr. Treptow didn't address the tender

4   again after the Supreme Court of Alaska ruled until

5   more than two months later; isn't that true?

6             MS. ROSS:   Object to the form.   You can

7   answer.

8             BY MR. STONE:

9        Q    A ruling in March and then his letter in

10  June.

11       A    He may have had discussions with Roosa

12  after that time.   I don't recall.

13       Q    I direct your attention back to -- well,

14  before we go back to the 30(b)(6) notice, let me ask

15  you about those letters that you have in front of

16  you there.

17            I apologize for not bringing the one from

18  John Treptow, but are you aware of any other letters

19  in this correspondence cycle between Roosa and

20  Treptow or anyone else at Continental or working for

21  Continental that should be in my group of letters

22  there to flesh out the full discussions?

19440
SE

30

| | |
|---|---|
| 1 | MS. ROSS:   I think you misread the last |
| 2 | word.  That's fine. |
| 3 | MR. STONE:   How did I misread it? |
| 4 | MS. ROSS:   You said the July 8, 1998, |
| 5 | letter," as opposed to "tender." |
| 6 | MR. STONE:   The last word in that |
| 7 | is "tender."  I apologize. |
| 8 | BY MR. STONE: |
| 9 | Q    Were you provided this letter that |
| 10 | Mr. Roosa sent to Mr. Schwab at Dorsey & Whitney? |
| 11 | MS. ROSS:   You're talking about the |
| 12 | October 30, 2001, or July 8, 1998 letter? |
| 13 | MR. STONE:   The October 30.  Thank you. |
| 14 | THE WITNESS:  Yes, I believe I was. |
| 15 | BY MR. STONE: |
| 16 | Q    So there was no question in your mind at |
| 17 | that time that the United States was again putting |
| 18 | you on notice and retendering the Kallstrom case; is |
| 19 | that correct? |
| 20 | A    Yes, but at this time, I believe we had a |
| 21 | mediation date set in early December where we were |
| 22 | working on one, and we were hoping to settle the |

EXHIBIT  E
Page 12 of 14

19448
SE

31

1    entire action in December of 2001.

2        Q    Let me take you back to Exhibit Number 1

3    now, paragraph 2.  In that exhibit, we've requested

4    a witness "who will identify and describe all

5    procedures followed and discussions or actions taken

6    by Continental and/or CNA Financial in scheduling,

7    establishing and/or holding or declining to hold any

8    other round table business discussions involving any

9    and all tenders of defense in the instant case."

10            Are you prepared to respond to that

11   request?

12       A    Yes.

13       Q    What are those procedures?

14       A    Again, just to put on the record, you

15   know, CNA Financial is not a party to this

16   litigation and had no involvement in the handling of

17   this -- in any part of this case.

18       Q    Okay.

19       A    But with respect to Continental, there

20   were no roundtable discussions involving this

21   matter.

22       Q    None involving the tender of the original

EXHIBIT___E___
Page_13_ of _14_

19448
SE

36

1   for a legal conclusion.  It's outside the scope of

2   what she's designated for.

3              But you can answer if you have an opinion.

4              THE WITNESS:  No.  As I indicated, we were

5   hopeful that the case was going to resolve at the

6   mediation in December.  When it didn't, we

7   immediately focused on the Kallstrom issues.  Again,

8   to put this in light in terms of the timing, you

9   have to realize this was shortly after September

10  11th.  This, you know, was a very stressful time, I

11  think, for everybody involved, both personally and

12  professionally.

13             As soon as we could, we reviewed the

14  Kallstrom issues.  There were coverage issues

15  involved.  We talked with Roosa.  We talked with

16  outside counsel.  There were attorneys that weren't

17  willing to take on the defense of the U.S.

18  government at that time, and we basically had to

19  find someone that was willing to do that.

20             And then we discussed our reservation of

21  rights, and then we found out that the U.S. was

22  successful.  So, you know, we were in litigation