Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

---

UNITED STATES OF AMERICA,              )
                                       )
         Plaintiff,                    )
                                       )
   vs.                                 )
                                       )
CNA FINANCIAL CORPORATION AND          )
THE CONTINENTAL CASUALTY COMPANY       )
d/b/a THE CONTINENTAL INSURANCE        )
COMPANY,                               )
                                       )
         Defendant.                    )
                                       )

Case No. A97-285 CV (JWS)

---

DEPOSITION OF JOHN TREPTOW

---

Monday, January 23, 2006
1:30 p.m.

Taken by Counsel for Plaintiff
at
Dorsey & Whitney
1031 West Fourth Avenue, Suite 600
Anchorage, Alaska

Page 8

1  Between yourself and Evan Schwab, who is contacting Ken
2  Roosa or the United States on what issues and the two of
3  you -- I'm sort of looking at how did you divide up -- I
4  mean, was there a division of labor as far as addressing
5  issues?
6          MR. ZIPKIN:  Object to form.
7      A.  I guess that would depend upon the period of time
8  that you are talking about.
9      Q.  Let's focus on October 2001.
10     A.  I think in October and November of 2001, Evan
11 Schwab was dealing directly with Ken on a number of
12 preliminary matters such as substitution of counsel,
13 perhaps status conference.
14         I remember in October or November talking with
15 Ken about a mediation that the parties were planning and
16 talking with him generally about the lawsuit that had
17 been filed, but my recollection is that Evan Schwab was
18 primarily responsible for the direct contacts with both
19 Ken and with the client.
20     Q.  And the November discussions on the mediation,
21 it's the mediation that occurred in December 2001?
22     A.  Correct.
23     Q.  Aside from the correspondence that we have
24 referenced, what telephone conversations do you recall
25 having with Ken Roosa on this case?

Page 9

1  A.  I remember a conversation with him in November in
2  which we talked about setting up the mediation.  There
3  had been a demand by the United States, and I was
4  involved in evaluating that demand and going through the
5  logistics of setting up the mediation with Ken.
6       And I remember we initially talked about the
7  case.  That was the first time I had talked to him.  I
8  had recently had contact with him in another case, so I
9  knew who he was, but I really didn't know him.
10      And so we were talking generally about the case,
11 what had transpired.  As I said, Dorsey had just gotten
12 in.  It was a bit overwhelming, all the material that
13 had to be reviewed and the different things that were
14 going on, so we basically talked a little bit about the
15 case.
16 Q.  I'm sure Mr. Zipkin can empathize with you in
17 that respect.  What other case had you had with Ken?
18 A.  It was a case in which Ken -- it was an attorney
19 malpractice case in which Mr. Roosa was a witness in
20 which he had written a letter.  I defended the law firm
21 that had ostensibly been requested by Ray Jean Bonnum to
22 provide advices on registering securities that her
23 company had.
24      My client had requested more information from
25 Ms. Bonnum, and Ms. Bonnum had provided letters from a

1  number of individuals; one was Mr. Roosa.
2        And in that he had said that he was an assistant
3  U.S. attorney, that he handled white collar fraud cases,
4  he knew what a Ponzi scheme was, and what Ms. Bonnum was
5  doing was not a Ponzi scheme. And he was deposed in
6  connection with that letter.
7     Q. Any other conversations with Mr. Roosa in 2001,
8  other than, obviously, the mediation itself?
9     A. Nothing that sticks out in my mind.
10    Q. Now, you referenced a memo that you had prepared
11 concerning a conversation or conversations with
12 Mr. Roosa in late January, early February 2002.
13    A. Correct.
14    Q. Was it one conversation or more than one
15 conversation?
16    A. The memo references two conversations.
17    Q. Were they telephone calls?
18    A. Correct.
19    Q. And what's the -- what does the memo recall or
20 your recollections you recorded in your memo?
21    A. They are.
22    Q. What were those recollections?
23       MR. ZIPKIN: Wouldn't it be easier just to
24 show him the memo to refresh your recollection?
25       Well, if the witness requests it, I guess

1  I'll leave it up to the witness.
2      A.  Obviously, the memo speaks for itself and that
3  would be the best recollection, but sitting here today,
4  if you are asking me what's my recollection about the
5  telephone calls, I would be happy to share that with
6  you.  Is that what you want?
7      Q.  Please do.
8      A.  I was taking a look, and this would be sometime
9  towards the latter part of January, at the Kallstrom
10 tender issue, the tender that had been made in October.
11 And after we went through all of the gyrations of the
12 mediation and that had been successful, it was decided
13 that there should be a response to that tender.
14         And my job was to take a look at what was
15 involved in the Kallstrom case.  I read the pleadings
16 that had been filed in the United States District Court.
17 I read the briefs that had been filed with the Ninth
18 Circuit.  I had seen the briefs and reviewed the briefs
19 filed in the Alaska Supreme Court.
20         And I thought I had a pretty good handle on the
21 issues that were involved.  I was in particular
22 interested in the status of the appeal since it had
23 appeared to me back in January of 2000 that the case had
24 been fully briefed before the Alaska Supreme Court, had
25 been argued 13, 14 months before, and I was wondering

Page 12

1  what, if anything, had happened and if perhaps I had
2  missed the Supreme Court coming down with a decision.
3        And so my purpose in calling Ken was to basically
4  find out what the status of the appeal was. I think
5  that was the initial conversation I had with him.
6        And then either in that conversation or started
7  up a second conversation, I basically asked him what the
8  United States wanted Continental to do with respect to
9  the tender at that point in time since it appeared to me
10 that absolutely nothing was happening because they were
11 waiting for the Supreme Court to decide whether or not
12 Ms. Kallstrom had a cause of action under Alaska law.
13       So after having those two conversations, I put
14 down the substance of my conversation in the memo to
15 Erin Finn and Evan Schwab.
16 Q.  What was your recollection of Mr. Roosa's
17 response to your inquiry about what the United States
18 wanted Continental to do?
19 A.  Basically, he wanted to be rid of the case. He
20 wanted Continental to step in and to handle whatever
21 might come in the future, since everything else -- and
22 we had talked -- this was all part of -- these two
23 conferences or two discussions were all part of
24 basically what's happening, you know, what do you think
25 is going to happen on appeal, and what do you want us to

Page 14

1  needed in a transition if the tender was accepted. Both
2  conversations were very cordial and Ken was very
3  cooperative and very informative.
4      Q.  Was there any indication by you that Continental
5  would be accepting this tender?
6      A.  No.  I was not authorized to make that -- and
7  once again, I was still -- this was part of my fact
8  gathering, my investigation of the Kallstrom
9  counterclaim and its status that I was going to present
10 to my client.
11         I think I told Ken that much too, "This is why I
12 am calling you."
13     Q.  Was there ever any indication that there would be
14 an acceptance of tender with a reservation of rights?
15     A.  To whom?
16     Q.  To either Mr. Roosa or another person
17 representing the United States?
18     A.  I don't recall me ever making that representation
19 to anyone.
20     Q.  Did you discuss with Mr. Roosa the possibility of
21 accepting -- Continental might accept tender with a
22 reservation of rights?
23     A.  It wasn't in that context.  It was in the context
24 that I was conducting an investigation and gathering
25 information as to what was involved.  As I said, I had

Page 15

1   done this memo on what I thought the issues were and I
2   wanted to get his intake on those issues, the Kallstrom
3   issues, the legal issues, and then get further
4   elaboration from him as to what, if the tender was
5   accepted, the United States wanted CNA to do.
6       Q.  You had indicated earlier that you did review the
7   deposition of Erin Finn?
8       A.  Yes.
9       Q.  And had you discussed with her during this time
10  frame, 2000, late 2001, early 2002, the reservation of
11  rights that she discussed in her deposition, that is,
12  whether a claim for negligent infliction of emotional
13  distress would even be covered under the insurance
14  policy?
15      A.  We did discuss that at some point in time after
16  my discussions with Mr. Roosa.
17      Q.  Do you recall whether the substance of those
18  conversations were conveyed to the United States?
19      A.  I prepared the draft of a letter agreeing to
20  accept the tender under a reservation of rights.
21      Q.  Okay.  Is that the February 2002 draft letter you
22  were earlier referencing?
23      A.  February or March.
24      Q.  And had you ever made a recommendation to your
25  client concerning whether or not to accept the tender

1   legal theory that they had come up with, and I don't
2   recall if he used the word "novel" or what, but, I mean,
3   I would certainly characterize it as a novel argument
4   given what congress said their reasons were for
5   extending the coverage of the FTCA to 638 providers.
6           And as I said, I was interested in the
7   government's position on that, not only as it related to
8   this lawsuit, but just kind of as a point of interest
9   because of my familiarity with the acts.
10       Q.  Turning to the Kallstrom appeal and your
11  conversations with Mr. Roosa regarding that claim, the
12  NIED claim by Ms. Kallstrom.  Did Mr. Roosa ever
13  indicate to you his opinion or view about the likely
14  outcome of that appeal to the Supreme Court?
15       A.  Yeah, he did.  He used the phrase "dead bang
16  winner".  And I think I referenced that in my memo.  I
17  thought that was a pretty cool term and "dead bang
18  winner" I think were the exact words he used.  In fact,
19  I'm sure they were the exact words.
20          That certainly conveyed to me that he thought
21  they were going to win the appeal.  And based upon what
22  I had seen in my analysis, I thought he was right.
23       Q.  Did Mr. Roosa convey to you any sense of the
24  urgency he felt existed or lack of urgency that existed
25  with respect to Continental responding to the tender

1  I called him to find out what do you want CNA to do, and
2  that was a general inquiry, that I know the status.
3  Now, is there basically anything I don't know, and given
4  the fact that it is on appeal, what do you want CNA to
5  do.
6      Q.  What, if anything, did he say that he wanted CNA
7  to actually do other than write a letter saying, "We
8  accept the tender"?
9      A.  All he wanted them to do was accept the tender.
10 There was nothing -- my recollection is he didn't say,
11 "We need you to do this now," or, "We want you to do
12 this," or "There is this deadline."  It is just, "Take
13 it off our hands."
14     Q.  In terms of taking it off the government's hands,
15 other than entering an appearance or arranging for
16 substitution of counsel, can you think of any single
17 thing that you would have needed to do other than
18 substituting in as counsel?
19     A.  Other than substituting in as counsel, simply
20 wait.
21          MR. ZIPKIN:  I have nothing further.
22                      EXAMINATION
23 BY MR. POMEROY:
24     Q.  Have you in your practice represented Indian
25 Self-Determination Act clients?