Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA, )
                          )
        Plaintiff,        )
                          )
   vs.                    )
                          )
CNA FINANCIAL CORPORATION )
AND THE CONTINENTAL       )
CASUALTY COMPANY d/b/a    )
THE CONTINENTAL INSURANCE )
COMPANY,                  )
                          )
        Defendant.        )
                          )

Case No. A98-285 CV (JWS)

DEPOSITION OF ROBERT A. LOHR

Pages 1 - 200, inclusive

Tuesday, February 7, 2006
        9:03 A.M.

Taken by Counsel for Plaintiff
            at
      GUESS & RUDD
510 L Street, Suite 700
   Anchorage, Alaska

Page 145

1  have you read Mr. Boysen's deposition, the
2  controller for Continental Casualty Company?
3       A.   Yes, I have.  I believe I cited the same.
4       Q.   Okay.  And you understand that he wasn't
5  able to break out the amount of money earned as
6  profit in Alaska.  Is that correct?
7       A.   I don't know if his problem was that he
8  wasn't able to or if he indicated that it wasn't
9  customary to analyze the business records in that
10 fashion.  That's more my recollection.
11      Q.   But he was asked to do that at his
12 deposition.  Do you remember?
13      A.   Yes, I do.
14      Q.   Okay.  And he didn't do it at his
15 deposition, did he?
16      A.   That is my recollection.
17      Q.   Do you recall what he stated about his
18 reasoning for not doing it at his deposition?
19      A.   I believe I just indicated what my
20 understanding of that was.
21      Q.   Okay.  What is your basis for concluding
22 that the annual profit for Continental Insurance
23 Company in Alaska is $339,105?
24      A.   That was an average figure over a ten -- a
25 recent ten-year period, so I wouldn't hold that out

Page 146

1  as any more than what it was.  But you're asking
2  about my basis for that conclusion.
3       Q.   Yes, sir.  Is your basis the chart that you
4  have attached to your report?
5       A.   That chart reflects my analysis, and that
6  is one of my bases for that opinion, yes.
7       Q.   Okay.  The policies that we have raised in
8  this case are all pre-1995 policies, aren't they?
9       A.   Yes.
10      Q.   And your chart doesn't cover any period of
11 time before 1995, does it?
12      A.   No.  That was the starting year for the
13 records I had available.
14      Q.   In your review of the quota-sharing
15 agreement and the pooling arrangement, did you come
16 up with any opinions that reflect in any way on the
17 issue of the amount of money earned in Alaska by
18 Continental?
19      A.   The source of the numbers that formed the
20 basis of my opinion, as reflected in Exhibit A, page
21 one of my affidavit, was the annual financial
22 statements filed with the State Insurance Regulatory
23 Agency for the domiciliary state, state where the
24 insurer was headquartered, using National
25 Association of Insurance Commissioners, or NAIC,

Page 147

1  blank forms. Then also the NAIC profitability
2  report by state by line of insurance. Those were my
3  sources for my numbers.
4       In reviewing the quota-share agreement and
5  the other documents contained on that CD-ROM, I did
6  not find a basis to question the numbers from the
7  sources I just cited on Exhibit A.
8       Q.  Do those agreements, either the pooling
9  agreement or the quota-sharing agreement -- I think
10 pooling agreement came first, and then it was
11 displaced by the quota-sharing agreement. But do
12 they create an arrangement where companies under the
13 CNA financial banner can share profits and share
14 losses in jurisdictions?
15      A.  Those agreements, based on my recollection,
16 reflect re-insurance arrangements by Continental
17 Insurance Company with other companies, largely with
18 affiliates of CNA.
19      Q.  What's a re-insurance arrangement?
20      A.  A re-insurance arrangement is a way to cede
21 risk and premiums associated with the risk to other
22 companies. It's a tool that is encouraged, if not
23 required, by regulators to make sure that a given
24 insurer's risk, the amount of risk it incurs,
25 doesn't exceed its surplus, policyholder surplus.

PACIFIC RIM REPORTING    907-272-4383  5
www.courtreportersalaska.com
Page 4 of 6 pages
95e814f2-bfea-4df4-9cbd-5f0e2bbef638

Page 148

1      A regulator wants to make sure, and the
2 company as well, that they're not at such risk that a
3 catastrophic event could take the company under by
4 virtue of writing more risk than they can handle. And
5 re-insurance is a recognized technique for spreading
6 that risk to a broader policyholder surplus, a broader
7 area of coverage.
8      Q.  And it permits the sharing of premiums
9 also, doesn't it?
10     A.  It would be hard to imagine that a company
11 would take on additional risk with no additional
12 premium, yes, that's correct.
13     Q.  How does the potential for sharing risks
14 and premiums, or the actual sharing of risks and
15 premiums that has occurred, if any, over the past 15
16 years, how do you evaluate that for purposes of your
17 report?
18     MR. URQUHART:  Objection.  Vague and
19 ambiguous.
20     THE WITNESS:  I evaluate the re-insurance
21 treatises that I reviewed as an appropriate and
22 prudent way to transfer risk off of the writing
23 insurer to other insurers, all of whom are licensed in
24 the appropriate jurisdictions.
25     It's not only best practice to do this.  It's

Page 149

1  an essential element of ensuring that the risk doesn't
2  get excessive for any carrier.
3         One of the primary considerations of
4  insurance regulators is to ensure that -- well, to
5  make certain that the companies remain solvent.
6         The worst thing you want is a company that
7  has collected premiums from customers in good faith to
8  be unable to pay a claim when it comes, because the
9  company has gotten too far out there.
10 BY MR. STONE:
11     Q.    Did you check the years between 1988 and up
12 to current, or any of those years, to determine
13 whether there had been any sharing of premiums or
14 risk amongst the companies under the CNA financial
15 banner?
16     A.    I did review those re-insurance agreements
17 on the disk, the CD-ROM, and I believe there was
18 ceding of risk and premium to other companies.
19     Q.    How does that enter into your evaluation of
20 amounts that have actually been earned in Alaska by
21 Continental Casualty Company?
22     A.    To the best of my knowledge, the numbers
23 that I reviewed for Alaska were from losses incurred
24 in Alaska for the years 1995 to 2004.  That would be
25 the column headed "Direct losses paid deducting