# Expert Report

## *USA v. CNA Financial, The Continental Casualty Company d/b/a The Continental Insurance Company.*

*By Deborah Senn*
November 22, 2005

### Description of Background and Qualifications

I served two four-year terms as Washington State's Insurance Commissioner from 1993 to 2001. This position is comparable to Alaska's Insurance Commissioner although Alaska's Commissioner is appointed while Washington's is elected. Washington and Alaska insurance commissioners have similar responsibilities and are governed by similar statutes. Both Alaska and Washington are included in the "Western Zone" of the National Association of Insurance Commissioners (NAIC).

I lived in Alaska in the early 1980's and practiced law with the firm then known as Baily and Mason.

Since leaving the Office of Insurance Commissioner in Washington, I have engaged in the practice of law and insurance consulting.

My curriculum vitae and fee schedule are appended to this report. (Attachment A)

As Insurance Commissioner, I regulated Washington's $18 billion per year insurance industry from 1993 to 2001. The regulatory functions of the Office of Insurance Commissioner include:

- Licensing and financial oversight of insurers,
- Detecting and dealing with insurance company insolvencies,
- Approving rates and contract forms,
- Licensing agents, brokers, and public adjusters,
- Interpreting insurance laws and regulations, including the issuance of "bulletins" to the industry,
- Investigating and resolving consumer complaints,
- Examining market conduct in sales and claim settlement practices,
- Bringing enforcement actions against insurers,
- Consumer education, and
- Coordinating insurance regulatory activities in Washington with those in other jurisdictions.

1


EXHIBIT A
Page 1 of 60

During my tenure as Insurance Commissioner, I served on numerous NAIC committees and task forces, including the Property & Casualty Insurance ("C") Committee. I also served on the NAIC's Executive Committee, and held the office of Vice President and President of the Western Zone. The Western Zone is responsible for conducting periodic "zone examinations" of insurance company finances.

In preparing this report, I have reviewed files in this case and other documents, listed in Attachment B.

## Purpose

In this report I shall summarize the facts surrounding the case of United States of America v. CNA Financial, the Continental Casualty Company d/b/a the Continental Insurance Company (referenced herein as Continental or the Company) and evaluate the Company's conduct in its handling the underlying insurance claim at issue.

I shall briefly review the regulatory standards of good faith by which an insurance company such as Continental is required to conduct itself. These standards are well defined by National Association of Insurance Commissioners (NAIC) model legislation and rules that in turn have become a template for state insurance regulation, including that in the State of Alaska. Continental acknowledges observance of this regulatory framework as essential in its claim settlement policies, practices and procedures.

It is already established in the law of this case that Continental's behavior breached necessary and acceptable standards for the conduct of the business of insurance. That is, the District Court has found that the Company has acted in bad faith. I shall further examine Continental's bad faith in light of the standards set forth in Alaska Statutes and the Alaska Administrative Code in order to address the precise nature and degree of Continental's bad faith—whether Continental's bad faith conduct was outrageous and in reckless disregard of the rights of the insured.

My opinions are based upon my experience and knowledge as the chief insurance regulator for the State of Washington for eight years and as an expert in insurance regulation over the past four years

### Continental's corporate structure

CNA Financial Corp (CNAF or Continental Financial) maintains a rather complex corporate structure, briefly described in its 2004 annual report to shareholders as follows: "CNA Financial Corporation (CNAF) was incorporated in 1967 and is an insurance holding company whose primary subsidiaries consist of property and casualty insurance companies. Collectively, CNAF and its subsidiaries are referred to as CNA or the Company. CNA's property and casualty insurance operations are conducted by Continental Casualty Company (CCC), incorporated in 1897, and its affiliates, and The Continental Insurance Company (CIC), organized in 1853, and its affiliates. CIC became

2

an affiliate of the Company in 1995 as a result of the acquisition of The Continental Corporation (Continental)."

The current Continental Insurance Company is a corporate shell created, maintained and 100% owned by Continental Casualty Company. Together, they comprise a unified insurance business enterprise. CIC has no employees—none. CCC designs and markets the insurance products sold under the CIC label. CCC performs the underwriting (decides who gets insurance). CCC receives premiums and invests money on behalf of CIC, whose current net worth is approximately $1.6 billion[1]. CCC acts as the claims adjustor for CIC insureds. CCC negotiates insurance pooling agreements on behalf of CIC. CIC periodically pays dividends to CCC as dictated by CCC employees ($262 million over the past 10 years). The cost of all the services performed by CCC personnel on behalf of CIC is charged to various expense accounts of CIC.

Bad faith arises from human activity. Employees of CCC and contractors retained by CCC personnel performed all of the acts, or today are responsible for all the acts, described in this report. CCC provides the business and legal leadership, training, and supervision for all of its employees and agents.

## The availability and integrity of insurance is essential to our modern economy

Insurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies.[2] In general, the concept of insurance is founded on the principle of indemnity—to be made whole. As a popular insurance slogan aptly puts it—it "gets you back where you belong."

Insurance is a product that affects the health, life and property of everyone in a modern society. Obtaining insurance, for example, is normally a prerequisite for purchasing a home or an automobile. Because of its importance in our lives and its relative complexity as a consumer product, the fifty United States, as well as nations around the world, regulate the business of insurance so it is widely available and so that public confidence in the integrity of the industry remains high. Many states' statutes explicitly recognize the public interest that clothes insurance. The Revised Code of Washington, for example, states, "The business of insurance is one affected by the public interest, requiring that all persons be actuated by good faith, abstain from deception, and practice honesty and equity in all insurance matters. Upon the insurer, the insured, their providers, and their representatives rests the duty of preserving inviolate the integrity of insurance."[3] "All persons" means everyone without respect to technical knowledge (expert and unsophisticated), wealth and income (rich and poor), or role (insured and insurer). An insurer's duty of good faith does not vary depending on the wealth or circumstances of

---

[1] CCC's current net worth is approximately $6 billion.

[2] This is the definition of "insurance" found in RCW 48.01.040, Washington's insurance statute.

[3] RCW 48.01.030

3

EXHIBIT  A
Page  3  of  60

the insured. The United States (with all its resources) is entitled to the same consideration owed to an 87-year old widow who can barely read and write. Similarly, an insured's duty to be truthful when applying for insurance and filing claims does not vary depending on the insurer's size.

The importance and integrity of insurance transcends the rights of the private parties that contract to transfer risk. An efficient, well-regulated market for insurance (as opposed to the default alternative of universal self-insurance) is a public good. For example, the business conducted in Edward Lloyd's seventeenth century coffee shop in London not only protected the private interests of ship owners and merchants, by extension it produced enormous benefits for all of English society as London developed into an influential center of world trade.

Paying money in advance for a promised benefit that fails to materialize is a recipe for a confidence game. Insurance is different because promises *are* kept. Honorable people in the industry conduct themselves with honesty, fairness, integrity, and lawfulness of purpose—and a system of public regulation shines a light on the policies, practices and procedures of the industry as a deterrent to anything less.

It is often said that insurers have heightened responsibilities when it comes to conducting their particular business in good faith. There is a common law principle of good faith for all commercial transactions. The Uniform Commercial Code imposes an obligation of good faith for the performance of every commercial contract. Insurance contracts may be complex and difficult to understand, and they are also commonly contracts of adhesion.[4] Because of these special characteristics of insurance, an obligation of *utmost* good faith is said to reside on insurers.

## Legal and regulatory standards

States, rather than the federal government, are responsible for insurance regulation in the United States, and all fifty states have an insurance statute that bars unfair trade practices (i.e., bad faith). These statutes are very nearly uniform, and in many cases they are identical, because they are closely patterned after the NAIC's "Model Unfair Claims Settlement Practices Act" created in 1971. (Attachment C) It is noteworthy that Continental's own Claim Management Manual includes a full reproduction of the NAIC model provisions.

Alaska's Unfair Claims Settlement Practices law (excerpted below and presented in its entirety in Attachment D) is in many respects identical to the Washington Law under which I regulated the insurance industry for eight years. (Refer to Attachment E for the Washington statute and regulations—Washington's Unfair practices are embodied in regulation while Alaska's are in statute with additional provision in regulation.) Both

---

[4] A contract devised by the insurer and offered to consumers on a "take-it-or-leave-it" basis.

4

EXHIBIT A
Page 4 of 100

Alaska and Washington statutes authorize their insurance regulators to promulgate rules necessary for the full implementation of their statutes' provisions, and consequently, each jurisdiction has created a body of regulations that further defines bad faith or "unfair trade practices."

The principles of fair practice under Alaska Law are a good measuring stick for the examination of Continental's conduct in this case. The Unfair Claims Settlement Practices Act sets forth the claims settlement principles and practices that everyone in the insurance industry must live by.

Here are the unfair claims settlement practices from the Alaska statute that are applicable in this case:

Alaska Statutes 21.36.125. Unfair claims settlement practices.

(a) A person may not commit any of the following acts or practices:

(1) misrepresent facts or policy provisions relating to coverage of an insurance policy;

(2) fail to acknowledge and act promptly upon communications regarding a claim arising under an insurance policy;

(3) fail to adopt and implement reasonable standards for prompt investigation of claims;

(4) refuse to pay a claim without a reasonable investigation of all of the available information and an explanation of the basis for denial of the claim or for an offer of compromise settlement;

(5) fail to affirm or deny coverage of claims within a reasonable time of the completion of proof-of-loss statements;

(6) fail to attempt in good faith to make prompt and equitable settlement of claims in which liability is reasonably clear;

(7) engage in a pattern or practice of compelling insureds to litigate for recovery of amounts due under insurance policies by offering substantially less than the amounts ultimately recovered in actions brought by those insureds;

(8) compel an insured or third-party claimant in a case in which liability is clear to litigate for recovery of an amount due under an insurance policy by offering an amount that does not have an objectively reasonable basis;

(13) delay investigation or payment of claims by requiring submission of unnecessary or substantially repetitive claims reports and proof-of-loss forms;

EXHIBIT A
Page 5 of 60

> (15) fail to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

The bad faith standard applied by the District Court in this case is rooted in both common law and the Alaska statute. But the former is similar in word and concept to the statutory standard. (The District Court's reasoning and orders most closely coincide with standards 4 and 15, enumerated above.) Specifically, the District Court has held that "a plaintiff must show that the defendant-insurer lacked a reasonable basis for denying benefits of the policy and the defendant-insurer had knowledge that no reasonable basis existed to deny the claim or acted in reckless disregard for the lack of a reasonable basis for denying the claim." *Preliminary Order*, September 4, 2001 at 21, citing *Hillman v. Nationwide Fire Ins. Co.* 855 P. 2d 1321, 1324 (Alaska 1993).

Case law citing bad faith and statutory bad faith (unfair claims settlement practice acts) complement each other from a public policy standpoint. Both "forums" provide appropriate remedies. The regulator charged with enforcing the bad faith statute has a toolbox of remedies—monetary fines, disapproval of the insurance product being marketed, or even suspension of the insurer's license to operate (a potentially fatal blow). Judicial remedies range from equitable remedies to punitive damages.

Punitive damages, as opposed to mere compensatory damages, are necessary to ensure that insurance contract provisions are honored. If an insurer engages in bad faith and the cost of that conduct is only paying the insured that which is owed under the insurance contract, then there will be a perverse incentive to engage in bad faith behavior on the chance that the insurer's bad faith may go unchallenged. Thus, public policy requires that bad faith behavior be punished. The standards for imposing punitive damages are very rigorous. Consequently, the Alaska statutes address the matter directly:

AS 09.17.020—Punitive Damages—states in pertinent part:

> (b) The fact finder may make an award of punitive damages only if the plaintiff proves by clear and convincing evidence that the defendant's conduct
>
> > (1) was outrageous, including acts done with malice or bad motives; or
> > (2) evidenced reckless indifference to the interest of another person.
>
> (c) At the separate proceeding to determine the amount of punitive damages to be awarded, the fact finder may consider
>
> > (1) the likelihood at the time of the conduct that serious harm would arise from the defendant's conduct;
> > (2) the degree of the defendant's awareness of the likelihood described in (1) of this subsection;
> > (3) the amount of financial gain the defendant gained or expected to gain as a result of the defendant's conduct;
> > (4) the duration of the conduct and any intentional concealment of the conduct;

EXHIBIT _A_
Page _6_ of _60_

(5) the attitude and conduct of the defendant upon discovery of the conduct;

(6) the financial condition of the defendant; and

(7) the total deterrence of other damages and punishment imposed on the defendant....

In *Ace v. Aetna*, 139 F. 3d 1241 (9th Cir. 1998) the Ninth Circuit explained the coupling of bad faith and punitive damages this way: to prove bad faith, a plaintiff must establish "the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of reasonable basis for denying the claim." Citing *Hillman v. Nationwide Mutual Fire Ins. Co.* 855 P. 2d 1321, 1324 (Alaska 1993).

In *Ace*, the Ninth Circuit found that Aetna did not investigate the claim, failed to make proper contact with plaintiff, failed to disclose its standards, failed to provide a reasonable explanation for its denial, failed to answer questions, and failed to acknowledge plaintiff's deteriorating condition. As a result, punitive damages were upheld in *Ace*.

In summary, punitive damages are recoverable when the defendant breaches the implied covenant of good faith and fair dealing *and* commits outrageous acts consisting of malice or bad motive or recklessly acts with indifference to the rights of the insured. Bad faith does not necessarily indicate the presence of outrageous acts of malice, or bad motive. There must be clear and convincing evidence of outrageous acts of malice, or bad motive or reckless indifference of the rights of others before punitive damages may be awarded.

Here, I am testifying as an expert on insurance and the standards of conduct for an insurer. I will offer my opinion as to whether the bad faith conduct of Continental reached the level of outrageous acts of malice or bad motive or reckless disregard of the rights of the United States.

## **Report Organization**

The balance of my report is organized as follows:

A. Continental failed to provide a prompt and reasonable explanation for its denial of coverage, and deliberately misconstrued the facts around the purchase of coverage.

B. Continental knowingly allowed a conflicted attorney to represent its interest.

C. Continental knowingly and deliberately concealed coverage.

D. Continental repeatedly and deliberately failed to reply to tenders by the United States.

7

EXHIBIT  A
Page  7  of  60

E.   Continental compelled its insured to litigate for recovery.

F.   Continental failed in its duty to defend.

G.   Continental's knowledge of its wrongdoing is supported by its own Claim Handling Guidelines, Best Practices and the testimony of its own employees.

H.   The United States Congress did not pass the ISDEAA and other statutes affecting Native Americans to benefit the private insurance industry.

## Discussion

**A.   Continental failed to provide a prompt and reasonable explanation for its denial of coverage, and deliberately misconstrued the facts around the purchase of coverage.**

The District Court has found bad faith on the part of Continental in this case, and this finding is the law of the case. Relying on the standard for bad faith in *Hillman v. Nationwide Insurance* 758 P. 2d 1248 (Alaska 1988), the District Court found that Continental failed to provide its insured with a prompt and reasonable explanation for its denial of coverage. In essence, the District Court found Continental's reasons for denial to be not credible and to be a *"post hoc rationale"*—that is, manufactured after the fact during the course of litigation. *Order from Chambers*, July 12, 2005, p.16 (In addition, the District Court found other circumstances arising out of the case to be violations of good faith; e.g. Continental's failure to respond to repeated tenders to defend and indemnify its insured.)

The case law standard cited by the District Court is for all practical purposes identical to provisions of Alaska's Unfair Claims Settlement Practices Act, although the standards in the statute contain more specific detail about prohibited conduct. For example, AS 21.136.125 defines an unfair practice as: "(15) fail[ure] to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

Before discussing the details of Continental's failure to provide a reasonable explanation for its denial of coverage, it is important to acknowledge another finding by the District Court that is linked to its finding of bad faith. When an insurer denies coverage, the denial is not automatically bad faith. There can be a reasonable denial of coverage.

In this instance, Continental argued that its denial of coverage and explanation for that denial was reasonable. More precisely, Continental argued that its position would not amount to bad faith because it could be construed as "fairly debatable" under *Hillman v. Nationwide,* (infra). However, the District Court stated that the facts of this case and the Hillman case were "markedly different."

EXHIBIT ___A___

Page ___8___ of ___60___

First, Nationwide relied on a policy exclusion while Continental relied on a policy omission. Second, Nationwide's denial was based on a "reasonable interpretation" (ultimately in *Hillman v. Nationwide* the exclusion was invalidated on public policy and statutory grounds) and Continental's was not. In fact, the District Court pointed out that the Ninth Circuit held that Continental's interpretation was "incorrect." Third, Continental had a duty to defend and failed to discharge that duty. Fourth, Continental's claim of "subjective intent" in excluding acts that fell within the Federal Tort Claims Act was simply not supported by the evidence. (The District Court points out in its *Preliminary Order*, September 4, 2001, "…Continental's reliance on the subjective testimony of witnesses obscures the correct legal analysis. The question is not whether BBAHC and Continental intended to include the United States, specifically as an insured. Instead, the question is whether the United States is in the class intended to be benefited." *Preliminary Order*, September 4, 2001 p. 14.) Fifth, Nationwide's denial was stated consistently from the beginning as opposed to Continental's "post hoc rationale first fully articulated in litigation over the rejection of the insureds' tenders." (*Order from Chambers,* July 12, 2005, pp. 14-16)

Having found that Continental's rejection was neither reasonable nor "fairly debatable," the District Court goes on to delineate the conduct that constitutes bad faith—i.e. the lack of a reasonable basis for denying coverage, and "the knowledge that no reasonable basis existed to deny the claim." In its earlier *Preliminary Order,* September 4, 2001, the District Court reviewed the unreasonable delays in response to the tenders from the United States, the inadequacy of the rejection explanation, the conflict of counsel Friderici, and the inadequacy of the explanation by new counsel Stowers. (*Preliminary Order,* September 4, 2001 at 24)

In its Final Order issued on September 18, 2001, the District Court additionally addressed Continental's substantive arguments that the FTCA relieved Continental from coverage. For example, Continental made the representation that BBAHC got insurance because "it was not sure that the FTCA would cover everything." (*Final Order*, September 18, 2001 at 4) The District Court states that this as an example of Continental's incorrect citations, absent citations (conclusory statements for which Continental provided no citation), and misrepresentations or half truths." (*Final Order,* September 18, 2001 at 4) The District Court went on to point that Continental's material misstatements about BBAHC officer Clark contradicted his actual statements. (See Deposition of Robert Clark.) And on the important issue of whether there was a reduction in premiums due to "less coverage" because of the FTCA, the District Court found none and concluded: "There are no contemporaneous documents objectively verifying any intent to exclude acts or omissions covered by the FTCA." (*Final Order,* September 18, 2001 at 6) Nor, the District Court goes on to say, was there any "intent" to exclude acts also covered by the FTCA. (*Final Order,* September 18, 2001 at 7) Despite Continental's unverifiable claims and misstatements about a reduction in premiums, it was in fact increasing premiums! Not only did Continental fail to reduce premiums (as it claimed to have done), it raised them. Attachment F shows the policies, the passage of the FTCA and the increase in premiums to BBAHC.

EXHIBIT  A

Page  9  of  60

**Conclusion**: Here lies the first order of good faith in insurance claim settlement—prompt and reasonable acknowledgment of the existence of coverage. Continental failed to be prompt. (See Section D below.) Continental failed to provide a reasonable explanation for denial of coverage, because, as the District Court found, there is no reasonable explanation. Instead of delivering on its promise of coverage, Continental engaged in all manner of stealthy behavior designed to mislead and frustrate the valid claim of its insured. It did so deliberately, without regard for the damage its insured would suffer, and without regard for the regulatory and legal consequences Continental might suffer. Continental also lied in this case when it stated that it had reduced BBAHC's premiums when in fact it had raised them. It did these things without any regard for its duty to uphold the integrity of insurance.

### B.      Continental knowingly allowed a conflicted attorney to represent its interest.

The District Court in its *Preliminary Order*, September 4, 2001 recognized the conflict that counsel for Continental (actually CNAF) brought upon himself: "As retained counsel for BBAHC, Friderici owed BBAHC his full, undivided loyalty and allegiance. There is some question concerning the ethical proprietary of Friderici's responding on behalf of the insurer, when he represented the insured BBAHC." (*Preliminary Order*, September 4, 2001 at p. 21-22)

Continental received timely warning of Friderici's conflict and should have retained other counsel. James Friderici was a lawyer with Delaney, Wiles, Hayes, Reitman and Brubaker. He was retained by Continental to represent BBAHC in the suit filed by the injured Lori Wilson. In what appears to be his first written communication with the insurer Continental, he cites the conflict that his participation could potentially create: "As we discussed, once we represent the insured, we can no longer advise you on coverage." (Letter from Friderici to William Hutson, May 10, 1994 at p. 4. BBAHC 001194.) Despite identifying his potential conflict, Mr. Friderici goes on to state that his firm will advise Continental on what the exposure is, and Continental continued to rely upon Friderici's advice.

By May 16, 1994, Mr. Friderici had filed an appearance as an attorney for BBAHC with the Alaska state court. It is at this point, according to his own words, that Mr. Friderici should have stopped counseling Continental on this case.[5] Despite his indisputable conflict, here is a log of Friderici's activities subsequent to the time that he filed his appearance on behalf of BBAHC.

---

[5] A very strong position can be taken that Mr. Friderici was conflicted at the time of his first communication with Continental. He was retained to represent BBAHC which is staffed by employees of the United States. Therefore, as soon as he was retained he was representing the United States and he should not have consulted with Continental at all. In fact, in its most recent order the District Court stated: "It is difficult to understand how Continental would admit a duty to defend its employees but not the United States itself."

EXHIBIT  A
Page  10  of  60

In a January 20, 1995 letter to William Hutson, Claims Director, Mr. Friderici advises Continental to reject the first tender from the United States. He clearly was advising Continental about its coverage and liability obligations vis-à-vis the United States and not as attorney for BBAHC. He compounds his misconduct and the bad faith of Continental by advising Continental not to reveal to the United States that there is a second and more applicable policy than the one initially tendered by the United States. (CNA 000565)

After receiving a letter addressed to Continental from the United States inquiring about a response to the first tender, Mr. Friderici sends a letter dated February 13, 1995 to the Asst. U.S. Attorney (AUSA) opening with the words: "We represent Continental Insurance Company with respect to your tender of defense." (CNA 000569) He has done precisely that which nine months earlier he said he could not do.

On May 8, 1995, Claims Director Hutson asks Mr. Friderici about next steps. (CNA 000430) Mr. Friderici responds on May 25, 1995 by describing the options that the United States has with regard to the refusal of tender by Continental. In that letter, Mr. Friderici characterizes what he believes is the understanding and motives of the U.S. government when it comes to insurance litigation. Clearly, in his letter of May 25, he is representing the interests of Continental.

On June 6, 1995, Mr. Friderici directly received another tender from the United States with the correct policy reference for the HMA policy that covered Jake's Place. (CNA 000623) In writing to Mr. Friderici, the United States was clearly operating under the assumption that Friderici was representing Continental. Mr. Friderici follows up by writing a letter to Mr. Hutson, the Claims Director, on June 8, 1995 saying that Continental now needs another attorney to respond to the tender. (CNA 000624) Yet, he goes on to say that if BBAHC and Continental agree on a position vis-à-vis the United States, then he, Friderici, will respond to this tender!

Three months later, the United States, again writes because its tender has gone unanswered. In a September 13, 1995 letter to Mr. Hutson, AUSA Attorney Ken Roosa states that he has made numerous efforts to get an answer from Mr. Friderici. Then, finally, he is informed that Mr. Friderici is conflicted and unable to represent Continental. (CNA 000347)

Amazingly, on October 3,1995 (almost another month), Mr. Hutson replies to tender number two from the United States, referencing the letter written previously by the conflicted attorney James Friderici. Clearly, Mr. Friderici has not bowed out of the case. In a claim file notation apparently authored by Mr. Hutson on October 3, 1995, he states: "Discussed with Friderici and rejection of tender to U.S. govt. ..." (BBAHC 001866)

Three months later, despite recognition that Friderici was "conflicted" and out of the case, a claims log entry, appearing to have been entered by Mr. Hutson, dated January 5, 1996, asks Mr. Friderici to monitor the case, which has been set for trial. (BBAHC 001866)

EXHIBIT A
Page 11 of 60

Finally, an email from Greg Steele to Steve Garrett dated April 28, 1997 refers to the fact that Continental needs new coverage counsel and Friderici should not be allowed to represent BBAHC any longer.

**Conclusion:** The facts and circumstances around the conflict of Continental's attorney James Friderici are an integral part of the evidence that led the District Court to find that Continental acted in bad faith. First, the District Court referenced the ethical problems facing Mr. Friderici. Second, the District Court found that the rationale for rejection of the tenders was not an adequate explanation of the denial: "it appears that Friderici (BBAHC's litigation counsel) rejected tender even though his client (BBAHC) had not reached any conclusion regarding whether the United States was an implied insured under the policy." (*Preliminary Order*, September 4, 2001 at 22) The District Court contrasted this with the position of the United States, which was "carefully crafted and well-supported." (*Preliminary Order* at 22) Finally, the District Court found that replacement counsel Stowers' response was so unacceptable that Mr. Stowers must have had the facts misrepresented to him by Continental, or that he conducted an inadequate investigation. Thus, the case law standard of bad faith was violated. So too, the statutory standards were violated.

At a minimum, the above-referenced conduct is conclusive evidence of violations of AS 21.136.125 (4), (5) (13), and (15). An insurer must not:

> (4)  refuse to pay a claim without a reasonable investigation of all of the available information and an explanation of the basis for denial...
>
> (5)  fail to affirm or deny coverage of claims within a reasonable time...
>
> (13)  delay investigation or payment of claims...
>
> (15)  fail to promptly provide a reasonable explanation...

My experience regulating the insurance industry leads me to conclude that Continental's conduct here is outrageous and malicious. It clearly demonstrates reckless indifference to the interest of its insured.

Continental and Mr. Friderici in his capacity as Continental's attorney acted in concert and persisted until well after Friderici identified his potential conflict of interest. Notwithstanding his conflict of interest, he continued to advise Continental after appearing in court on behalf of BBAHC. This was the event that he said would put him in conflict.

Continental was aware of these facts at all times. Not only did Friderici fail to promptly resolve his conflict of interest, he advised Continental to (unlawfully) conceal the existence of the insurance policy that covered Jake's Place. (Section C of this report.) Indeed, Continental's Fredirici responded in writing to the tender without mentioning the

second policy. Even after he informed the AUSA that he was conflicted, it appears that Friderici continued to advise Continental. Continental compounded its own wrongdoing by using Mr. Friderici's faulty coverage analysis by re-referencing his February 13, 1995 letter as the reason for rejection of subsequent tenders of the United States. So, in a practical sense, Continental has continuously relied upon Mr. Frederici.

Mr. Friderici's and Continental's actions were designed to deprive the United States of its rights under the law. Friderici and Continental obviously acted out of bad motives. Mr. Friderici carries ethical obligations as an attorney and officer of the court. To even put himself at risk to deprive the United States of its rights can only be described as reckless indifference. I have only described Continental's and Friderici's actions in this section with regard to the conflict issue. In later sections when I discuss the intentional misrepresentation of the pertinent policy, Friderici's analysis of how to avoid suit by the U.S. and the two years of stonewalling to the tender letters, the reckless indifference and bad motives are even more fully revealed.

### C.    Continental knowingly and deliberately concealed coverage

Of all the principles of good faith violated by Continental, perhaps the most shocking is the deliberate lies and concealment from the insured of the existence of a policy that covered the incident at Jake's Place. In its initial tender to Continental, the United States referenced one of two policies maintained by BBAHC, but not the one that included the facility at which the incident took place. (USDOJ letter June 6, 1995 CNA 000336) In his initial analysis for Claims Director William Hutson, James Friderici instigates a cover-up: "Since the United States has tendered only under the 93 CBP 06114933-94 policy and not under the HMA 9500648-5 policy, our recommendation is not to make any reference to the HMA 9500648-5 policy. That should be ignored until there is a demand directed toward the policy."

Continental has an affirmative duty to facilitate the filing of an appropriate claim, not play cat and mouse. It is relatively common for people to misplace or otherwise lose an insurance policy—and it is well understood by insurers that they are obligated to assist their insureds in such circumstances. Continental would have no duty to disclose an irrelevant policy, but clearly such is not the case here. HMA 9500648-5 was known to be the applicable policy because Continental would not have gone to great lengths to analyze it and conceal it if it believed otherwise. Indeed, it is ultimately the policy under which the District Court and the Ninth Circuit have held that the United States is an insured.

Mr. Friderici's deceit was not isolated. Earlier, in an April 6, 1994 memorandum from Claims Director William Hutson to George Ertle, Director of Liability Claims, Hutson writes: "We do have other sources of contribution from the Federal Tort Claims Act and also possibly under the Continental CBP policy. No one is aware of the CBP policy as of this date except myself and John Kurtz, resident adjustor in Spokane, Washington." (BBAHC 001212)

EXHIBIT _A_

Page _13_ of _6c_

It is obvious that Continental realized from the beginning that liability arose under the HMA 9500648-5 policy. In a document entitled "Initial File Recap/ Major Reserve Report" dated February 1, 1994, it states: "We insure Bristol Bay Area Health Corporation under Policy No. HMA 9500648-5." (BBAHC 000192)

A February 17, 1994 letter from Claims Director Hutson to John Kurtz in Spokane states: "It appears that coverage is in line for this loss." (CNA 000512)

In a February 18, 1994 letter from Claims Director Hutson to John Kurtz in Spokane states: (CNA 000510) "It is obvious that we will be facing a very serious situation regarding liability."

On March 18, 1994, George Ertle, Director of Liability, in a letter to Mr. Hutson states: "I agree we have problems."(CNA 000505)

If Continental believed the U.S. was not an implied insured, it should have nonetheless disclosed the existence of the policy and agreed to defend under a reservation of rights, not conceal the policy's existence.

**Conclusion:** The business of insurance would be an abject failure if insurance companies conducted their business by concealing coverage from their insureds and blatantly lying to them about liability. The leading provision of the Unfair Claims Settlement Practices Act deals with misrepresentation. An insurer must not:

> (1) misrepresent facts or policy provisions relating to coverage of an insurance policy.

The business of insurance can only be conducted successfully if the insurer is honest in dealing with the insured. The District Court has held that Continental's concealment of coverage rises to the level of bad faith. Does this bad faith conduct constitute outrageous acts done with malice or bad motive? Does this conduct consist of reckless indifference to the rights of others? I would say to both a resounding "yes!"

Continental and its employees and representatives acted knowingly and with malicious intent. The actual Unfair Claims Settlement Practice provisions are included in Continental's own claim handling guidelines. Misrepresenting or withholding information about coverage is a clear, logical and well-understood violation of good faith. To blatantly violate the law in this manner can only be described as reckless behavior. Continental's deceit is evident in repeated acts. Continental's attempt at concealment is self-recognition of its unlawful behavior. Continental's action was intended to deprive the United States, the implied insured, of its rights, despite the jeopardy to the Company that its actions might create.

14

**D.    Continental repeatedly and deliberately failed to reply to tenders by the United States**

Time (along with cash flow) is extremely important in the business of insurance. Insurance companies' profits in part come from investments accumulated policyholder premiums between the time they are received and the time claims are paid. In general, the longer policyholder premiums are retained, the more profitable an insurance company will be. Insurers' natural incentive to retain policyholder funds as long as possible is counterbalanced by regulatory requirements that mandate prompt claims handling. Even a casual reading of the Unfair Claims Practices Act will suffice to underscore the emphasis of prompt and timely action in handling claims.

Therefore, the front line of regulation revolves around timeliness. The first or second item on any bad faith list is the failure to respond in a timely manner. The Alaska Unfair Claims Settlement Practices Act (AS 21.36.125) contains numerous references to the need to avoid undue delay and to always provide a prompt and timely response to the insured. An insurer must not:

>   (2)   fail to acknowledge and act <u>promptly</u> upon communications regarding a claim arising under an insurance policy; [emphasis supplied]

>   (3)   fail to adopt and implement reasonable standards for <u>prompt</u> investigation of claims; [emphasis supplied]

>   (5)   fail to affirm or deny coverage of claims <u>within a reasonable time</u> of the completion of proof-of-loss statements; [emphasis supplied]

>   (6)   fail to attempt in good faith to make <u>prompt</u> and equitable settlement of claims in which liability is reasonably clear; [emphasis supplied]

>   (13)  <u>delay</u> investigation or payment of claims by requiring submission of unnecessary or substantially repetitive claims reports and proof-of-loss forms; [emphasis supplied]

>   (15)  fail to <u>promptly</u> provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement. [emphasis supplied]

Timeliness is invoked in six of the bad faith provisions in the Alaska Unfair Claim Practices Act. The tender attempts by the United States were discussed extensively in the pleadings and reviewed in the *Preliminary Order*, September 2001. In its order the District Court noted the multiple tenders by the United States, and Continental's failure to respond or the inadequacy of the response. In fact, the District Court used the term "dilatory" in describing Continental's actions.

The United States first tendered to Continental January 6, 1995. Thirty-three days later on February 13, 1995, Continental, through its counsel Friderici, rejected the tender. The District Court stated: "Friderici neither cited nor discussed any relevant case law. Friderici and Continental did not advise the United States that there was a separate policy covering Jake's Place." (*Preliminary Order,* September 4, 2001, at 22)

According to the District Court, approximately 108 days later, as of June 1, 1995, BBAHC, Continental's insured stated through its counsel that it had not yet reached a conclusion about whether the United States was an insured.

On June 6, 1995, having discovered the HMA policy that covered Jake's Place without any help from Continental, the United States tendered to Continental. The District Court pointed out that the United States "set forth its position in a carefully crafted and well-supported letter citing both treatises and case law." (*Preliminary Order,* September 4, 2001 at 22)

On June 8, 1995, Friderici answered, stating he was not authorized to respond but would forward the letter to Continental.

Three months later, on October 3, 1995, after inquiries from the United States about the whereabouts of its tenders, Continental responded. Once again, Continental rejected the tender of the United States, relying on Friderici's original letter. At this point, according to the District Court, Continental had failed for ten months to complete its investigation with regard to this tender thereby negating any "timely" response.

Sixteen months later, on February 20, 1997, and over two years after the original tender, the United States tendered once again. This tender took place when the United States was in final negotiations with the Lori Wilson family. Twenty-eight days later Continental acknowledged receipt of the tender, but did not otherwise respond.

The burden fell to the United States to once again contact Continental. It did so on May 16, 1997. Another month elapsed and on June 19, 1997, Continental's new counsel, Mr. Stowers, rejected the tender. The District Court concluded that Mr. Stowers must have had the facts misrepresented to him or conducted an inadequate investigation.

Regardless of the reason(s), the fourth good faith tender of the United States was ultimately rejected, too. The whole process of the four tenders and the final rejection consumed 2-½ years.

**The Kallstrom Case**

Continental's bad faith and bad motive continued unabated. Continental flagrantly denied tenders in the Wilson case. Additionally, Continental never really responded to tenders in a second matter. Ms. Kallstrom was the woman who served Lori Wilson the caustic dishwashing liquid. When Continental failed in its duty to defend the claim against the United States, it proceeded against Ms. Kallstrom. Ms. Kallstrom counter-sued for

EXHIBIT A
Page 14 of 60

emotional distress. Eventually, the United States successfully defended itself against the latter claim. During the course of this litigation, however, the United States tendered the Kallstrom litigation on several occasions.

AUSA (Ken Roosa) tendered the Kallsrom case to John Neeleman of Lane, Powell, Spears Lubersky in a letter dated September 26, 2001. On October 30, 2001, AUSA Ken Roosa again tendered the defense of the Kallstrom case. He made two important points. First, that the United States had initially tendered Kallstrom three years earlier on July 8, 1998. Second, prior to his letter, on September 18, 2001, the District Court had ruled. Although the letter doesn't specifically address this, it is notable that by that ruling the District Court had deemed the U.S. an implied insured. Since Continental committed bad faith with malice and bad motive all through this case, one would wonder why at that point Continental would not respond to the tender of the Kallstrom case.

Erin Finn is the 30 (b) (6) witness produced by Continental to speak for the Company regarding claims. Ms. Finn, Assistant Vice President and Claims Counsel for Continental Casualty Company was responsible for the case during the last two tenders of the Kallstrom case. In her deposition, Ms. Finn gave various reasons for failing to respond to the United States' tenders of Kallstrom. First, she said they had been "hopeful" to resolve the case with the government. (p. 16). She then claimed nothing was happening in the Kallstrom case. (p.16) Even though she acknowledged that the District Court had ruled that the United States was indeed an insured, she claimed there were still coverage issues they "needed to investigate." (p. 19) She noted the interest by Mr. Roosa "to be done with the case." (p. 17). She also talked about how they could not find a firm to take the Kallstrom case and once the case was over, there was "nothing to accept." (p. 22) This is astonishing reasoning given the fact that the United States had expended substantial resources on the case.

Finally, when asked if Continental could have accepted the tender with a reservation of rights, Ms. Finn said yes, but! Yes, but there was nothing to do since the case was over. (pp. 24-25) If insurers were allowed to do this, the system would breakdown. Continental's method is to refuse the tender, and when the tendered case is over, shrug its collective shoulders and justify the refusal because the case is over.

There is simply no excuse for Continental to have refused the tenders. *Understanding Insurance Law, 3rd Edition, Robert H. Jerry II* states that refusing a duty to defend must be treated as bad faith with punishment. If there is no consequence to the failure to discharge the duty to defend then the insurers will do it over and over. Jerry goes on to say that an insurer who fails to defend may lose control over the defense, or alternatively the attorney hired by the insured might be less effective or more expensive." That is the consequence paid by an insurer that ignores a tender to defend. It is extraordinarily inappropriate for an insurer to breach a duty to defend. It is detrimental to an insured and an orderly system of insurance. The District Court has held in this case that failure to defend is a breach of a primary duty.

EXHIBIT A
Page 17 of 60

**Conclusion**: The District Court unequivocally found that the failure to respond in a timely fashion was part of Continental's bad faith. (*Preliminary Order*, September 4, 2001 at 22-24) And, in the instance of the delayed tenders, the District Court addressed the punitive damages standard: "A jury could find that Continental's rejection of the United States' tenders was outrageous or done with reckless indifference." (*Preliminary Order*, at 17)

Continental's behavior at a minimum is a violation of AS 21.36.125 (2), (3), (5), (6), (13), and (15). Altogether, it does not seem that Continental's behavior is inadvertent or the result of carelessness or ineffective business control (any or all amounting to bad faith). Rather, it has been thoroughly demonstrated that Continental has acted deliberately and repeatedly in a manner calculated to frustrate and wear down its insured.

Does the lack of response or the delay in responding to tenders add to Continental's outrageous conduct that is otherwise laced with malice or bad motives? One would have to conclude, "yes." Two and one half years to receive a denial that is never adequately supported by a proper analysis is clearly unconscionable.

In the situation surrounding the Kallstrom case, there had been a ruling that the United States was an insured, and yet Continental ignored the direct and specific retenders of Kallstrom once more. Its behavior is intentional, reprehensible and completely beyond the standard of care for the insurance industry.

### E.   Continental compelled its insured to litigate for recovery

A great concern of regulators is that an insurance company, which has unequal bargaining power in relation to the insured, can simply drag its feet on a claim. This will require the insured to file a lawsuit or give up on the claim because the insured does not have the resources to take the insurance company to court. Delay tactics, unreasonable rejections of coverage, non-responsiveness are the things that force an insured to litigation. These tactics are considered a hallmark of bad faith. The AS 21.36.125 provides: An insurer may not:

> (7)   engage in a pattern or practice of compelling insureds to litigate for recovery of amounts due under insurance policies by offering substantially less than the amounts ultimately recovered in actions brought by those insureds.

> (8)   compel an insured or third-party claimant in a case in which liability is clear to litigate for recovery of an amount due under an insurance policy by offering an amount that does not have an objectively reasonable basis.

Continental has engaged in continuing dilatory behavior from the beginning of the case up to and through the findings by the Ninth Circuit and District Court (finding of bad faith), and still has not accepted tender from the United States or settled this matter. It has

18

just shut out the United States completely requiring over seven years of unnecessary litigation. That this was deliberate, knowing, and purposeful is minutely brought out in Continental's correspondence with Mr. Friderici. The District Court in its findings discusses the inadequacy of the analysis contained in Continental's rejection of the tenders by the the United States. In that analysis, Mr. Friderici was too busy speculating on the United State's possible course of conduct. First, he writes to Mr. Hutson that the United States is not "logical" about litigation. (CNA 000569). Then on May 25, 1995, in an update to Mr. Hutson, Mr. Friderici discussed several options that the United States could pursue:

    1)  Sue Continental now for coverage.

Although he said it would be a logical choice, Mr. Friderici observed: "If the United States were a private party, it would sue now. However, given the customary inertia of the government it is unlikely to do so." (BBAHC 001123)

    2)  The United States may wait to sue until the Wilson litigation was complete.

Mr. Friderici observed: "Option two is the most likely course because it involves procrastination which the government is good at." Id.

    3)  The United States would drop the claim.

Mr. Friderici said it was unlikely the United States would drop the claim because the United States "doesn't deal with insurance coverage. And is not intimidated by the prospect of losing the case." He went on to say: "this option cannot be totally dismissed since if the United States does well against the plaintiff, it may decide that Continental is not worth the effort of pursuing. Alternatively, if the U.S. Attorney gets his budget cut and has a manpower crunch, he may not do so because he is simply too busy to do so. The United States does very poorly on collecting money owed to it since everything else has a higher priority." (BBAHC 001123)

Mr. Friderici discussed a fourth option: a declaratory judgment. Here is why he dismissed the idea: "that option would foreclose the possibility of the government simply going away. We could inquire of the United States of what it intends to do, but there are disadvantages to us. First, the United States is unlikely to answer the question in any manner which is binding and second it is equivalent to kicking a sleeping dog. He is likely to wake up and do something you don't want. Our recommendation is to put the matter on hold and do nothing." BBAHC 001124.

So much for communicating with the insured!

**Conclusion**: Instead of engaging in fruitful and honest analysis of the situation, Continental's conflicted counsel engaged in name calling and speculation on scenarios in order to dodge the Company's legal responsibilities. Imagine if the United States were an

EXHIBIT A
Page 19 of 60

87-year old widow or a small Alaska businessperson. Mr. Friderici would simply delay until she were dead or the small business ran out of money to pursue litigation.

These egregious behaviors of delay and concealment forced the United States to litigate this case more than seven years at an enormous expense to the taxpayers of this country. This is a classic violation of claims handling standards and specifically AS 21.36.125 (7) and (8). Was the conduct outrageous with malice and bad motives or done with reckless indifference with regard to the interest of others? Yes!

The conduct was clearly deliberate. Mr. Friderici sought to wait out the United States and hope it would not sue. Second, the motive was to deny the ability of the United States to collect on the claim. What is clearly apparent is the belief that the United States was too large and bureaucratic to bother protecting the interests of a rural native-Alaskan health clinic. Continental believed it could get away with this behavior. It is this egregious behavior that should be punished.

**F.    Continental failed in its duty to defend.**

The duty to defend with a reservation of rights when an insurer believes there is no coverage is a concept that rises out of the common law and is generally not contained in insurance statutes. Nevertheless, many courts have found a breach of the duty to defend to be an element of bad faith. The District Court in this case raised the issue in its *Preliminary Order*, September 4, 2001: "…Continental's own 30(b)(6) witness later testified that Continental did have a duty to defend even if it did not have a duty to indemnify." (*Preliminary Order*, at 24) Courts have made failure to defend an element of bad faith and subject to punishment (punitive damages), because otherwise there would be an incentive to do what Continental did to the United States over and over. In *Insurance Law, 3rd Edition, Robert H. Jerry II*, explains the importance of good faith adherence to the duty to defend:

> If the only damages for which the insurer can anticipate being held liable
> are the costs the insured incurs in hiring counsel that the insurer did not
> provide, which is the cost the insurer would have incurred had it
> performed its duty, the insurer has few reasons not to breach the promise it
> made to the insurer. p. 886

The treatise goes on to say that if an insured gives up on an insurer's duty to defend because it is too expensive for the insured to go after the insurer, again, the insurer might profit from failing to discharge its duty to defend. This kind of insurer behavior is deterred by the threat of punitive damages. In the case of *Tibbs v. Great American Insurance Co.* 755 F. 2d 1370, 1375 (Ninth Circuit 1985), the court upheld the imposition of punitive damages for failing the duty to defend.

**Conclusion:** Continental's conduct in this instance—refusing to defend both the Wilson and Kallstrom cases—was an outrageous act done with bad motive. Continental could

EXHIBIT  A

Page 20 of 60

have "protected itself" and discharged its "duty to defend" by using a "reservation of rights." Yet it chose to recklessly deny the United States its rights under the contract. Continental threw all insurance custom and practice to the wind and defied the interests of its insured, for which it should be punished.

### G. Continental's knowledge of its wrongdoing is supported by its own Claim Handling Guidelines, Best Practices and the testimony of its own employees

During the course of this litigation, Continental produced its Claim Handling Guidelines, Claim Handling Best Practices, and attachments. (CNA 015712-015728) The Guidelines are attached as Attachment G. The Guidelines are offered here to highlight the fact that Continental knowingly and intentionally denied the rights of the United States. I noted above that the NAIC Model Unfair Claims Settlement Practices are attached to Continental's Guidelines, as are provisions from the unfair practices codes from California and Texas. The principles contained in the Model Act and statutes are enunciated in other sections of Continental's Guidelines.

The following excepts are by no means exhaustive, but illustrate some of Continental's numerous violations of its own internal guidelines.

On the first page, under the heading "Coverage," the Guidelines provide:
- Communication with the insured is maintained and documented. The potential financial impact to them is explained and they are aware what they should do/not do while the claim is pending.
- Reservation of rights/non-waiver is tendered as appropriate and in a timely manner based upon jurisdictional requirements.
- The coverage decision is fully supported, documented and made timely.

At a minimum, three major provisions of Continental's Coverage section were egregiously and intentionally violated in this case.

Under the heading "Liability/Causation Determination," the Guidelines provide:
- The investigation is timely, objective and well balanced. The claim handler controls and conducts the investigation throughout the life of the claim and does NOT abandon the investigation to counsel. Multiple avenues of investigation are pursued simultaneously. (emphasis in original)
- The claim handler assures resource expertise, gives clear direction, and agrees upon and enforces deadlines.

Clearly, the conflicted Mr. Friderici was running the show while Mr. Hutson, Claims Manager, kept asking Friderici: What's next?

- The rationale for the liability/causation decision is fully supported and documented.

21

The District Court held that Mr. Friderici did not do that.

- The claim file will not contain any derogatory comments.

I earlier noted Mr. Friderici's inappropriate assessment of the insured. Remember the "sleeping dog" comment.

Under the heading "Evaluation/Negotiation/Settlement," the Guidelines provide:
- A negotiation plan is developed and documented.
- The claim is resolved in a timely manner.

Under the heading "Litigation Management," the Guidelines provide:
- Attorney selection and referral reflects a complete assessment of case facts ....

Mr. Friderici and Continental failed at both of these.

A document is attached to the Guidelines, which is entitled: CNA Pro, Claims Handling Best Practices. Here are some highlights.

Under the heading, "Communications, Best Practices should include:"
- It is important to contact our insureds and claimants, when indicated, in a timely manner. This includes timely returning of telephone messages, responses to letters, explanation of issues and/or assignment of counsel.
- Claims professionals should attempt to contact the insured within two working days after their receipt of an initial assignment provided through normal claim unit processing of first notice of claim.
- An acknowledgement letter should be sent to the insured within a reasonable time frame after receipt of the first notice of claim.

In this case, there were two rounds of approximately seven unanswered tenders.

Under the heading, "Coverage Determination, Best Practices should include:"
- Claims professionals should provide a timely analysis of the coverage afforded based upon the available facts, the pleadings involved in the case (if any) and the applicable coverage terms.
- Coverage positions should be communicated to the insured as soon as practicable.
- Reservations of rights letters should be sent promptly and clearly identify the rights that are being reserved, the basis for the reservation of rights and the rights of the insured rising from the reservation.
- Denials of coverage should be sent promptly and clearly set forth the basis of the denial. If required by law, the insured should be informed of entities to which a dispute, relating to the coverage position taken, may be reported. The claim file should reflect the basis for the denial.

Continental simply ignored the provisions in its own Best Practices, particularly in regard to reservation of rights.

EXHIBIT A

Page 22 of 60

Under the heading, Investigation, Best Practices should include:
- The claim professional should determine what information is required to evaluate the issues on a timely basis. The necessary documentation should then be requested for review.

The District Court found that Continental failed to complete its investigation.

Under the heading, "Evaluation and Resolution, Best Practices should include:"
- The claim professional should analyze liability and damages and develop an appropriate resolution strategy for the claim. The resolution strategy should be developed in conjunction with the insured, and as may be applicable with defense counsel.

There is no evidence of consultation or collaboration in this case.

Under the heading, "Litigation Management, Best Practices should include:"
- CNA Pro is committed to achieving early, successful disposition of all litigation cases for the benefits of our policyholders.

"Early" has been left in the dust years ago.

Finally, under the heading, "Professionalism, Best Practices should include:"
- Familiarity and commitment to state regulatory requirements pertaining to the good faith handling of claims. See Addendum B for reference and California regulations attached thereto.

State regulatory requirements clearly have been left in the dust as well.


**H.    The United States Congress did not pass the ISDEAA and other statutes affecting Native Americans to benefit the private insurance industry.**

Continental is not entitled to a windfall because of the passage of the ISDEAA or any other laws designed to support the Native American tribes. The Ninth Circuit addressed the "windfall" issue in its opinion:

> Under Continental's interpretation of the United States' relationship to the policy, Continental could never incur liability under Bristol Bay's policy. Such a result is inherently inequitable; indeed, it would be inimical to public policy to permit insurance policies to insure nothing. On the other hand, deeming the United States to be an implied insured, and thereby obligating Continental to compensate the United States for damages arising from the negligence of Bristol employees, is inherently equitable: the United States gets the benefits of an insurance policy which by its own terms covered the losses for which the United States was exclusively

23

liable; and Continental is precluded from a windfall. *Ninth Circuit Order* Docket No. 03-35446 and 03-35534.

So did the District Court in this case:

> The amendments to ISDEAA shifting the liability for tort claims from the contracting tribal entity to the federal government were intended for the benefit of the tribal entity not their insurance carriers." *Order from Chambers,* July 12, 2005

Congress made the FTCA applicable to cover injuries caused by contractor employees like those at BBAHC while acting in the scope of their employment in order to assume the liability and reduce insurance premiums for federal facilities. The FTCA was enacted during a time of steep increases in commercial liability premiums. The benefit of these federal insurance cost savings was not intended to fall into the wallets of insurance companies.

I dealt with a similar situation in my capacity as Insurance Commissioner. Native tribes of Washington State complained that insurers were not reimbursing Indian health care clinics because the Indian population was getting free health care and ostensibly the clinics "discriminated" by only serving the Indian community. The free Indian health care was not designed to benefit insurance companies. I adopted regulations that put an end to this insurer practice as a result. Attachment H.

In this case, Continental has unreasonably attempted to rationalize its behavior by asserting that it could receive premiums for a kind of phantom insurance on which a claim could never be made. Thus, it attempted to make itself the beneficiary of the FTCA, rather than acknowledge the BBAHC as the rightful beneficiary.

### Conclusion

The District Court in this case has made extensive findings of bad faith on the part of Continental. I have addressed the facts decided by the District Court and the numerous tenets of statutory bad faith that Continental has violated. In fact, I have never seen a case with as many applicable unfair claims practice violations as this one. The numerous, frequent, intentional and knowing acts of bad faith were maliciously intended to deprive the United States of its rights as an insured in this matter. That the United States is a powerful and resourceful entity does not change its status as an insured entitled to good faith, fair dealing and to the benefits of the contract as an insured. As the District Court pointed out, the United States is in the class intended to be benefited by this policy and the risk to Continental is not increased by the United States being an additional implied insured under the policy. The success of insurance as an American business enterprise depends on the simple principle that promises must be kept. The Ninth Circuit reiterated that principle in this case when it said: "it would be inimical to public policy to permit insurance policies to insure nothing." To protect that public policy Continental should be subject to the full penalty of law and punished by the jury in this matter.

EXHIBIT _A_

Page _24_ of _60_

_Deborah Senn_, November 22, 2005

Deborah Senn Expert Services
501 Wellington
Seattle, Washington 98122
206-328-5004
deborahsenn@comcast.net

EXHIBIT _A_
Page 25 of 60

# Deborah Senn Expert Services

Attachment A

501 Wellington Avenue • Seattle, WA 98122 • (206) 328-5004 • deborahsenn@comcast.net

## *CURRICULUM VITAE*

**Education:**  J.D., Loyola University of Chicago
M.A., Political Science, University of Illinois
B.A, History, University of Illinois

**Professional:**  **Principal, Deborah Senn Expert Services**
2001-present          Seattle, Washington
Consulting and testifying on insurance and regulatory issues as Washington's former
chief regulator. Areas of testimony include corporate structure, coverage issues,
financial and ratemaking standards, unfair practices and standards of practice, bad faith,
in life, health, disability and property and casualty cases.

Recent projects:
- *Sitton v. State Farm* (WA)
- *Bigfoot v. Penn-American Insurance Company* (NV)
- *Logan v. Farmers* (CA)
- *Dickerson v. State Farm* (IL)
- *Segal v. State Farm* (CA)
- *Decker v. Farmers* (CA)
- *Werlinger v. Clarendon National Insurance* (WA)
- *Thueringer v. Edwards and Seattle BMW* (WA)
- *Hodge v. Blue Cross* (VI)
- *Scammel v. Farmers* (WA)
- *Moeller v. Farmers* (WA)
- *Tacoma Orthopedic Surgeons v. Regence Blue Shield* (WA)
- *Rose v. Nationwide* (WA)
- *Laughlin v. Allstate* (WA)
- *Van Winkle v. Farmers* (MT)
- *Martinez v. Farmers* (CA)
- *Curtis v. NOLIC* (WA)
- *Bouma v. Fortis*
- *Truong v. Allstate* (NM)
- *Jolley v. Regence Blue Shield* (WA)
- *Webb v. USAA* (WA)

**Partner, Bergman Senn Pageler & Frockt**
2001-2004      Seattle, Washington
Complex insurance litigation.

**Washington State Insurance Commissioner**
1993-2000          Olympia, Washington
Elected twice, each time with well over 1 million votes. Regulated $18 billion per year
insurance industry. Oversaw $28 million biennial budget. Supervised staff of 160
people. *(See attached)*

**Deborah Senn, Attorney at Law**
1989-1993                    Seattle, Washington
Represented Washington clients with business before the Washington State Legislature.

**Legal Counsel, Washington State House-Senate**
1985-1989                    Olympia, Washington
Joint Select Committee on Telecommunications, Subcommittee on Telecommunications, House Energy and Utilities Committee. Drafted and reviewed legislation regarding telecommunications and telephone deregulation.

**Deborah Senn, Attorney at Law**
1982-1986                    Seattle, Washington
Complex litigation in telephone, gas, and electric regulatory matters.

**Attorney, Bailey & Mason**
1983                         Anchorage, Alaska
Practiced telecommunications, business and regulatory law.
**Supervising Attorney, Governor's Office of Consumer Services**
1979-1982                    Chicago, Illinois
Complex litigation in telephone, gas and electric cases.

**Enforcement Attorney, Illinois Environmental Protection Agency**
1977-1979        .           Chicago, Illinois
Enforced Illinois State law regarding air and water pollution.

**Admitted to:**
**Practice:**          State of Washington, Federal Court, Western District of Washington
                       State of Illinois, Federal Court, Northern District of Illinois

**Awards and**
**Honors:**            Honored by Washington State Legislature, January, 2001

                       *Honored for Contributions to the Complementary and Alternative Medicine Profession*
                       The Acupuncture Association of Washington, February, 2000

                       *Governor's Public Service Award for Exemplary Public Service*
                       Northwest AIDS Foundation, 1999

                       *Freedom Award* Washington State Chiropractic Association, 1999

                       *Special Recognition Award* Washington State Nurses Association, 1999

                       *Special Recognition*    .
                       American College of Obstetricians and Gynecologists, May 12, 1998

                       *Legislative Award* American Massage Therapy Association, 1996

                       *Political Leadership Award* Washington Citizen Action, March 31, 1995

                       *Dorothy Bullitt Women of Achievement Award* Women's Funding Alliance, April, 1995

                       *Person of the Year* Home Care Association of Washington, 1994

                       American Podiatric Medical Association, 1994

                       *Citizen of the Year Award* -The Disability Coalition, 1993

# DEBORAH SENN
## Accomplishments as Washington State Insurance Commissioner
### 1993-2001

**Legislation–Successfully enacted**
*(Either requested by the Commissioner's office or spearheading support)*

Financial Solvency including specification of types of insurance investment
Patient Bill of Rights
Prohibiting Insurance Discrimination Against Victims of Domestic Violence
Medicare Portability
Holocaust Victims Assistance Act
Regulating Viatical Settlements
Continuing Education and Licensing for Agents and Brokers
Midwifery Malpractice Insurance Pool
Trigger Mechanism for Guaranty Fund for Insurance Insolvencies
Insurer Capital and Surplus Requirements

**Rules and Regulations-Successfully Adopted**

Environmental Cleanup
Comprehensive Rules on Personal Injury Protection
Deregulation of Large Commercial Lines
Accelerated Benefits for Life Insurance
Health Insurance Portability and Accessibility Rules
Direct Access to Women's Healthcare Providers
Manager Care Rules
Insurance Coverage of Chemical Dependency
Disclosure of Mental Health Benefits
Privacy of Medical and Insurance Records
Coverage of "Off-Label" Drugs
Disclosure of Prescription Drug Benefits
Every Category Of Health Provider (adding Alternative Health Providers)
Cost of Service Rate Regulation
Expedited Grievances for Treatment Denials
Triple X Life Insurance Consumer Protection

- An excellent record on insurance solvency. Only two health care companies placed in receivership. One company was liquidated; the other was successfully rehabilitated.

- Millions of dollars recovered on behalf of consumers. Each year the OIC broke the record set in the previous year.

- Major initiative to provide access to emergency room coverage.

- Chair of National Association of Insurance Commissioners Task Force on Domestic Violence, Experimental Treatments Working Group, Holocaust Task Force, and President of the Western Zone of Commissioners.

- Served with Governor on Washington State Health Care Facility Authority. Approved tax exempt bonds for hospitals and other health care organizations.

Fee Schedule

Deborah Senn Expert Services for services of Deborah Senn bills at a rate of $300 per hour, and $400 per hour at deposition or trial.

Attachment B

Continental Document list

Continental Policy 93 CBP 06114933-94

Continental Policy HMA 9500648-5

*Preliminary Order from Chambers*, September 4, 2001

*Final Order*, September 18, 2001

*Order from Chambers*, July 12, 2005

Order From Chambers Re: Motion and Cross-Motion for Partial Summary Judgment, June 28, 2002

NAIC's "Model Unfair Claims Settlement Practices Act"

*Hillman v. Nationwide Fire Ins. Co.* 855 P. 2d 1321 (Alaska 1993).

*Ace v. Aetna* 139 F. 3d 1241 (Ninth Circuit 1998)

*Tibbs v. Great American Insurance Co.* 755 F. 2d 1370 (1985)

Continental Claims Handling Guidelines, Claims Handling Best Practices, and attachments CNA 015712-015728

*Ninth Circuit Order* Docket No. 03-35446 and 03-35534.

Alaska Unfair Claims Settlement Practices Act

Washington State Unfair Practices Act

*Insurance Bad Faith*, William Shernoff

*Understanding Insurance Law*, 3rd Edition Robert H. Jerry II, 2002

*Hameid v. National Fire Insurance of Hartford* 94 Cal. App. 4th 1155 (2001)

*Powers v. United States Service Auto Ass'n* 92 P. 2d 596 (Nev. 1998)

*State Farm v. Weiford* 831 P. 2d 1264 (Alaska 1992)

*United Fire Insurance Company v. McClelland* 780 P. 2d 193 (Nev. 1989)